U S COURT OF APPEALS
RECEIVED
JUN 05 2026
FIFTH CIRCUIT

# BINDER
# 1 of 2

No. ________________

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

**IN RE TIMOTHY L. BARTON,**

*Petitioner*

---

# APPENDIX TO PETITION FOR WRIT OF MANDAMUS

---

**Related District Court Case:**

SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)
The Honorable Brantley Starr, United States District Judge

**Related Fifth Circuit Appeal:** No. 25-10871

**Related Supreme Court Proceeding:** No. 25-465

*/s/ Timothy L. Barton*
Timothy L. Barton, Pro Se
3926 Vista Woods Drive
Carrollton, TX 75007
Phone: 214-673-8714
Email: Timothy.Barton@proton.me

*Appendix to Petition for Writ of Mandamus – In re Timothy L. Barton*

# TABLE OF CONTENTS


| Tab | Document Description | Source | App. Pages |
|---|---|---|---|
| A | DOJ Stay Order | Dkt. 64 (Nov. 2022) | App-003 |
| B | First Receivership Order | Dkt. 29 (Sept. 2022) | App-006 |
| C | Second Receivership Order | Dkt. 417 (Nov. 2023) | App-032 |
| D | Third Receivership Order | Dkt. 650 (June 23, 2025) | App-061 |
| E | Blessing Order (Ratifying Vacated Receiver's Actions) | Dkt. 419 (Nov. 2023) | App-090 |
| F | Privilege Protocol Order | Dkt. 235 (May 2023) | App-100 |
| G | Order Denying Stay Pending Appeal | Dkt. 700 (Jan. 8, 2026) | App-112 |
| H | Order Lifting Bankruptcy Stay for Dismissal | Dkt. 660 (2025) | App-115 |
| I | DOJ's Request for Stay | Dkt. 44 (Nov. 2022) | App-118 |
| J | Petitioner's Motion for Stay Pending Appeal | Dkt. 691 (2025) | App-130 |
| K | Receiver's Declaration | Dkt. 308 (2023) | App-140 |
| L | Fifth Circuit Opinion Vacating First Receivership, SEC v. Barton, 79 F.4th 573 (5th Cir. 2023) | No. 22-11132 (Aug. 2023) | App-320 |
| M | Fifth Circuit Opinion on Second Receivership | No. 23-11237 (Consolidated with No. 23-10004) (Apr. 2025) | App-336 |
| N | Fifth Circuit Order Referring Stay Motion to District Court | No. 25-10871 (2025) | App-373 |
| O | Index of Denied Defense Motions | Dkts. 114, 397, 402, 407, 555, 604, 625, | App-376 |
| P | Defendant Barton's Motion for Stay Pending Appeal | Dkt. 71 (Nov. 2022) | App-377 |
| Q | ELECTRONIC ORDER: ORDER the Receiver to file by September 14, 2023 a declaration | Dkt. 305 (Aug. 2023) | App-404 |
| R | Order Regarding the BM318, LLC's Settlement Agreements with The Dixon Water Foundation and Lumar Land & Cattle, LLC | Dkt. 550 (Aug. 2024) | App-406 |
| S | Transcript of the hearing before the Honorable Brantley Starr, US District Judge, Dallas, Texas, October 11, 2023. | Dkt. 359 (Oct. 2023) | App-413 |
| T | Defendant Barton's response to the United States of America's motion to intervene and stay [ecf no. 44] | Dkt. 54 (Nov, 2022) | App-628 |
| U | Barton motion for leave to proceed pro se and file electronically | Dkt. 717 (Mar, 2026) | App-635 |
| V | Electronic order denying [717] motion to withdraw as attorney | Dkt. 720 (Apr, 2026) | App-640 |
| W | Motion to withdraw as counsel for defendant pursuant to local rule 83.12 | Dkt. 724 (Apr, 2026) | App-642 |
| X | Plaintiff Securities and Exchange Commission's notice of non-opposition to Jules p. Slim's motion to withdraw as counsel | Dkt. 729 (May, 2026) | App-649 |
| Y | District Court Docket Sheet | No. 3:22-CV-2118-X (N.D. Tex.) | App-652 |

# INDEX OF APPENDIX DOCUMENTS BY DOCKET NUMBER

| Dkt. No. | Description | Tab |
|---|---|---|
| 29 | ORDER APPOINTING RECEIVER | B |
| 44 | GOVERNMENT'S UNOPPOSED MOTION TO INTERVENE AND TO STAY PROCEEDINGS | I |
| 54 | BARTON RESPONSE TO U.S. MOTION TO INTERVENE AND STAY | T |
| 64 | ORDER GRANTING MOTION TO INTERVENE AND STAY PROCEEDINGS | A |
| 71 | DEFENDANT BARTON'S MOTION FOR STAY PENDING APPEAL | P |
| 235 | ORDER GRANTING THE RECEIVER'S MOTION TO COMPEL DOCUMENTS AND REQUEST FOR SANCTIONS AND ENTERING PRIVILEGE PROTOCOL | F |
| 305 | ELECTRONIC ORDER: ORDER THE RECEIVER TO FILE BY SEPTEMBER 14, 2023 A DECLARATION | Q |
| 308 | DECLARATION AND INTERIM REPORT OF CORTNEY C. THOMAS, AS RECEIVER | K |
| 359 | TRANSCRIPT OF THE HEARING BEFORE THE HONORABLE BRANTLEY STARR UNITED STATES DISTRICT JUDGE Dallas, Texas October 11, 2023 | O |
| 397 | DEFENDANT BARTON'S OPPOSITION TO RECEIVER'S EXPEDITED MOTION TO APPROVE, RATIFY, ADOPT, AND OTHERWISE "BLESS" PREVIOUS ACTIONS OF RECEIVER AND ORDERS ISSUED | O |
| 398 | BARTON SUPPORTING BRIEF—PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW | O |
| 399 | BARTON PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW; PROPOSED ORDERS | O |
| 400 | BARTON SUPPORTING BRIEF—PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW | O |
| 401 | BARTON BRIEF IN SUPPORT OF PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW | O |
| 402 | BARTON MOTION FOR LEAVE TO FILE CORRECTED MEMORANDUM | O |
| 405 | BARTON OPPOSITION TO RECEIVER'S EXPEDITED MOTION TO AMEND SUPPLEMENTING RECEIVERSHIP ORDER; AND NOTICE OF SUPPLEMENTAL INFORMATION REGARDS MYRA PARK 635 | O |
| 407 | BARTON CORRECTED OPPOSITION TO RECEIVER'S EXPEDITED MOTION TO AMEND ORDER SUPPLEMENTING RECEIVERSHIP; NOTICE OF SUPPLEMENTAL INFORMATION (MYRA PARK 635) | O |
| 417 | ORDER APPOINTING RECEIVER | C |
| 419 | ORDER GRANTING IN PART RECEIVER'S BLESSING MOTION | E |
| 550 | ORDER REGARDING THE BM318, LLC'S SETTLEMENT AGREEMENTS WITH THE DIXON WATER FOUNDATION AND LUMAR LAND & CATTLE, LLC | R |
| 650 | ORDER APPOINTING RECEIVER MODIFIED | D |
| 660 | ORDER GRANTING RECEIVER'S MOTION TO LIFT LITIGATION STAY | H |
| 691 | BARTON'S EMERGENCY MOTION FOR STAY PENDING APPEAL OR, ALTERNATIVELY, FOR AN ADMINISTRATIVE STAY, WITH EXPEDITED CONSIDERATION | J |
| 700 | ORDER DEFENDANT TIMOTHY BARTON'S MOTION OF AN EMERGENCY STAY OF THE SECOND RECEIVER ORDER DOC 691) | G |
| 717 | BARTON MOTION FOR LEAVE TO PROCEED PRO SE AND FILE ELECTRONICALLY | U |
| 720 | ELECTRONIC ORDER DENYING [717] MOTION TO WITHDRAW AS ATTORNEY | V |
| 724 | UNOPPOSED MOTION TO WITHDRAW AS ATTORNEY FOR DEFENDANT TIMOTHY BARTON | W |
| 729 | NOTICE OF NOT OBJECTION OF SEC FOR WITHDRAWAL OF JULES P SLIM | X |

# TAB A

## DOJ STAY ORDER

Dkt. 64 (November 2022)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (a/k/a MICHAEL FU),<br>STEPHEN T. WALL,<br><br>*Defendants*,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>*Relief Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-cv-2118-X |

**ORDER GRANTING MOTION TO**
**INTERVENE AND STAY PROCEEDINGS**

Before the Court is the Government's Motion to Intervene and Stay Proceedings. [Doc. No. 44]. After careful consideration, the Court finds that the motion should be, and hereby is, **GRANTED.**

The Court therefore **ORDERS** that this proceeding is stayed until otherwise ordered by the Court. Nothing in this Order shall preclude the Court-appointed

Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's Order Appointing Receiver.[1]

**SO ORDERED**, this 16th day of November, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

[1] Doc. No. 29.

# TAB B

## FIRST RECEIVERSHIP ORDER

Dkt. 29 (September 2022)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (a/k/a MICHAEL FU),<br>STEPHEN T. WALL,<br><br>*Defendants,*<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>*Relief Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-cv-2118-X |

**ORDER APPOINTING RECEIVER**

**WHEREAS** this matter has come before this Court upon motion of Plaintiff Securities and Exchange Commission ("SEC") to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities (defined below);

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Entities, and venue properly lies in this district.

**WHEREAS**, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, including all tangible and intangible property, of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC, Carnegie Development, LLC, DJD Land Partners, LLC, LDG001, LLC, and any other entities that Defendant Timothy Barton directly or indirectly controls, including, but not limited to, the following Barton-controlled entities that received investor funds, real

property interests purchased with investor funds, or own property interests that were improved with or otherwise have benefited from the use of investor funds: BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, "Receivership Entities"). The assets of these Receivership Entities are referenced below as "Receivership Assets."

2. Until further Order of this Court, Cortney C. Thomas is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Entities.

## I. GENERAL POWERS AND DUTIES OF RECEIVER

3. The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and FED. R. CIV. P. 66.

4. The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Entities are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect

to the Receivership Entities' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Entities and shall pursue and preserve all of their claims.

5. No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities.

6. Subject to the specific provisions in Sections II through XII below, the Receiver shall have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities;

F. To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property;

H. Enter into and cancel contracts and purchase insurance as the Receiver deems necessary or advisable;

G. The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I. To bring such legal actions based in law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities; and,

K. To take such other action as may be approved by this Court.

## II. ACCESS TO INFORMATION

7. The individual Receivership Entities and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the entity Receivership Entities, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

8. Within ten (10) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and any other agents or contractors of the Receivership Entities; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Entities.

9. Within twenty (20) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement and accounting, with complete documentation, covering the period from January 1, 2017 to the present:

> A. Of all Receivership Property, wherever located, held by or in the name of the Receivership Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage, or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage, or other financial institution;
>
> B. Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Entities have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Entities;
>
> C. Identifying all credit, bank, charge, debit, or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve (12) months;

D. Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E. Of all funds received by the Receivership Entities, and each of them, in any way related, directly or indirectly, to the conduct alleged in the SEC's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

F. Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

G. Of all transfers of assets made by any of them.

10. Within thirty (30) days of the entry of this Order, the Receivership Entities shall provide to the Receiver and the SEC copies of the Receivership Entities' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.

11. The individual Receivership Entities and the entity Receivership Entities' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Entities, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Entities.

12. The Receivership Entities are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## III. ACCESS TO BOOKS, RECORDS, AND ACCOUNTS

13. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Entities. All persons and entities having control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

14. The Receivership Entities, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Entities, and any persons receiving notice of this Order by personal service, email, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

15. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, any of the Receivership Entities that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

A. Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in

the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## IV. ACCESS TO REAL AND PERSONAL PROPERTY

16. The Receiver is authorized to take immediate possession of all personal property of the Receivership Entities, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

17. The Receiver is authorized to take immediate possession of all real property of the Receivership Entities, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, email, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing, or erasing anything on such premises.

18. The Receivership Entities, all persons acting on behalf of any Receivership Defendant, and any person who receives actual or constructive notice of

this Order who has or had possession or control over any Receivership Assets, is directed to:

A. Hold and retain any such Receivership Assets that are within his or her control and prohibit any person or entity from assigning, concealing, converting, disbursing, dissipating, encumbering, liquidating, loaning, pledging, selling, spending, transferring, or withdrawing any such Asset except:

1. As directed by further order of the Court; or

2. As directed in writing by the Receiver.

B. Within five (5) business days after being served a copy of this Order, provide the Receiver a sworn statement setting forth:

1. The account number and other identifying information for any such Receivership Asset belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Defendant;

2. The balance of each such account, or a description of the nature and value of such Asset as of the close of business on the day on which this Order is received, and, if the account or other Asset has been closed or removed, or more than $5,000 withdrawn or transferred from it, on or after March 1, 2021, the date of the closure or removal of the funds, the total funds removed or transferred, and the name of the person or entity to whom such account or other Asset was remitted;

3. All keys, codes, and passwords, entry codes, combinations to locks, and information or devices required to open or gain access to any Asset or Document, including, but not limited to, access to the business premises, computer servers, networks, or databases, or telecommunications systems or devices;

4. The identification and location of any safe deposit box, commercial mailbox, or storage facility belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity, and if the safe deposit box, storage facility, commercial mailbox, or storage facility has been closed or removed, the date closed or removed;

5. Within five (5) business days of a written request from the Receiver, provide the Receiver copies of all Documents relating to each

Receivership Asset, including, but not limited to account applications, statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

19. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

20. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

21. Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.

## V. REPATRIATION OF ASSETS AND DOCUMENTS

22. Immediately upon service of this Order, any person or entity with possession or control over any Receivership Assets shall:

A. Take such steps as are necessary to transfer to the United States all Documents and Assets that are located outside the United States and belong to, are for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity; and

B. Hold and retain all repatriated Assets and prevent the disposition, transfer, or dissipation of such Assets except as required by this Order.

23. Receivership Entities, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from taking any action that may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including:

A. Sending any statement, letter, fax, email or wire transmission, telephoning, or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time as all Assets have been fully repatriated according to Section VIII of this Order; or

B. Notifying any trustee, protector, or other agent of any Defendant or Receivership Entity of the existence of this Order, or of the fact that repatriation is required under a court Order, until such time as all Assets have been fully repatriated according to Section VIII of this Order.

## VI. NOTICE TO THIRD PARTIES

24. Defendants and the Receivership Entities shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, subsidiary, division, and representative of any Defendant or Receivership Defendant. Within ten (10) business days following service of this Order, Defendants and Receivership Entities shall serve on the Receiver a declaration identifying the name, title, address, telephone number, date of service, and manner of service of each person

Defendants or Receivership Entities served with a copy of this Order in compliance with this provision.

25. Copies of this Order may be served by the Receiver by any means, including U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally by agents or employees of the Receiver, by any law enforcement agency, or by process server, upon any person, including financial institutions, that may have possession, custody, or control over any Asset or Document belonging to, for the use or benefit of, under the control of, or subject to access by any Receivership Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch or office of any financial institution shall constitute service upon the entire financial institution.

26. The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

27. All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

28. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or

government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

29. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

30. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Entities. The Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

31. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VII. INJUNCTION AGAINST INTERFERENCE WITH RECEIVER

32. The Receivership Entities and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B. Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C. Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property;

D. Create, operate, or exercise any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the

names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities; or,

E. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

## VIII. COOPERATION WITH THE RECEIVER

33. Defendants and Receivership Entities, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly and all persons who receive actual notice of this Order, shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities. This cooperation and assistance shall include, but is not limited to:

A. Providing information to the Receiver as directed above or that the Receiver deems necessary to exercise the authority and discharge the responsibilities delegated to the Receiver under this Order;

B. Advising all persons who owe money to the Receivership Entities that all debts should be paid directly to the Receiver; and

C. Transferring funds at the Receiver's direction and producing Documents related to the Assets and sales of the Receivership Entities. The entities obligated to cooperate with the Receiver under this provision include financial institutions and persons that have transacted business with the Receivership Entities. The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## IX. STAY OF LITIGATION

34. As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the SEC related

to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

35. The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

36. All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## X. MANAGING ASSETS

37. For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

38. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Barton Companies" together with the name of the action.

39. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

40. Subject to Paragraph 42 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

41. Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

42. The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

43. The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## XI. INVESTIGATE AND PROSECUTE CLAIMS

44. The Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

45. Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the SEC before commencing investigations and/or actions.

46. The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Entities.

47. The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII. BANKRUPTCY FILING

48. Effective immediately, the Receiver, as sole and exclusive officer, director and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.*, No. 22-41049 (Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of the Wall Entities is and are hereby terminated by the Court. All such persons shall comply with the applicable provisions of this Order.

49. Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

50. The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Entities. If a Receivership Defendant is (or has been) placed in

bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all entity Receivership Entities and may therefore file and manage a Chapter 11 petition.

51. All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Entities.

## XIII. LIABILITY OF RECEIVER

52. Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

53. The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

54. This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

55. In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the

resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIV. RECOMMENDATIONS AND REPORTS

56. The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

57. Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

58. Within thirty (30) days after the end of each subsequent calendar quarter following the date on which the Receiver files his Liquidation Plan, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

59. The Quarterly Status Report shall contain the following:

A. A summary of the operations of the Receiver;

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E. A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F. A list of all known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H. The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

60. On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

## XV. FEES, EXPENSES, AND ACCOUNTINGS

61. Subject to the paragraphs below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

62. Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any

Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

63. The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates. Such compensation shall require the prior approval of the Court.

64. Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

65. All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

66. Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

67. Each Quarterly Fee Application shall:

A. Contain representations that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) unless previously disclosed to and approved by the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

68. At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED**, this 18th day of October, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB C

## SECOND RECEIVERSHIP ORDER

Dkt. 417 (November 2023)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (a/k/a MICHAEL FU),<br>STEPHEN T. WALL,<br><br>*Defendants,*<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>*Relief Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-2118-X |

**ORDER APPOINTING RECEIVER**

For the reasons set out in a memorandum opinion and order filed today, the Court enters the following order.

**WHEREAS** this matter has come before this Court upon motion of Plaintiff Securities and Exchange Commission ("SEC") to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities (defined below);

**WHEREAS** the Court finds that: (a) there is a clear necessity for the receivership to protect defrauded investors' interest in property; (b) legal and less drastic equitable remedies are inadequate; and (c) the benefits of a receivership outweigh the burdens on the affected parties.

**WHEREAS** the Court finds that: (a) a receiver is necessary to manage the Receivership Entities' properties to preserve and protect the value of such properties; (b) Defendant Timothy Barton ("Barton") has misused and mismanaged the Receivership Entities' properties and has, and is likely to continue to, misuse, dissipate and/or conceal investor funds and assets obtained with, or that otherwise benefited from, investor funds; (c) certain Receivership Entities and their assets are subject to liens, lawsuits, and foreclosures that threaten to further diminish their value without the protection of a receiver that would have the power to stay litigation and foreclosures, among other powers; (d) there is a substantial risk that Barton, the Receivership Entities, and other entities that Barton directly or indirectly controls do not hold assets sufficient to satisfy the potential disgorgement of ill-gotten gains for the benefit of investors; (e) absent a receiver to manage, maximize, and protect the value of the Receivership Entities' assets, the investors' interest in these properties is at substantial risk; and (f) these benefits outweigh the burden on Barton.

**WHEREAS** the Court finds that each of the Receivership Entities received or

benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Entities, and venue properly lies in this district.

**WHEREAS**, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following entities, each of which received or benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation (collectively, "Receivership Entities"):

2. 126 Villita, LLC
3. 2999TC Acquisitions LLC
4. 2999TC JMJ CMGR, LLC (Delaware)
5. AVG West, LLC
6. BEE2019, LLC

7. BM318, LLC
8. Broadview Holdings Trust
9. Carnegie Development, LLC
10. D4DS LLC
11. D4FR LLC
12. D4IN, LLC (Texas)
13. D4KL, LLC
14. D4MC, LLC (Texas)
15. D4OP, LLC
16. DJD Land Partners, LLC
17. Enoch Investments, LLC
18. FHC Acquisition, LLC
19. Gillespie Villas, LLC
20. Goldmark Hospitality, LLC
21. HR Sterling, LLC
22. JMJ Acquisitions, LLC
23. JMJ Development LLC (f/k/a JMJ Development, Inc.)
24. JMJ Hospitality, LLC
25. JMJ VC Management, LLC
26. JMJAV, LLC
27. JMJD4, LLC (Delaware)
28. JMR100, LLC
29. LaJolla Construction Management, LLC

30. LC Aledo TX, LLC
31. LDG001, LLC
32. Lynco Ventures, LLC
33. Mansions Apartment Homes at Marine Creek, LLC
34. Marine Creek SP, LLC
35. MO 2999TC, LLC
36. Northstar PM, LLC (Texas)
37. Orchard Farms Village, LLC
38. Ridgeview Addition, LLC (Texas)
39. Seagoville Farms, LLC
40. SF Rock Creek, LLC
41. TC Hall, LLC
42. Titan Investments, LLC a/k/a Titan 2022 Investments, LLC
43. Venus59, LLC
44. Villita Development, LLC
45. Villita Towers, LLC
46. WALL007, LLC
47. WALL009, LLC
48. WALL010, LLC
49. WALL011, LLC
50. WALL012, LLC
51. WALL016, LLC
52. WALL017, LLC

53. WALL018, LLC

54. WALL019, LLC

55. WRL2019, LLC (Texas)

2. Until further Order of this Court, Cortney C. Thomas is hereby appointed to serve without bond as receiver (the "Receiver") of the Receivership Entities.

3. The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, trustees, managers and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Rule 66 of the Federal Rules of Civil Procedure.

## I. GENERAL POWERS AND DUTIES OF RECEIVER

4. The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Entities are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Entities' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Entities and shall pursue and preserve all of their claims.

5. No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities.

6. Subject to the specific provisions in Sections II through XII below, the Receiver shall have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities;

F. To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property;

H. Enter into and cancel contracts and purchase insurance as the Receiver deems necessary or advisable;

G. The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I. To bring such legal actions based in law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities; and,

K. To take such other action as may be approved by this Court.

## II. ACCESS TO INFORMATION

7. The individual Receivership Entities and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the entity Receivership Entities, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

8. Within ten (10) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and

any other agents or contractors of the Receivership Entities; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Entities.

9. Within twenty (20) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement and accounting, with complete documentation, covering the period from January 1, 2017 to the present:

A. Of all Receivership Property, wherever located, held by or in the name of the Receivership Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage, or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage, or other financial institution;

B. Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Entities have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Entities;

C. Identifying all credit, bank, charge, debit, or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve (12) months;

D. Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E. Of all funds received by the Receivership Entities, and each of them, in any way related, directly or indirectly, to the conduct alleged in the SEC's Complaint. The submission must clearly identify, among other things,

all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

F. Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

G. Of all transfers of assets made by any of them.

10. Within thirty (30) days of the entry of this Order, the Receivership Entities shall provide to the Receiver and the SEC copies of the Receivership Entities' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.

11. The Receivership Entities and the Receivership Entities' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Entities, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Entities.

12. The Receivership Entities are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## III. ACCESS TO BOOKS, RECORDS, AND ACCOUNTS

13. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Entities. All persons and entities having

control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

14. The Receivership Entities, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Entities, and any persons receiving notice of this Order by personal service, email, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

15. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, any of the Receivership Entities that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

A. Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## IV. ACCESS TO REAL AND PERSONAL PROPERTY

16. The Receiver is authorized to take immediate possession of all personal property of the Receivership Entities, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

17. The Receiver is authorized to take immediate possession of all real property of the Receivership Entities, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, email, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing, or erasing anything on such premises.

18. The Receivership Entities, all persons acting on behalf of any Receivership Defendant, and any person who receives actual or constructive notice of this Order who has or had possession or control over any Receivership Assets, is directed to:

A. Hold and retain any such Receivership Assets that are within his or her control and prohibit any person or entity from assigning, concealing, converting, disbursing, dissipating, encumbering, liquidating, loaning,

pledging, selling, spending, transferring, or withdrawing any such Asset except:

1. As directed by further order of the Court; or

2. As directed in writing by the Receiver.

B. Within five (5) business days after being served a copy of this Order, provide the Receiver a sworn statement setting forth:

1. The account number and other identifying information for any such Receivership Asset belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Defendant;

2. The balance of each such account, or a description of the nature and value of such Asset as of the close of business on the day on which this Order is received, and, if the account or other Asset has been closed or removed, or more than $5,000 withdrawn or transferred from it, on or after March 1, 2021, the date of the closure or removal of the funds, the total funds removed or transferred, and the name of the person or entity to whom such account or other Asset was remitted;

3. All keys, codes, and passwords, entry codes, combinations to locks, and information or devices required to open or gain access to any Asset or Document, including, but not limited to, access to the business premises, computer servers, networks, or databases, or telecommunications systems or devices;

4. The identification and location of any safe deposit box, commercial mailbox, or storage facility belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity, and if the safe deposit box, storage facility, commercial mailbox, or storage facility has been closed or removed, the date closed or removed;

5. Within five (5) business days of a written request from the Receiver, provide the Receiver copies of all Documents relating to each Receivership Asset, including, but not limited to account applications, statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

19. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

20. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

21. Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.

## V. REPATRIATION OF ASSETS AND DOCUMENTS

22. Immediately upon service of this Order, any person or entity with possession or control over any Receivership Assets shall:

A. Take such steps as are necessary to transfer to the United States all Documents and Assets that are located outside the United States and belong to, are for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity; and

B. Hold and retain all repatriated Assets and prevent the disposition, transfer, or dissipation of such Assets except as required by this Order.

23. Receivership Entities, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from taking any action that may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including:

A. Sending any statement, letter, fax, email or wire transmission, telephoning, or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time as all Assets have been fully repatriated according to Section VIII of this Order; or

B. Notifying any trustee, protector, or other agent of any Defendant or Receivership Entity of the existence of this Order, or of the fact that repatriation is required under a court Order, until such time as all Assets have been fully repatriated according to Section VIII of this Order.

## VI. NOTICE TO THIRD PARTIES

24. Defendants and the Receivership Entities shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, subsidiary, division, and representative of any Defendant or Receivership Defendant. Within ten (10) business days following service of this Order, Defendants and Receivership Entities shall serve on the Receiver a declaration identifying the name, title, address, telephone number, date of service, and manner of service of each person Defendants or Receivership Entities served with a copy of this Order in compliance with this provision.

25. Copies of this Order may be served by the Receiver by any means, including U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally by agents or employees of the Receiver, by any law enforcement agency, or by process server, upon any person, including financial institutions, that may have possession, custody, or control over any Asset or Document belonging to, for the use or benefit of, under the control of, or subject to access by any Receivership Defendant, or that may otherwise be subject to any provision of this Order. Service upon any branch or office of any financial institution shall constitute service upon the entire financial institution.

26. The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

27. All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

28. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates. All government

offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

29. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

30. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Entities. The Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

31. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership

Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VII. INJUNCTION AGAINST INTERFERENCE WITH RECEIVER

32. The Receivership Entities and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B. Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C. Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property;

D. Create, operate, or exercise any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities; or,

E. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

## VIII. COOPERATION WITH THE RECEIVER

33. Defendants and Receivership Entities, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly and all persons who receive actual notice of this Order, shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities. This cooperation and assistance shall include, but is not limited to:

A. Providing information to the Receiver as directed above or that the Receiver deems necessary to exercise the authority and discharge the responsibilities delegated to the Receiver under this Order;

B. Advising all persons who owe money to the Receivership Entities that all debts should be paid directly to the Receiver; and

C. Transferring funds at the Receiver's direction and producing Documents related to the Assets and sales of the Receivership Entities. The entities obligated to cooperate with the Receiver under this provision include financial institutions and persons that have transacted business with the Receivership Entities. The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## IX. STAY OF LITIGATION

34. As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the SEC related to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of the Receivership Entities' past or present officers, directors, managers, agents, parent or affiliated entities, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

35. The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

36. All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## X. MANAGING ASSETS

37. For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

38. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Barton Companies" together with the name of the action.

39. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

40. Subject to Paragraph 42 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

41. Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

42. The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

43. The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## XI. INVESTIGATE AND PROSECUTE CLAIMS

44. The Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

45. Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the SEC before commencing investigations and/or actions.

46. The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Entities.

47. The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII. <u>BANKRUPTCY FILING</u>

48. Effective immediately, the Receiver, as sole and exclusive officer, director and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.*, No. 22-41049 (Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of the Wall Entities is and are hereby terminated by the Court. All such persons shall comply with the applicable provisions of this Order.

49. Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

50. The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Entities. If a Receivership Defendant is (or has been) placed in

bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all entity Receivership Entities and may therefore file and manage a Chapter 11 petition.

51. All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Entities.

## XIII. LIABILITY OF RECEIVER

52. Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

53. The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

54. This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

55. In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the

resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIV. RECOMMENDATIONS AND REPORTS

56. The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

57. Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

58. Within thirty (30) days after the end of each subsequent calendar quarter following the date on which the Receiver files his Liquidation Plan, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

59. The Quarterly Status Report shall contain the following:

A. A summary of the operations of the Receiver;

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E. A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F. A list of all known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H. The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

60. On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

## XV. FEES, EXPENSES, AND ACCOUNTINGS

61. Subject to the paragraphs below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

62. Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any

Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

63. The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates. Such compensation shall require the prior approval of the Court.

64. Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

65. All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

66. Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

67. Each Quarterly Fee Application shall:

A. Contain representations that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) unless previously disclosed to and approved by the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

68. At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED**, this 29th day of November, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB D

## THIRD RECEIVERSHIP ORDER

Dkt. 650 (June 23, 2025)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (a/k/a MICHAEL FU),<br>STEPHEN T. WALL,<br><br>*Defendants*,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>*Relief Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-cv-2118-X |

**ORDER APPOINTING RECEIVER**

For the reasons set out in the Court's order at Doc. 649, the Court amends the existing Receivership Order at Doc. 417 as follows.

**WHEREAS** this matter has come before this Court upon motion of Plaintiff Securities and Exchange Commission ("SEC") to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities (defined below);

**WHEREAS** the Court finds that: (a) there is a clear necessity for the receivership to protect defrauded investors' interest in property; (b) legal and less drastic equitable remedies are inadequate; and (c) the benefits of a receivership outweigh the burdens on the affected parties.

**WHEREAS** the Court finds that: (a) a receiver is necessary to manage the Receivership Entities' properties; (b) Defendant Timothy Barton ("Barton") has misused and mismanaged the Receivership Entities' properties and has, and is likely to continue to, misuse, dissipate and/or conceal investor funds and assets obtained with, or that otherwise benefited from, investor funds; (c) certain Receivership Entities and their assets are subject to liens, lawsuits, and foreclosures that threaten to further diminish their value without the protection of a receiver that would have the power to stay litigation and foreclosures, among other powers; (d) there is a substantial risk that Barton, the Receivership Entities, and other entities that Barton directly or indirectly controls do not hold assets sufficient to satisfy the potential disgorgement of ill-gotten gains for the benefit of investors; (e) absent a receiver to manage, maximize, and protect the value of the Receivership Entities' assets, the investors' interest in these properties is at substantial risk; and (f) these benefits outweigh the burden on Barton.

**WHEREAS** the Court finds that each of the Receivership Entities received or

benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Entities, and venue properly lies in this district.

**WHEREAS**, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of the following entities that each received or benefited from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation (collectively, "Receivership Entities"):

2. 126 Villita, LLC

3. 2999TC Acquisitions LLC

4. 2999TC JMJ CMGR, LLC (Delaware)

5. AVG West, LLC

6. BEE2019, LLC

7. BM318, LLC
8. Broadview Holdings Trust
9. Carnegie Development, LLC
10. D4DS LLC
11. D4FR LLC
12. D4IN, LLC (Texas)
13. D4KL, LLC
14. D4MC, LLC (Texas)
15. D4OP, LLC
16. DJD Land Partners, LLC
17. Enoch Investments, LLC
18. FHC Acquisition, LLC
19. Gillespie Villas, LLC
20. Goldmark Hospitality, LLC
21. HR Sterling, LLC
22. JMJ Acquisitions, LLC
23. JMJ Development LLC (f/k/a JMJ Development, Inc.)
24. JMJ Hospitality, LLC
25. JMJ VC Management, LLC
26. JMJAV, LLC
27. JMJD4, LLC (Delaware)
28. JMR100, LLC
29. Lajolla Construction Management, LLC

30. LC Aledo TX, LLC
31. LDG001, LLC
32. Lynco Ventures, LLC
33. Mansions Apartment Homes at Marine Creek, LLC
34. Marine Creek SP, LLC
35. MO 2999TC, LLC
36. Northstar PM, LLC (Texas)
37. Orchard Farms Village, LLC
38. Ridgeview Addition, LLC (Texas)
39. Seagoville Farms, LLC
40. SF Rock Creek, LLC
41. TC Hall, LLC
42. Titan Investments, LLC a/k/a Titan 2022 Investments, LLC
43. Venus59, LLC
44. Villita Towers, LLC
45. WALL007, LLC
46. WALL009, LLC
47. WALL010, LLC
48. WALL011, LLC
49. WALL012, LLC
50. WALL016, LLC
51. WALL017, LLC
52. WALL018, LLC

53. WALL019, LLC

54. WRL2019, LLC (Texas)

55. Until further Order of this Court, Cortney C. Thomas is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Entities.

## I. GENERAL POWERS AND DUTIES OF RECEIVER

56. The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the entity Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and FED. R. CIV. P. 66.

57. The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Entities are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Entities' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Entities and shall pursue and preserve all of their claims.

58. No person holding or claiming any position of any sort with any of the Receivership Entities shall possess any authority to act by or on behalf of any of the Receivership Entities.

59. Subject to the specific provisions in Sections II through XII below, the Receiver shall have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Entities, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Entities;

F. To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation, concealment, or inequitable distribution of Receivership Property;

H. Enter into and cancel contracts and purchase insurance as the Receiver deems necessary or advisable;

G. The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I. To bring such legal actions based in law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist, defend, compromise or otherwise dispose of all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Entities; and,

K. To take such other action as may be approved by this Court.

## II. ACCESS TO INFORMATION

60. The individual Receivership Entities and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and employees of the entity Receivership Entities, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

61. Within ten (10) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and any other agents or contractors of the Receivership Entities; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Entities.

62. Within twenty (20) days of the entry of this Order, the Receivership Entities shall file with the Court and serve upon the Receiver and the SEC a sworn

statement and accounting, with complete documentation, covering the period from January 1, 2017 to the present:

A. Of all Receivership Property, wherever located, held by or in the name of the Receivership Entities, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage, or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage, or other financial institution;

B. Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Entities have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Entities;

C. Identifying all credit, bank, charge, debit, or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve (12) months;

D. Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E. Of all funds received by the Receivership Entities, and each of them, in any way related, directly or indirectly, to the conduct alleged in the SEC's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

F. Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

G. Of all transfers of assets made by any of them.

63. Within thirty (30) days of the entry of this Order, the Receivership Entities shall provide to the Receiver and the SEC copies of the Receivership Entities' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.

64. The individual Receivership Entities and the entity Receivership Entities' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Entities, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Entities.

65. The Receivership Entities are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## III. ACCESS TO BOOKS, RECORDS, AND ACCOUNTS

66. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Entities. All persons and entities having control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

67. The Receivership Entities, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Entities, and any

persons receiving notice of this Order by personal service, email, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Entities are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

68. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, any of the Receivership Entities that receive actual notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

A. Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## IV. ACCESS TO REAL AND PERSONAL PROPERTY

69. The Receiver is authorized to take immediate possession of all personal property of the Receivership Entities, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books,

papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

70. The Receiver is authorized to take immediate possession of all real property of the Receivership Entities, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, email, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything from such premises; or, (c) destroying, concealing, or erasing anything on such premises.

71. The Receivership Entities, all persons acting on behalf of any Receivership Defendant, and any person who receives actual or constructive notice of this Order who has or had possession or control over any Receivership Assets, is directed to:

A. Hold and retain any such Receivership Assets that are within his or her control and prohibit any person or entity from assigning, concealing, converting, disbursing, dissipating, encumbering, liquidating, loaning, pledging, selling, spending, transferring, or withdrawing any such Asset except:

1. As directed by further order of the Court; or

2. As directed in writing by the Receiver.

B. Within five (5) business days after being served a copy of this Order, provide the Receiver a sworn statement setting forth:

1. The account number and other identifying information for any such Receivership Asset belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Defendant;

2. The balance of each such account, or a description of the nature and value of such Asset as of the close of business on the day on which this Order is received, and, if the account or other Asset has been closed or removed, or more than $5,000 withdrawn or transferred from it, on or after March 1, 2021, the date of the closure or removal of the funds, the total funds removed or transferred, and the name of the person or entity to whom such account or other Asset was remitted;

3. All keys, codes, and passwords, entry codes, combinations to locks, and information or devices required to open or gain access to any Asset or Document, including, but not limited to, access to the business premises, computer servers, networks, or databases, or telecommunications systems or devices;

4. The identification and location of any safe deposit box, commercial mailbox, or storage facility belonging to, for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity, and if the safe deposit box, storage facility, commercial mailbox, or storage facility has been closed or removed, the date closed or removed;

5. Within five (5) business days of a written request from the Receiver, provide the Receiver copies of all Documents relating to each Receivership Asset, including, but not limited to account applications, statements, corporate resolutions, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

72. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Entities, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

73. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

74. Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.

## V. REPATRIATION OF ASSETS AND DOCUMENTS

75. Immediately upon service of this Order, any person or entity with possession or control over any Receivership Assets shall:

A. Take such steps as are necessary to transfer to the United States all Documents and Assets that are located outside the United States and belong to, are for the use or benefit of, under the control of, or subject to access by any Defendant or Receivership Entity; and

B. Hold and retain all repatriated Assets and prevent the disposition, transfer, or dissipation of such Assets except as required by this Order.

76. Receivership Entities, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from taking any action that may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including:

A. Sending any statement, letter, fax, email or wire transmission, telephoning, or engaging in any other act, directly or indirectly, that results in

a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time as all Assets have been fully repatriated according to Section VIII of this Order; or

B. Notifying any trustee, protector, or other agent of any Defendant or Receivership Entity of the existence of this Order, or of the fact that repatriation is required under a court Order, until such time as all Assets have been fully repatriated according to Section VIII of this Order.

## VI. NOTICE TO THIRD PARTIES

77. Defendants and the Receivership Entities shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, subsidiary, division, and representative of any Defendant or Receivership Defendant. Within ten (10) business days following service of this Order, Defendants and Receivership Entities shall serve on the Receiver a declaration identifying the name, title, address, telephone number, date of service, and manner of service of each person Defendants or Receivership Entities served with a copy of this Order in compliance with this provision.

78. Copies of this Order may be served by the Receiver by any means, including U.S. first class mail, overnight delivery, facsimile, electronic mail, or personally by agents or employees of the Receiver, by any law enforcement agency, or by process server, upon any person, including financial institutions, that may have possession, custody, or control over any Asset or Document belonging to, for the use or benefit of, under the control of, or subject to access by any Receivership Defendant, or that may otherwise be subject to any provision of this Order. Service upon any

branch or office of any financial institution shall constitute service upon the entire financial institution.

79. The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Entities, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

80. All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

81. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

82. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.

83. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Entities, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Entities. The Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

84. Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage, or trash removal services to the Receivership Entities shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

## VII. INJUNCTION AGAINST INTERFERENCE WITH RECEIVER

85. The Receivership Entities and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B. Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C. Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property;

D. Create, operate, or exercise any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities; or,

E. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

85(a). Further, the Defendants, Receivership Entities, and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, must obtain leave of the Court before filing any grievance or complaint with any state bar, or any such complaint as would require the Receiver or his counsel to expend the assets of the Receivership estate in defense.

## VIII. COOPERATION WITH THE RECEIVER

86. Defendants and Receivership Entities, and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly and all persons who receive actual notice of this Order, shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the Receivership Entities. This cooperation and assistance shall include, but is not limited to:

> A. Providing information to the Receiver as directed above or that the Receiver deems necessary to exercise the authority and discharge the responsibilities delegated to the Receiver under this Order;
>
> B. Advising all persons who owe money to the Receivership Entities that all debts should be paid directly to the Receiver; and
>
> C. Transferring funds at the Receiver's direction and producing Documents related to the Assets and sales of the Receivership Entities. The entities obligated to cooperate with the Receiver under this provision include financial institutions and persons that have transacted business with the Receivership Entities. The Receiver shall promptly notify the Court and SEC counsel of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## IX. STAY OF LITIGATION

87. As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the SEC related to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property,

wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

88. The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

89. All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## X. MANAGING ASSETS

90. For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

91. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Barton Companies" together with the name of the action.

92. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real

estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

93. Subject to Paragraph 42 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

94. Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

95. The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

96. The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## XI. INVESTIGATE AND PROSECUTE CLAIMS

97. The Receiver is authorized, empowered, and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

98. Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the SEC before commencing investigations and/or actions.

99. The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Entities.

100. The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII. BANKRUPTCY FILING

101. Effective immediately, the Receiver, as sole and exclusive officer, director and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.*, No. 22-41049 (Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of the Wall Entities is and are hereby terminated by the Court. All such persons shall comply with the applicable provisions of this Order.

102. Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

103. The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Entities. If a Receivership Defendant is (or has been) placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession

under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all entity Receivership Entities and may therefore file and manage a Chapter 11 petition.

104. All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Entities.

## XIII. LIABILITY OF RECEIVER

105. Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

106. The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

107. This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

108. In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XIV. RECOMMENDATIONS AND REPORTS

109. The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

110. Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

111. Within thirty (30) days after the end of each subsequent calendar quarter following the date on which the Receiver files his Liquidation Plan, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

112. The Quarterly Status Report shall contain the following:

A. A summary of the operations of the Receiver;

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E. A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F. A list of all known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H. The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

113. On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

## XV. FEES, EXPENSES, AND ACCOUNTINGS

114. Subject to the paragraphs below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

115. Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

116. The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates. Such compensation shall require the prior approval of the Court.

117. Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

118. All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

119. Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

120. Each Quarterly Fee Application shall:

A. Contain representations that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii)

unless previously disclosed to and approved by the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

121. At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED**, this 23rd day of June, 2025.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB E

## BLESSING ORDER

*(Ratifying Vacated Receiver's Actions)*

Dkt. 419 (November 2023)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (a/k/a MICHAEL FU),<br>STEPHEN T. WALL,<br><br>*Defendants*,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>*Relief Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-2118-X |

**ORDER GRANTING IN PART RECEIVER'S BLESSING MOTION**

Before the Court is the Receiver's Expedited Motion to Approve, Ratify, Adopt, and Otherwise "Bless" Previous Actions of Receiver and Orders Issued Prior to Effective Date of Vacatur of Initial Receivership Order (the "Motion"). (Doc. 372). In this motion, the Receiver asks for the following: (1) ratification of all activities undertaken by the Receiver and his retained professionals in good faith;

(2) ratification of nine prior orders by the Court; (3) approval of carryover of accrued fees and expenses and authorization to file one Final Accounting; (4) continuation of litigation stay; (5) order requiring Barton file a Notice of Compliance with each relevant paragraph of the new Receivership Order; and (6) immunity for the Receiver and his Retained Professionals for activities taken in good faith under the prior receivership.[1]

Having carefully considered the Motion, the Court concludes that the Motion should be and hereby is **GRANTED IN PART.**

The Court will address each of the Receiver's requests in turn.

First, the Receiver asks the Court ratify all activities undertaken, in good faith, by the Receiver and his Retained Professionals in reliance on and in performance of the Initial Receivership Order.[2] Such activities include, "his present possession of any documents, data, assets, properties, access credentials, or materials; use of the tax ID number obtained and the bank account opened for the receivership created by the Initial Receivership Order; preparation and filing of tax returns for Receivership Entities; and all contracts and agreements entered into in his capacity as Receiver."[3] Barton argues that because the prior receivership was vacated, the vacated orders "are entitled to no legal effect," and thus cannot be ratified.[4] Barton would like us to believe that the Fifth Circuit's order in this case "evaporate[d]" the last year of

---

[1] Doc. 372.

[2] *Id.* at 12–13.

[3] *Id.*

[4] Doc. 397 at 3.

receivership history "as if it never existed."[5] The Court agrees with the Receiver that "each order, each activity" under the prior receivership "did factually occur."[6] Since his appointment, the Receiver has had thirteen months of receivership activity. Tax returns were filed. A bank account was opened. Contracts were signed. As such, the Court **GRANTS** this request because these activities are administrative, consistent with the Court's "broad powers and wide discretion to determine the appropriate relief in an equity receivership."[7]

Second, the Receiver asks the Court to adopt nine orders, *nunc pro tunc*, it previously issued as to the administration of the prior Receivership Estate.[8] These orders are: Order Ratifying or Approving Agreements with DLP Capital and HNGH Turtle Creek;[9] Order Ratifying Agreement with Lumar Land and Cattle;[10] Order Granting Motion for Order Governing Administration of the Receivership Estate;[11] Order Declaring Lis Pendens Void (as included in the Order Approving the Sale of the Rock Creek Property);[12] Order Granting Motion to Compel and Establishing Privilege Protocol;[13] Orders Granting Fee Petitions;[14] and Order Approving

[5] *Id.*

[6] Doc. 408 at 4.

[7] *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372–73 (5th Cir. 1982).

[8] Doc. 372 at 13–14.

[9] Docs. 109, 236.

[10] Doc. 163.

[11] Doc. 63.

[12] Doc. 104.

[13] Doc. 235.

[14] Docs. 195, 287.

Engagement Agreements.[15] Barton's objects to this request on the same grounds as the Receiver's first request.[16] Like the Court said above, the fact that these orders were issued is a reality. Four of these orders are purely administrative.[17] Three of these orders involve the Court approving settlement agreements relating to the Receivership Estate[18]—orders, the Court notes, it did not have to issue since 28 U.S.C. § 2001, which governs the sale of real property by a receiver, does not apply to settlement agreements or contractual compromises.[19] The order finding Barton in civil contempt and compelling him to comply with the Court's orders, also establishes a privilege protocol—again, an administrative function.[20] Though that ruling is in an order that also holds Barton in contempt, the Court is only ratifying the privilege protocol. The last order the Receiver seeks to ratify is one in which the Court found that Barton's Notice of Lis Pendens on a property was void.[21] Though that ruling is in an order that also approves the sale of a property, the Receiver does not ask to, and the Court does not here ratify the sale of that property, only the ruling that the lis

[15] Doc. 38.

[16] *See* Doc. 397 at 2–7.

[17] *See* Doc. 63 (order governing administration of the Receivership Estate); Doc. 195 (order granting the Receiver's first quarterly fee application); Doc. 287 (order granting the Receiver's second quarterly fee application); and Doc. 38 (approving the Receiver's engagements of professionals).

[18] *See* Doc. 109 (order granting Receiver's motion to ratify a settlement agreement); Doc. 236 (order granting Receiver's motion to ratify a settlement agreement); and Doc. 163 (order granting Receiver's motion to ratify a partial settlement agreement).

[19] *See* Doc. 163 at 1 (quoting 28 U.S.C. § 2001 (detailing procedures for sale of "[a]ny realty or interest therein sold under decree of any court of the United States" as well as "[p]roperty in the possession of a receiver").

[20] Doc. 235 at 8–11.

[21] Doc. 104.

pendens was void. Accordingly, the Court will adopt these nine orders and **GRANTS** this request.

Third, the Receiver requests that the Court approve carryover of accrued fees and expenses and authorize the Receiver to file one Final Accounting.[22] Barton is concerned that he would lack the opportunity to object to fee applications if the Court grants the Receiver's request.[23] The Court isn't worried about this. As for the previously approved fees and expenses, the Court's already considered Barton's objections. And for any remaining fee application the Receiver may need to file, Barton will have the opportunity to object once the application is filed. The Court **GRANTS** this request.

Fourth, the Receiver requests the Court continue the prior litigation stay.[24] Barton objects because the Court can order a litigation stay with a new receivership.[25] The Court did just that with the new Receivership Order. And since notices of stay have already been filed, the Court finds that pending litigation has been stayed and now remains stayed under the new receivership. The Court **DENIES** this request.

Fifth, the Receiver asks the Court to order Barton to file a Notice of Compliance preemptively with the new Receivership Order.[26] The Court does not find it

---

[22] Doc. 372 at 14–15.

[23] Doc. 397 at 7–8.

[24] Doc. 372 at 15–16.

[25] Doc. 397 at 8.

[26] Doc. 372 at 16.

necessary to do so. Rather, with the Court's new Receivership Order, Barton is already ordered to comply. The Court **DENIES** this request.

And finally, the Receiver asks for immunity for all prior acts of the Receiver, made in good faith, under the previous receivership.[27] Barton objects, opposing to "blanket immunity"[28] and claiming that the Receiver analogize[d] himself to the Court.[29] But Mr. Thomas _is_ an agent of the Court. As the Supreme Court and Fifth Circuit explained, "The receiver is not an agent of the parties . . . [h]e is an officer or arm of the court . . . appointed to assist the court in protecting and preserving, for the benefit of all parties concerned, the properties in the court's custody."[30] Therefore, the Court will release the Receiver, his Retained Professionals, and all agents from any liability for any action undertaken in performance of the prior Receivership Order. The Court will also expressly retain jurisdiction over any and all matters relating to the Receiver and the Receivership based on performance of the prior Receivership Order. The Court is being consistent. In the new Receivership Order, the Court released the Receiver and his agents from liability for any actions undertaken in performance of the new receivership, and retained jurisdiction over

---

[27] *Id.* at 16–19.

[28] Doc. 397 at 8–10.

[29] *Id.* at 8. In fact, what Barton said was, "[w]e must have missed his appointment by the President and confirmation by the Senate." *Id.*

[30] *See Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 896 (5th Cir. 2019) (quoting *Crites, Inc. v. Prudential Ins. Co. of Am.*, 322 U.S. 408, 414 (1944)).

any matters relating to the Receiver and his agents. The Court **GRANTS** this request.

Accordingly, in reliance on the Order Appointing Receiver entered on November 29, 2023, (the "New Receivership Order") as well as the Court's discretion in administering a receivership, it is hereby ORDERED that:

1. All activities undertaken by the Receiver and his Retained Professionals in good faith and in reliance on and in performing the Initial Receivership Order, including, but not limited to his present possession of any documents, data, assets, properties, access credentials, or materials; use of the tax ID number obtained and the bank account opened for the receivership created by the Initial Receivership Order; preparation and filing of tax returns for Receivership Entities; and all contracts and agreements entered into in his capacity as Receiver, are **HEREBY RATIFIED.**

2. The Receiver's possession or control over **any and all** materials and information obtained pursuant to the Initial Receivership Order is **HEREBY RATIFIED.**

3. The Court **HEREBY RATIFIES and APPROVES** the Receiver's continued use of the tax ID number obtained in connection with the Initial Receivership Order, as well as use of the bank account opened in compliance with the Initial Receivership Order.

4. The Court **HEREBY RATIFIES and ADOPTS,** *nunc pro tunc* the following orders:

- Orders Ratifying or Approving Agreements with DLP Capital and HNGH Turtle Creek;[31]
- Order Ratifying Agreement with Lumar Land and Cattle;[32]
- Order Granting Motion for Order Governing Administration of the Receivership Estate;[33]
- Order Declaring Lis Pendens Void (as included in the Order Approving the Sale of the Rock Creek Property);[34]
- Order Granting Motion to Compel and Establishing Privilege Protocol;[35]
- Orders Granting Fee Petitions;[36]
- Order Approving Engagement Agreements;[37]

5. The Court **HEREBY RATIFIES and APPROVES** carryover and assumption of any accrued but unpaid expenses, costs, or fees, incurred in connection with the Initial Receivership Order for consideration pursuant to the terms of the New Receivership Order, and when properly presented by the Receiver in a motion to approve and authorize payment of such expenses and fees. Thus, any unpaid fee or expense incurred in performing the Initial Receivership Order are deemed, *nunc pro tunc*, a fee or expense incurred by the Receivership Estate in the course of administration based on a new Receivership Order.

---

[31] Docs. 109, 236.

[32] Doc. 163.

[33] Doc. 63.

[34] Doc. 104.

[35] Doc. 235.

[36] Docs. 195, 287.

[37] Doc. 38.

6. The Receiver is **EXCUSED** from submitting a Final Accounting "at the close of the Receivership," in connection with vacatur of the Initial Receivership Order. Instead, the Receiver is **AUTHORIZED** to file one final accounting at the close of the receivership created or continued by the New Receivership Order, following performance of all duties assigned in the New Receivership Order. All fees and expenses incurred during the administration of the Estate, whether premised on the Initial or a new Receivership Order shall be included in the same Final Accounting.

7. The Court **HEREBY RELEASES** the Receiver, his Retained Professionals, and all agents from any liability for any activity undertaken in performing the Initial Receivership Order. The Court also expressly retains jurisdiction over any and all matters relating to the Receiver, the Receivership and the Receivership Estate, *nunc pro tunc*, based on performance of the Initial Receivership Order.

It is **SO ORDERED**, this 29th day of November, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB F

## PRIVILEGE PROTOCOL ORDER

Dkt. 235 (May 2023)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>TIMOTHY BARTON, et al.,<br><br>*Defendants*,<br><br>DJD LAND PARTNERS, LLC, and LDG001, LLC,<br><br>*Relief Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-2118-X |

**ORDER GRANTING THE RECEIVER'S MOTION TO COMPEL DOCUMENTS AND REQUEST FOR SANCTIONS AND ENTERING PRIVILEGE PROTOCOL**

Before the Court is the Receiver's Motion to Compel Documents and Information, Request for Sanctions, or Alternatively, Motion for Show Cause Hearing. [Doc. 133]. Having carefully considered the motion, the Court **GRANTS** the Receiver's request to compel documents and information, **GRANTS** the Receiver's request for sanctions, and **DENIES** Defendant Timothy Barton's request for a hearing on the motion. Also before the Court is Barton's motion for leave to file a sur-reply to the Receiver's motion. [Doc. 201]. The Court has reviewed the proposed sur-reply and it does not alter the Court's analysis on the Receiver's motion. Accordingly, the Court **DENIES** Barton's motion for leave to file a sur-reply.

The Court's Order Appointing Receiver (the "Receivership Order") empowers and obligates the Receiver to, among many other things, "[t]ake custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Entities."[1] It also ordered "[t]he individual Receivership Entities and the[ir] past and/or present officers . . . to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or all Receivership Property."[2] And it places the following *ongoing* obligation on the Receivership Entities and their past and present officers and directors: They "shall answer under oath to the Receiver all questions which the Receiver may put to them and *produce all documents as required by the Receiver* regarding the business of the Receivership Entities, or any other matter relevant to the operation or administration of the [R]eceivership[.]"[3]

Since the Court issued these clear commands, Barton has flagrantly disregarded them and duplicitously sought to minimize or misinterpret their scope. A few of the most egregious examples serve to illustrate this pervasive trend.

After the first in-person meeting between Barton and the Receiver, the Receiver sent a written request for ten specific pieces of information that he believed were "most urgent" for the Receivership.[4] Despite multiple follow-up calls and

---

[1] Doc. 29 at 4.

[2] *Id.* at 5.

[3] *Id.* at 7 (emphasis added).

[4] Doc. 134 at 16.

emails, Barton answered only one request, providing the contact information for a single individual.[5]

Barton refused the Receiver's request to provide information necessary to access the Receivership Entities' electronic data storage, such as contact information for IT employees or passwords, usernames, and contractor information.[6] The Receiver eventually learned that Barton had retained a new IT professional and directed them to change Barton's passwords and access information, which he still refuses to provide.[7] Barton also refused to provide the name or contact information for the head of the Receivership Entities' accounting group, and though the Receiver eventually located him through third parties, this Barton-controlled individual has so far refused to answer any of the Receiver's questions or provide any information.[8]

Despite multiple and repeated requests, Barton has thus far refused to provide an inventory of the art and antiques owned by the Receivership Entities. The day

---

[5] *Id.* at 5.

[6] *Id.* at 5–8.

[7] *Id.* Though Barton asserts he withheld this and other data due to privilege concerns, the Receiver holds, and may waive, the privilege for all Receivership Entities. Doc. 29 at 19. And while the Receiver eventually sought proposed privilege protocol from Barton—which the Receivership Order does not require—Barton then refused to respond to the Receiver's requested modifications. Doc. 134 at 8–10. The Court ordered Barton to respond, and having considered the Receiver's proposal and Barton's response, the Court details below the privilege protocol that shall govern going forward. Barton additionally claims his Fifth Amendment privilege obviates the need to comply with the Court's order, but while "a claim of Fifth Amendment privilege may be an adequate reason for the [C]ourt not compelling [Barton] to respond to cross-examination at [a] contempt hearing, [] the claim of privilege is not a substitute for relevant evidence." *United States v. Rylander*, 460 U.S. 752, 761 (1983). And Barton's testimonial privilege does not apply to the act of producing the documents at issue because that act is not testimonial. *See United States v. Hubbell*, 530 U.S. 27, 36 (2000). Regardless, the Court is unaware of any assertion of Barton's Fifth Amendment privilege by Barton himself, rather than Barton's counsel, so this argument is at best premature. *See Hall v. United States*, 413 F.2d 45, 48 (5th Cir. 1969).

[8] Doc. 134 at 10–11.

after the Receiver's appointment, he learned that Barton was removing art and antiques from a property in the Receivership, and Barton has yet to account for those missing items.[9] Barton has confirmed that one Receivership Entity owned art and antiques valued at $12 million, but other than a handful of items worth only a few thousand dollars Barton has refused to disclose the location or description of any art or antiques.[10]

In perhaps his most blatant act of contempt, Barton violated the Receivership Order by interfering with a sale of property after the Court orally granted the Receiver's motion approving the sale.[11] Barton personally contacted the purchaser of the property and attempted to dissuade them from going through with the sale.[12] Barton succeeded in delaying the sale, which has so far cost the Receivership tens of thousands of dollars due to his illicit activity.[13]

"If a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders," including "treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination."[14] Additionally, "the court must order the disobedient party,

[9] *Id.* at 7, 35.

[10] *Id.* at 7–8, 37.

[11] Doc. 29 at 15–16.

[12] Doc. 134 at 12.

[13] *Id.*

[14] FED. R. CIV. PROC. 37(b)(2)(A)(vii).

the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure[.]"[15]

A finding of civil contempt requires "(1) that a court order was in effect, [] (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[16] Civil contempt is excusable only where a party has "ma[d]e in good faith all reasonable efforts to comply."[17] Willfulness is not required, and "[g]ood faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order" or not.[18]

The Court finds that Barton is in civil contempt of the Court's Receivership Order because he has repeatedly refused to follow its clear requirements. Accordingly, the Court **ORDERS** Barton to provide the following information, materials, and documents to the Receiver by the close of business (5pm central time) on the third calendar day from the date of this Order:

1. All information and materials required by paragraphs 8–10 and paragraph 18 of the Receivership Order, including specifically the credentials and

---

[15] *Id.* at 37(b)(2)(C); *Carroll v. Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 n.2 (5th Cir. 1997) ("Rule 37, in part, permits the court to order the offending party or its attorneys or both to pay the opposing counsel's reasonable expenses and fees incurred as sanctions for the offending party's failure to make disclosures or to cooperate during discovery."). Though Barton protests that Rule 37 is inapplicable because the Receivership Order does not "provide or permit discovery," the Rule's subsection permitting discovery sanctions permits them for discovery violations *and* "an order under Rule . . . 37(a)." FED. R. CIV. PROC. 37(b)(2)(A). And Rule 37(a) contemplates "order[s] compelling *disclosure or* discovery," which clearly encompasses the Receivership Order. *Id.* at 37(a).

[16] *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009) (cleaned up).

[17] *Smith v. Smith*, No. 99-50212, 1999 WL 766991, at *2 (5th Cir. 1999) (per curiam) (cleaned up). This exception—a contemnor's *inability* to comply—does not encompass Barton's claim that he is unable to access the documents at issue because he has submitted no evidence that they're located at a property he cannot access or that he has made any effort to provide the documents that he *can* access.

[18] *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

information necessary to access the Receivership Entities' servers, email accounts, financial, accounting, and/or Quickbook accounts and the identity, location, and appraisal information for all art owned by any Receivership Entity, including art that was sold, transferred or otherwise disposed of since 2019;

2. All information specifically requested by the Receiver in communications with Barton's counsel and others not addressed above, including:

(a) All books and records of any Receivership Entities that are still in Barton's custody/control/possession, including all accounting data in Venkat Murugan's possession or control;

(b) The location of any Quickbooks or other accounting files or backup files and all information necessary to access or obtain those documents and information;

(c) The names, phone numbers, and email addresses for all former employees who were members of the accounting/financial team for the Receivership Entities between 2017 and 2022;

(d) Tax Returns for the Receivership Entities for 2017–2022 or the contact information for whomever has possession or control of the tax returns;

(e) Name and contact information for any bookkeeper used by any of the Receivership Entities between 2017 and 2022;

(f) Name and contact information for any accountant used by any of the Receivership Entities between 2017 and 2022;

(g) A list of all properties (or property interests) owned by any entity owned or controlled by Barton, including the entity that owns the property interest, the property location, the type of asset (undeveloped land, apartments, etc.), the approximate net value, amounts and identity of lienholders and encumbrances, contact information for any entity involved in developing, managing, or operating the property, and the addresses used by the entity for receipt of mail;

(h) Appraisals and potential lenders or purchasers for the Turtle Creek property and the apartments;

(i) An organizational or flow chart related to all Receivership Entities;

(j) Properties or assets that are generating income and the accounts into which that income is deposited;

(k) A list of all persons who hold company credit cards, and the entities listed as the account holder for those cards; and

(l) A list of banks at which any Receivership Entity may have an open account.

3. If Barton fails to fully comply by providing all listed information, documents, and materials by the close of business (5pm central time) on the third calendar day from the date of this Order, the Receiver shall file a Notice describing all information and materials that have not been provided. Upon the filing of such Notice, sanctions in the amount of $500 per day will begin to accrue until such time as the Receiver files a Notice of Compliance indicating Barton's full compliance with this Order. Barton may contest the adequacy of his compliance, although such contest will not stay the accrual of these coercive sanctions unless the Court subsequently sustains Barton's assertion that his compliance has been complete.

4. The Court further finds that Barton's failure to comply with the Receivership Order as described in the Receiver's motion and evidenced by the supporting evidence has caused the Receivership Estate to unnecessarily incur costs and expenses, which are hereby assessed against Barton as compensatory sanctions. Within three business days from the date of this Order, Barton shall pay to the Receiver the amount of $19,250.

Finally, having considered the Receiver's proposed privilege protocol and Barton's response to that proposal, the Court **DENIES** Barton's request for the Court to order the parties to meet and confer about the privilege protocol[19] and **ORDERS** that the following privilege protocol shall govern going forward:

1. The Receiver is authorized to retain a third-party computer forensic expert of his choosing, Veracity Forensics LLC (the "Vendor") to perform the forensic inspection. The costs for the work performed by the Vendor as described below, or as further requested by Barton, will be paid by Barton, in accordance with the Vendor's standard billing practices.

2. The Vendor will capture a forensic image, forensic extraction, or forensic collection of each Electronic Device, External Device, or Cloud Account (collectively, the "Devices") identified by the Receiver or in the possession of Barton. In addition to providing the IT Access Data as previously ordered, Barton will provide or cause to be provided to the Vendor any additional logins, passwords, or encryption keys necessary for the Vendor to access each Device. The Vendor will create a working copy of all original forensic images, extractions, or collections. All downstream work including processing, filtering, searching, or analysis will be performed using the working copies. All original images, extractions, and collections will be maintained as pristine copies.

[19] The Court is apprised of Barton's concerns about the Receiver exercising control over documents he believes may be privileged, but the Receivership Order makes clear that the Receiver holds, and may waive, the privilege for all Receivership Entities. Doc. 29 at 19. Barton's concern is thus with the Receivership Order, not with this privilege protocol. And to the extent that Barton believes this protocol should be limited and then "tailor[ed]" for future issues, he may request modification of the protocol in response to such future issues should they arise. Doc. 229 at 4.

3. The Vendor will search the working copies of each Device to identify potentially privileged documents or information using search terms and parameters provided by the Receiver. Such search terms must include each attorney or law firm employed by Barton individually, or employed to defend Barton in any litigation in which Barton was sued as an individual, as supplemented by the Receiver. Not later than two days after receiving search terms from the Receiver, Barton's counsel may propose additional terms or parameters, which the Receiver will, in his discretion, determine whether to utilize.

4. The parties may determine by agreement the method of presentation of the search results after learning the nature and volume of such searches. If no agreement is reached within 10 days after the search volume is determined, the Receiver will determine the method of presentation for the search results.

5. Before providing any reports or work product to the Parties, the Vendor will take steps to remove all potentially privileged documents including emails by running the search terms provided by the Receiver.

6. Upon completion of the above steps, the Vendor will promptly provide the results of its findings to both Parties. The Vendor will include a Search Result Report ("SRR") in electronic spreadsheet form of all potentially privileged documents identified in the search of each Device. The SRR will include the appropriate metadata fields for each data type so that both Parties can determine if an Identified Item is indeed privileged, but will not include the content of any email.

7. Unless the parties agree otherwise, counsel for Barton will have seven (7) days from receipt of each SRR to determine which items identified on the SRR they object to being provided to the Receiver. For any item Barton objects to, counsel for Barton will make their objection clear by indicating in color highlight (RED) on the SRR. The highlighted SRR will be sent to counsel for the Receiver and to the Vendor. Unless the parties agree otherwise, the Receiver's counsel will have seven (7) business days to review and respond to Barton's objections. For any items objected to by Barton that the Receiver agrees are privileged, no further action is needed. Those items will remain highlighted RED and will not be produced to the Receiver. Barton may obtain copies if requested. For any item objected to by Barton that the Receiver does not agree with and believes is not privileged, the Receiver will change the highlight to (BLUE). Once their review is completed, the Receiver's counsel will return the SRR to counsel for Barton and to the Vendor.

8. The parties will confer regarding any item highlighted BLUE ("Potentially Privileged") and seek to resolve their dispute regarding whether such item is privileged. If no agreement is reached, the Vendor will export and produce to counsel for Barton all items identified as Potentially Privileged and include a report with the appropriate metadata for each Potentially Privileged item. Counsel for Barton will review the report and each item to determine which items are indeed Privileged. Unless otherwise agreed by the parties, within fourteen business days Barton's counsel will indicate Privileged or Not Privileged on the report as well as mark the item RED if they object to the item being produced to the Receiver. The

report will be returned to the Vendor and any item that is marked Not Privileged and is not highlighted will be provided to the Receiver. A report of items marked as Not Privileged but highlighted RED will be sent to counsel for the Receiver for review.

9. If after a further conference, the parties are unable to agree regarding the existence of privilege regarding any item, within seven (7) days of written notice from the Receiver that further conferences will be unproductive, Barton must file a motion seeking the Court's resolution.

10. After each SRR has been reviewed by both Parties and returned to the Vendor, the Vendor will provide all items not marked RED or BLUE to the Receiver as further directed by the Receiver.

11. The Vendor may also perform other forensic examinations as directed by the Receiver, for instance to identify data that was deleted or removed.

12. The Receiver shall task attorneys who have not and will not otherwise work on this case to sort paper documents located in the Office for privilege, utilizing written instructions, search terms, and a process similar to that described above.

13. Barton must cooperate fully in providing assistance as necessary to comply with the privilege protocol.

**IT IS SO ORDERED** this 15th day of May, 2023.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB G

## ORDER DENYING STAY PENDING APPEAL

Dkt. 700 (January 8, 2026)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff,* v. TIMOTHY BARTON et al., *Defendants,* BYRON WALKER, TBW LAND & CATTLE, LLC, *Relief Defendants.* | § § § § § § § § § § § § § § § | Civil Action No. 3:22-CV-2118-X |

## ORDER

Before the Court is Defendant Timothy Barton's motion of an emergency stay of the second receivership order. (Doc. 691).

To receive a stay pending appeal, the movant bears the burden of showing (1) likelihood of success on the merits, (2) an irreparable injury if the stay is not granted, (3) the balance of equities favors a stay, and (4) that the stay would serve the public interest.[1] Having carefully considered the motion, the Court concludes that Mr. Barton has not met his burden and **DENIES** the motion.

**IT IS SO ORDERED** this 8th day of January, 2026.

---

[1] *Ruiz v. Estelle*, 666 F.2d 854, 856 (5th Cir. 1982).

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB H

## ORDER LIFTING BANKRUPTCY STAY FOR DISMISSAL

Dkt. 660 (2025)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-2118-X |
| | § | |
| TIMOTHY BARTON, et al. | § | |
| | § | |
| *Defendants*. | § | |

**ORDER GRANTING RECEIVER'S MOTION TO LIFT LITIGATION STAY**

Before the Court is the Receiver's Motion to Lift Litigation Stay (Doc. 648). Having considered the Motion and any Responses, the Court **GRANTS** the Motion.

Accordingly, the Court hereby **LIFTS THE STAY** of the following jointly administered cases pending in the U.S. Bankruptcy Court for the Eastern District of Texas: (1) *In re Wall007, LLC*, Case No. 22-41049; (2) *In re Wall009, LLC*, Case No. 22-41113; (3) *In re Wall010, LLC*, Case No. 22-41125; (4) *In re Wall011, LLC*, Case No. 22-41114; (5) *In re Wall012, LLC*, Case No. 22-41125; (6) *In re Wall016, LLC,* Case No. 22-41136; (7) *In re Wall017, LLC,* Case No. 22-41137; (8) *In re Wall018, LLC*, Case No. 22-41176; (9) *In re Wall019, LLC*, Case No. 22-41177; and (10) *In re Seagoville Farms, LLC*, Case No. 22-41181 (collectively the "Bankruptcy Cases"), for the limited purpose of allowing the bankruptcy court to consider U.S. Trustee's *Motion to Convert or Dismiss with Prejudice Pursuant to 11 U.S.C. § 1112(b), or In the Alternative, For the Appointment of a Chapter 11 Trustee to 11 U.S.C. § 1104, or For Other Relief, with Waiver of 30-Day Hearing Requirement,* which was filed in the Bankruptcy Cases on October 13, 2022.

Pursuant to the Receivership Order, the Receiver may take all steps that he deems appropriate and necessary to effectuate the dismissal of the Bankruptcy Cases.

**IT IS SO ORDERED** this 28th day of July, 2025.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB I

## DOJ'S REQUEST FOR STAY

Dkt. 44 (November 2022)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION

v.

TIMOTHY BARTON,
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC

Relief Defendants

CASE NO. 3:22-CV-2118-X

**GOVERNMENT'S UNOPPOSED MOTION**
**TO INTERVENE AND TO STAY PROCEEDINGS**

The government respectfully moves to intervene in this action so that it may seek a stay of this proceeding pending the completion of a parallel criminal prosecution ("the criminal matter").[1] The criminal matter relates to acts and transactions that are the

[1] *See United States v. Timothy Barton*, Case No. 3:22-cr-352-K.

**1. The government moves to intervene in the civil proceeding.**

Rule 24(a) of the Federal Rules of Civil Procedure provides a right of intervention for a movant who: (1) "claims an interest relating to the . . . transaction that is the subject of the action;" and (2) "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed R. Civ. P. 24(a). Despite those circumstances, the movant is not entitled to intervene if "existing parties adequately represent" the movant's interest. *Id.*

Under Rule 24(b)(1)(B), the Court in its discretion may permit intervention if the movant has "a claim . . . that shares with the main action a question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion to grant permissive intervention under Rule 24(b)(1)(B), "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Because the criminal matter relates to acts and transactions that are the subject of this case, the United States "claims an interest relating to the . . . transaction that is the subject of" this civil action. Fed. R. Civ. P. 24(a). The government has an interest in enforcing criminal laws that may have been violated by the same acts and transactions to which the civil action relates.

Also, the government has "a claim . . . that shares with the main action a question of law or fact." Fed. R. Civ. P. 24(b). Criminal violations of the securities laws involve many elements of proof that are also part of this civil action, including schemes and artifices, material misrepresentations and omissions, and use of the mails and interstate commerce. Therefore, the criminal matter will likely share with this civil action

numerous legal issues, in addition to being based on common facts.

Furthermore, the government "is so situated that disposing of the action may as a practical matter impair or impede [its] ability to protect its interest." Fed R. Civ. P. 24(a). Specifically, the government has a "discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *See SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988) (finding no abuse of discretion in permitting intervention by the government under Rule 24(a) or (b)).

Also, the government's interest in enforcing its criminal laws cannot be protected adequately by the existing parties in the civil case. Despite the SEC's status as a governmental agency, the parties to this civil action cannot represent the government's interest with respect to the enforcement of federal criminal statutes. *See Bureering v. Urawas,* 1996 WL 277206 (C.D. Cal. Jan. 8, 1996) (observing that "the Government's prosecutorial and investigative interest is not adequately protected by any of the civil parties . . . neither the plaintiff or the defendants have this identical interest").

Finally, intervention by the United States will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). The criminal matter is set for trial on December 5, 2022, although the government anticipates that it will likely be continued from that date. The civil matter was filed days after the indictment was returned by the grand jury in the criminal matter. It is certainly possible that the criminal matter will be resolved sooner than the civil matter and thus may obviate the need for further litigation in this proceeding.

For the foregoing reasons, the government respectfully moves to intervene in this matter for the purposes of seeking a stay of the proceeding.

**2. The government moves to stay the civil proceeding pending the resolution of the criminal matter.**

The Court has discretionary authority to stay this civil proceeding. A court's authority to grant a stay derives from the power of every court "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for the litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (relying on *Landis* for authority to grant stay). Moreover, a court may stay civil proceedings "when the interests of justice seem[] to require such action." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980) (quoting *United States v. Kordel*, 397 U.S. 1, 12 n. 27 (1969)); *see also Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986). Before granting a stay, a court must consider "the competing interests which will be affected by the granting or refusal to grant a stay." *CMAX, Inc.*, 300 F.2d at 268.

A stay under the present circumstances is consistent with the governing case law. The interests of justice generally weigh in favor of a stay of parallel civil proceedings that could impede a criminal investigation. *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir.), *cert. denied,* 449 U.S. 993 (1980); *United States v. One 1964 Cadillac Coupe DeVille,* 41 F.R.D. 352, 353 (S.D.N.Y. 1966) ("where both civil and criminal proceedings arise out of the same or related transactions the government is ordinarily entitled to a stay of all discovery in the civil case until disposition of the criminal

matter"). Courts have long recognized the wisdom of staying civil actions or civil discovery pending the resolution of related criminal proceedings dealing with the same underlying facts and issues. *See United States v. United States Currency*, 626 F.2d 11, 17 (6th Cir. 1980); *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1089 (5th Cir. 1979). Indeed, staying this action now, before the parties conduct civil discovery, will prevent significant prejudice to the interests of the United States in the criminal matter. Federal criminal law provides certain time frames for discovery by defendants and establishes strict limitations on the material criminal defendants obtain prior to trial. By contrast, the discovery available to parties in civil litigation is much more expansive, and therefore threatens to subvert the public interests protected by the discovery limitations in the Criminal Rules.

For example, under Rule 26.2 of the Federal Rules of Criminal Procedure and 18U.S.C. § 3500, the prosecution is not required to provide a witness's statements to a criminal defendant until after the witness has testified on direct examination at trial, and the Rules of Criminal Procedure do not provide for routine depositions of government witnesses. *See* Fed. R. Crim. P. 15(a)(1). By contrast, the Rules of Civil Procedure liberally allow for depositions of potential witnesses. *See* Fed. R. Civ. P. 30(a). Given the near identity of issues and evidence in this case and the criminal matter, if civil discovery proceeds in this case, the defendants will be able to depose witnesses whom the government is likely to call in a criminal trial, effectively circumventing the limitations on criminal discovery. The government submits that the parallel criminal matter should be allowed to proceed unimpaired by premature disclosure of critical evidence that may

have a bearing on the government's ability to prosecute the case.

Importantly, the stay sought by the government will not result in unfair prejudice to the parties to the civil action, as evidenced by the fact that none of the parties to this civil case opposes the stay. For the defendants in the civil action, the stay may be preferable in some respects to proceeding with civil discovery while a criminal prosecution is underway.

## CONCLUSION

For the foregoing reasons, the government respectfully moves to intervene in this proceeding for the limited purpose of seeking a stay and for an order staying the civil proceeding, while permitting the Court-appointed Receiver to continue performing the duties and obligations and exercising the powers and rights previously ordered by the Court, pending resolution of the parallel criminal matter.

Dated: November 2, 2022.

Respectfully submitted,

CHAD E. MEACHAM
UNITED STATES ATTORNEY

*/s/ Renee M. Hunter*
RENEE M. HUNTER
Assistant United States Attorney
Texas State Bar No. 24072942
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8978
Facsimile: 214-659-8802
Renee.hunter@usdoj.gov

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with counsel for the SEC (Keefe Bernstein) who confirmed that the SEC did not oppose the government's limited intervention for purposes of seeking a stay or the government's motion for a stay of the civil proceeding pending resolution of the criminal matter. I further certified that I conferred with the defendants, Timothy Barton, Haoqiang Fu, and Stephen Wall, through their attorneys (Richard Roper, Robert Webster, and Michael Heiskell), who confirmed that they were also unopposed to the government's motion. I have also conferred with counsel for the Court-appointed Receiver (Charlene Koonce), who confirmed the Receiver is also unopposed to the government's motion.

*/s/ Renee M. Hunter*
RENEE M. HUNTER
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (A/K/A MICHAEL FU),<br>STEPHEN T. WALL,<br><br>Defendants,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC<br><br>Relief Defendants | CASE NO. 3:22-CV-2118-X |

**ORDER GRANTING GOVERNMENT'S UNOPPOSED MOTION**
**<u>TO INTERVENE AND TO STAY PROCEEDINGS</u>**

Pending before the Court is the Government's Unopposed Motion to Stay to Intervene and to Stay Proceedings (the "Motion"). After review of the Motion and the entirety of the record, the Court has determined that the unopposed Motion should be, and hereby is, **GRANTED**.

Therefore, it is:

ORDERED that this proceeding is stayed until otherwise ordered by the Court;

IT IS FURTHER ORDERED that nothing in this Order shall preclude the Court-appointed Receiver, Cort Thomas, from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's October 18, 2022, Order Appointing Receiver (Dkt. 29).

SO ORDERED this _______ day of November, 2022.

______________________________
JUDGE BRANTLEY STARR
UNITED STATES DISTRICT COURT JUDGE

# TAB J

## PETITIONER'S MOTION FOR STAY PENDING APPEAL

Dkt. 691 (2025)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

Jules P. Slim
State Bar No. 00793026
PO BOX 140307
Irving, Texas 75014
Telephone: (214) 350-5183
Email: jslim@slimlawfirm.com
**Attorney for Defendant**
**Timothy Barton**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL 009, LLC, WALL 010, LLC, WALL 011, LLC, WALL 012, LLC, WALL 016, LLC, WALL 017, LLC, WALL 018, LLC, WALL 019, LLC, HAOQIANT FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | **No. 3:22-cv-2118-X** |
| **Defendants,** | § | |
| **v.** | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| **Relief Defendants.** | § | |

**DEFENDANT TIMOTHY BARTON'S EMERGENCY MOTION TO STAY PENDING APPEAL, OR, ALTERNATIVELY, FOR AN ADMINISTRATIVE STAY, WITH EXPEDITED CONSIDERATION**

**COMES NOW** Timothy Barton through counsel and files this motion to stay pending appeal Fifth Circuit Case No 25-10871 notified as ECF No 659 or alternatively ,for an administrative stay with expedited consideration and presents following to the honorable court:

## I. INTRODUCTION

Defendant Timothy Barton humbly and at this point, desperately, implores this Court to enjoin the receiver's apparent "shoot first, ask questions later" policy of expunging the totality of Mr. Barton's life's work. The history of this case demonstrates little to no likelihood that assets and asset value will be preserved for the benefit of any alleged victims but are being squandered.

Defendant Timothy Barton respectfully moves this Court for a stay pending appeal of the Court's order appointing receiver ECF No 650, and, in the alternative, for a short administrative stay while this Motion is decided. Under FRAP 8(a)(1) and Rule 62, stays should issue to preserve the *status quo* where the *Hilton/Nken* factors[1] are satisfied. The pending Fifth Circuit appeal is docketed as Case No. 25-10871. Appellant previously sought a stay in the Fifth Circuit at *SEC v. Barton*, No. 25-10871, Dkt. 38 (5th Cir. Nov. 4, 2025); the Court denied that application solely because Appellant had not first sought relief in the district court.[2] Appellant now properly seeks relief here first and demonstrates entitlement to a stay.

## II. RELIEF REQUESTED

Defendant asks the Court to:

1. Stay—pending issuance of the Fifth Circuit's mandate in *SEC v. Barton*, No. 25-10871, Dkt. 38, at 8 (5th Cir. Nov. 4, 2025) —any sales, closings, conveyances, deeds, encumbrances, distributions, fee payments, settlements, or transfers (and any steps in furtherance thereof) under ECF 650;

2. Order segregation/escrow of all receipts, proceeds, and reserves during the stay, with no professional-fee disbursements absent further order;

---

[1] See *Nken v. Holder*, 556 U.S. 418, 434 (2009) (articulating the four stay factors), also reported at 129 S. Ct. 1749, 173 L. Ed. 2d 550. And *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (same factors and considerations), also reported at 107 S. Ct. 2113, 95 L. Ed. 2d 724.

[2] *SEC v. Barton*, No. 25-10871, Dkt. 68 (5th Cir. Nov. 4, 2025) Unpublished Order

3. Alternatively, enter an administrative stay effective immediately and lasting through resolution of this Motion;

4. Order that any response be filed within five (5) days of this Motion, any reply within two (2) days thereafter, and respectfully request a ruling within seven (7) days of filing or as soon thereafter as practicable under LR 7.1.

## III. PROCEDURAL BACKGROUND

Following entry of the ECF No 650 on date June 23, 2025, Defendant timely noticed an appeal to the Fifth Circuit No. 25-10871 ECF No 659 dated July 22, 2025.

On October 10, 2025, Defendant sought a stay pending appeal in that court (App. Dkt. 38). On November 4, 2025, the Fifth Circuit denied the application, explaining that Appellant/Defendant "has not justified his failure to file for a stay initially in the district court." In light of that ruling and consistent with FRAP 8(a)(1), Defendant now requests that this Court decide the stay in the first instance.

## IV. LEGAL STANDARD

A stay pending appeal turns on four familiar factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). District courts may grant stays and set appropriate security under FRCP 62.

## V. ARGUMENT

**A. Defendant Shows a Strong Likelihood of Success—or at least substantial questions warranting a stay.**

1. **Overbreadth and necessity/tailoring under*Netsphere*.** The Fifth Circuit has made clear a federal receivership is an extraordinary remedy, permitted only to protect and conserve assets where less drastic remedies are inadequate, and must be tightly tailored. *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305–11 (5th Cir. 2012). The challenged order authorizes value-depressive liquidations and fee disbursements untethered to genuine preservation, conflicting with Netsphere's constraints.

2. **First-Amendment restraint on petitioning.** The provision barring or conditioning bar-complaint filings (e.g., ¶ 85(a)) is a prior restraint on Petition-Clause activity. The loss of First Amendment freedoms, even for minimal periods, is irreparable and presumptively invalid absent narrow, objective standards and procedural safeguards. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The record lacks the necessary findings and precision; the restraint is thus likely unconstitutional.

3. **Status-quo disruption that risks mooting appellate review.** Without a stay, closings, deeds, and distributions will irreversibly alter property rights and moot meaningful relief on appeal—precisely the circumstance warranting a stay to preserve jurisdiction. *See Nken*, 556 U.S. at 426–27 (stay maintains status quo during appellate review).

**B. Irreparable harm is concrete and imminent.**

- **Irreversible transactions.** Asset sales, title transfers, and fee distributions are not fully unwound even if Appellant ultimately prevails. The estate's capacity to satisfy creditors is diminished with each consummation; appellate relief risks becoming hollow.
- **Constitutional injury.** The bar-complaint restraint imposes an ongoing First Amendment injury that is per se irreparable. *Elrod*, 427 U.S. at 373.
- **Judicial economy.** A short pause avoids costly entanglements and remedial complexity if the Fifth Circuit modifies or vacates portions of the order.

**C. The balance of equities favors a stay that preserves the status quo.**

The requested relief pauses irreversible acts; it does not extinguish claims. Any delay-related cost to the Receiver/SEC is compensable or mitigable via escrow and reporting. By contrast, Appellant faces non-recoupable losses. Tailored segregation of proceeds and fee-disbursement holds minimize countervailing harms.

**D. The public interest supports a stay.**

The public interest favors orderly appellate review, confidence that extraordinary remedies are narrowly tailored, and protection of constitutional rights before irreversible steps occur.[3]

**E. An administrative stay should issue immediately while the Court decides this Motion.**

To prevent mootness during briefing, the Court should enter a short administrative stay now and resolve the full stay on an expedited schedule. Courts routinely use this tool to maintain

---

[3] *See Hilton*, 481 U.S. at 776; Nken, 556 U.S. at 436.

the status quo and preserve appellate jurisdiction. See FRAP 8(a) (district court is the initial forum for stays); LR 7.1 (court may "otherwise direct" schedules).

Given the imminent risk of irreversible transactions, Defendant respectfully requests the Court shorten the default schedule and decide within 7 days or as soon as practicable. The Court has ample discretion to adjust timing under LR 7.1 and its inherent docket-management authority.

## VI. SECURITY

Because this Motion seeks to preserve the status quo and protect appellate jurisdiction, no bond should be required. Alternatively, the Court may set "other security" tailored to the circumstances (e.g., escrow/segregation) under Rule 62/FRAP 8.

## VII. CONCLUSION & RELIEF SOUGHT

Defendant respectfully requests that the Court grant a stay pending appeal and order (i) segregation/escrow of all proceeds and (ii) no professional-fee disbursements absent further order. At a minimum, the Court should enter an immediate administrative stay and adopt the proposed expedited schedule (response in five days; reply in two days) with a ruling within seven days or as soon as practicable. Given the status-quo-preserving nature of the relief, the Court should require no bond or, in the alternative, set modest, tailored security consistent with Rule 62 and FRAP 8.

Respectfully Submitted,

*/s/ Jules P. Slim*
Jules P. Slim
State Bar No. 00793026
PO BOX 140307
Irving, Texas 75014
Telephone: (214) 350-5183
Email: jslim@slimlawfirm.com

**Attorney for Defendant**
**Timothy Barton**

## CERTIFICATE OF CONFERENCE

I hereby certify that an emergency exists of such a nature that given the a conference was not feasible as of the time of filing.

*/s/Jules P. Slim*
Jules P. Slim

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2025, a true and correct copy of the foregoing Response was filed and served through the Court's e-filing (CM/ECF) system.

*/s/ Jules P. Slim*
Jules P. Slim

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL 009, LLC, WALL 010, LLC, WALL 011, LLC, WALL 012, LLC, WALL 016, LLC, WALL 017, LLC, WALL 018, LLC, WALL 019, LLC, HAOQIANT FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | **No. 3:22-cv-2118-X** |
| **Defendants,** | § | |
| **v.** | § | |
| | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| **Relief Defendants.** | § | |

**[PROPOSED] ORDER GRANTING MOTION TO STAY
PENDING APPEAL AND FOR EXPEDITED CONSIDERATION**

Upon consideration of Defendant/Appellant Timothy Barton's Motion to Stay Pending Appeal, or, Alternatively, for an Administrative Stay, with Expedited Consideration, the Court **GRANTS** the Motion and **ORDERS**:

1. Stay: Pending issuance of the Fifth Circuit's mandate in No. 25-10871, the following are **STAYED/ENJOINED** under [identify order]: any sale, closing, conveyance, deed, encumbrance, settlement, transfer, distribution, or fee payment, and any steps in furtherance thereof.
2. Segregation/Escrow: All proceeds, receipts, and reserves shall be segregated in escrow; no professional-fee disbursements absent further order.
3. Administrative Stay: This Order is effective immediately.
4. Expedited Schedule: Response is due 5 days from the Motion's filing; Reply due 2 days thereafter. The Court anticipates issuing a ruling within 7 days (or as soon as practicable).
5. Security: No bond is required.

***END OF ORDER***

Submitted by:

Jules P. Slim, Attorney
For Defendant, Timothy Barton

# TAB K

## RECEIVER'S DECLARATION (EXCERPT)

Dkt. 308, Page 89 (2023)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

**Note:** This excerpt contains the Receiver's statement demonstrating bias and prejudgment language, including the statement:

> *"In either event, because all Initial Receivership Entities discussed above either received Wall Investor Funds, the proceeds of Wall Investor Funds, or benefited from Wall Investor Funds, including only certain of these entities or properties in a new receivership order would be tantamount to allowing Judas to use Peter's funds to repay Paul, where Judas obtained Peter's funds through fraudulent securities offerings and became indebted to Paul to enrich himself at the expense of and rather than repaying Peter. Such a result would be grossly inequitable."*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| | § | |
| **TIMOTHY BARTON, et al.** | § | |
| | § | |
| ***Defendants.*** | § | |

**DECLARATION AND INTERIM REPORT OF CORTNEY C. THOMAS, AS RECEIVER**

1. My name is Cortney C. Thomas. I have personal knowledge of the matters set forth in this Declaration and Interim Report. I am of sound mind, and I am otherwise competent to testify to the facts set forth below.

2. I am an attorney and have been licensed to practice law in the State of Texas since 2010. After graduating from the University of Texas School of Law, I served one year as a federal law clerk in the Northern District of Texas to the Honorable Jane J. Boyle, where I worked on a host of civil litigation matters. Following the clerkship, I was employed by Vinson & Elkins LLP ("V&E") as a trial lawyer, where I worked on a variety of complex commercial disputes in federal and state courts and before administrative tribunals. After approximately seven years at V&E, in September 2018, I joined Brown Fox PLLC ("Brown Fox") as a partner. During my time at Brown Fox, I have continued to handle a variety of business and commercial litigation matters, including multiple cases in federal courts around the country. I have also been appointed as Receiver in one other government enforcement matter, am representing another Receiver in a different enforcement case, and am a member of the National Association of Federal Equity Receivers.

## I. Background

### A. The Initial Receivership Entities

3. On October 18, 2022, I was appointed Receiver in this case. Order Appointing Receiver [Dkt. 29] (the "Receivership Order"). As Receiver, I serve as the Court's agent.

4. Pursuant to the Receivership Order, the Court took "exclusive jurisdiction of the assets, of whatever kind and wherever situated, including all tangible and intangible property of twelve listed entities,[1] as well as "any other entities that Defendant Timothy Barton directly or indirectly controls"[2] (collectively, the "Initial Receivership Entities"). Receivership Order ¶ 1.

5. Within days of my appointment, I realized that Defendant Barton controlled over one hundred additional entities that were not initially identified by the Securities and Exchange Commission ("SEC") in its filings. Accordingly, on November 1, 2022, I filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement the Receivership Order to specifically identify these entities as Receivership Entities. While these entities were already Receivership Entities because of Barton's control, identifying them was necessary to clarify for banks and other third parties that they fell within the Receivership Order.

6. On November 16, 2022, the Court entered its first Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] (the "First Supplemental Order"), which, in addition to the 29 entities listed in the Receivership Order, specifically identified 126 additional entities that were controlled by Barton. The Court deferred ruling on the inclusion of certain additional entities pending further briefing.

---

[1] Wall007, LLC; Wall009, LLC; Wall010, LLC; Wall011, LLC; Wall012, LLC; Wall016, LLC; Wall017, LLC; Wall018, LLC; Wall019, LLC; Carnegie Development, LLC; DJD Land Partners, LLC; and LDG001, LLC.

[2] Including, but not limited to: BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC.

7. On December 13, 2022, the Court entered a second Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 88] (the "Second Supplemental Order"), which, in addition to the 155 previously identified entities, identified nine additional entities that were controlled by Barton. Since my appointment, I have continued to serve as Receiver over the assets of these 160+ Receivership Entities (the "Initial Receivership Entities").

**B. Barton's Appeal of the Receivership Order**

8. On November 17, 2022, Defendant Barton filed a Notice of Interlocutory Appeal, appealing to the Fifth Circuit, among other things, the Receivership Order and the First Supplemental Order. On November 28, 2022, Barton filed a Motion for Stay Pending Appeal [Dkt. 71], in which he argued that the SEC improperly sought the receivership under the standard applied in *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429 (5th Cir. 1981), rather than the three-factor standard applied in *Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012).

9. On January 17, 2023, the Court entered its Order Denying Motion to Stay Pending Appeal [Dkt. 132], in which it analyzed the three factors from the *Netsphere* standard, determined that Barton was not likely to succeed on the merits, and denied the requested stay. On January 6, 2023, the Fifth Circuit denied a separate but similar requested stay.

10. On May 1, 2023, the Fifth Circuit heard oral argument on Barton's challenge to the Receivership Order. Among other things considered during oral argument, the judges and parties discussed whether the District Court's findings in its Order denying the Motion to Stay regarding the *Netsphere* factors mooted Defendant Barton's appellate arguments. Judge Clement noted that if the Fifth Circuit was not permitted to consider the District Court's Order denying Barton's requested stay, a successful appeal for Barton could result in creating "make work" for the District Court. *See* Fifth Circuit Oral Argument at 23:41 (available at https://www.ca5.uscourts.gov/OralArgRecordings/22/22-11132_5-1-2023.mp3).

11. On June 28, 2023, the Fifth Circuit issued its Opinion, concluding, among other things, that:

(a) the SEC's reliance upon the *First Financial* test was mispleaded because the SEC had not obtained injunctive relief before seeking the receivership (Op. at 6);

(b) because no injunctive relief had been obtained, the *Netsphere* factors must be met for a receivership to be justified (Op. at 7);

(c) in reaching its decision, the Fifth Circuit could not consider the supplemental explanation of its Receivership Order and the *Netsphere* factors in the District Court's January 2023 Order denying Barton's Motion to Stay (Op. at 8-9);

(d) constraining its review to the limited reasoning in the original Receivership Order, the Fifth Circuit could not "say whether [the District Court] abused its discretion (Op. at 9);

(e) accordingly, the receivership order would be vacated;

(f) given the "breadth of the Receivership and the possibility that a new receivership would cover some of the same entities," vacatur would not occur until 90 days from the issuance of the Fifth Circuit's mandate (Op. at 9); and

(g) on remand, "[s]hould the district court decide that a new receivership is justified on remand, it can only extend over entities that ***received or benefitted*** from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." (Op. at 11).

12. Finally, the Fifth Circuit granted, in part, Barton's requested stay, staying the Receiver's power to sell or dispose of property belonging to Receivership Entities, except for activities in furtherance of sales or dispositions of property that had already been approved by the District Court. (Op. at 13). Barton later asked the Fifth Circuit to broaden this stay so that, among other things, I would be precluded from continuing with my forensic accounting (and the tracing described herein). On August 24, 2023, the Fifth Circuit denied Barton's requested stay. On August 31, 2023, the Fifth Circuit withdrew its prior opinion, entered a new opinion substantially similar to the prior opinion though clarifying that I could not close any previously approved property sales without a new receivership order, and issued its mandate.

## II. The Reasons for This Declaration

13. I have prepared this Declaration and Interim Report for a number of reasons.

14. First, because I have been ordered to prepare it by the Court. *See* Dkt. 305.

15. Second, I began planning this Declaration and Interim Report in June shortly after receipt of the Fifth Circuit's opinion. It was clear that (a) the Fifth Circuit was remanding to the District Court for consideration of whether a new receivership order should be put in place; and (b) in the event the SEC did not seek injunctive relief, this Court's consideration of whether to impose a new receivership order would turn on whether particular entities "received or benefitted from assets traceable to Barton's alleged fraudulent activities."

16. Third, the District Court indicated, first on July 5 [Dkt. 291] and again on July 16 [Dkt. 293], that it intended to order the SEC to move for appointment of a receiver. *See* Op. at 11.

17. Fourth, I have prepared this Declaration and Interim Report to comply with and fulfill my duties under the existing Receivership Order. With the exception of property sales, the Fifth Circuit's opinion leaves the existing Receivership Order in effect until ninety days after the mandate issues, unless a new receivership order is entered before then. Under the existing Receivership Order, I am required to use reasonable efforts to identify the nature, location and value of all Initial Receivership Entity property, and "subject to my obligation to expend receivership funds in a reasonable and cost-effective manner" was directed to investigate "the manner in which the financial and business affairs of the [Initial] Receivership Entities were conducted." Receivership Order ¶ 45. This work necessarily included, to whatever extent possible, the use of Wall Investor Funds.[3]

[3] "Wall Investor Funds" means funds received from the Wall Investors, as further defined and described in the SEC's Complaint. Any capitalized terms used but not defined herein have the same meaning used in my prior Declarations or motions.

18. Fifth, and perhaps most importantly, I have prepared this Declaration because the best interests of the Receivership Estate—particularly the defrauded investors and creditors—require maximizing and accurately identifying the assets included in the Receivership Estate. Because of the extensive efforts of my accountants, my legal team, and myself over the past 10+ months, I have access to far more information now than I had at the time of my initial appointment. To the extent tracing of Wall Investor Funds into individual Receivership Entities is necessary—including identifying assets and entities that benefitted from Wall Investor Funds—my team and I are best suited to accomplish this work because of our extensive work since my appointment. Although other interested creditors or investors may possess limited access to information and data regarding funds transferred to or used by certain Initial Receivership Entities, those third parties lack access to the totality of information available to my team and I, and in some instances are incentivized to exclude assets from the Receivership Estate. Relatedly, because virtually every property in the Receivership Estate is encumbered by significant debt, any assets that are not included in a new Receivership Order will very likely be foreclosed upon and any value will dissipate without the stay protections that will presumably be included in such an order.

19. Finally, this Declaration is also intended to reveal the inequity and unfairness to the Wall Investors and other creditors that would result if Defendant Barton succeeds in preventing the Initial Receivership Entities' assets from being included in a new receivership despite (a) forming a tangled web of over 160 entities, (b) raising well over $20 million from the Wall investors,[4] (c) raising at least $10 million from other creditors,[5] (d) engaging in dense and

[4] My accounting team is still determining the exact amount of Wall Investor Funds. Our preliminary analysis, however, suggests the total is likely higher than the $26 million alleged by the SEC.

[5] My accounting team is similarly still reviewing financial data to determine the exact amount of monies the Initial Receivership Entities received from creditors other than the Wall Investors.

comprehensive comingling, and (e) refusing to comply with the Receivership Order in providing access to electronic information, such as bank records, accounting records, and other documents stored in the cloud for months on end, leading this Court to hold him in contempt.

* * * *

20. As of the date of this Declaration and Interim Report, the Receivership still faces massive challenges over-and-above the issues surrounding a new receivership order. As discussed in my prior quarterly Status Reports, which are hereby incorporated by reference as if fully set forth herein, the Receivership Entities were cash-starved from the outset of the Receivership. Though the SEC alleges over $26 million was raised from the Wall investors (Compl. ¶ 26), less than $75,000 was available in the Receivership Entities' bank accounts upon my appointment, and several properties were on the verge of foreclosure. Moreover, with only one exception, each piece of real estate owned by the Initial Receivership Entities is encumbered with significant amounts of debt—debt that to date I have largely been unable to service.

21. These cash-flow issues still exist today—despite my best efforts to increase liquidity and the District Court and Fifth Circuit's repeated denials of Barton's requested stays—because Barton's practice of appealing sale orders has caused title companies to refuse to issue title policies. As of the date of this Declaration, sales that would net over $4 million to the Receivership have been approved for several months, yet none of the sales have closed. Additionally, despite multiple representations that Barton has no funds available to pay contempt and other sanctions, and despite Barton's counsel's repeated assurances that they are not being paid for their work, the Receivership Estate has been forced to expend significant time and resources responding to Barton's challenges and appeals of nearly every order approving my activities. Given the continued cash flow issues for this Receivership, I am filing this Declaration

on September 5, rather than waiting until September 14 as allowed by the Court's Order [Dkt. 305], in the hopes of allowing the parties time to digest the information contained herein and hopefully avoid any amended briefing schedule or other delay in consideration of a new Receivership Order.

**III. The Challenges Facing a Tracing Analysis.**

22. As outlined in Section IV below, my team and I have traced Wall Investor Funds into the vast majority, if not all, of the Initial Receivership Entities that hold assets. However, such tracing has been difficult, tedious, and time consuming, largely because of (a) Barton's use of 160+ Initial Receivership Entities; (b) his *extensive* commingling between those Entities, and (c) his refusal to comply with the provisions of the Receivership Order that required his cooperation in providing me with information and access to information.

**A. *Extensive* Comingling**

23. In some instances, the extent and consistency of comingling between and among the many entities Barton controls renders tracing nearly impossible. As one example only, in February 2019, Wall017, LLC transferred over $2.5 million from an account at JP Morgan Chase Bank ("Chase") to a Carnegie Development, LLC account at Chase. Carnegie Development then transferred over $2 million of those funds to no less than five separate Barton-controlled entities through a series of wire transfers. From these entities the funds were then dispersed to various accounts and recipients. *See* Exhibit 1.

24. In several instances, the complexity of intercompany transfers and comingling appear more like money laundering transactions than legitimate business transactions. For instance, in November 2017 a Carnegie Development account at Capital One Bank received and sent more than 20 wire transfers totaling approximately $2 million to six separate Barton-controlled entities. No less than $1.275 million of the money transferred to these entities

was from Wall010, LLC and over $375,000 was from Wall007, LLC, although the receiving entities purportedly had no role in purchasing or managing the properties that were supposed to have been purchased with Wall Investor Funds. See Exhibit 2.

25. Together with my Retained Professionals (as defined below), we have evaluated thousands of transactions reflected in hundreds of bank statements, closing binders and settlement statements, tax returns, and QuickBooks entries. The pervasive and dense comingling rendered a definitive, start-to-finish tracing analysis nearly impossible for many accounts. Although a further and later analysis using additional information not yet obtained may serve to reveal additional uses of Wall Investor Funds, using the financial data available at this time, my team is nonetheless able to trace Wall Investor Funds into the specific Initial Receivership Entities outlined below.

26. A repeated practice employed by Barton that has rendered tracing difficult, was selling or refinancing a property and instructing the title company to transfer the proceeds to a different property transaction, which in some cases was at a different title company. Funds transferred in these transactions would not pass through the Initial Receivership Entities' bank accounts. To trace these funds, my attorneys and I contacted the many title companies used by the Initial Receivership Entities and requested closing documents for these transactions. Due to the number of entities, the title companies often had difficulty locating all of the transactions which required my team and I to scour the Initial Receivership Entity records and county deed records for title company file numbers that the title companies could use to locate these closing documents. The process of reaching out to title companies, researching file numbers, and obtaining transaction documents is still ongoing.

27. As one example of this practice, in June 2018, DJD Land Partners, LLC ("DJD") purchased property using funds primarily obtained from Wall011, LLC. Then in August of 2019,

DJD received a loan of $4 million from Moss and Associates, LLC ("Moss") collateralized against the property owned by DJD. The loan proceeds from Moss were deposited with Silver Star Title dba Sendera Title ("Sendera"). Sendera then wired $1.325 million of the loan funds to Benchmark Title with a memo stating, "Transfer to Purchase Turtle Creek," a reference to property located at 2999 Turtle Creek, purchased by the entity now known as 2999 TC Acquisitions LLC, using these loan proceeds as well as loans from third parties and other sources.

28. An additional and more recent example involves the property at 3600 Gillespie Street in Dallas ("Gillespie Property") owned by Gillespie Villas, LLC ("Gillespie"). In May 2022, Gillespie purchased the Gillespie Property using proceeds from the sale of property in Winter Haven, Florida owned by AVG West, LLC. In August 2022, Gillespie obtained a loan from an individual collateralized against the Gillespie Property. The loan proceeds from this transaction were deposited with Sendera which then transferred the funds to Commonwealth Title to complete TC Hall, LLC's purchase of properties located at 3407 and 3409 Hall Street in Dallas.

29. A further example of Barton's commingling funds (and disregard for corporate formalities) is illustrated through his use of loans obtained by one entity but used for the benefit of another. For example, I have identified 26 Barton controlled entities that received loans from the Small Business Administration totaling approximately $3.4 million. The bank records for the entities that received these loans demonstrate that, once the loan funded, the receiving entity would transfer the funds to another Barton controlled entity—generally JMJ Development or JMJAV—to be spent on, as one example among many, the purchase of the Rock Creek Property.

30. Bank records also reveal that Barton used loan proceeds from Greystone (the servicer on HUD loans), which were intended for D4DS to build the Parc at Bellwether Ridge apartments, to pay the mortgage for the Rock Creek Property.

31. One final example of Barton's comingling relates to his 2018 use of Wall Investor Funds to purchase land in Venus, Texas through LDG001, LLC. In July of 2019, Barton took a loan out against the property owned by LDG001 and among other uses, transferred $200,000 of the loan proceeds to a bank account for HR Sterling, LLC for payroll payments, and sent $675,000 to a JMJ Development bank account, where the money was then dispersed to various accounts, including $100,000 to D4FR, LLC—the entity that owns the Park at Windmill Farms.

32. Based on the financial data we have analyzed to date, and despite the commingling and complexity of the data with respect to the entities and properties listed below, none were operated or funded with monies or assets wholly untainted by Wall Investor Funds, the proceeds of Wall Investor Funds, or the benefit of Wall Investor Funds.

**B. Use of Corporate Forms As a Sham and Without Observance of Corporate Formalities**

33. As stated in prior Declarations, each Initial Receivership Entity was owned and/or controlled by Barton. *See* Motion to Supplement the Receivership Order [Dkt. 41] and related Appendix [Dkt. 42]; Supplemental Brief in Support of Motion to Supplement Receivership Order [Dkt 73] and related Appendix [Dkt. 74]. My testimony in the Declarations included in those appendices, as well as the evidence included therein, is hereby incorporated by reference as if fully set forth herein. The basis for my determination regarding Barton's control over each Initial Receivership Entity includes but is not limited to: (a) binders with entity information, for instance tax ID records from the IRS that disclosed Barton as a control person, located at 2999 Turtle Creek in Dallas, Texas (the "Turtle Creek Office"), occupied by Barton and the entities kept in alphabetical order over a series of multiple drawers; (b) tax records; (c) the common addresses used by Barton and virtually all entities; (d) additional documents reviewed at the Turtle Creek Office, for instance real property records, contracts, bank records and bills; (e) a spread sheet located

in the Turtle Creek Office identifying virtually all entities included in the Motion; (f) inclusion of several of the entities in a list of on-going litigation managed by counsel who officed on-site with Barton; (g) Barton's inclusion of most of these entities in a list provided to the SEC as entities he controlled; and (h) two different interviews in which I was informed that certain entities were created identifying Max Barton as the manager/in control to create distance between those entities and the deals in which they engaged, and Barton.

34. Similarly, the Initial Receivership Entities were operated as an interdependent collective. For instance, Gillespie Villas owns 3600 Gillespie Street, but purchased that property, in part, with assets obtained from Broadview Holdings, LLC, ("Broadview") which in turn received proceeds from the sale of property by the Mansions Apartment Homes at Marine Creek, LLC, which was purchased, at least in part, with Wall Investor Funds. Gillespie funds in turn, funded, in part, TC Hall's purchase of additional real property, and Gillespie's property was used as collateral for a loan to TC Hall. Marine Creek SP, LLC held valuable contractual rights in the form of a Participation Agreement related to the sale of real estate by the Mansions Apartment Homes at Marine Creek, LLC, real estate which was purchased at least in part, with Wall Investor Funds.

35. I also discovered that Barton regularly held himself out as the owner, President, or other controlling member of various Initial Receivership Entities, regardless of who held that role on paper. For instance,

- A 2016 email from Barton to employee Saskya Bedoya instructed her to "make Max owner in TRTX" to follow instructions of Barton's attorney to facilitate refinancing debt owed by the entity.
- Timothy Barton signed the Statement of Change of Registered Office/Agent dated May 2, 2022 for TRTX Properties, LLC, although he purportedly had no authority over the entity on that date.

- On January 17, 2022, Barton signed a contract for Titan Investments, LLC to purchase real estate, as Titan's President, although corporate records reflect that Max Barton held that position as of that date.[6]

36. None of the Initial Receivership Entities appears to have had any outside directors, managers, or officers. Many, such as TRWF, LLC or One Pass Investments, LLC had no capitalization and were instead mere holding companies or shells. Some, for instance, Carnegie Development, LLC, appear to have been capitalized through funds from other Receivership Entities. As reflected by various corporate records located in the Turtle Creek Office, and other records found on the Texas Secretary of State's website, virtually every Entity appears to have been incorporated by either Ms. Bedoya, or one of two attorneys who worked for Barton.

37. Documents evidencing formation, tax information, bills, contracts, or mail for the Initial Receivership Entities were found at the Turtle Creek Office. Nearly all of the Initial Receivership Entities were used for real estate investments or activities incident to real estate investments. Other than documents evidencing incorporation and tax ID numbers, very few documents suggest observation of any corporate formalities.

38. Barton also created and used shell entities that had no purpose or assets except ownership interest in other entities that received Wall Investor Funds, the proceeds of Wall Investor Funds, or benefitted from Wall Investor Funds. The D4 Entities, discussed in my Motion for Summary Judgment regarding SPC's purported ownership interest in those entities, Dkt. 206-208, are a good example. As explained in the SPC Motion for Summary Judgment and supporting Declaration, Barton used certain "Parent Entities" to own each of the D4 Entities. The D4 Entities received sizable HUD construction loans to purchase realty and develop certain Apartment Developments. Each of the D4 Entities also received funds directly or indirectly from JMJ or

---

[6] *See* Dkt. 73 ¶11 and exhibits thereto.

JMJD4, LLC, each of which had also received Wall Investor Funds. SPC contends that the Apartment Developments were funded wholly with the HUD Loan proceeds and the proceeds of SPC's loans. Based on the tracing analysis discussed below, that assertion is inaccurate. Regardless, while the vast majority of funds that were used to construct and develop the HUD Apartments came from the HUD construction loans (not the Initial Receivership Entities and not SPC), the HUD Apartments and D4 Entities benefitted greatly from the other Initial Receivership Entities and Wall Investor Funds, as discussed below.

39. Similarly, Barton's indirect control over Gillespie Villas, LLC (through One SF Residential, LLC and use of Broadview Holdings to fund Gillespie Villas) and TC Hall (as evidenced, among other things, by his role in obtaining a loan from Louisiana National Bank and his control over the funds TC Hall used to purchase property),[7] and Barton's use of JMJ Development to develop and solicit investors for both the Gillespie and TC Hall properties, provides a further example of the Initial Receivership Entities' operation as a singular enterprise using commingled funds, including funds originating from Wall Investors, and Barton's disregard for the corporate existence of these entities.

### C. Barton's Refusal to Provide Information or Access Credentials and the Basis for the Information Provided Below

40. As detailed in my Motion to Compel [Dkt. 133], despite repeated requests for such information, Barton refused to provide access credentials to the Initial Receivership Entities' accounting system, servers and email accounts, (the "IT Access Data"), as well as the contact information for any accountants who provided accounting services for the Initial Receivership Entities. Details related to my efforts to obtain that information, including the call I received from

[7] *See* Dkt. 84 for further explanation regarding these transactions.

the person identified as the primary accountant used by Barton and the Initial Receivership Entities, are included in my Declaration submitted in support of the Motion to Compel. *See* Dkt. Nos. 133, 134. In response to the Court's order granting the Motion to Compel, Dkt. 235, Barton provided me with contact information for two individuals and login credentials for a Microsoft 365 account, but refused to provide any additional information, documents, or materials required by the Order, and instead provided a list of objections to the requested information he had been ordered to provide. Dkt. 243, 244.

41. Similarly, although ordered to provide extensive information regarding the Initial Receivership Entities' assets,[8] Barton did not and has not complied. He refused to provide virtually any information regarding assets owned or controlled by any Initial Receivership Entity, the present location of Wall Investor Funds, the proceeds of those funds, the uses and disposition of those funds, or the benefits obtained through their use. On the contrary, Barton insisted that I should focus my efforts on selling two of the four D4 Properties, while ignoring SPC's competing claim of ownership, as well as SPC's and HUD's debt.

42. Despite Barton's attempts to prevent me from accessing information, I have located or obtained sufficient information for my forensic accountants to perform a preliminary tracing analysis.[9] The Receivership Order directed me to assume possession and control over all books and records of the Receivership Entities. Receivership Order ¶ 6-7; 13-14. Based on that responsibility and authority, I obtained documents related to the Receivership Entities' operations, transactions, finances, and assets, including documents referenced below. These documents

[8] *See* Receivership Order, ¶¶ 7-11; 14, 18, and 33.

[9] Prior to receipt of the Fifth Circuit's opinion, my accountants had already begun the process of a forensic tracing because, among other things, (1) tracing of Wall Investor Funds will be necessary for an eventual claims process and (2) tracing of the disposition of Wall Investor Funds is necessary for the Receivership's potential fraudulent transfer claims (which are decreasing daily because of TUFTA's statue of repose).

include reports, spreadsheets, summaries, invoices, accounts and notes obtained from the Initial Receivership Entities' office location. Additionally, as authorized by the Court, I retained professionals to assist me with my appointment, including accountants and lawyers (the "Retained Professionals"). The Retained Professionals assisted me in gathering, reviewing, and summarizing voluminous information, particularly related to the Initial Receivership Entities' bank records and financial transactions.

43. More specifically, pursuant to the provisions of the Receivership Order, my attorneys have obtained approximately sixty months of bank statements from banks or financial institutions for most Initial Receivership Entities, if those entities owned bank accounts. These bank statements reflect activity from not less than 163 accounts at 16 different financial institutions, including, but not limited to JP Morgan Chase, Texas Brand Bank, Capital One, Texas Republic Bank, Veritex, and Vista Bank. For many accounts, and only after many months of requests and follow-up requests, we have also obtained most of the source documents referenced in the bank statements, for instance copies of checks, wire transfers or deposit slips. Additionally, to date we have obtained closing binders from title companies for more than 30 real property transactions to evaluate the settlement statements and source and use of funds related to those transactions. With respect to several transactions, for instance the dispute with HN Capital, we also obtained financial documents and other records from adverse parties. As of the date of this Report and Declaration, my efforts to obtain information from banks, title companies, and third parties is still ongoing.

44. We have also obtained access to the Initial Receivership Entities' QuickBooks and other on-line accounting records, despite Barton's lack of cooperation. These records are incomplete in many instances and also reflect certain transactions, booked as "repayment of inter-

company loans" that appear to have been made to justify certain of the financial transactions discussed below, without regard to the Initial Receivership Entity that was entitled to or owned the funds at issue or owed the obligation that was paid.

45. Through my investigation I discovered that Barton utilized IT professionals to frustrate any investigation into his finances by transferring information to cloud-based servers and directing the IT professionals to withhold access from me or my team. *See* Dkt. 134, Ex 1, ¶¶ 11–13. Similarly, as recently as March 29, 2022 Barton, through counsel for JMJ Development and "its Affiliated and Related Entities" (for whom I hold any attorney–client privilege) engaged an accounting firm under a Kovel agreement to work on the "Wall Entities Project" thereby attempting to shield any accounting data and analysis under an attorney client or work product privilege.

46. Collectively, the bank records, source documents, QuickBooks, closing binders, tax returns, and Initial Receivership Entity business records are referenced below as the "Financial Records."

47. The summaries attached to this Declaration and my testimony regarding the financial transactions by and between the Initial Receivership Entities and the properties purchased by those entities, as well as the tracing analysis of Wall Investor Funds and commingling, were derived from the Financial Records and analysis, and were prepared by me or at my request. As described above, the financial information underlying these summaries is voluminous, and the summaries are thus necessary for the Court's consideration and use. To the greatest extent possible, I have also reviewed, analyzed, and evaluated the information summarized to ensure the summaries are accurate and helpful to the Court's analysis, while also attempting to do so as efficiently and economically as possible.

48. Documents that are not summaries which are attached to this Declaration were obtained by me in the course of performing my appointment. These non-summary documents were located in the office utilized by the Initial Receivership Entities, obtained from former counsel for the Initial Receivership Entities, or obtained from banks, title companies, or the Initial Receivership Entities' former accountants. Pursuant to my investigation of the Initial Receivership Entities and their operations, I learned that contracts and related documents such as those attached to this Declaration were regularly created by the Initial Receivership Entities, were made by persons with knowledge of the matters reflected by the documents, and it was the regular practice of the Initial Receivership Entities to maintain copies of these documents either directly, or through agents or servicers, like Greystone.

49. Pursuant to my appointment and the Court's instruction that I take possession and control over all books and records of the Initial Receivership Entities, I am the custodian of records for the Initial Receivership Entities and the Receivership Estate.

50. Since October 18, 2022, I have performed the mandate of the Receivership Order as reflected in multiple reports, motions, responses, declarations, and other documents filed in the docket. My work in this regard, as well as the documents and information described above and below, provides the basis for my personal knowledge of the facts included in this Declaration.

## IV. Analysis of Initial Receivership Entities that Received or Benefitted from Wall Investor Funds.

51. As the Court's agent, and pursuant to the initial Receivership Order, I was tasked with identifying, locating, and recovering Receivership Assets, and particularly assets obtained with Wall Investor Funds. Because the Receivership Order also required me to take possession and control over any entity owned or controlled by Barton, my appointment also required an

in-depth analysis of the use of Wall Investor Funds, as well as identifying entities that fell within the scope of the Receivership Order.

52. Because the Fifth Circuit remanded the case for this Court's further consideration regarding whether to issue a new receivership order, I knew the report and analysis below would be necessary. Based on the limited stay of my efforts to sell or dispose of Receivership Property during the window of time allowed for this Court to consider and issue a new receivership order, I also understood the existing Receivership Order remained in effect and required that I and my Retained Professionals continue performing all required activities other than those the Fifth Circuit expressly stayed.

53. As referenced above, absent the SEC seeking injunctive relief, the Fifth Circuit has directed that "[s]hould the district court decide that a new receivership is justified on remand, it can only extend over entities that ***received or benefitted from*** assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." Op. at 11 (emphasis added). While my team and I endeavored to perform this analysis economically and efficiently, the magnitude and complexity of commingling involving the Wall Investor Funds, combined with the incomplete records initially available to me and silence from virtually all former Receivership Entity employees, has made the task laborious and expensive.

54. Below, and generally in the interest of brevity and efficiency for each Initial Receivership Entity that holds or held assets, I have provided a single example of the Wall Investor Funds each received, or the benefits of those funds received, although in a few instances, I provide additional detail or examples. These examples do not provide a complete picture of all instances of Wall Investor Funds benefitting other Initial Receivership Entities, nor are they necessarily the best examples in all instances. To the contrary, these examples provide a small cross-section of

the tracing analysis. For ease of reference, I have categorized the Initial Receivership Entities as follows:

(A) Entities that received Wall Investor Funds directly from Wall Investors;

(B) Entities that used Wall Investor Funds to buy property or hold property that is still owned by the Receivership Entities;

(C) Entities that used Wall Investor Funds to buy property or hold property that was sold prior to my appointment as Receiver;

(D) Initial Receivership Entities Max Barton contends he controls or owns, but which were controlled by Defendant Barton and received or benefitted from Wall Investor Funds;

(E) Entities that otherwise received Wall Investor Funds—either directly from Wall Entities (defined below); indirectly from other Initial Receivership Entities that received monies from the Wall Entities; or indirectly through proceeds from the sale of properties that had been purchased with or benefited from, at least in part, Wall Investor Funds;

(F) Entities that benefitted from Wall Investor Funds by receiving a participation interest in a development that received Wall Investor Funds;

(G) Entities that benefited from Wall Investor Funds by serving as the managing member or owner of an entity that received Wall Investor Funds;

(H) Trusts that benefitted from Wall Investor Funds by receiving property from, being the ultimate owner of, or being the beneficiary of assets that were purchased with or benefitted from Wall Investor Funds;

(I) Entities that benefited from being associated with entities that received Wall Investor Funds and received a Small Business Administration loan;

(J) Entities that received a nominal amount of funds from other entities that received Wall Investor Funds;

(K) Entities that served as registered agents for other Initial Receivership Entities; and

(L) Entities that are part of the Barton-controlled collective enterprise but for which I have not located any additional information.

55. The Court has already determined that each of these entities was controlled by Barton at the time of my appointment in October 2022, and my continued investigation has not revealed any information to the contrary. *See* Dkts. 29, 62, 88.

### A. Receivership Entities That Directly Received Wall Investor Funds.

56. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records, I have traced over $20 million in Wall Investor Funds directly into the following Initial Receivership Entities, all of which are owned and/or controlled by Tim Barton:

- WALL007, LLC;
- WALL009, LLC;
- WALL010, LLC;
- WALL011, LLC;
- WALL012, LLC;
- WALL016, LLC;
- WALL017, LLC;
- WALL018, LLC;
- WALL019, LLC (collectively, the "Wall Entities")

57. While my team and I have traced Wall Investor Funds into each of these entities, we have not yet determined the exact amount of Wall Investor Funds that flowed into each of the Wall Entities. The Hahn Declaration included in the SEC's appendix to the initial Motion for the Appointment of Receiver [Dkt 7] explains that $26.3 million was raised from over 100 investors between March 2017 and June 2019. *See* Appendix [Dkt. 7] at APP001-15. Rather than include an incomplete or unverified summary of Wall Investor Funds at this time, and for ease of reference, and understanding that at some point in the future if a claims process is established, I will be submitting a claims report with the most accurate information, I am including the Hahn Declaration's chart summarizing the funds flowing into each of the Wall Entities here:

| Offering | Offering Dates[4] | Total Funds Raised[5] | |
|---|---|---|---|
| Wall 7 | March - April 2017 | $ | 2,759,293 |
| Wall 9 | May - July 2017 | $ | 2,320,091 |
| Wall 10 | September - November 2017 | $ | 2,279,897 |
| Wall 11 | December 2017 - February 2018 | $ | 2,024,723 |
| Wall 12 | April - July 2018 | $ | 3,986,062 |
| Wall 16 | July - November 2018 | $ | 1,879,804 |
| Wall 17 | October 2018 - February 2019 | $ | 7,798,471 |
| Wall 18 | March - June 2019 | $ | 2,363,286 |
| Wall 19 | May 2019 | $ | 900,000 |
| | | $ | 26,311,627 |

**B. Receivership Entities That Hold Property Purchased with Wall Investor Funds.**

58. The entities listed below own properties that were purchased, in whole or in part, with Wall Investor Funds. Transactional summaries illustrating the date, amount, and origins of Wall Investor Funds transferred into the entities summarized in the list below are attached as Exhibits 3 through 14. These exhibits are representative of just some of the Wall Investor Funds we traced into the entities listed below, and by no means represent the totality of all Wall Investor Funds transferred into these entities. For ease of reference and to prevent the Court or parties from having to cross-reference details from my Quarterly Reports regarding a property or entity, I have incorporated descriptions from my most recent Quarterly Status Report [Dkt. 299], along with examples of the tracing analysis for each. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records, I have traced Wall Investor Funds into the following entities and properties which are owned and/or controlled by Barton:

**1. SF Rock Creek, LLC**

59. **Tracing.** SF Rock Creek, LLC is the record owner of 4107 Rock Creek Drive in Dallas (the "Rock Creek Property"). SF Rock Creek received commingled funds from entities that

received SBA loans obtained by relying on properties purchased with Wall Investor Funds, and at least one entity (BM318 LLC, via Carnegie Development, LLC) that received Wall Investor Funds and used these funds to purchase the Rock Creek Property. Similarly, proceeds from the sale of the Mansion Apartment Homes at Marine Creek, which was purchased using Wall Investor Funds, were used to repay a loan on the Rock Creek Property. Examples of these transactions are attached as Exhibit 3.

60. **Background.** As detailed in my Initial Status Report, while reviewing documents at the Turtle Creek Office, my team discovered documents indicating loans and insurance payments on the Rock Creek Property during the early days of the Receivership. Upon further examination, we determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton. *See* Dkt. 41 ¶¶ 6-7. Accordingly, the Rock Creek Property was a Receivership Asset under the existing Receivership Order.

61. I obtained an initial opinion of value that the property was worth approximately $1.45 million. Because (1) the property was financed with a "house flipping loan" that included a high interest rate (9.99%), in addition to being saddled with continuing obligations to pay utilities, insurance, and taxes; (2) the Receivership faced a general dearth of liquid assets with which to administer its ongoing needs; and (3) the relative ease and efficiency in selling residential properties versus commercial properties, I decided to list this property for sale as expeditiously as possible through a respected, independent broker.

62. After receiving several offers on the property, I ultimately agreed, subject to Court approval, to sell the Rock Creek Property "AS IS" to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the Court's Administration Order [Dkt. 63], I obtained three separate appraisals that resulted in an average

appraised value of $1,393,333. The contracted sales price not only exceeded two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b), but exceeded the average appraised value.

63. On December 2, 2022, I filed a Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [Dkt. 76], contending that the sale of the Rock Creek Property for $1.4 million was in the best interest of the Receivership. The Court set a hearing to consider approval of the sale for December 19, 2022. Barton filed a Response in opposition to the proposed sale [Dkt. 91].

64. Shortly before the December 19 hearing, the title company assisting my team with the sale of the Rock Creek Property notified us that on December 1, 2022—after I had discussed my efforts to sell the Rock Creek Property in my Initial Status Report and the same day that my counsel conferred on the sale of the property—Defendant Barton recorded a lis pendens on the property. Because the title company was unwilling to issue a title policy with the existence of the lis pendens, we were forced to file an Emergency Motion to Declare Lis Pendens Void [Dkt. 96] on December 16, 2022.

65. At the December 19 hearing, which started at 10 am and concluded shortly before lunch, the Court found that the sale was in the best interest of the Receivership, giving me authority to complete the sale at the scheduled December 28 closing. The Court also ordered Barton to pay for the Receivership's fees (totaling $1,200) in seeking to have the lis pendens declared void.

66. However, just hours after the conclusion of the hearing, Defendant Barton reached out to the purchaser (unsolicited and without permission from the Court or me) to notify the purchaser of past foundation and flooding issues Barton claims to have had with the property. In light of Barton's communication, the purchaser requested an extension of the closing date.

67. Moreover, on December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order. Case No. 22-11226. The title company refused to issue a title policy while the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by me), I initially sought to intervene in the appeal, be treated as an appellee, or alternatively be treated as an amicus and submitted a motion to dismiss. The Fifth Circuit denied the request to be treated as appellee or an intervenor but granted me leave to file as an amicus. During the Second Quarter of 2023, I sought leave to file a second amicus brief in response to arguments by Barton relating to tracing of funds into the Rock Creek Property. This motion was opposed by Barton and denied. However, on June 19, 2022, the Fifth Circuit entered an Order dismissing the appeal based on the absence of jurisdiction.

68. As of the date of this Declaration, I have been stayed from closing this transaction absent a new Receivership Order. It also remains unclear whether the title company will issue a title policy based on the procedural status of the case. In the months since the District Court's issuance of the Rock Creek sale order, the Rock Creek purchaser and I have entered into several extensions of the closing date. Pending resolution of this Court's consideration of a new Receivership Order, the Rock Creek purchaser continues to rent the property subject to a long-term lease.

69. In the interim, the financial problems that plagued the Rock Creek Property persist. As stated in prior status reports, I have confirmed that the loan on the Rock Creek Property was not a traditional homeowner's loan. To the contrary, Defendant Barton agreed that during the term of the Loan, SF Rock Creek would "not occupy any portion of the Mortgaged Property in any manner" and that "persons with a direct or indirect ownership interest in [SF Rock Creek] shall

not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan." Interest continues to accrue daily. While I have leased the Rock Creek Property to the approved purchaser to salvage (hopefully) the sale, under the loan documents all rent payments go to the lender. Finally, while I had negotiated favorable terms regarding penalty interest and a pre-payment penalty that would otherwise have been due based upon a December 28, 2022 closing, no guarantees exist that these favorable terms will be part of a delayed closing or subsequent sale.

70. After payment of the existing loan, associated fees, taxes, closing costs, and broker commissions, I still anticipate net proceeds flowing into the Receivership Estate. However, given the continued uncertainty surrounding the closing date, it is still impossible to accurately predict the amount of funds that will flow into the Receivership Estate.

**2. FHC Acquisition, LLC**

71. **Tracing.** FHC Acquisition, LLC ("FHC Acquisition") is the record owner of approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate Property"). FHC Acquisition received Wall Investor Funds that were used to pay down FHC Acquisition's loan on the Frisco Gate Property. An example of such a transaction is attached as Exhibit 4.

72. **Background.** Early in the Receivership, I obtained multiple broker's opinions of value for the Frisco Gate Property. These BOVs generally estimated the property's value between $8.9MM and $10.8MM. Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property approached me about acquiring the Frisco Gate Property for $9,000,000. The parties entered a Letter of Intent on October 31, 2022. Between October 31 and December 13, 2022, we negotiated a purchase and sale agreement.

73. Pursuant to 28 U.S.C. § 2001, I sought three appraisals on the property—two broker opinions of value and one formal appraisal. The three appraisals valued the Property at $9,016,920

- $10,018,800, $8,896,365 - $9,884,850, and $9,000,000, respectively. After receiving the formal appraisal on December 16, 2022, my team and I prepared a Motion for Appointment of Appraisers, Approval of Appraisals, and a Hearing Regarding Approval of Sale of Frisco Gate Property [Dkt. 110], which was filed on December 22, 2022. Barton filed a Notice of Non-Opposition [Dkt. 123]. On January 31, 2023, the Court held a hearing to approve the sale of the Frisco Gate Property and entered an Order [Dkt. 142] approving the sale the same day.

74. Because of certain challenges regarding potential parking commitments on the property and obligations under certain master development agreements, on January 24, 2023 I entered an Addendum to the purchase and sale agreement with he purchaser. The Addendum did not materially alter the agreement, but simply (1) extended the Feasibility Period defined in the Agreement by an additional 30 days, (2) extended the closing date in proportion to the Feasibility Period, and (3) made certain Earnest Money nonrefundable if specified conditions are met. Pursuant to the Addendum, the Feasibility Period would end on February 13, 2023, with Closing set to occur on or before April 14, 2023. The purchaser and I ultimately entered similar Second and Third Amendments that extended the Feasibility Period and Closing Date because the parking issues remained unresolved. Pursuant to a Fourth Amendment, the purchaser agreed to take the risk of resolving the parking issues, with closing set to occur in late September 2023. However, prior to the closing date, the purchaser indicated it would not be able to close in September, and the Fifth Circuit stayed any ability to close on this transaction prior to a new Receivership Order.

75. The sale continues to be in the best interest of the Receivership because, among other things, it allows the Receivership to accomplish a sale of the property (a) without a listing process, (b) without having to pay any broker fees (the potential purchaser of the property has

agreed to pay its broker separately and outside of the sale proceeds), and (c) with a purchaser who is willing to work through and take the risk of the various parking and master development issues.

76. After payment of the existing loan (which appears to exceed $3 million), a second investment/loan of approximately $3.5 million, taxes, and closing costs, I anticipate this sale resulting in net proceeds of approximately $2 million into the Receivership Estate. However, continued delays caused by the non-disclosed parking issues and the current stay continue to decrease the equity ultimately available to the Receivership. I am still uncertain whether and when closing will occur.

**3. HUD Apartments**

77. D4DS, LLC ("D4DS"), D4FR, LLC ("D4FR"), DRIN, LLC ("D4IN"), and D4OP, LLC ("D4OP," and together with D4DS, D4FR, and D4IN, the "D4 Entities"), are the record owners and HUD borrowers on four separate apartment complexes (collectively, the "HUD Apartments"). These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC).

78. As outlined below, the HUD Apartments each benefitted from Wall Investor Funds. The vast majority of funds used to develop each of the HUD Apartments, however, were from (a) a sizeable HUD loan serviced by Greystone and secured by a lien on each property and (b) a secondary mezzanine loan from Southern Properties Capital, Ltd. ("SPC"). SPC has argued at length that its loans were convertible to equity in the D4 Entities' parent companies, that it converted its loans into equity in D4DS, D4FR, and D4IN in the weeks prior to my appointment, and thus that SPC owns these properties, and therefore none is a Receivership Asset. *See generally* SPC's Response Brief to Motion for Summary Judgment [Dkt. 247]. On the contrary, even if no

Wall Investor Funds flowed directly into the HUD Apartments (as outlined below, Wall Investor Funds did flow into the HUD Apartments, as did other non-SPC commingled funds), it does not follow those one of the three lenders—HUD, SPC, or the Small Business Administration[10]—would become anything more than a lender. Moreover, although Barton initially urged me to sell two of the HUD Apartments, he most recently argued—at the hearing on the Motion to Approve the sale of the Amerigold Suites discussed below—that these properties should be excluded from the Receivership Estate and available to Barton for his personal benefit.

79. However, these four properties are and should remain Receivership Assets, and the entities holding the properties should be included under a new Receivership Order as Receivership Entities.

80. For one, as discussed below, Wall Investor Funds, albeit a limited amount given the substantial loans that funded the developments, have been traced into the HUD Apartments, as have other commingled funds, although our tracing analysis is still ongoing.

81. Further, each of the HUD Apartments "received or benefitted from" Wall Investor Funds. For example:

(a) Wall Investor Funds were used to pay the salaries of JMJ employees who worked on the projects, including Bella Khusal, Mark Adams, and other employees whose work focused on construction, development, and coordination with lenders on the HUD Apartments. For instance, between 2018 and 2022, Bella Khusal was regularly paid by HR Sterling, LLC. Based on a review of the bank records for HR Sterling, my Retained Professionals and I have identified several instances where

[10] Each lender made separate loans to each of D4DS, D4FR, D4IN, and D4OP, though only Greystone's was secured.

Wall Investor Funds were used by HR Sterling to make payroll payments to Bella Khusal and others.

(b) Wall Investor Funds were used to purchase and maintain the Turtle Creek Office, where Khusal, Adams, and other employees officed, and where D4DS, D4FR, D4IN, and D4OP maintained their business records and officed.

(c) These same salary and property expenses were used in obtaining Economic Injury Disaster Loans for each of the D4 Entities from the SBA. While the SBA's PPP loans were generally forgivable, the EIDL loans obtained by the D4 Entities and twenty-two other Receivership Entities, which collectively received approximately $3,400,000, were not forgivable. As discovered in the D4OP cost certification process necessitated by the HUD loans, the D4OP EIDL loan in particular had to be cured (*i.e.*, paid off in full with Receivership funds) prior to submission of the cost certification to Greystone.

(d) Assets that were purchased with or otherwise benefitted from Wall Investor Funds were also essential in obtaining each of the sizeable HUD loans used to develop the HUD Apartments. Four loan packets were submitted to Greystone in connection with each of the four D4 Entities' mortgage applications. I obtained copies of these loan packets from Greystone, and each application touted the "JMJ team" as bringing "over thirty years of development experience to each project." None of the packets referenced SPC.[11] The packets expressly reference Mark Adams's experience, who, as discussed above, was a Receivership Entity employee paid not

[11] The packet's silence regarding SPC is hardly surprising, given the fact that their purported relationship with the D4 Entities would be a violation of HUD regulations. *See* Brief in Support of Motion for Summary Judgment [Dkt. 207] at 40-42.

with Greystone or SPC loan proceeds, but, at least in part, with Wall Investor Funds.

Also, in submitting a HUD Personal Financial and Credit Statement for both D4DS and D4FR, a document "required to obtain [HUD] benefits," "used as a minimum to make a determination of the financial and credit status of the respondent," and certified by Barton as "true" and "correct," Barton identified $11,328,353 in assets. $5,300,000 of these assets were "real property," described as (i) 100.687 acres of vacant land owned by Wall009, LLC in Venus, Texas, valued at $2,900,000 and (ii) 88 acres of vacant land owned by Seagoville Farms, LLC in Seagoville, Texas, valued at $2,400,000. As discussed below, my accountants have traced substantial Wall Investor Funds into both of those properties. The listed assets also included a $1,100,000 receivable owed by Villita Towers, another entity into which Wall Investor Funds were traced (also discussed below). The Application for D4FR, submitted around the same time, included this same information. The later applications for D4IN and D4OP list the other assets of JMJD4 (*i.e.*, D4DS and D4FR), as well as Villita and Goldmark Hospitality (discussed below) as assets justifying a HUD construction loans to D4IN and D4OP.

None of the four loan packets reference SPC, SPC's loan, or any assets that SPC owned at the time. Indeed, SPC had not even made its secondary loans at the time the HUD applications were submitted. Thus, HUD and Greystone issued the four sizeable HUD loans to the D4 Entities independent and irrespective of SPC and the subsequent secondary loans on each property. SPC was, however,

indirectly and furtively involved in these financial disclosures. With each mortgage application, in response to HUD's request for "verification of deposit," which assisted HUD in "determining whether you qualify as a prospective mortgagor," the D4 Entities submitted documentation regarding the amount of funds on deposit. For instance, D4DS provided proof of $3,000,000 on deposit as of May 5, 2017. While SPC is not referenced in the proof of funds on deposit, D4DS's bank records reflect that SPC transferred this same amount to D4DS earlier on May 5, 2017, and the same amount was transferred back to SPC on May 9, just a few days after the HUD deposit verification. The same process utilizing SPC's funds to create the appearance of the D4 Entities' liquidity occurred for D4FR ($6,000,000) and D4IN ($5,900,000). It also possibly happened with D4OP ($5,800,000), though to date I have been unable to find any transactions supporting that verification of deposit.

(e) On or before September 15, 2023, I will be filing tax returns on behalf of the Initial Receivership Entities. The last tax returns filed for the Initial Receivership Entities that I have been able to find are from 2019. Accordingly, I will be filing tax returns for D4DS, D4FR, D4IN, and D4OP for tax years 2020, 2021, and 2022. Each of the D4 Entities had varying levels of income at some point during these periods. To the extent a tax liability is owed, it will be owed by the D4 Entities, not SPC or Barton individually. While historically income was used to pay down the HUD loans and surplus cash was used to pay down the SPC debt, it is unclear as of this Interim Report if that debt service and other expenses will exceed the income or if taxes will be due. Regardless, any taxes and the costs of tax preparation will be borne by the D4 Entities, and thus the Receivership Estate, and not SPC.

82. In short, without the HUD loans, none of the D4 Entities could have constructed the HUD Apartments, and the developments simply would not exist. Each of these loans was substantial and was the primary source of funds to develop and construct each HUD Apartment Complex. In turn, the HUD loans were obtained based upon financial information that in large part relied on assets obtained with or which received Wall Investor Funds. The D4 Entities also benefitted from Wall Investors Funds in the other ways outlined above (*i.e.*, employee salaries, offices, SBA loans, and taxes). Thus, while below I outline my accountants' efforts to trace Wall Investor Funds into the D4 Entities and the HUD Apartments, this tracing exercise is not essential because of the benefits each otherwise received from Wall Investor Funds described above.

83. Each of the HUD Apartments is dealt with individually below:

(a) D4DS, LLC—Bellwether Ridge (DeSoto)

84. **Tracing.** D4DS, LLC is the record owner of the Bellwether Ridge apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge"). D4DS received Wall Investor Funds, or at the very least, commingled funds from JMJ Development and other Receivership Entities. Examples of some of these transactions are included as Exhibit 5.

85. **Background.** In accordance with this Court's Orders and 28 U.S.C. § 2001, I have obtained three independent appraisals of Bellwether Ridge. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Bellwether Ridge at $28,000,000, $27,750,000 - $29,750,000, and $28,800,000 - $31,900,000, resulting in an average appraised value of $29,033,333.[12]

[12] On November 14, 2022, Defendant Barton filed an opinion of value—from an individual who is connected to Barton on at least one other transaction—that estimates the value of Bellwether Ridge to be between $26.7 million and $28.0 million. [Dkt. 57 at 7].

86. After my appointment, I consulted multiple industry professionals and brokers regarding the potential value of the Property and the other HUD Apartments. Due to the uncertainty surrounding SPC's claimed ownership, I was ultimately unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to SPC's ownership claims. If the Court resolves SPC's claimed ownership, the basis for these brokers' hesitancy to market the properties would be eliminated.

87. Despite difficulties listing the Property with a broker, I communicated with dozens of potential interested purchasers. While most of the potential purchasers ultimately were unwilling to submit offers on the Property, I still obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf of a joint venture (Polk Street 2023, LLC) between Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

88. During the following months, I engaged in protracted negotiations with Palmetto/i3 regarding the purchase and sale agreements for the Property and one other related property. During this time, I continued to communicate with other potential interested purchasers, none of whom provided higher offers than Palmetto/i3. Finally, on February 21, 2023, Palmetto/i3 and I entered into a Purchase and Sale Agreement, whereby I agreed, subject to Court approval and certain other contingencies, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000.[13]

89. I remain hopeful, albeit increasingly pessimistic in light of the protracted and thorough summary judgment briefing, that I will be able to reach agreement with SPC to treat its loan as just that—a loan that will be paid at closing. Regardless of any ultimate agreement, SPC's

[13] SPC's claimed ownership was a significant factor in the purchase price.

claims to the proceeds from the sale of Bellwether Ridge could be administered through a claims process, where the adjudication of its claim to the proceeds from the sale of any HUD Apartment complex could range from treatment as an unsecured creditor, to the Court's determination that SPC is entitled to 100% of the sale proceeds.

90. As of the date of this Declaration, the contract for the sale of Bellwether Ridge remains pending, but the Sale Motion has been denied without prejudice. Pursuant to the parties' contract, because several months have passed since the execution of the agreement, either of the parties to the contract may terminate at any time. Once the issue of SPC's claimed ownership has been resolved, court approval for any sale will still be necessary pursuant to 28 U.S.C. § 2001. Assuming that SPC is ultimately treated as a lender, and if the Court approves the sale, after discounting the HUD loan balance ($17,823,548.47), the SPC loan balance ($3,797,758.95), and the fee to buyer's broker ($270,000), the sale would result in a net benefit of approximately $5.1 million to the Receivership Estate prior to other closing costs.[14]

(b) D4FR, LLC—Parc at Windmill Farms (Forney)

91. **Tracing.** D4FR, LLC is the record owner of the Park at Windmill Farms apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126 ("Windmill Farms"). D4FR received Wall Investor Funds that were used to construct Windmill Farms. An example of such a transaction is included as Exhibit 6.

92. **Background.** In accordance with this Court's Orders and 28 U.S.C. § 2001, I also obtained three independent appraisals of Windmill Farms. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Windmill Farms at $50,000,000,

[14] These loan balances for each of the HUD Apartments are as of January 2023. I intend to update loan balances no later than January 2024.

$52,000,000 - $56,000,000, $53,000,000 - $58,000,000 resulting in an average appraised value of $53,166,666.

93. Despite difficulties listing the Property with a broker (as outlined above), after communicating with dozens of potential interested purchasers, I ultimately entered into a Purchase and Sale Agreement with Palmetto/i3 whereby I agreed, subject to Court approval, to sell the Property to Palmetto/i3, which would assume the existing HUD loan, for a total of $51,000,000.

94. As of the date of this Declaration, the contract for the sale of Windmill Farms remains pending, but the Sale Motion has been denied without prejudice. Assuming that SPC is ultimately treated as a lender, and if the Court ultimately approves the sale, after discounting the Greystone loan balance ($35,076,762.98), the SPC loan balance ($7,885,547.12), and the fee to buyer's broker ($510,000), the sale will result in a net benefit of approximately $7.5 million to the Receivership Estate prior to other closing costs.

(c) <u>D4IN, LLC—Parc at Ingleside (Corpus Christi area)</u>

95. **<u>Tracing.</u>** D4IN, LLC is the record owner of the Parc at Ingleside apartment complex located at 2850 Ave. J, Ingleside, TX, 78362 ("Parc at Ingleside"). As discussed above, D4IN benefitted from Wall Investor Funds in a variety of ways, including salary payments and the securing of the HUD loan. My accountants' tracing analysis is still ongoing, but examples that show D4IN's involvement in other Receivership Entities' extensive commingling are included as Exhibit 7.

96. **<u>Background.</u>** I am still gathering opinions of value and appraisal(s) on this property. To date, I have received opinions of value ranging between $28 million and $31.1 million. As of January 13, 2023, the balance on the HUD loan for this property was $24,790,081.91. As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,759,163.65. While I am hopeful that the value of this property compared to its

loans will continue to increase in the coming months while the ownership dispute with SPC is resolved, the estimates above indicate that the sale of this property would result in the infusion of no more than $2.5 million into the Receivership Estate.

(d) D4OP, LLC—Parc at Opelika (Alabama)

97. **Tracing.** D4OP, LLC is the record owner of the Parc at Opelika apartment complex located at 1375 McCoy Street, Opelika, AL 36801 (the "Parc at Opelika). D4OP received Wall Investor Funds that were used to construct the Parc at Opelika. Examples of some of these transactions are included as Exhibits 8.

98. **Background.** Construction on Opelika is complete and the rental process is ongoing. Endorsement of the HUD loan on the Opelika is not yet complete and cost certification remains in process. I have encountered multiple challenges in this respect, including construction liens, interest payments that had to be made when draw requests were delayed, ongoing challenges surrounding my team's lack of access to QuickBooks and the Receivership Entities' digital files, and most recently Barton's refusal to sign cost certification documents.

99. The auditors assisting me with the cost certification identified two findings related to funds flowing from D4OP's bank accounts that required curing prior to the submission of the cost certification: (1) the repayment of an SBA loan (totaling $166,782.52) and (2) the repayment of monies sent to other Receivership Entities ($126,582.00). I cured these findings during the Second Quarter of 2023. At this time, although certification is not guaranteed, I am optimistic that it will occur, albeit with potential loan penalty payments.

100. Similar to Bellwether Ridge, Windmill Farms and Ingleside, Opelika has both a HUD loan and additional funding from SPC. As of January 13, 2023, the balance on the HUD loan for this property was $21,878,710.41. As of January 17, 2023, SPC claims that the balance of its second loan for this property was $3,189,659.90. SPC claims that while it has not yet

converted its debt to equity, its convertible loan will allow it to do so in the future. While I believe that Opelika presents significant value to the Receivership Estate especially over time, at this time it is impossible to predict what that value will be.

* * * *

101. As noted in my Quarterly Reports, Defendant Barton has suggested in various filings that the sale of one, two, or three of the HUD Apartments would result in the recovery of sufficient funds to pay a 100% recovery to the Wall investors. However, as I have detailed in prior filings, this contention not only ignores SPC's arguments regarding its equity position in the properties, but, even assuming that SPC's loans are treated as debt, it ignores the existing HUD and SPC debt. If SPC is determined to be the owner of the HUD Apartments, the Receivership will receive $0. If the Receivership Entities are the owners of these properties, the current best estimate net value to the Receivership Estate would be $15.1 million; a substantial amount, but still far less than the $26 million alleged in the SEC's complaint. Barton also ignores the non-Wall creditors who would participate in any eventual claims process, increasing total losses well in excess of $26 million.

102. Finally, at the hearing on the Motion to Approve the sale of the Amerigold Suites (discussed below), Barton argued that contrary to prior assertions regarding the use of sale proceeds from the sale of any HUD Apartments, Barton rather than the Receivership Estate should receive the proceeds.

### 4. Goldmark Hospitality, LLC

103. <u>**Tracing.**</u> Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites"). The Amerigold Suites received Wall Investor Funds for improvements and operations. Examples of such transactions are attached as Exhibit 9. Further, the manager of the Amerigold Suites was

regularly paid by HR Sterling, LLC, another Receivership Entity used primarily to manage payroll for most other Receivership Entities and which on many occasions used Wall Investor Funds to make such payments. Other contractors and bills were regularly paid by JMJ Development as early as 2017 and booked as intercompany transactions.

104. **Background.** While the HUD Apartments have third-party property managers, Goldmark Hospitality, LLC and other Receivership Entities coordinated with contractors to manage the Amerigold Suites. As discussed in my Initial Report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a high number of vacant units and the generally poor condition of several units. Within days of my appointment, I learned, among other things, that insurance on the property was on the verge of cancellation, electricity was on the verge of being shut off, and significant water bills were long overdue, even under a prior negotiated settlement. I was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued. Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the lender, Texas Brand Bank, would likely have been entitled to foreclose after my appointment since insufficient assets existed to make mortgage payments on this, or any other property owned by the Initial Receivership Entities.

105. During the Fourth Quarter of 2022 and continuing into the First Quarter of 2023, my team and I were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability insurance despite the history of the property and the existence of the Receivership; (3) meeting with the property manager to discuss the ongoing maintenance and repair needs of the property; and (4) analyzing various options to maximize the value of the Amerigold Suites.

106. In December 2022, Texas Brand Bank sold the note secured by the Amerigold Suites to a third party. As of January 30, 2022, the note holder claims that the outstanding balance on its loan is $2,543,820.04. I am aware of at least one other smaller loan encumbering the property, as well as a few other smaller liabilities.

107. A personal injury lawsuit involving Amerigold that was pending when I was appointed is currently stayed. During the First Quarter of 2023, I received notice of a second potential personal injury that occurred because of a storm. During the Second Quarter of 2023, a City of Dallas fire inspector visited Amerigold and discovered a host of items that were out of compliance. Over several weeks, the Amerigold property manager resolved each of the findings in the inspection report and eventually received a clean bill of health from the fire inspector. On or about July 6, 2023, a small fire occurred at the property. The Dallas Fire Department was called to the property, and the fire was extinguished with minimal property damage.

108. During the Second Quarter of 2023 and into the Third Quarter, the Texas heat has continued to take its toll on Amerigold's air conditioning units, resulting in significant repair costs. Meanwhile, interest on the property has continued to accrue, the necessity for significant repairs have continued, property tax and insurance bills remain high, and my team and I are required to continue devoting significant attention to this property. The majority of these challenges have existed from the outset of the Receivership.

109. In light of these challenges, and to avoid using limited receivership assets to continue operating the Property at a loss, I determined that selling the Property was in the best interest of the Receivership Estate if a sale would generate a net return for the Estate. After consulting multiple industry professionals and brokers regarding the Property's potential value, I engaged a broker to market the Property.

110. The broker obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Matthew Flume (the "Amerigold Purchaser") on January 25, 2023 at a purchase price of $5,500,000. The Amerigold Purchaser (and his affiliated entities) have extensive experience rehabilitating distressed multifamily assets.

111. The Amerigold Purchaser and I engaged in negotiations regarding a purchase and sale agreement for the Property, and on March 1, 2023, we entered into a Purchase and Sale Agreement (the "Amerigold Contract"), pursuant to which I agreed, subject to Court approval, to sell the Property to the Amerigold Purchaser for $5,500,000.

112. In connection with the sale and pursuant to 28 U.S.C. § 2001, I obtained three independent appraisals of the Property. Two are informal broker opinions of value, and one is a certified appraisal (collectively, the "Appraisals"). The three Appraisals valued the Property at $4,400,000, $3,500,000, and $4,900,000 -$5,500,000, resulting in an average appraised value of $4,366,667.[15] Thus, the contracted sales price, $5,500,000, not only greatly exceeded two-thirds of the average appraised value of the Property ($2.9 million) as required by 28 U.S.C. § 2001, but also exceeds the average appraised value by over $1 million.

113. On March 2, 2023, I filed my Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 167] (the "Amerigold Sale Motion"). Barton objected to the sale [Dkt. 185]. On March 20, 2023, the Court held a hearing on the Amerigold Sale Motion, and, on March 29, 2023, entered an Order approving the sale [Dkt. 202].

114. On May 16, 2023, Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property. Case No. 23-10515. Similar to the Rock Creek

[15] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

Property, the title company refused to issue a title policy so long as the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that I, rather than the SEC, filed the motion to approve the sale) and the particular issues outlined above prompting the expeditious sale of this property, I once again sought to intervene or be treated as appellee. The Fifth Circuit denied the request to be treated as appellee or an intervenor, instead inviting me to file an amicus brief. The SEC ultimately filed a motion to dismiss, and on July 17, 2023, the Fifth Circuit granted the motion and dismissed the appeal.

115. In the months since the District Court's issuance of the Amerigold sale order, the Amerigold purchaser and I have entered into amendments extending the closing date, with closing currently set during September 2023. In light of the Fifth Circuit's recent stay of previously approved sales, I anticipate further extensions of the closing date.

116. If the sale ultimately closes, after discounting the loan balance (which was approximately $2,543,820 as of January 30, 2023 and has continued to accrue), liens on the Property (totaling approximately $6,298.59), and the fee to seller's broker ($192,500), prior to other closing costs, the sale will result in a net benefit of over $2.5 million to the Receivership Estate.[16]

**5. Venus Development**

117. **Background.** Prior to my appointment, several Initial Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus. The properties included in this potential

[16] Although not reflected in the title commitment or an independent review of the Dallas County property records, I have discovered a second loan for several hundred thousand dollars may encumber the Property. I will verify the status of the purported loan before closing. Even if the loan exists, the net to the Receivership Estate will likely be more than $2 million.

development, including the Initial Receivership Entity that currently owns the properties is detailed below:

| Project Name | Current Owner | Approximate Address | CAD Geographic ID | Acres |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00050 | 1 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00051 | 110.9 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00052 | 14.25 |
| Northstar | DJD Land Partners, LLC | 1025 N FM 157, Venus, TX | 126.0857.00030 | 1 |
| Northstar | Lynco Ventures, LLC | 1209 Cr 501, Venus, TX | 126.0358.00070 | 62.8 |
| Northstar | Lynco Ventures, LLC | 11209 Cr 501, Venus TX | 126.0358.00060 | 1 |
| Griffin I | LDG001, LLC | 980 CR 110, Venus, TX | 126.0093.00010 | 150.9 |
| Griffin II | LDG001, LLC | 324 W CR 109, Venus, TX | 126.0758.00100 | 46.9 |
| Griffin House | LDG001, LLC | 940 CR 110 Venus, TX | 126.0093.00009 | 1 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00044 | 17.6 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00039 | 86.9 |
| Berkowitz | Carnegie Development, LLC | 11129 CR 506, Venus, TX | 126.0261.00040 | 1 |
| Berkowitz | Carnegie Development, LLC | 11101 CR 506, Venus, TX | 126.0261.00041 | 30 |

| | | | | |
|---|---|---|---|---|
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00042 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00043 | 30 |
| Johnston | Venus 59, LLC | 916 S Fm 157, Venus, TX | 126.0379.00110 | 3.4 |
| Johnston | Venus 59, LLC | 817 CR 214, Venus, TX | 126.0379.00040 | 59 |

118. At the time of my appointment in October 2022, foreclosure proceedings initiated by secured lenders were in process regarding many of these properties. Those proceedings were automatically stayed upon entry of the Receivership Order, although my team and I had to expend effort to avoid scheduled foreclosure sales since not all lenders were aware of the stay included in the Receivership Order or even entry of the Receivership Order. Through the date of this Declaration, lenders on many of these properties have continued to threaten motions to intervene and lift the stay of enforcement to permit initiation of foreclosure proceedings.

119. My team and I have spent considerable time discussing the Venus Project with the representatives from the City of Venus, consultants who assisted the Receivership Entities with the entitlements process, lenders and secured creditors, multiple developers who are potentially interested in developing the project, and other interested purchasers of the land. If the development agreements with the City are finalized, the value of the properties could increase significantly. However, as of the date of this Report, I still cannot predict (1) whether the development agreements will ultimately be finalized with the City of Venus and (2) if the development agreements are finalized, what value will ultimately be realized by the Receivership Estate. Each of the properties associated with this development have significant debt (which debt collectively exceeds at least $11 million). While I have received offers to purchase the property in excess of the total debt, I have not yet found viable paths towards development. Thus, at this time, it is still

too early to determine whether I would be able to recover any value for the Receivership Estate from the Venus Development or, if any net recoverable value exists, what that value will ultimately be. Thus, I do not expect significant recoveries for the Receivership under either path.

120. **Tracing.** DJD Land Partners, LLC, Lynco Ventures, LLC, LDG001, LLC, Carnegie Development, LLC, and Venus 59, LLC all own tracts of land in close proximity to each other in Venus, Texas. Except for Venus59, LLC, these parcels were all bought using Wall Investor Funds or proceeds from sales of other properties bought with Wall Investor Funds.[17] All five entities, including Venus59, LLC, benefitted from the Receivership Entities' extensive work and expense preparing to develop the properties as a single, joint development.

121. DJD Land Partners, LLC is the record owner of certain tracts of land located at 11417 CR 501, Venus, TX and 10125 N. FM 157, Venus, TX collectively known as the NorthStar Property. Wall Investor Funds were used to purchase the NorthStar Property. An example of these transactions is attached as Exhibit 10.

122. Lynco Ventures, LLC is the record owner of certain parcels of land located at 1209 CR 501 Venus, TX and 11209 CR 501 Venus, TX (the "Lynco Property"). Wall009, LLC initially purchased the Lynco Property using Wall Investor Funds. According to Johnson County property records, the Lynco Property was transferred to Lynco Ventures on or about August 17, 2022, long after Defendant Barton was aware of the SEC's investigation. An example of the Wall Investor Funds used to purchase the Lynco Property is attached as Exhibit 11.

123. LDG001, LLC is the record owner of certain parcels of land located at 980 CR 110 Venus, TX; 324 W. CR 109 Venus, TX; and 940 CR 110 Venus, TX (the "Griffin Property"). Wall

[17] My investigation of Venus59, LLC is ongoing. As discussed below, I have attached examples of the Receivership Entities' extensive commingling to and with Venus59, LLC.

Investor Funds from Wall016, LLC and Wall012, LLC provided most of the funds to purchase the Griffin Property. An example of the Wall Investor Funds used to purchase the Griffin Property is attached as Exhibit 12.

124. Carnegie Development, LLC is the record owner of certain parcels of land located at 10901 CR 507, Venus, TX; 11129 CR 506, Venus, TX; 11101 CR 506, Venus, TX; and 11129 N. FM 157, Venus, TX (the "Berkowitz Property"). Carnegie Development purchased the Berkowitz Property using Wall Investor Funds. An example of these transactions is attached as Exhibit 13.

125. Venus 59, LLC is discussed *infra.*

**6. Ridgeview Addition, LLC**

126. **Tracing.** Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas (the "Ridgeview Property"). Wall Investor Funds have been traced to Ridgeview Addition, LLC and the Ridgeview Property. One such example is attached as Exhibit 14, which shows proceeds from the sale of Villita Towers (purchased using funds from Wall007) routed through a series of transfers to Ridgeview Addition, LLC which then paid out the funds.

127. **Background.** On or around July 2021, Ridgeview Addition, LLC entered into a Lot Take-Down Contract whereby it agreed to sell 54 developed lots to an affiliate of Lillian Homes at a price of $61,000 per lot (for a total purchase price of $3,294,000). The contract did not require conveyance of all lots at one time; rather twelve lots would be conveyed at closing, an additional twelve lots would be conveyed 120 days later, and three successive transfers of ten lots each would occur at 90-day intervals thereafter. All told, the Contract contemplated that the take down of the lots will occur over a thirteen-month period.

128. I am aware of one loan on Ridgeview Addition (to a separate SPC-related entity) and a second loan burdening the property, which is cross-collateralized (to a separate SPC-related entity). Collectively, these loans almost certainly exceed the value of the property. Moreover, I have discovered significant additional liens burdening the property that would require release or satisfaction prior to closing the Lot Take-Down Contract or other transfer of the lots. And finally, the City of Venus insists that Defendant Barton agreed to construct a playground at the development as part of a platting promise, but the playground has not yet been constructed. Thus, despite Defendant Barton's prior claim that the sale of this property will bring in "approximately $265,000 in immediate cash equity into the Receivership," significant challenges and uncertainties render predicting the net recovery, if any, based on the Lot Take-Down Contract impossible.

* * * *

129. In sum, the following entities should be included in a new receivership order because they currently hold property purchased at least in part, with Wall Investor Funds:

- DJD Land Partners, LLC
- D4DS, LLC
- D4FR, LLC
- D4IN, LLC
- D4OP, LLC
- FHC Acquisition, LLC
- Goldmark Hospitality, LLC
- LDG001, LLC
- Lynco Ventures, LLC
- Ridgeview Addition, LLC

- SF Rock Creek, LLC

### C. Receivership Entities That Held Property Purchased With Wall Investor Funds, But Sold Before My Appointment.

130. The entities listed below at one time held properties that were purchased, in part, with Wall Investor Funds, but prior to my appointment those properties were sold and the proceeds distributed (again, less than $75,000 was available for use in the Receivership Entities' bank accounts upon my appointment). Inclusion of these Entities in any new Receivership Order is nonetheless essential because, among other things, these Entities were or are owed funds based on contractual obligations, participated in a variety of fraudulent transfers, and have asserted or could assert various other potential claims against third parties that may present value to the Receivership Estate. Transactional summaries illustrating the date, amount, and origins of Wall Investor Funds transferred into the entities summarized in the list below are attached as Exhibits 15 through 27. Once again, these exhibits are representative of just some of the Wall Investor Funds we have traced into the entities listed below, and by no means represent the totality of all Wall Investor Funds transferred into these entities. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records, I have traced Wall Investor Funds into the following entities and properties, all of which are owned and/or controlled by Tim Barton:

#### 1. 2999TC Acquisitions, LLC

131. **<u>Tracing.</u>** At one time, Receivership Entity 2999TC Acquisitions, LLC was the owner of 2999 Turtle Creek Boulevard in Dallas (the "Turtle Creek Office"), having purchased the property in or around September of 2019. Wall Investor Funds have been traced to the purchase of this property through direct transfers between receivership entity bank accounts and transfers between title companies from loan proceeds obtained by borrowing against other Barton controlled

properties. Wall Investor Funds have also been traced into other payments made to the lender on the property. Examples of these types of transactions are attached as Exhibit 15.

132. **Background.** In connection with the 2019 purchase of the Turtle Creek Office, Receivership Entity 2999TC Acquisitions, LLC or its predecessor obtained a loan in the amount of $32,500,000. Through protracted litigation in the bankruptcy court—and millions of dollars in payments from the Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")—the Bankruptcy Court eventually entered an Order (the "Order Enforcing Agreed Orders") on September 28, 2022 that found, among other things, that HNGH, not 2999TC Acquisitions, LLC "owned" the Turtle Creek Office. That Order was appealed shortly after it was entered, and the appeal, which was also with this Court, was automatically stayed upon my October 18, 2022 appointment.

133. On November 25, 2022, HNGH filed a Motion to Intervene and to Confirm Ownership of Property Located at 2999 Turtle Creek Boulevard [Dkt. 69]. Among other things, HNGH claimed that the Bankruptcy Court's September 28 order confirmed that as of May 2022, HNGH owned the Turtle Creek Office. I filed a Response [Dkt. 94] on December 15, 2022, in which I indicated that we were not opposed to HNGH's request to intervene as a party in interest but were opposed to HNGH's requested confirmation of any ownership interest in 2999 Turtle Creek and HNGH's implicit request to lift the stay of litigation imposed by the Receivership Order to permit resolution of the pending bankruptcy appeal. Defendant Barton also filed a Response [Dkt. 97] opposed to HNGH's request.

134. The Court ultimately granted HNGH's motion to intervene but denied HNGH's request that the Court confirm ownership of the property. Dkt. 154. Instead, the Court ordered

the parties to mediate and appointed Retired Bankruptcy Judge Harlin Hale as mediator. Mediation occurred on March 10, 2023.

135. As detailed more fully in my Verified Motion to Approve Settlement Agreement with HNGH [Dkt. 210], as a result of the mediation, I settled the dispute with HNGH. Pursuant to the terms of the Settlement Agreement, HNGH agreed to pay the Receivership a total of $2.5 million in the following intervals following the Court's approval of the Settlement Agreement: (i) $500,000 paid within seven days; (ii) $500,000 paid within one year; (iii) $750,000 paid within eighteen months; and (iv) $750,000 paid within two years (collectively, the "Settlement Payments").

136. I entered the Settlement Agreement and presented the Motion to the Court because the settlement with HNGH was in the best interest of the Receivership. More specifically,

(1) After an extensive investigation, I determined that there were significant, potentially impossible hurdles to unwinding the bankruptcy court's prior Agreed Orders, the confirmed and effective Plan, and the Order Enforcing Agreed Orders. The Appeal would likely be unsuccessful, given the bankruptcy court's thoroughly examined factual record "in a hearing that lasted over fifty hours, stretched out over two months" and the requisite "clear error" standard of review for a bankruptcy court's findings of fact.

(2) Even if the Receivership were to succeed on the Appeal—after an indefinite amount of time for the District Court's decision and then HNGH's inevitable appeal to the Fifth Circuit—the likely amount due under the Loan Documents would far exceed the value of the Property and the likely selling price of the Property.

(3) I contended that $3.95 million of the $4.735 million that the Receivership Entities paid to HNGH under the Loan Documents were arguably fraudulent transfers, although

$3.8 million of that was paid in accordance with obligations incurred by 2999TC under the Agreed Orders, which were incorporated into the confirmed and now-effective Plan, approved in the Bankruptcy Case. Even if the payments were made with actual or constructive fraudulent intent, the Receivership faced the significant hurdle of overcoming HNGH's good-faith defense because these payments were made by Receivership Entities pursuant to court orders. The substantial financial costs and delay of litigating these fraudulent transfer claims would only deplete the Receivership Estate with no guarantee of success. Consequently, the Receivership Estate's receipt of $2.5 million of potentially $3.95 million in fraudulent transfer amounts was a fair and equitable result.

137. The Court ultimately granted the Motion to Approve Settlement Agreement with HNGH on May 15, 2023. Dkt. 236. On May 16, 2023, Defendant Barton filed a Notice of Appeal of the Court's Order approving the HNGH Settlement Agreement. Fifth Circuit Case No. 23-10516. On May 26, 2023, Barton separately filed a motion to stay with the Fifth Circuit that, among other things, sought a stay of the HNGH Settlement, including the Receiver's transfer of possession of the Turtle Creek Office to HNGH. On June 8 and June 9, 2023, the Fifth Circuit denied the motion to stay to the extent it sought to suspend the HNGH Settlement. On July 17, 2023, the Fifth Circuit dismissed Barton's separate appeal of the Order approving the HNGH Settlement Agreement.

138. As of the date of this Declaration, certain ancillary matters in the Bankruptcy Court remain pending. Otherwise, the second $500,000 payment under the HNGH Settlement is due on or before May 15, 2024, with the remaining $1.5 million being paid over two payments thereafter.

**2. Mansions Apartment Homes at Marine Creek, LLC**

139. **Tracing.** At one time, Mansion Apartment Homes at Marine Creek, LLC ("Marine Creek") owned certain property along Shadydell Drive in Fort Worth, Texas (the "Marine Creek

Property"). Marine Creek sought to develop the Marine Creek Property into an apartment complex. I have traced Wall Investor Funds to Marine Creek and the Marine Creek Property, and an example of Wall Investor Funds being used to pay a loan acquired by Marine Creek and collateralized against the Marine Creek Property is attached as Exhibit 16.

140. **Background.** During the twelve months prior to my appointment (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida. In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

141. For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms and Winter Haven:

- $800,000 on March 14, 2022 to Mansions Apartment Homes at Marine Creek, LLC
- $500,000 on March 14, 2022 to Orchard Farms Village, LLC
- $200,000 on May 6, 2022 to Mansions Apartment Homes at Marine Creek, LLC
- $2,000,000 on May 9, 2022 to AVG West, LLC (Winter Haven)

142. Although my accountants still have not completed their forensic accounting, the majority of the above-described funds flowed into a bank account at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC. Notably, a bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings account to Barton's law firms.

143. Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales.[18] I am still investigating and analyzing the potential value of participation interests related to the Killeen and San Antonio properties. While it is impossible to predict the value these contractual interests may ultimately generate, I am optimistic that some value will be realized.

144. As detailed more fully in my Verified Motion to Ratify Agreement with DLP Capital and Other Entities [Dkt. 95], in late 2021, Orchard Farms Village, LLC and Mansions Apartment Homes at Marine Creek, LLC sold certain properties in Fort Worth (Orchard Farms and the Mansions at Marine Creek) and AVG West, LLC sold property in Florida (Winter Haven) to DLP Capital. As part of these transactions, the Receivership Entities (1) received several million dollars over a period of months, (2) transferred title to the properties, and (3) as to each of the Fort Worth properties, entered into a Construction Agreement, a Development Agreement, and a Participation Agreement. On October 18, 2022, the same day that I was appointed, DLP Capital sent default notices to the involved Receivership Entities regarding their obligations under the Construction Agreement and Development Agreement. After a meeting between counsel and protracted settlement negotiations, DLP Capital and I eventually agreed to a mutual release of claims and a payment of $750,000 from DLP Capital to the Receivership Estate. The Court entered an Order ratifying the DLP agreement over Barton's objection, and also denied Barton's motion to stay my performance of the DLP agreement. Dkt. 109.

145. Barton filed an interlocutory appeal of this Order. Case No. 22-11242. As of the filing of this Declaration, briefing in the DLP Appeal is ripe, and oral argument has been calendared for October 2, 2023. Because the order subject to the appeal was entered based upon

[18] I have seen no evidence that a participation agreement exists for AVG West, LLC.

a motion that I filed, I attempted to intervene and file a motion to dismiss based on the absence of interlocutory appellate jurisdiction. The Fifth Circuit denied the motion to intervene but allowed me to file as an amicus a motion to dismiss for lack of jurisdiction.

### 3. Orchard Farms Village, LLC

146. **Tracing.** At one time, Orchard Farms Village, LLC owned certain property near Everman Parkway in Fort Worth, Texas (the "Orchard Farms Property"). Wall007, LLC initially purchased the Orchard Farms Property using Wall Investor Funds and later transferred the property to Orchard Farms Village, LLC. An example of Wall Investor Funds used to purchase the Orchard Farms Property is attached as Exhibit 17.

147. **Background.** See discussion of Mansions at Marine Creek, *supra*.

### 4. AVG West, LLC[19]—Winter Haven

148. **Tracing.** At one time, AVG West, LLC owned certain property in Winter Haven, Florida (the "Winter Haven Property"). The Winter Haven Property was originally acquired by JMJ Acquisitions, LLC, which later became AVG West, LLC. Wall Investor Funds have been traced to the Winter Haven Property, and examples of Wall Investor Funds being used to purchase the Winter Haven Property are attached as Exhibit 18.

149. **Background.** See discussion of Mansions at Marine Creek, *supra*.

### 5. D4KL, LLC—Killeen

150. **Tracing.** At one time, D4KL, LLC owned certain property along Rosewood Drive, in Killeen, Texas (the "Rosewood Property"). JMJ Acquisitions, LLC initially purchased the Rosewood Property and then transferred it to D4KL, LLC. Wall Investor Funds were used to purchase the Rosewood Property. A diagram of this transaction is attached as Exhibit 19.

---

[19] AVG West, LLC was formerly known as JMJ Acquisitions, LLC.

151. **<u>Background.</u>** See discussion of Mansions at Marine Creek, *supra*.

**6. Villita Towers, LLC and 126 Villita, LLC**

152. **<u>Tracing.</u>** At one time, Villita Towers, LLC and 126 Villita, LLC owned certain property near Villita Street in San Antonio, Texas (the "Villita Property"). The Villita property was purchased and developed, in part, using Wall Investor Funds. An example of such a transaction showing Wall Investor Funds being used to purchase the Villita Property is attached as Exhibit 20.

153. **<u>Background.</u>** In 2017, JMJ Acquisitions, LLC contracted to purchase the Villita Property. At some point, Villita Towers, LLC and 126 Villita, LLC acquired interests in the property. On or around December 31, 2021, the Villita Property was then sold by Villita Towers, LLC and 126 Villita, LLC. For additional information, *see* discussion of Mansions at Marine Creek, *supra*.

**7. BM318, LLC—Bear Creek**

154. **<u>Tracing.</u>** At one time, BM318, LLC ("BM318") owned property near Bear Creek Road in Aledo, Texas, which was referred to as the Bear Creek Ranch. Wall Investor Funds have been traced to the Bear Creek Ranch. An example is attached as Exhibit 21, showing Wall Investor Funds transferred to BM318, LLC. These funds were then transferred to a title company for the purchase of the Bear Creek Ranch.

155. **<u>Background.</u>** BM318 purchased a tract of land from Dixon Water Foundation ("Dixon") with a $2 million down payment and a seller-financed note of $33 million held by Dixon. BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon. BM318 then filed Chapter 11 bankruptcy and the Bankruptcy court confirmed the plan on August 2, 2021. After the Court approved the Chapter 11 plan, BM318 filed an adversary proceeding against Dixon alleging the special warranty deed was a preferential or fraudulent transfer, and also filed a lis pendens. Dixon filed a counterclaim requesting that if the Court determines the

transfer was void to find that Dixon still has a lien on the property. During the pending bankruptcy in the related case, but several months before the adversarial proceeding was filed, Lumar Land and Cattle, LLC ("Lumar") bought a 204 acre tract of land from Dixon. The land later became part of the adversarial proceeding between BM318 and Dixon. Lumar then contracted to sell part of the land and the lis pendens was discovered causing the sale to fall through. After discovering the lis pendens, Lumar sought, and was granted, permission to intervene in the adversarial proceeding and asserted it was a good faith purchaser and that the lis pendens is an incorrect cloud on its title. I have negotiated a partial settlement with Dixon and Lamar and also attended a mediation..

**8. LC Aledo TX, LLC—Lost Creek**

156. **Tracing.** At one time, JMJ Acquisitions, LLC entered into negotiations to purchase certain property in Aledo, Texas commonly referred to as the Lost Creek Golf Course. During negotiations, JMJ Acquisitions, LLC brought Wall010, LLC into the transaction. Wall010 then assigned certain rights to a newly formed entity, LC Aledo ("LC Aledo"). Wall Investor Funds were used to provide certain earnest money payments and loans for the Lost Creek Golf Course. An example of Wall Investor Funds being used for the purchase of the Lost Creek Golf Course is attached as Exhibit 22.

157. **Background.** LC Aledo, holds a $300,000 note secured by a Deed of Trust on the Lost Creek Golf Course. The sellers of the Lost Creek Golf Course initiated a lawsuit to set aside a prior foreclosure by the Wall010, LLC. The seller contends it can sell the property free and clear of the Wall Note based on that foreclosure. LC Aledo, LLC, Wall010, LLC, and JMJ Acquisitions, LLC's counterclaims for breach of contract and fraud in connection with real estate are pending.

**9. Seagoville Farms, LLC**

158. **Tracing.** At one time, Seagoville Farms, LLC ("Seagoville Farms") owned certain property in Seagoville, Texas (the "Seagoville Property"). Seagoville Farms purchased the

Seagoville Property using, in part, Wall Investor Funds. An example of Wall Investor Funds being wired to a title company for the purchase of the Seagoville Property is attached as Exhibit 23.

159. **Background.** On or about May 2, 2017, Seagoville Farms purchased 89 acres in Seagoville, Texas, referred to as the Seagoville Property. Seagoville Farms held the property until July 2018 when it sold the Seagoville property to a third party.

**10. JMR100, LLC**

160. **Tracing.** At one time, JMR100, LLC ("JMJR100") owned certain property near White Settlement Road in Aledo, Texas (the "JMR100 Property"). Wall Investor Funds have been traced to JMR100, LLC and the JMR100 Property. An example of Wall Investor Funds being wired to a title company to purchase the JMR100 Property is attached as Exhibit 24.

161. **Background.** On or about February 2, 2019, JMR100 purchased approximately 100 acres near White Settlement Road in Aledo, Texas. JMR100 held the property until July 2021 when it sold the JMR100 Property to a third party.

* * * *

162. In sum, the following entities previously held real property that received Wall Investor Funds, and currently hold contractual or legal rights related to those properties and sales proceeds and thus would be appropriately included within a new receivership order:

- 2999TC Acquisitions, LLC;
- AVG West, LLC;
- BM318, LLC;
- D4KL, LLC;
- JMR100, LLC;
- LC Aledo TX, LLC;

- Mansions Apartment Homes at Marine Creek, LLC;
- Orchard Farms Village, LLC;
- Seagoville Farms, LLC; and
- Villita Towers, LLC.

**D. Initial Receivership Entities Claimed by Max Barton**

163. As discussed above, in the initial Receivership Order the Court placed in receivership certain specifically listed entities, as well as "any other entities that Barton directly or indirectly controls . . ." [Dkt. 29, ¶ 1]. On November 1, 2022, I filed a Motion to Supplement Order Appointing Receiver, submitting evidence that more than 130 additional entities were included within the scope of the Receivership Order because they were controlled "directly or indirectly" by Defendant Barton and sought an Order supplementing the Receivership Order, *nunc pro tunc*. Maximilien Barton ("Max") objected to the Motion [Dkt. 53] and asserted at least five specific entities should be exempted: Gillespie Villas LLC, Venus59 LLC, TRTX Properties LLC, MXBA LLC, and Titan Investments LLC. The Court asked for additional briefing, and on November 30, 2023, I filed a Supplemental Brief [Dkt. 73] regarding the following Max-Barton related entities: (1) Gillespie Villas, LLC; (2) TC Hall, LLC; (3) Venus 59, LLC; (4) TRTX Properties, LLC; (5) MXBA, LLC; and (6) Titan Investments, LLC / Titan 2022 Investment, LLC.[20] While the Supplemental Brief and supporting Appendix [Dkt. 74][21] lay out in detail the reasons why those entities constituted Initial Receivership Entities, they should likewise be included in a new Receivership Order. Each of the entities is dealt with in turn.

[20] The Supplemental Brief also included discussion of Marine Creek SP, LLC and LC Aledo TX, LLC, which did not relate to Max Barton and are discussed elsewhere herein.

[21] The Supplement Brief [Dkt. 73] and Appendix [Dkt. 74] are once again incorporated by reference as if fully set forth herein.

### 1. Gillespie Villas, LLC

164. **Tracing.** Receivership Entity Gillespie Villas, LLC owns a residential/multi-family property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property"). The Gillespie Property was purchased using the proceeds of Wall Investor Funds received from the sale of the Marine Creek Property and the Winter Haven property, both of which were purchased using Wall Investor Funds. An example of Wall Investor funds being wired to a title company to purchase the Gillespie Property is attached as Exhibit 25. Additionally, on September 9, 2022, Broadview Holdings paid Stone Street Development LLC $15,000 for "Gillespie." On September 15, 2022, Broadview Holdings paid Texas Brand Bank $17,100 for "Cashier CK in the name of Gillespie Villas LLC." Checks from the Broadview account at Texas Brand Bank evidence similar and additional payments made by Broadview Holdings on behalf of Gillespie Villas. Gillespie borrowed $550,000 from a third-party lender, secured by real estate purchased by Gillespie with funds from Broadview Holdings, in the months following acquisition of that property with Broadview funds.

165. **Background.** On December 13, 2022, the Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity. Max Barton's appeal of the Second Supplemental Order is pending, and it remains to be seen how a new Receivership Order will impact that appeal. As referenced above, however, substantial funds were provided by Receivership Entity Broadview Holdings to purchase this property. Moreover, as detailed in my Supplemental Brief [Dkt. 73], Gillespie Villas should remain a Receivership Entity for a number of other reasons:

- It is a Texas entity formed April 18, 2022; uses 2999 Turtle Creek as its address, the location from which JMJ Development operated;
- MXBA, LLC is identified as the only member in Amended Company Agreement, executed April 28, 2022. Dkt. 53-1 at 33;

- ONE SF Residential, LLC, an entity Barton admits he controls. Dkt. 7-1, at 24; Dkt. 42 at 39], is the current manager, [Dkt. 53-1 at 69.

- The Certificate of Formation filed for the entity, on April 13, 2022, reflects MXBA, LLC and One SF Residential, LLC as the Governing Authority. Dkt. 74 at 118-120.

- Property owned by Gillespie Villas is subject to a lien held by Broadview Holdings, LLC, an entity that Barton admitted he controlled. Dkt. 7-1 at 24; Dkt. 74 at 121-140.

- On September 9, 2022, Broadview Holdings paid Stone Street Development LLC $15,000 for "Gillespie." Dkt. 74 at 141.

- On September 15, 2022, Broadview Holdings paid Texas Brand Bank $17,100 for "Cashier CK in the name of Gillespie Villas LLC." Checks from the Broadview account at Texas Brand Bank evidence similar and additional payments made by Broadview Holdings on behalf of Gillespie Villas, as if the two entities were one and the same. Dkt. 74 at 141-146.

- Gillespie borrowed $550,000 from a third-party , secured by real estate purchased by Gillespie with a loan from Broadview Holdings. Broadview subordinated its own loan in favor of the third party. Dkt. 74 at 147-156.

- Enoch Investments, LLC, an entity Barton admits controlling, [Dkt. 7-1 at 24; Dkt. 42 at 39], guaranteed the third-party loan.

166. During the Second Quarter of 2023, I secured the necessary appraisals and opinions of value on the Gillespie Property. These appraisals value the property at approximately $1,100,000. I have also received notices from the City of Dallas regarding needed repairs at the property, which were completed. The property remains in poor physical condition and, without extensive repairs, is unrentable. The Gillespie Property is subject to a single promissory note, with an account balance exceeding $600,000, meaning if the property were to sell today, prior to closing costs, it would result in a net benefit of approximately $500,000 to the Receivership.

**2. TC Hall, LLC**

167. **Tracing.** Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). Wall Investor Funds have been traced to the Hall Street Property. Shortly after Gillespie Villas closed the

purchase on the Gillespie Property (with Marine Creek proceeds received by Broadview Holdings), a third-party loan was provided to Gillespie Villas, LLC and collateralized against the Gillespie Property. The proceeds from this loan were then wired to a title company for purchasing the Hall Property. As diagram of this transaction is attached as Exhibit 26.

168. **Background.** The Court's December 13, 2022, Second Supplemental Order clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton. Once against Max Barton's appeal of the Second Supplemental Order is pending. Moreover, as detailed in my Supplemental Brief [Dkt. 73], TC Hall, LLC should remain a Receivership Entity for a number of other reasons:

- It was formed in Texas July 16, 2022; uses New Hampshire address. Dkt. 74 at 415-420.
- Sole member and manager is MF Container, LLC, a Delaware company, which in turn was formed July 11, 2022. Dkt. 74 at 418.
- In communications with a lender, Louisiana National Bank, the bank offered a loan to Enoch Investments, LLC (admittedly a Barton-controlled entity), or a TBD entity, but corresponded with Barton about the loan. Dkt. 74 at 421-423.
- On May 6, 2022, Broadview Holdings paid Commonwealth Title $100,000 for "Earnest Money Deposit for 3407 & 3409 N. Hall St." Dkt. 74 at 429.
- On May 25, 2022, Broadview Holdings paid Commonwealth Title $100,000 for "Earnest Money Deposit-3407 & 3409 N. Hall St." Dkt. 74 at 429.
- On July 25, 2022, Broadview Holdings paid Commonwealth Title $40,000 for "Earnest Money Deposit-3407 & 3409 N. Hall St." Dkt. 74 at 429-430.
- On August 9, 2022, Broadview Holdings paid Commonwealth Title $40,000 for "Extension for 3407 & 3409 N. Hall St." Dkt. 74 at 429.
- On or about August 24, 2022, TC Hall, LLC purchased property at 3407 and 3409 N. Hall Street Dallas, Texas. The purchase was funded, at least in part, by $545,806.40 received from Gillespie Villas, LLC, which in turn had borrowed $550,000 from a third party, after obtaining Barton's Guaranty on that loan and subordinating Broadview's lien on the collateral. Dkt. 74 at 429-430; 443; *see also id.* at 147-151.
- Barton controlled the flow of money on behalf of TC Hall as evidenced by an email from Barton to his attorney Randy Marx in which Barton provided instructions about where to

originate payments for the benefit of TC Hall. Dkt. 74 at 444-445.

- However, long before TC Hall was formed, and continuing after it was formed, Broadview Holdings, LLC and JMJ Development spent over $1.4M on the same Hall Street property. Dkt. 74 at 475-480.

169. As referenced above, the purchase of the Hall Property was funded, at least in part, by $545,806.40 received from Gillespie Villas, LLC, which in turn had borrowed $550,000 from a third party, after obtaining Barton's guaranty on that loan and subordinating Broadview's lien on the collateral (*i.e.*, the Gillespie Property). TC Hall, LLC also received not less than $1.4 million from Broadview Holdings, LLC and JMJ Development, both of which also received Wall Investor Funds in dense comingled transactions, but during the same time-frame each transferred funds to TC Hall. Substantial debt exists on this property, in the form of a loan from Louisiana National Bank. The most recent payoff statement I received for the Hall Property shows a recurring balance of over $4.2 million. During the second quarter of 2023, a broker that I retained listed the property for sale for the sum of $6,000,000. If the Hall Property were to sell for this amount, prior to closing costs and broker fees, the net value to the Receivership Estate would be $1,800,000.

**3. Venus 59, LLC**

170. Venus 59, LLC is the record owner of certain parcels of land located at 916 S. FM 157, Venus, TX; and 817 CR 214, Venus, TX (the Venus 59 Property"). While my accountants' efforts to trace Venus 59, LLC funds is ongoing, the attached examples, Exhibit 27, demonstrate that Venus 59, LLC was included in extensive commingling with other Initial Receivership Entities. Additionally, as referenced above, along with the other properties that form the Venus Development, Venus 59, LLC benefitted from extensive engineering and other pre-development expenses that benefitted the entire potential project.

171. **Background.** See discussion regarding Venus Development *supra*. Moreover, as detailed in my Supplemental Brief [Dkt. 73], Venus 59, LLC should remain a Receivership Entity because:

- It is a Texas entity formed June 1, 2020; uses Midway address.

- ONE SF Residential, LLC, an entity Barton admits he controls[22] [Dkt. 7-1, pdf p. 24; Dkt. 42, pdf p. 39], is the current manager, [Dkt. 53-1, pdf p. 69]. In an earlier Company Agreement, JMJ Residential, LLC (an entity also controlled by Barton) is identified as a Member. Dkt. 74 at 203-204.

- The Certificate of Formation filed for the entity, on April 13, 2022, reflects MXBA, LLC and One SF Residential, LLC as the Governing Authority.

- Form SF-4 filed with the IRS on June 11, 2022 lists Tim Barton as the sole member. Dkt. 74 at 167

- Officers identified in the Company Agreement were Max Barton as President, and Saskya Bedoya ("Bedoya") as Treasurer/Secretary. Dkt. 74 at 261.

- On September 15, 2022, Broadview Holdings paid $23,325.62 to Venus 59, LLC in reference to a loan. Dkt. 74 at 208.

- On August 31, 2021, Venus59 entered into a funding agreement with Daniel Crow, which provided that the funding agreement was "consented to by One SF Residential, LLC ("OSFR") (as the manager and a member of the Company) and MXBA, LLC ("MXBA") (collectively, "Members") as the members in the Company. Dkt. 74 at 209-261.

- Despite not being identified as an officer in the Company Agreement, on October 31, 2022, after the Receivership Order was entered, Barton resigned as an officer or agent. Dkt. 53-1, pdf p. 72.

### 4. TRTX Properties, LLC

172. The Court's December 13, 2022, Second Supplemental Order also clarified that TRTX Properties, LLC ("TRTX") is a Receivership Entity controlled by Defendant Barton. As detailed in my Supplemental Brief [Dkt. 73], TRTX should remain a Receivership Entity for a number of reasons:

---

[22] Although other documents also demonstrate Barton's control over One SF Resident, LLC, he also admitted his control. *See* Dkt. 74 at 157-59.

- It is a Texas entity, formed August 20, 2010 [Dkt. 53-1, pdf p. 115] uses Midway address. Dkt. 74 at 264.

- William Vance McMcMurry, an attorney who represented Barton and most Receivership Entities for many years and who officed at the Turtle Creek Property, was identified as the Managing Member in TRTX's Certificate of Formation. Dkt. 74 at 266. In 2015, the members were changed to Enoch Investments, LLC and Max Barton. App. 303. In later filings, TRWF, LLC was identified as a manager. [Dkt. 53-1, pdf p. 115] Barton admitted control over TRWF, LLC [Dkt. 7-1, pdf p. 24].

- A 2016 email from Barton to employee Bedoya instructed her to "make Max owner in TRTX and we will make him sign and then I will be added as guarantor" to follow instructions of Barton's attorney to facilitate refinancing debt owed by the entity. Dkt. 74 at 304.

- On July 7, 2020, TRWF, LLC was deleted as a manager, pursuant to an amendment, and replaced with the MXBA Trust. Dkt. 53-1, pdf page 116, 212.

- Tim Barton is the Grantor of the MXBA Trust, and his personal assistant and primary employee, Bedoya, is the Trustee. Dkt. 53-1, pdf. p. 119. Bedoya, through her attorney, has informed the Receiver that with respect to all entity business and transactions, she followed Barton's instructions. He was in control. Dkt. 74 at 3, ¶ 7.

- On October 4, 2022, in *In re FM 544 Park Vista, Ltd.*, Cause No. 17-34255-SGJ-11 and Cause No. 17-34274-SGJ-11, pending in the United States Bankruptcy Court for the Northern District of Texas, TRTX Properties, LLC and JMJ Development, Inc. filed a notice of appeal in which they identified Barton and counsel, McMurry as the "principals" of those entities. Dkt. 74 at 305-308.

- Timothy Barton signed the Statement of Change of Registered Office/Agent dated May 2, 2022, although he purportedly had no authority [on paper] over the entity on that date. Dkt. 74 at 310-311.

173. As the managing worker of Goldmark Hospitality, LLC, TRTX benefitted from Wall Investor Funds, as explained in Category "G" below.

### 5. MXBA, LLC

174. The Second Supplemental Order also lists MXBA, LLC as a Receivership Entity controlled by Defendant Barton. As detailed in my Supplemental Brief [Dkt. 73], MXBA, LLC should remain a Receivership Entity for a number of reasons:

- It is a Delaware corporation formed on August 24, 2020, Dkt. 53-1 at 160-212; uses Midway address.

- The Company Agreement identifies MXBA Trust as the only member, on behalf of which Max Barton signed as *President*. Max Barton is not the President of the MXBA Trust, however. He is the beneficiary, and as such lacks authority to sign anything on behalf of the trust. *Compare* Dkt. 53-1, pdf pgs. 169-170 (member signature for MXBA Trust is "Max Barton, President") *and* MXBA Trust, identifying Max as beneficiary and Saskya Bedoya as Trustee. Dkt. 53-1 at 119.

- Tim Barton is the Grantor of the MXBA Trust, and his primary employee and administrative assistant, Bedoya, is the Trustee. [Dkt. 53-1, pdf. p. 119]. As his employee, Barton controlled Bedoya and therefore also controlled the trust. *See* Dkt. 74 at Exs. A-3 (49-57), A-4 (58-62), A-5 (63-67) and A-13 (304).

175. As the managing member of Gillespie Villas, LLC, MXBA, LLC benefitted from Wall Investor Funds, as explained in Category "G" below.

**6. Titan Investments, LLC and Titan 2022 Investment, LLC**

176. The Second Supplemental Order also lists both Titan Investments, LLC and Titan 2022 Investments, LLC (collectively, "Titan Investments") as Receivership Entities controlled by Defendant Barton. Titan 2022 Investments, LLC is the name under which Titan Investments, LLC, a Delaware entity, is registered to do business in the State of Texas. The two entities are thus one and the same. As detailed in my Supplemental Brief [Dkt. 73], Titan Investments, LLC should remain a Receivership Entity for a number of reasons:

- Formed in Delaware on August 20, 2022 by Vance McMurry; uses 3600 Gillespie, property owned by Gillespie Villas, as its mailing address. Dkt. 74 at 318, 324.

- In formative documents, Max Barton is identified as Manager and the only officer. Dkt. 74 at 320, 324-25.

- Application of Registration filed in Texas on October 5, 2022, uses Titan Investments 2022, LLC as its name. Dkt. 74 at 324.

- On January 17, 2022, Barton signed a contract for Titan to purchase real estate, as Titan's President, although corporate records reflect that Max held that position as of that date. Dkt. 74 at 358-373.

- Tim Barton again signed a purchase contract on February 10, 2022 as President, although Max is listed as the only officer in the company documents. Dkt. 74 at 326-356.

- On January 12 and 18, 2022, on behalf of Titan Investments, Barton also signed two Letters of Intent for Titan to purchase property. Dkt. 74 at 348-356.

- Tim Barton signed resignation from role as signatory/agent *effective* October 6, 2022. [Dkt. 53-1, pdf p. 177]; Dkt. 74 at 357.

- On February 23, 2022, Titan contracted to purchase real estate from Patricia Butler. The earnest money and extension fees were provided by Broadview Holdings, LLC, during a time period in which Broadview received Wall Investor Funds and the proceeds of Wall Investor Funds. Dkt. 74 at 374-376.

177. Titan Investments also attempted to purchase multiple pieces of property using Broadview Holdings funds. Between September 1, 2021 and September 12, 2022, Broadview Holdings transferred no less than $175,000 to Byron Walker and TBW Land & Cattle in connection with Titan Investment's intended purchase of Walker and TBW property in Ennis, Texas. Several of these transfers from Broadview came from the proceeds of sales of properties that were acquired with or benefitted from Wall Investor Funds. For example, on May 9, 2022, Walker deposited a $30,000 "earnest money" check from Broadview Holdings. Just three days earlier, on May 6, 2022, Broadview had received $200,000 in proceeds from the sale of Marine Creek, which as outlined above, received Wall Investor Funds. Transfers to Walker from Broadview continued into September 2022, with Walker depositing payments of $25,000 (on September 9) and $10,000 (on September 12), a little over a month before my appointment.

* * * *

178. In sum, the following entities should be included in a new receivership order, despite any claim of ownership by Max Barton:

- Gillespie Villas, LLC
- MXBA, LLC
- TC Hall, LLC
- Titan Investments, LLC a/k/a Titan 2022 Investments, LLC

- TRTX Properties, LLC
- Venus 59, LLC

**E. Receivership Entities That Otherwise Received Wall Investor Funds.**

179. The entities listed below also received Wall Investor Funds, though not directly from Wall Investors. These entities either received funds directly from the Wall Entities' bank accounts, indirectly via other Receivership Entities that received Wall Investor Funds from the Wall Entities, or indirectly through proceeds of the sale of properties that were originally purchased with or benefitted by Wall Investor Funds. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records, I have traced Wall Investor Funds, indirectly, into the following entities:

- 126 Villita, LLC (also listed elsewhere herein)
- 2999TC JMJ CMGR, LLC (Delaware)
- Broadview Holdings Trust
- Broadview Holdings, LLC (Texas)
- Carnegie Development, LLC (also listed elsewhere herein)
- D4AVEG, LLC
- Enoch Investments, LLC
- HR Sterling, LLC
- JMJ Acquisitions, LLC (also listed elsewhere herein in discussion of AVG West, LLC)
- JMJ Development LLC (f/k/a JMJ Development, Inc.)
- JMJ VC Management, LLC
- JMJAV, LLC
- JMJD4, LLC (Delaware)

- LaJolla Construction Management, LLC

**F. Entities That Benefited From Wall Investor Funds by Receiving a Participation Interest in a Development That Had Received Wall Investor Funds.**

180. The entities listed below benefitted from Wall Investor Funds as the recipient of a participation interest in continuing developments that received Wall Investor Funds. As detailed above, my team traced Wall Investor Funds into the Marine Creek, Orchard Farms, Killeen, and Villita properties. The Initial Receivership Entities that owned each property sold their ownership interests in these developments for several million dollars prior to my appointment. However, in connection with the sales, Barton retained some form of participation interest in each of the projects, usually in the name of a wholly separate Initial Receivership Entity. These entities include:

- Marine Creek SP, LLC—Marine Creek;
- Orchard Farms Village, LLC (also listed elsewhere herein)—Orchard Farms;
- Enoch Investments, LLC (also listed elsewhere herein)—Killeen; and
- Villita Development LLC (Villita).[23]

**G. Entities That Benefited From Wall Investor Funds As a Managing Member or Owner of an Entity That Received Wall Investor Funds.**

181. The entities listed below benefitted from Wall Investor Funds by being the manager, member, or other owner of the entities listed above that received Wall Investor Funds. Through the chain of ownership, these entities received a benefit from Wall Investor Funds by their ownership (whether partial or complete) and control of the activities of entities that received Wall Investor Funds, and thus controlled the disposition of the Investor Funds. Because to date I still have not found any organizational or entity charts for the tangled web of Initial Receivership

[23] Villita Development LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

Entities, I have been forced to rely upon formation binders found in the Turtle Creek Office, records from the Texas Secretary of State and Delaware Secretary of State, prior tax returns, and purchase agreements, assignments, and other deal documents involving the Initial Receivership Entities, among other things. To date, I have located no evidence suggesting anyone other than Tim Barton owns or controls the below-listed entities. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records I have identified the following entities as owners or managers of entities that received Wall Investor Funds:

- 2999TC Acquisitions MZ, LLC f/k/a MO 2999TC MZ, LLC;[24]
- Carnegie Development, LLC (also listed elsewhere herein);[25]
- D4OPM, LLC (Texas);[26]
- Dallas Real Estate Investors, LLC;[27]
- Dallas Real Estate Lenders, LLC (Delaware);[28]
- Enoch Investments LLC (also listed elsewhere herein);[29]
- Five Star MM, LLC (Delaware);[30]
- Five Star MM, LLC (Texas);[31]

---

[24] Listed as sole member of MO 2999TC, LLC (2999TC Acquisitions, LLC) according to Turtle Creek Property closing binder.

[25] Listed as current manager of Wall Entities in multiple filings with the Texas Secretary of State. Also listed as manager of LDG001, LLC, Northstar PM, LLC, Ridgeview Addition, LLC, and Seagoville Farms, LLC.

[26] Listed as manager of D4OP, LLC, per Texas Secretary of State website.

[27] Listed as member of FHC Acquisition, LLC in one or more filings with the Texas Secretary of State. Also listed as manager of Dallas Real Estate Lenders, LLC in assignment document obtained from Texas Republic Bank.

[28] Listed as manager of FHC Acquisition, LLC in one or more filings with the Texas Secretary of State.

[29] Listed as holding 99% membership interest in JMJD4 according to D4DS, LLC, D4FR, LLC, and D4 IN, LLC Pledge and Security Agreements. Also listed as manager of 126 Villita, LLC in one or more filings with the Texas Secretary of State.

[30] Listed as managing member of Five Star TC, LLC, according to Turtle Creek Property closing binder.

[31] Listed as manager of DJD Land Partners, LLC in one or more filings with the Texas Secretary of State.

- Five Star TC, LLC (Delaware);[32]
- JMJAV, LLC (Texas) (also listed elsewhere herein);[33]
- JMJD4 LLC;[34]
- JMJ Residential, LLC;[35]
- MF Container, LLC (Delaware);[36]
- MXBA LLC (also listed elsewhere herein);[37]
- MXBA Trust (also listed elsewhere herein);[38]
- Northstar PM, LLC (Texas);[39]
- One MFD4, LLC;[40]
- One Pass Investments, LLC (Delaware);[41]
- ONE MF Residential, LLC;[42]

[32] Listed as sole member of MO 2999TC MZ, LLC (2999TC Acquisitions MZ, LLC) according to Turtle Creek Property closing binder.

[33] Listed as manager of JMJD4, LLC in one or more filings with the Texas Secretary of State.

[34] Listed as manager of D4AVEG, LLC, D4DS, LLC, D4FR, LLC, D4IN, LLC, D4KL, LLC, D4OP, LLC, and Villita Towers LLC in multiple filings with the Texas Secretary of State.

[35] Listed as manager of Orchard Farms Village LLC and Venus59 LLC in multiple filings with the Texas Secretary of State.

[36] Listed as manager of TC Hall, LLC. MF Container, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders

[37] Listed as manager of Gillespie Villas, LLC in one of more filings with the Texas Secretary of State.

[38] Listed as replacing TRWF LLC as manager of TRTX Properties LLC around July 31, 2020 according to filings with the Texas Secretary of State.

[39] Listed as manager for Five STAR MM, LLC in one or more filings with the Texas Secretary of State. Northstar PM, LLC (Texas) was not previously listed on the Receivership Order or either of the Supplemental Orders

[40] Listed as Manager of D4OPM, LLC, D4DS, LLC, and D4IN, LLC in multiple filings with the Texas Secretary of State.

[41] Listed as manager of FHC Acquisition LLC, Five Star MM, LLC, LC Aledo TX, LLC, One MFD4, LLC, ONE SF Residential, LLC, SF Rock Creek, LLC, TRWF Lodge, LLC in multiple filings with the Texas Secretary of State.

[42] Listed as manager of Mansion Apartment Homes at Marine Creek LLC in one or more filings with Texas Secretary of State. ONE MF Residential LLC was not previously listed on the Receivership Order or either of the Supplemental Orders

- ONE SF Residential, LLC;[43]
- TLB 2018 Trust;[44]
- TRTX Properties, LLC (also listed elsewhere herein);[45]
- TRWF, LLC; and[46]
- TRWF Lodge, LLC.[47]

### H. Trusts that Benefitted from Wall Investor Funds.

182. The trusts listed below benefited from the Wall Investor Funds by holding the ultimate beneficial interests in entities that hold or held property purchased with or benefitted by Wall Investor Funds. Similar to the prior category, these entities received a benefit by controlling or otherwise benefitting from the activities of entities that received Wall Investor Funds, for instance, through entitlement to direct, directly or indirectly, the use and disposition of entities or properties purchased with Wall Investor Funds or the proceeds of Wall Investor Funds. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records I have identified the following trusts as owners, managers, or otherwise holding beneficial interest in entities that received Wall Investor Funds:

- One RL Trust;[48]

---

[43] Listed as manager of AVG West, LLC, BM 318 LLC, JMJAV, LLC, JMR100 LLC, LaJolla Construction Management LLC, Orchard Farms Village LLC, Villita Towers LLC, and Venus59, LLC in multiple filings with the Texas Secretary of State.

[44] Listed as manager of SF Rock Creek, LLC in one or more filings with the Texas Secretary of State. Listed as member of 2999TC JMJ MGR, LLC on account formation documents.

[45] Listed as manager of Goldmark Hospitality LLC in one or more filings with the Texas Secretary of State.

[46] Listed as manager of Wall Entities at inception. Also listed as manager of Goldmark Hospitality LLC, JMJAV LLC, JMR100 LLC, Seagoville Farms, LLC, and TRTX Properties LLC in one or more filings with the Texas Secretary of State.

[47] Listed as manager of AVG West, LLC, BM318, LLC, JMJ Holding US, LLC, and Mansions Apartment Homes at Marine Creek LLC in multiple filings with the Texas Secretary of State.

[48] The One RL Trust is the owner, manager, or otherwise holds an ultimate beneficial interest in the following entities: 126 Villita LLC, 2999 TC Acquisitions LLC, 2999TC JMJ CMGR LLC, 2999TC JMJ Equity LLC, 2999TC MM

- TLB 2018 Trust (also listed elsewhere herein);[49]
- TLB 2019 Trust;[50]
- Broadview Holdings Trust (also listed elsewhere herein);[51] and
- MXBA Trust.[52]

183. Trust agreements generally are not filed as of public record, and much of the information has been gleaned from prior tax returns, discovered only through tax year 2019. I have found evidence of additional trusts controlled by Defendant Barton, but to date I have been able to locate the trust agreements or what assets would be subject to the trust. Accordingly, the following trusts would fall within the description of Category K below:

- TLB 2020 Trust;
- Middlebury Trust;
- The Timothy L. Barton Irrevocable Life Insurance Trust; and
- TLB 2012 IRR Trust.

---

LLC, 2999TC MZ LLC, AVG West LLC, Enoch Investments LLC, Five Star MM LLC, JMJ Acquisitions Mgmt LLC, ONE FHC LLC, One Pass Investments LLC, Orchard Farms Village LLC, TRWF LLC, Venus59 LLC, VenusBK195 LLC, and VenusPark201 LLC.

[49] The TLB 2018 Trust is the owner, manager, or otherwise holds an ultimate beneficial interest in the following entities: 2999TC JMJ LLC, 2999TC JMJ CMGR LLC, Dallas Real Estate Investors LLC, JMJ Hospitality LLC, One Pass Investments LLC, and TRWF LLC.

[50] The TLB 2019 Trust is the owner, manager, or otherwise holds an ultimate beneficial interest in the following entities: Carnegie Finance LLC and CYNKFP LLC.

[51] The Braodview Holdings Trust is the owner, manager, or otherwise holds an ultimate beneficial interest in Carnegie Development Inc.

[52] The MXBA Trust is the owner, manager, or otherwise holds an ultimate beneficial interest in MXBA LLC.

### I. Entities That Benefited from Association With Entities That Received Wall Investor Funds and Received a Small Business Administration Loan.[53]

184. The entities listed below benefited from the Wall Investor Funds by receiving an SBA loan dependent on these Entities' association with other Initial Receivership Entities that received Wall Investor Funds. Many of these entities received loans of $150,000, and all but one received a loan over $100,000. Except for JMJD4Allensville and the entities listed in the footnote below, these entities have no apparent revenue and provide no services. Yet, to receive SBA loans, representations regarding the financial health of the other entities under Barton's control and collateral (preferably real estate) would be required.[54] After these entities received their SBA loans, the funds were transferred, almost immediately, to other Barton controlled entities that received Wall Investor Funds. Using the Financial Records, the Initial Receivership Entities' business records, and Receivership Estate business records I have identified the following entities as receiving a benefit from their association with the Wall Entities and entities that received Wall Investor Funds:

- BEE2019, LLC;
- D4AT, LLC;
- D4BM, LLC;
- D4MC, LLC (Texas);
- JMJ Holdings USA, Inc.;
- JMJ Holdings, LLC;
- JMJ Home Building Inc (Nevada);

[53] The following entities also received a Small Business Administration loan but are listed under other categories: 126 Villita LLC; 2999TC Acquisition LLC; BM 318 LLC; D4FR LLC; D4IN LLC; D4KL LLC; D4OP LLC; JMJAV LLC; Lajolla Construction Management LLC; TRWF LLC; Villita Towers LLC; Wall009 LLC; and Wall018 LLC.

[54] *See* https://www.sba.gov/funding-programs/disaster-assistance/economic-injury-disaster-loans, listing eligibility requirements for SBA loans and providing link to application.

- JMJ Regional Center, LLC (Delaware);
- JMJD4Allensville LLC;
- JMJKH, LLC;
- MV9490 Land Lot, LLC;[55]
- SK Carnegie, LLC; and
- WRL2019, LLC (Texas).

185. While these entities very possibly only have liabilities (*i.e.*, an SBA loan), and may not have assets, EIDL loans require collateral (typically real property) to qualify for any loan. Accordingly, if not included in a new receivership order, freezing the operation, ownership, and assets of these Entities would preserve the status quo and allow additional time to investigate the collateral used by these Entities to obtain their SBA loans.

**J. Entities That Received a Nominal Amount of Funds from Other Entities That Received Wall Investor Funds.**

186. The entities listed below own at least one bank account that received a nominal amount of funds (generally around $100) from Initial Receivership Entities that received more substantial amounts of Wall Investor Funds. Based on my review of the records for these entities, each engaged in limited transactions involving small dollar amounts. Because tracing such small dollar amounts is difficult, at this time I cannot definitively say that these entities received Wall Investor Funds. These entities, however, were funded at least in small part, and benefited from entities that received Wall investor Funds. Additionally, because these entities have similar names to entities that benefitted immensely from the Wall Investor Funds and the entity structures of all entities that received Wall Investor funds are not yet fully known.[56] If not included as Receivership

[55] MV9490 Land Lot, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[56] Barton refused to provide an organizational chart or other description of the management, structure, and ownership of any entities he controlled.

Entities, freezing the operation, ownership, and assets of each would allow a continued investigation without disturbing the status quo.

- 2999TC JMJ MGR, LLC (Delaware);
- 2999TC LP, LLC (Delaware);
- 2999TC MZ, LLC (Delaware);
- Carnegie Finance, LLC;[57]
- D4SMC, LLC;
- D4WP, LLC;
- JMJ Aviation, LLC (Texas);
- JMJ Holding US LLC; and
- JMJ Multifamily, Inc (Nevada).

**K. Receivership Entities That Are Registered Agents.**

187. A limited number of Initial Receivership Entities served as registered agents for other Initial Receivership Entities (the "Registered Agent Entities"). The Registered Agent Entities either share the same paid mailbox as the other Receivership Entities or used the Amerigold Suites as their address. The Registered Agent Entities pay annual fees to the states in which they operate (Texas and Delaware). Moreover, the Registered Agent Entities did not have independent employees, but rather shared employees with the overall enterprise, employees who were paid by Receivership Entity HR Sterling LLC and thus, at least in part, with Wall Investor Funds. The Registered Agent Entities include:

- One Agent Texas, LLC (Texas LLC);
- One Agent, LLC (Delaware LLC); and

[57] Carnegie Finance, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

- TRWF Lodge, LLC (Texas LLC) (also listed elsewhere herein).

**L. Entities that Appear to Be Part of the Barton-Controlled Enterprise but Require Further Investigation.**

188. Finally, a host of entities exist for which documentation in the Turtle Creek Office or on the Texas Secretary of State's website indicates Barton's control or ownership but to which my team has not yet traced Wall Investor Funds. Lack of tracing to date does not mean that Investor Funds did not flow into these entities, since we have focused to date on entities holding assets and for which the Financial Records or Business Records demonstrated the most involvement with or readily identifiable receipt of Wall Investor Funds. My forensic accounting is ongoing. Indeed, I suspect that based on the payments to the Texas and Delaware Secretaries of State to form each of these entities even the formation was paid for with commingled Wall Investor Funds. Some of these entities may never have operated. Others may be holding companies in the chain of ownership for other Initial Receivership Entities or properties listed above. Since I do not have organization charts for the 160+ entities listed herein, and since to date Barton has refused to meet with me or provide information regarding the structure of his entities, I do not currently have sufficient information to confirm whether any of the below entities own assets or hold beneficial ownership positions in other Initial Receivership Entities that hold assets acquired with or benefitted by Wall Investor Funds. At the same time, because I likewise do not have sufficient information to rule out that any of these Entities received or benefitted by Wall Investor Funds, freezing each of the following entities would preserve any assets owned by these entities and preserve the status quo while allowing time for further investigation:

- 2999 Acquisitions, LLC (Delaware);
- 2999 Middlebury, LLC (Delaware);
- 2999 Roxbury, LLC (Delaware);
- 2999TC Founders, LLC (Delaware);

- 2999TC JMJ Equity, LLC;
- 2999TC JMJ, LLC (Delaware);
- 2999TC JMJ, LLC (Texas);
- 2999TC MM, LLC;
- AVEG WW, LLC (Delaware);
- Barton Texas Water District, LLC;
- Barton Water District, LLC (Delaware);
- BC Acquisitions, LLC (Delaware);
- BSJ Trading, LLC;
- BUILD VIOLET, LLC;
- Condo Towers GP, LLC;[58]
- CYNKFP, LLC;[59]
- D4BR, LLC (Texas);
- Dallas Real Estate Management, LLC;
- Five Star GM, LLC (Delaware);
- Food & Leverage Real Estate, LLC (Delaware);[60]
- Glenwood (18340) Property, LLC (Delaware);
- Illuminate Dallas, LLC (Texas);
- JB Special Asset, LLC;
- JMJ Acquisitions Mgmt, LLC;
- JMJ Blues, LLC (Texas);[61]
- JMJ BLUES TX, LLC;
- JMJ Centre, LLC;
- JMJ Development Brasil, LTDA;
- JMJ Development Fund;
- JMJ Development Fund, Inc.;

[58] Condo Towers GP, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[59] CYNKFP, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[60] Food & Leverage Real Estate, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[61] JMJ Blues, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

- JMJ EB5 Fund GP, LLC (Delaware);
- JMJ EB5 Fund, LP (Delaware);
- JMJ Hospitality General Trading FZE;
- JMJ Hospitality UAE;
- JMJ Hospitality, LLC;
- JMJ Investments Limited;
- JMJ Land Acquisition, Inc (Nevada);
- JMJ Land Development, Inc (Nevada);
- JMJ Land Venture, LLC;
- JMJ Mezzanine, Inc (Nevada);
- JMJ MF Development, LLC;
- JMJ Offshore, LTD;
- JMJ-Towers, LLC (Texas);[62]
- JMJ Valley Center, LLC;
- JMJ148, LLC (Texas);
- JMJDWG, LLC (Texas);
- Lynn Investments, LLC;
- MCFW, LLC;
- MCRS2019, LLC (Texas);
- MMCYN, LLC;
- MV9490, LLC;[63]
- MV9490 Management, LLC;[64]
- MXBA Managed, LLC;
- MXBA Services, LLC;
- Myra Park 635, LLC;
- Northstar 114, LLC (Delaware);
- Northstar PM, LLC (Delaware);

[62] JMJ-Towers, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[63] MV9490, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[64] MV9490 Management, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

- ONE FHC, LLC (Texas);
- Residential MF Assets, LLC (Delaware);
- Rhino Stainless US, LLC;[65]
- Riverwalk Invesco, LLC (Delaware);
- Riverwalk Opportunity Management, LLC (Delaware);
- Riverwalk OZFM, LLC (Delaware);
- Riverwalk OZFV, LLV (Delaware);
- Riverwalk QOZBJ, LLC (Delaware);
- Riverwalk QOZBM, LLC (Delaware);
- Riverwalk QOZBV, LLC (Delaware);
- STL Park, LLC (Delaware);
- Tarm Carnegie, LLC (Texas);[66]
- Tarm Carnegie Management, LLC (Delaware);[67]
- The Towers Condominium Partners Ltd.;[68]
- VenusBK195, LLC (Texas); and
- VenusPark201, LLC (Delaware).

189. Finally, to the extent the Court determines that any of the entities listed in sub-parts A-K above are not appropriately included as new Receivership Entities, including such entities in an asset freeze would likewise preserve potential Barton-controlled assets and preserve the status quo, while allowing additional time for further investigation.

## V. Analysis of *Netsphere* Factors

190. The Receivership Entities listed above in Categories A through K received or benefitted from assets traceable to Barton's activities that are the subject of the SEC's claims

[65] Rhino Stainless US, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[66] Tarm Carnegie, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[67] Tarm Carnegie Management, LLC was not previously listed on the Receivership Order or either of the Supplemental Orders.

[68] The Towers Condominium Partners Ltd. was not previously listed on the Receivership Order or either of the Supplemental Orders.

against him. *See* Op. at 11. Moreover, a new receivership order is justified because (a) protecting defrauded investors and creditors' interest in limited property is a clear necessity; (b) legal and less drastic equitable remedies are inadequate; and (c) the benefits of a new receivership order outweigh the burdens on affected parties. *See* Op. at 7 (citing *Netsphere v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012)). This Court has already found that these three factors are satisfied. *See* Order Denying Motion to Stay [Dkt. 132]. In the event this Court revisits its prior rulings regarding these issues, each of these *Netsphere* factors is discussed below.

**A. Clear Need for a Receivership to Protect Investor Assets**

**1. Contrary to Barton's Assertions, Insufficient Assets Exist to Satisfy All Wall Investor Claims, Let Alone All Creditor Claims.**

191. A new receivership order is necessary to ensure that funds are available to pay the victims of Barton's charged securities violations. As detailed in my prior Status Reports and elsewhere herein, upon my appointment in October 2022, less than $75,000 remained in the Initial Receivership Entities' bank accounts and multiple properties had been either posted for foreclosure or faced imminent loan defaults and potential foreclosure proceedings. Indeed, as outlined above, with the exception of the Gillespie Property, every other piece of real estate owned by the Initial Receivership Entities is subject to sizeable debt. But–for the initial Receivership Order's stay of foreclosures on these properties and my extensive efforts to mollify secured creditors' concerns because of the Receivership Entities' lack of cash flow both before and after my appointment, foreclosures would have eliminated millions of dollars in property value otherwise available for satisfaction of Investor claims.

192. In various filings, Barton has suggested that the sale of one, two, or three of the HUD Apartments described above would result in the recovery of sufficient funds to pay a 100% recovery to the Wall Investors, and thus a receivership over all of the Initial Receivership Entities

was not necessary. However, Barton's contention not only ignores SPC's arguments regarding SPC's equity position in the properties—if SPC is correct, the Receivership will not recover any money from the sale of any of the four HUD Apartments—but, even assuming that SPC's loans are treated as debt, ignores the sizeable HUD and SPC debt on the properties. Barton also ignores the non-Wall creditors, many of whom also claim to be the victims of fraud and who will thus participate in a new receivership's eventual claims process. These creditors account for at least $10,000,000 in additional investor/creditor claims. Finally, as discussed above, contrary to prior assertions regarding the use of sale proceeds from these properties, Barton now contends he, individually, should receive the proceeds from the sale of any HUD Apartments.

193. If this Court ultimately decides that SPC owns the D4 Entities, the Receivership will receive no proceeds from the HUD Apartments or a sale of those properties. Similarly, if Barton succeeds in obtaining control of the HUD Apartments because of a purported lack of tracing, the Receivership will receive $0 for these properties.

194. As outlined above, estimating with any degree of certainty what type of recovery will be available from the sale of the other real estate assets is difficult.[69] As of the date of this Declaration, I have not been able to close on any sale of real property owned by any Initial Receivership Entity. The ultimate proceeds from these sales is thus likewise uncertain. Nonetheless, assuming that I was able to sell and close all sales of all properties in the Receivership Estate today,[70] my estimate of the net funds flowing into the Receivership Estate is less than the SEC's allegation of $26 million in Wall Investor Funds owed by Defendant Barton:

[69] It is similarly not possible to predict what proceeds may flow into the Receivership Estate from the recovery of fraudulent transfers.

[70] Again, I have not yet closed on any sale because of the incessant roadblocks and challenges described above.

| Property Owner | Estimated Recovery[71] |
|---|---|
| SF Rock Creek, LLC | Less than $300,000 |
| FHC Acquisition, LLC | $2,000,000 |
| D4DS, LLC | $5,100,000 |
| D4FR, LLC | $7,500,000 |
| D4IN, LLC | Less than $2,500,000 |
| D4OP, LLC | Unknown |
| Goldmark Hospitality, LLC | $2,500,000 |
| Venus Development | Unknown |
| Ridgeview Addition, LLC | Less than $250,000 |
| Gillespie Villas, LLC | Less than $500,000 |
| TC Hall, LLC | Less than $1,800,000 |
| 2999TC Acquisitions, LLC | $2,500,000 |
| Mansions Apartment Homes at Marine Creek, LLC | $750,000 |
| Orchard Farms Village, LLC | See above |
| AVG West, LLC | $0 |
| D4KL LLC | Unknown |
| Villita Towers, LLC | Unknown |
| BM318, LLC | Unknown |
| JMR100, LLC | Unknown |
| LC Aledo TX, LLC | Unknown |
| Seagoville Farms, LLC | Unknown |
| **Total:** | **$25,700,000** |

195. These amounts do not account for the costs of establishing and managing a claims process, paying for the forensic accounting, costs related to maintenance and sale of realty, and paying additional costs of administration, including legal fees—which include the costs in responding to Defendant Barton's objections and prolific appellate practice, even for interlocutory orders for which no jurisdiction exists—and accounting fees. These expenses and fees will be substantial.

196. If the HUD Apartments are included in a new Receivership Order based on the tracing and benefit analysis above, Receivership Assets are likely insufficient to repay the Wall

[71] These numbers are estimates, based on existing contracts; discussions with brokers, purchasers, or prospective purchasers; market conditions (which continue to change); my knowledge of existing liens and encumbrances; and other similar but related factors.

Investors in full, let alone the Wall Investors plus at least $10 million in additional creditor claims. If the HUD Apartments are not included in a new Receivership Order, I estimate that a maximum of $9,700,000 would be recovered, some of which would be used for administering the Estate rather than returned to investors and creditors. While I am hopeful that I will recover some fraudulent transfers made by the Receivership Entities, as of today (1) the amount of these claims, (2) the viability of the transferees' potential good faith and reasonably equivalent value defenses, and (3) the transferees' financial ability to repay any amounts is wholly unknown.

**2. Barton Refused to Account for the Use and Disposition of Wall Investor Funds or Provide Information as Compelled by the Court**

197. Barton's demonstrated unwillingness to follow court orders and cooperate with my efforts to trace the use and disposition of Wall Investor Funds provides a further basis for the necessity of a new receivership order. As the Court is aware, the Receivership Order imposed broad and comprehensive disclosure requirements on Barton individually, as well as in his capacity as the primary officer for most of the Initial Receivership Entities. For instance, the Receivership Order required Barton as an officer of the Initial Receivership Entities, to:

- Preserve and turnover to me as Receiver, all books, records, accounts and papers related to the Initial Receivership Entities. Dkt. 29, ¶ 7; 14;
- File with the Court a sworn statement identifying, by item, location and value all Receivership Property, names and contact information for all employees, and the names and relevant information for Initial Receivership Entity creditors; ¶ 8;
- File with the Court a sworn statement and accounting of all Initial Receivership Entity property, including bank accounts and related signatory and owner information; ¶ 9;
- Turnover to me copies of all Initial Receivership Entity tax returns for 2017-2021; ¶ 10;
- Answer under oath my questions and produce documents related to the Initial Receivership Entities' operations; ¶ 11; 33
- Provide a sworn statement regarding the location of access information for all keys, entry codes and passwords necessary to access Initial Receivership Entity records, premises and data; ¶ 18;

198. As discussed in my Motion to Compel [Dkt. 133] Barton did not comply with these disclosure obligations. The Court found Barton in contempt for his violations of these, and other provisions. *See* May 15, 2023 Order Granting Motion to Compel [Dkt. 235]. Coercive sanctions are accruing, although Barton contends he is unable to pay them, or the compensatory sanctions that were also awarded. *See* Notice of Non-Compliance [Dkt. 243].

### 3. Barton's Use and Disposition of Wall Investor Funds

199. Despite Barton's lack of compliance and cooperation, I discovered that prior to my appointment, but for at least a significant period of time including while he was aware of the SEC's investigation, Barton was spending, secreting, and using Investors Funds for a multitude of purposes wholly unrelated to the real estate investments for which the Wall Investor Funds were invested. Barton's historical use of Wall Investor Funds to, among other things, pay for personal expenses, loans and other expenses on other properties, and pay for other Initial Receivership Entities' operating expenses demonstrates his lack of trustworthiness and a third reason why a new receivership order is necessary.

200. Barton's misuse of Wall Investor Funds continued right up to my appointment in October 2022. After the SEC filed its compliant on September 23, 2022, Barton spent no less than $225,000 of Wall Investor Funds—received through the sale of Villita Towers—to pay attorneys, including $75,000 to his current attorneys Hunton Andrews; purchase a cashier's check in the amount of $30,200 from Texas Brand Bank in the name of LDG001; and wired $42,000 from a Broadview Holdings account at Texas Brand Bank to D4OP—the entity that owns an apartment complex in Opelika, Alabama.

201. Barton's misuse of Receivership Entity funds (and therefore generally Wall Investor Funds or their proceeds) also includes to cash rents from Amerigold Suites. As detailed above, the Amerigold Suites had been cash-flow negative long before my appointment. While

Amerigold rents were collected from tenants by the on-site property manager, Amerigold expenses were paid out of the Receivership Entities' offices, often from commingled Wall Investor Funds. However, I discovered that from no later than April 2020 through at least September 2020, Barton received regular cash payments from the Amerigold Suites, cash that to date Barton has offered no account for and which I have been unable to determine was deposited in any Receivership Entity bank account.

202. Perhaps the clearest example of Barton's misuse of Wall Investor Funds is illustrated by his use of Wall Investor Funds to pay personal credit, debit, and other charges. To date, my accountants have traced not less than $5.6 million in Wall Investor Funds to payments for credit card bills incurred by Barton and his family members or one or more of the Initial Receivership Entities. While some of these charges appear "business" in nature, for instance payments to the Texas Secretary of State for entity formation and database searches, very few appear related in any way to the investment objectives of the Wall Investors. Instead, millions of dollars were used for personal expenses, such as meals, car payments, educational expenses, airplane repair expenses, payments to Barton's ex-wife and children, and mortgage payments on the residence Barton lived in (in violation of the loan documents for the Rock Creek Property), among other things.

203. For the most part, payments for the services or items listed above have no recoverable value. Thus, although a potential claim exists for recovering the amount of Wall Investor Funds Barton used to satisfy personal obligations made through credit card purchases, any recovery would be contingent on whether Barton (or others who benefitted from these payments) has sufficient personal, individual assets to satisfy such a judgment.

204. A final example of Barton's misuse of Wall Investor Funds is his purchase and repair of a plane currently owned by Initial Receivership Entity, JMJAV, LLC using Wall Investor Funds. Two large liens encumber the plane;, one held by mechanics who performed incomplete repairs, and a bank. The plane and the repairs are also the subject of stayed litigation between JMJAV and the entity that performed the mechanical work. The bank has asked several times about foreclosing on the plane but was stayed by the Receivership Order provision discussed below. While I do not know what value, if any, will ultimately be realized from the plane, since October 2022 only the Receivership Order's stay of litigation and collection has prevented foreclosure of the liens on the plane.

205. The only assets I am aware of that Barton currently owns individually are his ownership interests in the many Initial Receivership Entities,[72] which in turn own, directly or indirectly, various parcels of real estate, liens on real estate, and claims or contractual rights such as participation interests described above.

206. Barton's claimed inability to pay sanctions previously awarded,[73] a paupers affidavit he signed on or about July 25, 2022 in which he identified no assets and a mere $500.00 in monthly expenses,[74] and his absolute refusal to comply with relevant provisions of the Receivership Order also point to the same conclusion: that the only assets from which he could personally satisfy any obligation owed to the Wall Investors are his ownership interests in the Initial Receivership Entities. Indeed, shortly before my appointment, Barton used Wall Investor Funds to pay his current attorneys. Even if Barton's counsel's representations that they have not

[72] Barton's ownership of many entities is indirect or convoluted. For example, Barton's son, Max, allegedly controls certain entities, however, Barton repeatedly signed agreements or held himself out as the person in control of those entities. *See* Dkt. 73.

[73] *See* Dkt. 244, Ex. A.

[74] *See* Dkt. 42, Ex. A-4.

obtained a security interest in any asset and have received only one payment for all work performed in this matter and the many appeals remains true today, they *must* expect payment in the future, presumably from Receivership Assets encompassed by the Receivership Order, since Barton, individually, professes poverty.

### 4. Substantial Challenges to Recovering Assets for the Investors Would Be Exacerbated Without a New Receivership Order.

207. As outlined above, through threatened foreclosure, dissipating value caused by market conditions, accruing interest, penalties, or taxes), and failure to develop or continue HUD certifications, without continued oversight and management, every property owned by the Initial Receivership Entities is at risk of dissipating or diminishing value.

208. For example, from the outset of my appointment, the physical and financial status of the Amerigold Suites was dire. During the first days of the Receivership, I learned that insurance on the property was on the verge of cancellation for non-payment, shut off notices for the electricity had been received, significant water bills were owed, and at least one vendor was owed over $16,000 for months of unpaid invoices related to HVAC maintenance and repairs. At the same time, the property was losing money every month and had insufficient assets to pay any of these bills. Money from other Receivership Entities, including Wall Investor Funds, was historically used to keep Amerigold afloat. Despite the injection of these funds, crucial repairs and maintenance were not performed, and payment for services essential to maintain *any* occupancy had not been paid at the time of my appointment.

209. Failing to pay for property insurance also jeopardized the value of the Amerigold Property. I was able to secure new, albeit expensive, insurance for the property, which was essential because after the insurance was in place, an additional personal injury occurred on the premises.

210. My team also negotiated with the Dallas City Attorney's Office to prevent termination of water service. Continued oversight and management is required to ensure continued habitability for this occupied property, as well as to attempt increasing its occupancy to generate additional value for the Receivership Estate, in the event the approved sale ultimately does not close.

211. The stay of collection and foreclosure efforts by creditors (Receivership Order ¶ 34) has allowed me to pause payment on the mortgage, thereby freeing up sufficient funds to pay the past due electric bills and bring the account current, preventing cancellation. But interest on the loan continues to accrue daily. In March, the Court approved the sale of the Amerigold Suites. Although no jurisdiction existed for an interlocutory appeal, Barton appealed the order and the title company has been unwilling to issue a title policy to allow the sale to close. In the interim, at least one fire has occurred at the property, an additional claim based on a personal injury was made, a fire inspection by the City of Dallas generated additional repairs, and, most recently, because of the scalding Texas heat, tens of thousands of dollars in A/C repairs in July and August of 2023 alone.

212. Other properties are in various stages of development or sale. For instance, several Initial Receivership Entities, including DJD Land Partners, LLC and Lynco Ventures, LLC and LDG001,[75] LLC collectively own hundreds of acres in Venus, Texas as described above. At the time of my appointment, several parcels were subject to foreclosure proceedings, and lenders on many of these properties have continued threatening motions to intervene to lift the stay of

[75] In the evidence submitted in support of the Receivership Order, the SEC specifically traced Wall Investor Funds into LDG001: "Wall 18's property was acquired by Relief Defendant LDG001 in August 2018 after $1,660,000 of Wall Investor Funds from Wall 12 and $220,000 of Wall Investor Funds from Wall 16 were transferred to Carnegie Development. Carnegie Development then wired $1,878,179.37 to LDG001 who wired the funds ($1,878,579.27) to a title company to purchase the property." Dkt. 7, p. 9.

enforcement[76] and initiate or resume foreclosure proceedings. Development of these lots for the creation of single-family communities is in-process, and negotiations with the City of Venus regarding key elements of the development have continued since my appointment. Although the properties are subject to significant debt, without continuing negotiations and involvement, much of the value of these lots will never be realized.

213. With the exception of one property, I am unaware of any realty owned by any Initial Receivership Entity that is not subject to at least one loan. In other words, every parcel of real estate owned by any Initial Receivership Entity is encumbered, and accordingly, subject to foreclosure or other forfeiture if a default occurs, or if an existing default is not cured. Unless Barton possesses personal assets that he has not disclosed or that I have not discovered, the only potential means of repaying the loans on these and any other loan encumbering any property will be a further loan (secured by property owned by an Initial Receivership Entity), or, the sale of property owned by an Initial Receivership Entity. In either event, because all Initial Receivership Entities discussed above either received Wall Investor Funds, the proceeds of Wall Investor Funds, or benefited from Wall Investor Funds, including only certain of these entities or properties in a new receivership order would be tantamount to allowing Judas to use Peter's funds to repay Paul, where Judas obtained Peter's funds through fraudulent securities offerings and became indebted to Paul to enrich himself at the expense of and rather than repaying Peter. Such a result would be grossly inequitable.

214. Moreover, as discussed above, in several instances, Barton used properties purchased with Wall Investor Funds or the proceeds of Wall Investor Funds as collateral for loans taken to purchase or improve still other properties. Because none of the Initial Receivership

[76] *See* Dkt. 29, ¶ 32.

Entities possesses cash or cash equivalents, except for sales, loans secured by Properties purchased with Wall Investor Funds or the Proceeds of Wall Investor Funds are the only possibility by which funds can be raised to pay loans, taxes, attorney's fees, or other obligations owed by these Entities or Barton personally. Allowing further encumbrances on these Properties, as Barton has demonstrated is his usual business practice, however, diminishes their recoverable value. Unless the proceeds of such encumbrances are used for the benefit of the Property collateralizing such a loan, allowing further debt as will occur if these properties are not included in a new receivership order, will be at the expense of the defrauded Wall Investors.

215. The abnormally high interest rates, even in the current interest rate environment, burdening the majority of the properties owned by the Receivership Entities, presents a further challenge to recovering value from the Receivership Assets. For instance, lenders associated with the properties owned by SF Rock Creek and LDG001 claim that their loans are accruing interest at 18% per year. While I am optimistic the lenders will ultimately agree to the payment of standard, rather than default interest rates in accordance with the law (or that the Court will be declare that they are not entitled to such default rate or maturity interest), their refusal to do so will result in further litigation and administrative costs. Regardless of the interest rate, the accruing loan balances erode the equity, if any, held by the various Initial Receivership Entities in these properties.

216. Finally, litigation was a business tactic employed by Barton. When the Receivership Order was entered, the stay of litigation included at ¶ 34 of the Receivership Order stayed approximately 35 lawsuits. With some exceptions (e.g., a personal injury suit premised on an injury that occurred at the Amerigold Suites and at least one lawsuit involved claims between Barton and Defendant Fu related to the Wall Investors and their funds), the vast majority of these

disputes relate to foreclosure, defaults on purchase or sale agreements for realty, settlements related to purchase and sale agreements, and bankruptcies filed by Initial Receivership Entities to preclude foreclosures. The use of litigation, however, to cloud the title on real estate that an Initial Receivership Entity had sought to purchase but failed to fund or close,[77] or to challenge a foreclosure as wrongful following a payment default,[78] even if meritorious, is an expensive and risky strategy.

**B. A Less Drastic Remedy Would Not Be Effective**

217. Barton has requested or suggested the Court should impose a monitorship and return him to control over all entities and assets available to satisfy the obligations owed to the Wall Investors.[79] In arguments to this Court and the Fifth Circuit, he has also argued that this Court abused its discretion in failing to consider less drastic remedies.

218. Allowing Barton to resume control over any Receivership Entities and Receivership Assets, through a monitorship or perhaps some procedure more akin to a Chapter 11 Bankruptcy with Barton remaining as the debtor in possession, however, would return control of the only assets available for satisfaction of the defrauded victims' losses to an individual who has demonstrated repeatedly that (1) he is not trustworthy; and (2) that he will not obey the court's orders.

219. Nor would appointment of someone other than Barton as a monitor with authority only to approve certain corporate decisions—made presumably by Barton—provide a workable

[77] *See e.g.*, *Somerset-Lost Creek Golf Ltd.v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, No. 096-319595-20, pending in the 96th District Court, Tarrant County, Texas.

[78] *See e.g.*, *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County); *BM318, LLC v. Dixon Water Foundation*, Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789, pending in the United States Bankruptcy Court, Northern District of Texas, Dallas Division.

[79] *See* Dkt 24 at 25-26; Dkt. 71 at.9-10.

remedy here. As discussed above, neither the Court nor any monitor could trust Barton to follow the guidelines of such an order or be truthful or cooperative with the monitor.

220. Further, a monitor would lack authority to seek the recovery of fraudulent transfers made by any Receivership Entities to third parties. As noted elsewhere herein, the value of all properties owned by all Initial Receivership Entities is likely less than the total amount of Wall Investor Funds, and almost certainly less than the amount of the Wall Investor Funds together with all creditor claims. Thus, if justified from a cost benefit and merits analysis, an effort should be made to recover fraudulent transfers made by Receivership Entities to the insiders and third parties who received transfers without exchanging reasonably equivalent value, or where the transferees lacked good faith.

### 1. Barton Lacks Credibility and Has Demonstrated Refusal to Comply with the Court's Orders

221. Barton's conduct has also demonstrated other reasons why he should not continue in control of Receivership Entities and their assets, again, which are the only potential assets available to repay Wall Investor Funds. For instance, the D4 Properties are the most valuable properties owned by any Initial Receivership Entities. They are, however, encumbered by significant debt and subject to disputed ownership, and the manner in which Barton obtained the HUD Loans was, generously characterized, not compliant with HUD regulations. See Dkt. 178, 205 and 247. Nonetheless, Barton informed me and the Court repeatedly, that just selling just two of these properties would generate "well in excess of $27 million," and thereby satisfy the amount "allegedly" owed to Investors. Dkt. 57. Barton's assertion, however, wholly ignored both the HUD debt and SPC's debt, as well as SPC's alleged ownership of the respective D4 Entities or parent entities and SPC's purported conversion of its debt into equity. *Compare* Dkt. 57, and 178,

205, and 247. Barton's assertion that selling these properties "should end the need for further action by the receiver" was at best, misdirection.

222. With respect to the HN Capital Settlement and the DLP Settlement, Barton represented to this Court and the Fifth Circuit that both involved sales of realty. See Dkt. Nos. 114, 230; and May 26, 2023 Motion for Partial Stay and Standstill of District Court Receivership Pending Appeal, filed in the Fifth Circuit ("Motion for Partial Stay").[80] As discussed in my Responses to Barton's objections to those settlements or in response to Barton's motions to stay them, that assertion also was demonstrably false. See Dkt. Nos. 119, 210. Neither settlement involves the sale of anything. When the SEC and indeed the Fifth Circuit challenged his failure to certify the facts in his Motion for Partial Stay at the Fifth Circuit as true, Barton withdrew that assertion. *See* Order Denying Motion to Stay Appeal, Appeal No. 22-11132, June 8, 2023. *Compare* Motion for Partial Stay, Appeal No. 22-11132, May 26, 2023 with Emergency Motion for Reconsideration, Appeal No. 22-11132, June 8, 2023.

223. Similarly, regarding the Venus properties, Barton argued in response to the SEC's motion for appointment of a Receiver regarding the Venus properties, that "[t]hrough daily and persistent efforts, Project managers are on the cusp of securing city approval for necessary utilities and other permits to turn the property into a 4,159 building lots. If this approval occurs, the value of the property will increase by $20 to 50 million, against which increased value Wall lenders would have recourse." *See* Wilson Letter (Barton App. 004–005).[81] In evaluating these developments, however, I discovered not only significant debt and foreclosure proceedings for

---

[80] Notably, Barton's appellate motion lacked the required certification by counsel that "the facts supporting emergency consideration of the motion are true and complete." 5th Cir. R. 27.3. As the Fifth Circuit observed in denying his Motion, Barton's motion contained no such certification.

[81] The letter provided in support of these valuation assertions states that if the governmental approvals are obtained, the development value "might be" in the range Barton asserts as fact. Dkt. 25.

several of the Venus parcels omitted from Barton's rosy predictions, but also discovered that Barton's predicted values are grossly inflated.

224. As demonstrated by my Declaration in Support of Motion to Supplement the Receivership Order, Dkt. 74-1, overwhelming and undisputed evidence demonstrates Barton's practice of signing contracts as President or other officer of entities for which he was not an officer and after learning of the SEC's investigation, using certain entities to obscure his involvement. *See also* Dkt. 73, pp. 8–10; 12. An email between Barton and his assistant Ms. Bedoya also demonstrates Barton's use of his son Max, as an officer or manager for Entities—in name but not in practice—and further evidences improper use of the Receivership Entities' corporate forms. Dkt. 73 at 9; Dkt. 74 at 304.

225. The instances of Barton's disregard for this Court's orders, including the Receivership Order, are legion. Those actions include:

- Failing to comply with the provisions of the Receivership Order that required him to cooperate and provide asset information and access credentials discussed above; *see* Dkt. 133;
- Changing data access credentials;
- Filing a lis pendens on the Rock Creek Property to interfere in the sale, and then contacting the purchaser to more directly interfere;
- Diverting mail and threatening the owner of the mailbox location at which Initial Receivership Entity mail was delivered;
- Moving and hiding art and antiques out of the Rock Creek Property;
- Soliciting competing offers for properties I had listed for sale and failing to provide those offers to me or my counsel;
- Holding himself out as the President or other officer of Receivership Entities long after the Receivership Order removed him from those roles;
- Contacting individuals who are working on properties being developed by Initial Receivership Entities and attempting to insert himself back into those transactions, long after the Receivership Order was entered;

- Refusing to comply with the Order Granting my Motion to Compel;

### 2. An Asset Freeze Alone is Impractical and Would Result in Lost Value

226. An asset freeze only prohibit sales of property would not provide an adequate remedy. For one, continued oversight is necessary to ensure preservation of the Receivership Assets' value. For example, as noted in prior reports, the D4 Entities are operating apartment complexes. The process necessary to continue certification of the HUD loan for D4OP, the entity that owns the Opelika complex, is a continuing process. HUD's involvement requires extensive regulatory approval and cost certification, absent which, the project could face default and significant penalties. I, or someone else in my stead, must provide continued oversight to ensure this project does not lapse so that its value can be captured.

227. Other properties, like the Venus properties, require continuing efforts to either develop or sell. I have been advised by real estate experts in the Dallas area that holding these properties for a prolonged period will likely also result in a diminished value based on climbing interest rates, the slowing economy, and the substantial debt that encumbers these properties.

228. A limited receivership which does not authorize the sale of properties and assets, subject to this Court's authority and where appropriate, 28 U.S.C. § 2001, does not provide a workable solution. Virtually every property is subject to liens that increase with accruing interest, as well as property taxes and other obligations. Allowing those obligations to erode net equity does not serve the underlying goal of maximizing the value of the assets to reimburse the Investors.

229. Likewise, the stay of litigation cannot continue indefinitely and thus requires continued efforts to resolve the stayed litigation. For instance, with the lawsuit involving BM318, Dixon and Lumar. BM318 purchased a tract of land from Dixon with a $2 million down payment and a seller-financed note of $33 million held by Dixon. BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon. BM318 filed

an adversary proceeding against Dixon alleging preferential or fraudulent transfer, and also filed a lis pendens. Dixon filed a counterclaim. Lumar intervened after because it could not sell the property it purchased from Dixon because of the lis pendens. Prior to the Fifth Circuit's June 28th order, I negotiated a temporary solution that allowed Lumar to avoid bankruptcy [Dkt. 143] and mediated BM318's dispute with Dixon and Lumar. The mediation was successful, and the parties spent several weeks negotiating settlement agreements. Unless the litigation is resolved and the lis pendens is lifted, these issues will remain unresolved, as will the dozens of other lawsuits referenced in my Quarterly Reports.

230. Moreover, Barton's conduct described above, as well as the fraud described in the SEC's Complaint and supporting evidence, demonstrates his unclean hands.

231. Finally, and perhaps most practically, administering a receivership estate requires cash—to pay expenses related to the properties (for instance for the cost certification of D4OP, insurance and management for Amerigold, and property taxes), costs related to physical and electronic document and data storage and electronic document review and management, and fees for accountants and lawyers. In a Receivership Estate that lacks liquid assets, a receiver who is not authorized to generate income through sales or otherwise will not accomplish the goal of preserving estate assets, because he will be unable to pay these expenses.

**C. The Benefits of a Receivership Outweigh the Burdens on the Affected Parties**

232. In opposing the appointment of a receiver initially and in subsequent filings, Barton asserted "a receivership is a greater threat to the value of existing assets and their ability to repay subject lenders than any benefit it might provide to the parties, the lenders, and the Court." Dkt. p. 24. Similarly, Barton asserted that loss of real property, through sales in the receivership, causes him irreparable harm, and that a receiver's appointment and management of the Initial Receivership Entities created "an existential threat [to Barton's real estate] business and, more

importantly, tens of millions of dollars in project values that would have been available to repay the unsecured lenders that are subject to the SEC's claims. These business assets are being sold for pennies on the dollar because the Receiver has no ability to run them."[82]

233. First, but not foremost, I have not sold anything for pennies on the dollar. Barton's assertions in this regard, as a factor supporting the purported burden imposed on him by the receivership, is simply untrue.[83] The valuation and justification for the amount I have contracted to sell any property, as well as the same information for settlements the Court has ratified, are included in the respective motions related to those sales or settlements. *See* Dkts. 76, 110, 161, 164, 167.

234. Further, Barton, individually, does not own *any* of the parcels of real estate owned by the Initial Receivership Entities. Thus, he does not suffer any irreparable injury based on the inclusion of such properties within the scope of a new receivership.

235. Barton admits—indeed touts—his purported poverty as an individual, contending that he cannot pay $19,250 in sanctions, cannot pay his legal counsel, and contends he is being forced to sleep on his daughter's couch. *See* Dkt. 244, Ex. A; Transcript of Record at p. 14 ¶¶ 4-9, December 30, 2022; Transcript of Record at p. 16 ¶¶ 1-10; Motion to Stay Pending Appeal, Appeal No. 22-11132, December 28, 2022. Thus, unless the Court imposes a new receivership order over the entities and properties described below, Barton individually has no means of repaying the Investors. Nonetheless, withdrawing the assets owned by the Entities from Barton's use or control does not "deprive Barton of a defense," as he has argued. Instead, although Barton's

[82] Motion to Stay, Appeal No. 22-11132, December 28, 2022.

[83] *See* for example, Barton's unsupported arguments regarding the DLP settlement, and my response regarding the value of the compromise. Dkt. Nos. 95, 106, 114, 119. *See also,* Barton's unsupported arguments regarding the settlement with HN Capital, as compared with the facts established by the Bankruptcy Court's prior determinations and the *evidence* in support of the settlement. Dkt. 210, 230; and compare Barton's unverified arguments regarding the same settlement as presented to the Fifth Circuit and HN Capital's Response. Appeal No. 22-1132, Dkt. 84; 112.

counsel claimed in the Fifth Circuit that he had not been paid and represented to me that they have also not received any security interest or pledge to secure a future payment, counsel and his firm appear willing to represent Barton pro bono on his serial challenges to my efforts to maximize the Receivership Estate.[84]

236. On the other hand, the burden on the Investors, creditors, and others impacted by the fraud alleged in the SEC's Complaint absent a receivership will be the loss or diminished value of many of the only properties from which the Investor and creditor claims can be satisfied. Again, no other source exits for payment of these Investor losses, but the property values are diminishing and subject to liens that are ripe foreclosure and regarding which creditors frequently threaten motions to lift the litigation stay and seek foreclosure.

237. Barton has admitted that these properties or the entities that own them are the only assets from which he can pay his ever-growing attorney's fees[85] and because, as discussed above, he has already demonstrated his practice of using Wall Investor Funds and the assets held by all entities he controls as his personal funds, dissipation is likely, rather than a mere risk.

238. Similarly, creditors and parties who are in litigation with Initial Receivership Entities and whose claims are stayed will be unfairly prejudiced by imposition of a blanket stay (necessary to protect both the properties that are the subject of the litigation and the assets

[84] Barton has filed six appeals, and fully briefed three of them, including the appeal of the Receivership Order which was also argued. He has also filed a motion for rehearing or for rehearing en banc regarding the Fifth Circuit's dismissal of the appeal challenging the order approving the sale of the Rock Creek property. *See* Appeal No. 22-11226.

[85] *See* 3/20/23 TR., p. 16, ll. 1-10 ("And he's facing criminal charges that we are contesting, but he's not going to have the resources to contest those. And it is properties like this, and either retaining them for ourselves, or -- or -- or selling them ourselves and having -- having the proceeds available for the defense of this case, or the Court maintaining the proceeds of the sale of this property and having them available for the defense of this case is really going to be crucial to his due process rights.").

otherwise necessary to prosecute or defend those claims) unless a receiver is appointed and authorized to negotiate and resolve, if possible, such claims and lawsuits.

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 5, 2023.

*/s/ Cortney C. Thomas*
CORTNEY C. THOMAS

# EXHIBIT 1

CHASE

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

February 01, 2019 through February 28, 2019
Account Number: [redacted]7036

**CUSTOMER SERVICE INFORMATION**

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | 1-877-425-8100 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00011370 DRE 201 142 06419 NNNNNNNNNNN T 1 000000000 D4 0000
CARNEGIE DEVELOPMENT LLC
1755 WITTINGTON PLACE
STE 340
DALLAS TX 75234-1930

00113700201000000022

## CHECKING SUMMARY

Chase Platinum Business Checking

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$146.43** |
| Deposits and Additions | 17 | 2,666,774.21 |
| Checks Paid | 3 | -13,135.67 |
| Electronic Withdrawals | 19 | -2,646,352.73 |
| **Ending Balance** | 39 | **$7,432.24** |

Your Chase Platinum Business Checking account provides:
- No transaction fees for unlimited electronic deposits (including ACH, ATM, wire, Chase Quick Deposit)
- 500 debits and non-electronic deposits (those made via check or cash in branches) per statement cycle
- $25,000 in cash deposits per statement cycle
- Unlimited return deposited items with no fee

There are additional fee waivers and benefits associated with your account – please refer to your Deposit Account Agreement for more information.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/01 | Fedwire Credit Via: Resource One Credit Union/311080162 B/O: Hillstone Construction L Duncanville TX 75138 Ref: Chase Nyc/Ctr/Bnf=Carnegie Development LLC Dallas, TX 75234/Ac-0000000 02991 Rfb=O/B Resource One Imad: 0201Gmqfmp01020686 Trn: 8260709032Ff | $36,774.21 |
| 02/01 | Online Transfer From Chk ...2529 Transaction#: 7900197700 | 450,000.00 |
| 02/01 | Online Transfer From Chk ...2529 Transaction#: 7896840316 | 50,000.00 |
| 02/04 | Online Transfer From Chk ...2529 Transaction#: 7907645238 | 100,000.00 |
| 02/08 | Online Transfer From Chk ...2529 Transaction#: 7923661780 | 235,000.00 |
| 02/08 | Online Transfer From Chk ...2529 Transaction#: 7923616586 | 100,000.00 |
| 02/11 | Online Transfer From Chk ...2529 Transaction#: 7931286186 | 300,000.00 |
| 02/12 | Online Transfer From Chk ...2529 Transaction#: 7933680581 | 655,000.00 |
| 02/13 | Online Transfer From Chk ...2529 Transaction#: 7936856169 | 120,000.00 |
| 02/13 | Online Transfer From Chk ...2529 Transaction#: 7936886617 | 10,000.00 |
| 02/14 | Online Transfer From Chk ...2529 Transaction#: 7940283407 | 200,000.00 |
| 02/15 | Online Transfer From Chk ...2529 Transaction#: 7945815159 | 100,000.00 |
| 02/19 | Online Transfer From Chk ...2529 Transaction#: 7954317532 | 100,000.00 |
| 02/19 | Online Transfer From Chk ...5193 Transaction#: 7954321215 | 50,000.00 |

CHASE

February 01, 2019 through February 28, 2019
Account Number: [redacted]7036

## DEPOSITS AND ADDITIONS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/20 | Online Transfer From Chk ...2529 Transaction#: 7957581955 | 100,000.00 |
| 02/20 | Online Transfer From Chk ...5193 Transaction#: 7957583005 | 50,000.00 |
| 02/25 | Online Transfer From Chk ...5193 Transaction#: 7973218045 | 10,000.00 |
| **Total Deposits and Additions** | | **$2,666,774.21** |

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 10079 ^ | | 02/04 | $6,500.00 |
| 10080 ^ | | 02/11 | 135.67 |
| 10083 * ^ | | 02/25 | 6,500.00 |
| **Total Checks Paid** | | | **$13,135.67** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

* All of your recent checks may not be on this statement, either because they haven't cleared yet or they were listed on one of your previous statements.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/01 | 02/01 Online Transfer To Chk ...5193 Transaction#: 7896847914 | $40,000.00 |
| 02/01 | 02/01 Online Transfer To Chk ...5193 Transaction#: 7900352710 | 290,000.00 |
| 02/01 | 02/01 Online Domestic Wire Transfer Via: Wells Fargo NA/121000248 A/C: Lawyers Title Company Southlake TX 76092 US Ref: Gf2000671900026 Carnegie Homes LLC Attn Robin Taylor/Bnf/Gf20006719000 26 Carnegie Homesllc Attn Robin Tay Lor/Time/15:42 Imad: 0201B1Qgc01C028482 Trn: 7187000032Es | 158,750.00 |
| 02/04 | 02/03 Online Transfer To Chk ...5193 Transaction#: 7907646100 | 100,000.00 |
| 02/04 | 02/04 Online Domestic Wire Transfer Via: Affilated Bk NA TX/311978818 A/C: Carnegie Homes Dallas TX 75234 US Ref:/Bnf/Carnegie Homes Imad: 0204B1Qgc06C007354 Trn: 5554100035Es | 36,774.21 |
| 02/05 | 02/05 Online Transfer To Chk ...3096 Transaction#: 7912674449 | 300.00 |
| 02/08 | 02/08 Online Transfer To Chk ...5193 Transaction#: 7923618009 | 100,000.00 |
| 02/08 | 02/08 Online Transfer To Chk ...6539 Transaction#: 7923663673 | 235,000.00 |
| 02/11 | 02/11 Online Transfer To Chk ...5193 Transaction#: 7931286802 | 300,000.00 |
| 02/12 | 02/12 Online Transfer To Chk ...5193 Transaction#: 7933682207 | 655,000.00 |
| 02/13 | 02/13 Online Transfer To Chk ...9823 Transaction#: 7936857097 | 120,000.00 |
| 02/13 | 02/13 Online Transfer To Chk ...9823 Transaction#: 7936889460 | 7,000.00 |
| 02/14 | 02/14 Online Transfer To Chk ...3096 Transaction#: 7940286896 | 50,000.00 |
| 02/14 | 02/14 Online Transfer To Chk ...0075 Transaction#: 7940301564 | 26,000.00 |
| 02/14 | 02/14 Online Transfer To Chk ...5193 Transaction#: 7940304916 | 120,000.00 |
| 02/15 | 02/15 Online Transfer To Chk ...5193 Transaction#: 7945816617 | 100,000.00 |
| 02/19 | 02/19 Online Transfer To Chk ...5193 Transaction#: 7954319077 | 100,000.00 |
| 02/19 | 02/19 Online Domestic Wire Transfer Via: Tib Dallas/111010170 A/C: Southern Star Capital LLC Dallas TX 75254 US Ref: Ridgeview/Bnf/Ridgeview Imad: 0219B1Qgc07C007885 Trn: 7006900050Es | 52,500.00 |
| 02/20 | 02/20 Online Domestic Wire Transfer Via: BB&T Florida/263191387 A/C: First Western Title Escrow Accountburleson TX 76028 US Ref: Order 1814715086 First Western Title 201 W Bufford 103 Burleson TX7602 8/Bnf/Order 1814715086 201 W Buffor Dburleson TX First Western Title Imad: 0220B1Qgc05C006943 Trn: 5281100051Es | 155,028.52 |
| **Total Electronic Withdrawals** | | **$2,646,352.73** |

CHASE

February 01, 2019 through February 28, 2019
Account Number: [redacted]7036

## DAILY ENDING BALANCE

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|---|---|---|---|---|---|
| 02/01 | $48,170.64 | 02/11 | 4,460.76 | 02/15 | 11,460.76 |
| 02/04 | 4,896.43 | 02/12 | 4,460.76 | 02/19 | 8,960.76 |
| 02/05 | 4,596.43 | 02/13 | 7,460.76 | 02/20 | 3,932.24 |
| 02/08 | 4,596.43 | 02/14 | 11,460.76 | 02/25 | 7,432.24 |

10113700202000000062

## SERVICE CHARGE SUMMARY

| | |
|---|---|
| Monthly Service Fee | $0.00 |
| Other Service Charges | $0.00 |
| **Total Service Charges** | **$0.00** |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

EQUAL HOUSING LENDER
JPMorgan Chase Bank, N.A. Member FDIC

CHASE

February 01, 2019 through February 28, 2019
Account Number: [redacted]7036

This Page Intentionally Left Blank

# EXHIBIT 2

CARNEGIE DEVELOPMENT LLC
1755 WITTINGTON PL
SUITE 340
DALLAS TX 75234-1927

Speak to a dedicated business solutions expert at 1-888-755-2172 — a one-stop number for both your business and personal needs.

## ACCOUNT SUMMARY FOR PERIOD NOVEMBER 01, 2017 - NOVEMBER 30, 2017

**Spark Basic Checking** [redacted]1331 — **CARNEGIE DEVELOPMENT LLC**

| | | | |
|---|---|---|---|
| Previous Balance 10/31/17 | $168,652.98 | Number of Days in Cycle | 30 |
| 9 Deposits/Credits | $1,931,670.87 | Minimum Balance This Cycle | ($44,549.64) |
| 24 Checks/Debits | ($2,049,873.49) | Average Collected Balance | $143,800.65 |
| Service Charges | $0.00 | | |
| Ending Balance 11/30/17 | $50,450.36 | | |

## ACCOUNT DETAIL FOR PERIOD NOVEMBER 01, 2017 - NOVEMBER 30, 2017

**Spark Basic Checking** [redacted]1331 — **CARNEGIE DEVELOPMENT LLC**

| *Date* | *Description* | *Deposits/Credits* | *Withdrawals/Debits* | *Resulting Balance* |
|---|---|---|---|---|
| 11/01 | Online banking xfer deposit FROM ...3851 | $150,000.00 | | $318,652.98 |
| 11/01 | Transfer Debit TO ...5459 | | $150,000.00 | $168,652.98 |
| 11/02 | Wire transfer withdrawal SILVER STAR TITL E LLC DBA 110217 USD81531122 | | $25,000.00 | $143,652.98 |
| 11/02 | Wire transfer withdrawal MKP DEVELPMENT, LLC 110217 USD81527966 | | $100,000.00 | $43,652.98 |
| 11/02 | Wire transfer fee WIRE TRANSFER 110217 | | $25.00 | $43,627.98 |
| 11/02 | Wire transfer fee WIRE TRANSFER 110217 | | $25.00 | $43,602.98 |
| 11/03 | Online banking xfer deposit FROM ...3851 | $375,000.00 | | $418,602.98 |
| 11/03 | Reverse miscellaneous fee WIRE TRANSFER 110317 | $25.00 | | $418,627.98 |
| 11/03 | Online banking xfer withdrawal TO ...5436 | | $375,000.00 | $43,627.98 |
| 11/03 | Wire transfer fee WIRE TRANSFER 110317 | | $25.00 | $43,602.98 |

*Thank you for banking with us.*



Products and services are offered by Capital One, N.A., Member FDIC.
©2017 Capital One. All rights reserved.

MEMBER FDIC

An Important Message to Our Clients

What should I do if I find an error or problem on my statement?

In case of error or questions about your electronic transfers telephone us at 1-888-755-2172 or write us at Capital One, N.A., 7933 Preston Rd. Plano, Texas 75024, Attn: Customer Service Center as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt.

For small business accounts: Please refer to your Electronic Fund Transfer Agreement/Disclosure for additional information.

For consumer accounts: We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number (if any).
2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

CARNEGIE DEVELOPMENT LLC

ACCOUNT DETAIL CONTINUED FOR PERIOD NOVEMBER 01, 2017 - NOVEMBER 30, 2017

| Date | Description | Deposits/Credits | Withdrawals/Debits | Resulting Balance |
|---|---|---|---|---|
| 11/06 | Online banking xfer withdrawal TO ...5436 | | $5,000.00 | $38,602.98 |
| 11/07 | Online banking xfer deposit FROM ...3851 | $50,000.00 | | $88,602.98 |
| 11/07 | Online banking xfer withdrawal TO ...1622 | | $50,000.00 | $38,602.98 |
| 11/08 | Online banking xfer withdrawal TO ...5436 | | $7,000.00 | $31,602.98 |
| 11/10 | Online banking xfer withdrawal TO ...1846 | | $1,000.00 | $30,602.98 |
| 11/13 | Check 109 | | $6,738.49 | $23,864.49 |
| 11/14 | Online banking xfer deposit FROM ...3851 | $250,000.00 | | $273,864.49 |
| 11/14 | Online banking xfer withdrawal TO ...1622 | | $250,000.00 | $23,864.49 |
| 11/16 | Online banking xfer deposit FROM ...1622 | $356,645.87 | | $380,510.36 |
| 11/16 | Online banking xfer deposit FROM ...3851 | $250,000.00 | | $630,510.36 |
| 11/16 | Online banking xfer withdrawal TO ...1622 | | $250,000.00 | $380,510.36 |
| 11/16 | Wire transfer withdrawal TRAFALGAR CHINA CAPITAL, L 111617 USD81678681 | | $25,000.00 | $355,510.36 |
| 11/16 | Wire transfer fee WIRE TRANSFER 111617 | | $25.00 | $355,485.36 |
| 11/17 | Online banking xfer withdrawal TO ...7841 | | $5,000.00 | $350,485.36 |
| 11/17 | Online banking xfer withdrawal TO ...5436 | | $45,000.00 | $305,485.36 |
| 11/27 | Online banking xfer withdrawal TO ...5459 | | $300,000.00 | $5,485.36 |
| 11/27 | Check 110 | | $50,000.00 | ($44,514.64) |
| 11/27 | Overdraft charge DR AMT 50,000.00 0050150000 112717 | | $35.00 | ($44,549.64) |
| 11/28 | Online banking xfer deposit FROM ...5459 | $300,000.00 | | $255,450.36 |
| 11/28 | Online banking xfer withdrawal TO ...7841 | | $55,000.00 | $200,450.36 |
| 11/29 | Online banking xfer withdrawal TO ...1622 | | $150,000.00 | $50,450.36 |
| 11/30 | Online banking xfer deposit FROM ...3851 | $200,000.00 | | $250,450.36 |



Products and services are offered by Capital One, N.A., Member FDIC.
©2017 Capital One. All rights reserved.

MEMBER FDIC

ACCOUNT DETAIL CONTINUED FOR PERIOD NOVEMBER 01, 2017 - NOVEMBER 30, 2017

| *Date* | *Description* | *Deposits/Credits* | *Withdrawals/Debits* | *Resulting Balance* |
|---|---|---|---|---|
| 11/30 | Online banking xfer withdrawal TO ...1622 | | $200,000.00 | $50,450.36 |
| ***Total*** | | $1,931,670.87 | $2,049,873.49 | |

| | *Total For This Period* | *Total Year-to-Date* |
|---|---|---|
| Total Overdraft Fees | $35.00 | $35.00 |
| Total NSF Fees | $0.00 | $0.00 |

**Spark Basic Checking [redacted]1331** **CARNEGIE DEVELOPMENT LLC**

**Checks** * designates gap in check sequence

| *Check No.* | *Date* | *Amount* | *Check No.* | *Date* | *Amount* | *Check No.* | *Date* | *Amount* |
|---|---|---|---|---|---|---|---|---|
| 109 | 11/13 | $6,738.49 | 110 | 11/27 | $50,000.00 | | | |

# EXHIBIT 3




1 For the transactions that comprise the beginning balance amount in JMJKH, LLC Chase account No. 3236, please refer to Exhibit 17A. Note that the beginning balance of $26,734.38 includes a SBA small business loan of $153,900.

2 For the transactions that comprise the beginning balance amount in JMJAV, LLC account No. 6539, please refer to Exhibit 17B. Note that the beginning balance of $78,146.78 includes a SBA small business loan of $149,900.00.

3 For the transactions that comprise the beginning balance amount in account JMJD4, LLC no. 5320, please refer to Exhibit 17C.

4 For the transactions that comprise the beginning balance amount in Lajolla Construction Management, LLC account No. 1391, please refer to Exhibit 17D. Note that the beginning balance of $128,439.42 consists of various SBA small business loans.

5 For the transactions that comprise the beginning balance amount in Carnegie Development, LLC account no. 7036, please refer to Exhibit 17E.

# Transaction Schedule– SF Rock Creek

| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 8/21/2020 | | | | 860,649.50 | | | | FTF Lending, LLC Loan 1 Funding |
| 334.38 | 6/17/2020 | JMJKH, LLC | Chase | 3236 | 4,000.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Jmjkh, LLC |
| 4,334.38 | 6/18/2020 | JMJKH, LLC | Chase | 3236 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Jmjkh, LLC |
| 26,734.38 | 8/17/2020 | JMJKH, LLC | Chase | 3236 | -20,000.00 | 5193 | | JMJ Development LLC | Online Transfer to Chk 5193 |
| 4,352.98 | 6/18/2020 | JMJAV, LLC | Chase | 6539 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Jmjav LLC |
| 78,146.78 | 8/17/2020 | JMJAV, LLC | Chase | 6539 | -50,000.00 | 5193 | | JMJ Development LLC | Online Transfer to Chk 5193 |
| 1,000.00 | 6/22/2020 | BM318 LLC | Chase | 9931 | 8,000.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: BM 318 LLC |
| 9,000.00 | 6/23/2020 | BM318 LLC | Chase | 9931 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: BM 318 LLC |
| 89,636.43 | 8/17/2020 | BM318 LLC | Chase | 9931 | -50,000.00 | 7036 | | Carnegie Development, LLC | Online Transfer to Chk 7036 |
| 1,475.43 | 8/17/2020 | Carnegie Development, LLC | Chase | 7036 | 50,000.00 | | 9931 | BM318 LLC | ONLINE TRANSFER FROM CHK ... 9931 |
| | 8/17/2020 | Carnegie Development, LLC | Chase | 7036 | -50,000.00 | 5193 | | JMJ Development LLC | ONLINE TRANSFER TO CHK ... 5193 |
| 39.42 | 6/18/2020 | Lajolla Construction Management LLC | Chase | 1391 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Lajolla Construction M |
| | 6/18/2020 | Lajolla Construction Management LLC | Chase | 1391 | 113,500.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Maximilien Berton |
| 263,439.42 | 6/26/2020 | Lajolla Construction Management LLC | Chase | 1391 | 4,000.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Lajolla Construction M |
| 185,439.42 | 7/14/2020 | Lajolla Construction Management LLC | Chase | 1391 | 3,000.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: Rhino Stainless US |
| 128,439.42 | 8/17/2020 | Lajolla Construction Management LLC | Chase | 1391 | -120,000.00 | 5193 | | JMJ Development LLC | Online Transfer to Chk 5193 |
| 13,557.67 | 5/5/2020 | D4DS LLC | Chase | 5851 | 4,000.00 | | | | Sbad Treas 310 |
| 17,557.67 | 6/18/2020 | D4DS LLC | Chase | 5851 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: D4DS LLC |
| 167,457.67 | 8/17/2020 | D4DS LLC | Chase | 5851 | -150,000.00 | 5320 | | | ONLINE TRANSFER TO CHK ... 5320 |
| 3,100.00 | 6/17/2020 | D4OP, LLC | Chase | 1720 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: D4OP LLC |
| 153,000.00 | 8/17/2020 | D4OP, LLC | Chase | 1720 | -150,000.00 | 5320 | | | ONLINE TRANSFER TO CHK ... 5320 |
| 4,100.00 | 6/17/2020 | D4KL LLC | Chase | 0077 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: D4KL LLC |
| 143,734.25 | 8/17/2020 | D4KL LLC | Chase | 0077 | -140,000.00 | 5320 | | | ONLINE TRANSFER TO CHK ... 5320 |
| 0.00 | 6/16/2020 | D4AT, LLC | Chase | 8525 | 149,900.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: D4DT LLC |
| 84,900.00 | 6/26/2020 | D4AT, LLC | Chase | 8525 | 3,000.00 | | | | Orig CO Name: Sbad Treas 310 Ind Name: D4DT LLC |
| 82,900.00 | 8/17/2020 | D4AT, LLC | Chase | 8525 | -80,000.00 | 5320 | | | ONLINE TRANSFER TO CHK ... 5320 |
| 850.00 | 8/17/2020 | JMJD4, LLC | Chase | 5320 | 150,000.00 | | 5851 | D4DS LLC | ONLINE TRANSFER FROM CHK ... 5851 |
| | 8/17/2020 | JMJD4, LLC | Chase | 5320 | 150,000.00 | | 1720 | D4OP, LLC | ONLINE TRANSFER FROM CHK ... 1720 |
| | 8/17/2020 | JMJD4, LLC | Chase | 5320 | 140,000.00 | | 0077 | D4KL LLC | ONLINE TRANSFER FROM CHK ... 0077 |
| | 8/17/2020 | JMJD4, LLC | Chase | 5320 | 80,000.00 | | 8525 | D4AT, LLC | ONLINE TRANSFER FROM CHK ... 8525 |
| | 8/17/2020 | JMJD4, LLC | Chase | 5320 | -520,000.00 | 5193 | | JMJ Development LLC | ONLINE TRANSFER TO CHK ... 5193 |
| 80,124.46 | 8/17/2020 | JMJ Development LLC | Chase | 5193 | 20,000.00 | | 3236 | JMJKH, LLC | ONLINE TRANSFER FROM CHK ... 3236 TRANSACTION #: 10133237646 |
| | 8/17/2020 | JMJ Development LLC | Chase | 5193 | 50,000.00 | | 6539 | JMJAV, LLC | ONLINE TRANSFER FROM CHK ... 6539 TRANSACTION #: 10132853301 |
| | 8/17/2020 | JMJ Development LLC | Chase | 5193 | 50,000.00 | | 7036 | Carnegie Development, LLC | ONLINE TRANSFER FROM CHK ... 7036 TRANSACTION #: 10133396312 |
| | 8/17/2020 | JMJ Development LLC | Chase | 5193 | 120,000.00 | | 1391 | Lajolla Construction Management LLC | ONLINE TRANSFER FROM CHK ... 1391 TRANSACTION #: 10133278583 |
| | 8/17/2020 | JMJ Development LLC | Chase | 5193 | 520,000.00 | | 5320 | JMJD4, LLC | ONLINE TRANSFER FROM CHK ... 5320 TRANSACTION #: 10133386423 |
| | 8/17/2020 | JMJ Development LLC | Chase | 5193 | -300,000.00 | 3575 | | SF Rock Creek, LLC | ONLINE TRANSFER TO CHK ... 3575 TRANSACTION #: 10133408794 |
| 0.00 | 8/17/2020 | SF Rock Creek, LLC | Chase | 3575 | 300,000.00 | | 5193 | JMJ Development LLC | Online Transfer from Chk 5193 |
| | 8/17/2020 | SF Rock Creek, LLC | Chase | 3575 | -299,832.36 | | | | Online Domestic Wire Transfer A/C: Hstx Title LLC Ref: 41047 Rock Creek Drive Dallas TX 75204 - Balance Due at Closing |

# Exhibit 17A – SF Rock Creek



# Exhibit 17B – SF Rock Creek



# Exhibit 17C – SF Rock Creek



# Exhibit 17D – SF Rock Creek



# Exhibit 17E – SF Rock Creek



# SF – Rock Creek Repayment of Funds




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 50.08 | 5/6/2022 | Mansions Apartment Homes at Marine Creek LLC | Chase | 9592 | 200,000.00 | | | | Fedwire Credit via: Axos Bank B/O: Marine Creek Ventures LLC Bnf=Mansions Apartment Homes At Marine Dallas TX |
| | 5/6/2022 | Mansions Apartment Homes at Marine Creek LLC | Chase | 9592 | -200,000.00 | | | | Domestic Wire Transfer A/C: Broadview Holdings |
| 50,449.42 | 5/6/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 200,000.00 | | | | Wire Transfer from Mansions Apartment Homes at Marine |
| 147,104.31 | 5/10/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 2,000,000.00 | | | | Wire Transfer from AVG West, LLC |
| | 5/10/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -750,000.00 | | | | To Fund CD#71791434-7179143 Broadview Holdings |
| 123,021.64 | 5/16/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 560,000.00 | | | | Advance from Loans |
| | 5/16/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -500,000.00 | | | | WIRE TRANSFER TO FUND THAT FLIP INC |

# EXHIBIT 4




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 7,050.08 | 3/14/2022 | Mansions Apartment Homes at Marine Creek LLC | Chase | 9592 | 800,000.00 | | | | Fedwire Credit B/O: Marine Creek Ventures LLC. Marine Creek Partial Holdback release |
| 232,050.08 | 3/24/2022 | Mansions Apartment Homes at Marine Creek LLC | Chase | 9592 | -232,000.00 | 4611 | | Broadview Holdings | Domestic Wire Transfer via Texas Brand Bank A/C Broadview Holdings |
| 28,568.58 | 3/24/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 232,000.00 | | | | Wire transfer from Mansions Apartment Homes at Marine |
| | 3/29/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -168,146.67 | | | | Check #1083 payable to Texas Republic Bank. Check memo states: "Loan #49799" (FHC Acquisition, LLC) |
| 5,300.75 | 3/29/2022 | FHC Acquisition, LLC | Texas Republic Bank | 1427 | 168,146.67 | | | | Deposit |

Note: Between March 2022 and October 2022, the funds presented in the above schedule were used for payments on Texas Republic's loan on the property.

*Besides the deposit of $800,000 on 03/14/2022, no **other** deposits were received between **03/14/2022** and **03/24/2022** for Mansions Apartment Homes at Marine Creek, LLC account no. 9592.

Regarding Broadview Holdings Texas Brand Bank account no. 4611, the following deposits were received between **03/24/2022** and **03/29/2022** in addition to the deposit of $232,000 presented in the schedule on 03/24/2022: 1) $100,000 Advance from Loans #8464699-15 on 03/24/2022; 2) $2,500,000 Wire Transfer from Capital Title of Texas, LLC on 03/25/2022; and 3) $35,000 Wire Transfer from Capital Title of Texas, LLC on 03/28/2022.

# EXHIBIT 5




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 2,481.59 | 7/12/2019 | JMJ Development, Inc. | Capital One | 1622 | 1,186,680.95 | | | | WIRE TRANSFER DEPOSIT SILVER STAR TITLE, LLC 071219 USD20191930125200 |
| 304,284.34 | 7/18/2019 | JMJ Development, Inc. | Capital One | 1622 | -150,000.00 | 5193 | | JMJ Development, LLC | CHECK 11674 |
| 135,545.16 | 7/18/2019* | JMJ Development, LLC | Chase | 5193 | 150,000.00 | | 1622 | JMJ Development, Inc. | DEPOSIT 1037819946 |
| 144,191.84 | 7/26/2019 | JMJ Development, Inc. | Capital One | 1622 | -75,000.00 | | | | CHECK 11676 - Check payable to JMJ Development LLC totaling $75,000.00 |
| 91,816.71 | 7/26/2019 | JMJ Development, LLC | Chase | 5193 | 75,000.00 | | | | DEPOSIT 1037819530 - Deposited Ck # 11676 from JMJ Development, Inc. account #1622 payable to JMJ Development, LLC totaling $75,000.00 |
| 79,095.16 | 8/1/2019* | JMJ Development, LLC | Chase | 5193 | -25,000.00 | 5851 | | D4DS, LLC | 08/01 ONLINE TRANSFER TO CHK ... 5851 |
| 6,367.82 | 8/1/2019 | D4DS, LLC | Chase | 5851 | 25,000.00 | | 5193 | JMJ Development, LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION # : 8491660344 |
| | 8/1/2019 | D4DS, LLC | Chase | 5851 | -28,644.51 | | | | 08/01 ONLINE DOMESTIC WIRE TRANSFER VIA : BK AMER NYC / 026009593 A / C : GREYSTONE SERVICING COMPANY WARRENTON VA 20186 US REF : LOAN NUMBER 002081 BELLWETHER RIDGE APARTMENTS MORTGAGE PAYMENT / BNF / LOAN NUMBER 002081 BELLWETHER RIDGE APARTMENTS MORTGAGE PAYMENT IMAD : 0801B1QGC08C028961 TRN : 6733500213ES |

*Note that no **other** deposits were made into JMJ Development, LLC account no. 5193 between 7/18/2019 and 8/1/2019, except for one deposit of $30,000 on 8/1/2019 from Goldmark Hospitality, LLC Chase account no. 6928.




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 100.00 | 8/1/2019 | 2999TC JMJ CMGR, LLC | Chase | 1126 | 1,000,000.00 | | | | Fedwire Credit B/O: John Geoffrey Dowdall Sugar Land, TX: Investment Turtle Creek Acc Tim Barton |
| 800,100.00 | 8/8/2019 | 2999TC JMJ CMGR, LLC | Chase | 1126 | -160,000.00 | 5193 | | JMJ Development, LLC | Online Transfer to Chk 5193 |
| -113,956.72 | 8/8/2019 | JMJ Development LLC | Chase | 5193 | 160,000.00* | | 1126 | 2999TC JMJ CMGR, LLC | ONLINE TRANSFER FROM CHK ... 1126 TRANSACTION # : 8516766334 |
| | 8/8/2019 | Goldmark Hospitality LLC | Chase | 6928 | 30,000.00 | | 6936 | Goldmark Hospitality LLC | Online Transfer from Chk 6936 |
| | 8/8/2019 | Goldmark Hospitality LLC | Chase | 6928 | -30,000.00 | 5193 | | JMJ Development, LLC | Online Transfer to Chk 5193 |
| | 8/8/2019 | JMJ Development LLC | Chase | 5193 | 30,000.00* | | 6928 | Goldmark Hospitality LLC | ONLINE TRANSFER FROM CHK ... 6928 TRANSACTION # : 8517746103 |
| 69,961.37 | 8/12/2019 | JMJ Development LLC | Chase | 5193 | -30,000.00 | 5851 | | D4DS, LLC | 08/12 ONLINE TRANSFER TO CHK ... 5851 |
| 1,350.25 | 8/12/2019 | D4DS LLC | Chase | 5851 | 30,000.00 | | 5193 | JMJ Development LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION # : 8530388106 |
| 6,247.51 | 8/13/2019 | D4DS LLC | Chase | 5851 | 28,644.51 | | | | DEPOSIT 1062307830 |
| 34,892.02 | 8/14/2019 | D4DS LLC | Chase | 5851 | 35,529.45 | | 5193 | JMJ Development LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION # : 8536592857 |
| | 8/14/2019 | D4DS LLC** | Chase | 5851 | -35,529.45 | | | | 08/14 ONLINE DOMESTIC WIRE TRANSFER VIA : BK AMER NYC / 026009593 A / C : GREYSTONE SERVICING COMPANY WARRENTON VA 20186 US REF : FUNDS FOR CHANGE ORDER 03 FOR BELLWETHER RIDGE APARTMENTS LOAN NUMBER 002081 / BNF / FUNDS FOR CHANGE ORDER 0 3 FOR BELLWETHER RIDGE APARTMENTS LOAN NUMBER 002081 IMAD : 0814B1QGC08C008933 TRN : 5269600226ES |

*The deposits presented in the schedule are the only deposits received between 8/8/2019 and 8/12/2019 for JMJ Development, LLC bank account #5193.

**Note that after D4DS, LLC received funds in the amount of $35,529.45 on 8/14/2019, funds in the same amount of $35,529.45 were further disbursed on the same day via a wire transfer to Greystone Servicing Company for Bellwether Ridge Apartments Loan Number 002081.

# EXHIBIT 6




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 2,481.59 | 7/12/2019 | JMJ Development, Inc. | Capital One | 1622 | 1,186,680.95 | | | | WIRE TRANSFER DEPOSIT SILVER STAR TITLE LLC 071219 USD20191930125200 |
| | 7/12/2019 | JMJ Development, Inc. | Capital One | 1622 | -350,000.00 | | | | CHECK 11669 totaling $350,000 payable to JMJ Development LLC |
| 404,663.34 | 7/17/2019 | JMJ Development, Inc. | Capital One | 1622 | -100,000.00 | | | | CHECK 11673 totaling $100,000 payable to JMJ Development LLC |
| 49,539.41 | 7/12/2019 | JMJ Development, LLC | Chase | 5193 | 350,000.00 | | | | Deposited CHECK 11669 CHECK 11669 totaling $350,000 payable to JMJ Development LLC from JMJ Dev acct #1622 |
| 149,945.86 | 7/17/2019 | JMJ Development, LLC | Chase | 5193 | 100,000.00 | | | | DEPOSIT 1038419914 - Deposited chk #11673 totaling $100,000 payable to JMJ Development LLC |
| | 7/17/2019 | JMJ Development, LLC | Chase | 5193 | -106,097.70 | 9375 | | D4FR LLC | 07/17 ONLINE TRANSFER TO CHK ...9375 |
| 74,276.30 | 7/17/2019 | D4FR LLC | Chase | 9375 | 106,097.70 | | 5193 | JMJ Development, LLC | Online Transfer From Chk ... 5193 Transaction#: 8442112520 |
| 180,374.00 | 7/19/2019** | D4FR LLC | Chase | 9375 | -59,300.00 | | | | Check No. 10030; Pay to the Order of Kaufman Co FWSD 1- (Kaufman County Freshwater Supply District), P.O. Box 863657 Plano, TX; District Account Plains Capital Bank |
| 121,074.00 | 7/22/2019** | D4FR LLC | Chase | 9375 | 13,028.00 | | | | Fedwire Credit Via: Bank of America, N. A./026009593 B/O: General Disbursement 20186 US VA Ref: Chase Nyc/Ctr/Bnf=D4Fr LLC Dallas, TX 75234/Ac-000000002838 Rfb=197MEt 8419120N03 Obi=Parc At Windmill Far MS Bbi=iOcmt/USD13028,00/ I mad 072286B7Hu4R012065 Trn 5383709203Ff |
| | 7/22/2019** | D4FR LLC | Chase | 9375 | -162.09 | | | | Check No. 10031; Pay to the Order of: "BGE Brown & Gay Engineers, Inc." BGE Brown & Gay Engineers, Inc., 10777 Westheimer, Suite 400, Houston, TX 77042 |
| | 7/22/2019** | D4FR LLC | Chase | 9375 | -22,239.03 | | | | Check No. 10034; Pay to the Order of: "BGO Architects" BGO Architects, 4202 Beltway Drive, Addison, TX 75001 |
| 111,700.88 | 7/23/2019** | D4FR LLC | Chase | 9375 | -15,000.00 | | | | Check No. 10033; Pay to the Order of: "Torque Electric LLC" Torque Electric LLC, 11998 US Hwy 69, Whitewright, TX, 75491 |
| | 7/23/2019** | D4FR LLC | Chase | 9375 | -1,360.00 | | | | Check No. 10035; Pay to the Order of: "Home Innovation Research Labs" 400 Prince George's Blvd, Upper Marlboro, MD 20774 |
| 95,340.88 | 7/25/2019** | D4FR LLC | Chase | 9375 | -10,827.22 | | | | Check No. 10038; Pay to the Order of: "BGO Architects" BGO Architects, 4202 Beltway Drive, Addison, TX 75001 |
| 84,513.66 | 7/26/2019** | D4FR LLC | Chase | 9375 | -535.02 | | | | Check No. 10037; Pay to the Order of: "BGE Brown & Gay Engineers, Inc." BGE Brown & Gay Engineers, Inc., 10777 Westheimer, Suite 400, Houston, TX 77042 |
| 83,978.64 | 7/26/2019** | D4FR LLC | Chase | 9375 | -565.00 | | | | Check No. 10032; Pay to the Order of: "The Access Partnership LP" 3267 Bee Cave Road Suite 107-502, Austin, TX 78746 |

*No other deposits were received between the transactions presented in the schedule above on 7/12/2019 and 7/17/2019 for JMJ Development, LLC bank account #5193.
**Note that after D4FR, LLC received funds in the amount of $106,097.70 on 7/17/2019, funds were further disbursed over the following days to various vendors via check payments, as presented in the schedule. Paid entities include: "BGE Brown & Gay Engineers, Inc.", "BGO Architects", "Torque Electric, LLC", "Home Innovation Research Labs", and "The Access Partnership, LP".

Further note that JMJ Development, LLC bank no. 5193 received deposits of $20,114.20 on 6/21/2019 and $20,114.20 on 7/10/2019 from SPC.

# EXHIBIT 7




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 923.28 | 2/23/2022 | D4IN LLC | Third Coast Bank | 0850 | 357,147.50 | | | | Wire Transfer Credit Capital Title of Texas LLC: Parc At Ingleside - Final Endo NT - Robert Blanshard |
| 358,065.78 | 2/24/2022 | D4IN LLC | Third Coast Bank | 0850 | -358,000.00 | | | | Wire Transfer Debit JMJD4 LLC |
| 88.34 | 2/24/2022 | JMJD4 LLC | Chase | 5320 | 358,000.00 | | | | Fedwire Credit Via: Third Coast Bank B/O D4IN LLC |
| | 2/24/2022 | JMJD4 LLC | Chase | 5320 | -163,054.48 | | | | Online Domestic Wire Transfer A/C: Southern Properties Capital |
| 195,033.86 | 2/25/2022 | JMJD4 LLC | Chase | 5320 | -72,000.00 | | | | Online Domestic Wire Transfer A/C: Jmj Vc Management LLC |
| 123,033.86 | 2/28/2022 | JMJD4 LLC | Chase | 5320 | -120,000.00 | | | | Online Domestic Wire Transfer A/A: Maximillen Barton |




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 100.00 | 6/16/2020 | D4MC | Chase | 0735 | 149,900.00 | | | | Funds from SBA loan (Sbad Treas 310) |
| 150,000.00 | 6/17/2020 | D4MC | Chase | 0735 | -24,014.85 | 1565 | | D4IN, LLC | Online transfer to Chk 1565 |
| 21,878.22 | 6/16/2020 | D4IN, LLC | Chase | 1565 | -24,014.85 | | | | Check payable to "City of Fort Worth" |
| -2,136.63 | 6/17/2020 | D4IN, LLC | Chase | 1565 | 24,014.85 | | | | |

# EXHIBIT 8




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 3,270.32 | 11/23/2021 | Ridgeview Addition, LLC | Chase | 8152 | 306,348.79 | | | | Book Transfer Credit: American Benefit Life Insurance Company Ref: Ab0071 - Draw #5/Ins/Aba/043000096PNCBank |
| 240,273.00 | 12/3/2021 | Ridgeview Addition, LLC | Chase | 8152 | -210,000.00 | 1391 | | Lajolla Construction Management LLC | |
| 2,668.80 | 12/3/2021 | Lajolla Construction Management, LLC | Chase | 1391 | 210,000.00 | | 8152 | Ridgeview Addition, LLC | |
| | 12/3/2021 | Lajolla Construction Management, LLC | Chase | 1391 | -210,000.00 | 9892 | | Enoch Investments, LLC | |
| 693.96 | 12/3/2021 | Enoch Investments, LLC | Chase | 9892 | 210,000.00 | | 1391 | Lajolla Construction Management LLC | Online Transfer From Chk 1391 |
| | 12/3/2021 | Enoch Investments, LLC | Chase | 9892 | -210,000.00 | 1720 | | D4OP, LLC | Online Transfer To Chk 1720 |

* No other deposits were received between 11/13/2021 and 12/03/2021 for Ridgeview Addition, LLC bank account no. 8152.




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 34.25 | 6/14/2021 | D4KL LLC | Chase | 0077 | 260,435.53* | | | | Book Transfer Credit B/O: Nmp-Killeen Limited Partnership Ref: Enclave Killeen Bnf Enclave At Killeen Reimbursements |
| 469.78 | 6/18/2021 | D4KL LLC | Chase | 0077 | 420,292.75* | | | | Book Transfer Credit B/O: Chicago Title of Texas LLC Ref: Cta2005804 Proceeds Prop addr: 3701 Rosewoood Drive, Killeen, TX |
| 319,481.02 | 6/22/2021 | D4KL LLC | Chase | 0077 | -30,000.00 | 5320 | | JMJD4 LLC | Online Transfer To Chk 5320 |
| 1,426.34 | 6/22/2021 | JMJD4 LLC | Chase | 5320 | 30,000.00 | | 0077 | D4KL LLC | Online Transfer From Chk 0077 |
| 31,426.34 | 6/23/2021 | JMJD4 LLC | Chase | 5320 | -15,000.00 | 1720 | | D4OP, LLC | Online Transfer To Chk 1720 |

* These two deposits were the only deposits received in June 2021 for D4KL LLC Chase bank account #0077.

# EXHIBIT 9




| Bal Before Trans | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 9/28/2018 | Wall016, LLC | Chase | 1761 | -750,000.00 | 7036 | | Carnegie Development, LLC | Online Transfer to Chk ... 7036 (Carnegie Development, LLC) |
| 17,585.24 | 9/28/2018 | Carnegie Development, LLC | Chase | 7036 | 750,000.00 | | 1761 | Wall016, LLC | Online Transfer from Chk ... 1761 (Wall016, LLC) |
| | 9/28/2018 | Carnegie Development, LLC | Chase | 7036 | -200,000.00 | 5193 | | | |
| | 9/28/2018 | Carnegie Development, LLC | Chase | 7036 | -325,000.00 | 5193 | | | |
| 191,198.87 | 9/28/2018 | JMJ Development, LLC | Chase | 5193 | 200,000.00 | | 7036 | | Online Transfer from Chk 7036 (Carnegie Development, LLC) |
| | 9/28/2018 | JMJ Development, LLC | Chase | 5193 | 325,000.00 | | 7036 | | Online Transfer from Chk 7036 (Carnegie Development, LLC) |
| | 9/28/2018 | JMJ Development, LLC | Chase | 5193 | -200,000.00 | 6928 | | Goldmark Hospitality, LLC | |
| | 9/28/2018 | JMJ Development, LLC | Chase | 5193 | -300,000.00 | | | | Online Domestic Wire Transfer A/A Aero Space Reports Inc. Escrow Account /Bnf/Christina Hancock |
| 24,950.98 | 9/28/2018 | Goldmark Hospitality, LLC | Chase | 6928 | 200,000.00 | | 5193 | JMJ Development, LLC | Online Transfer from Chk 5193 |
| 225,010.64 | 10/3/2018 | Goldmark Hospitality, LLC | Chase | 6928 | -200,000.00 | | | | Check #10201 dated 9/28/2018 payable to Universal Solar System paid on 10/3/2018. |




| Bal Before Trans | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 12/26/2018 | WALL017, LLC | Chase | 2529 | -100,000.00 | 7036 | | Carnegie Development, LLC | 12/28 Online Transfer To Chk .7036 Transaction#: 7796534313 |
| 30,664.29 | 12/28/2018* | Carnegie Development, LLC | Chase | 7036 | 100,000.00 | | 2529 | WALL017, LLC | ONLINE TRANSFER FROM CHK ... 2529 TRANSACTION # : 7796534313 |
| | 12/28/2018 | Carnegie Development, LLC | Chase | 7036 | -100,000.00 | 5193 | | JMJ Development, LLC | 12/28 ONLINE TRANSFER TO CHK ... 5193 TRANSACTION # : 7796535175 |
| 39,305.95 | 12/28/2018* | JMJ Development, LLC | Chase | 5193 | 100,000.00 | | 7036 | Carnegie Development, LLC | ONLINE TRANSFER FROM CHK ... 7036 TRANSACTION # : 7796535175 |
| 37,896.59 | 12/31/2018* | JMJ Development, LLC | Chase | 5193 | 550,000.00 | | | | FEDWIRE CREDIT VIA : PROSPERITY BANK / 113122655 B / O : SILVER STAR TITLE, LLC DALLAS , TX 75204-0000 REF : CHASE NYC / CTR / BNF = JMJ DEVELOPMENT , LLC DALLAS , TX 75234 / AC - 00000000276 2 RFB = 0 / B PROSPERITY B OBI - PROCEEDS ; 1300 FM 157, VENUS; 1804244 - MCCB ; 214-891-1957 SR / HN BBI- / ACC / PROCEE DS : 1300 FM 157 , VENUS : 1804 |
| | 12/31/2018* | JMJ Development, LLC | Chase | 5193 | 120,000.00 | | 7036 | Carnegie Development, LLC | ONLINE TRANSFER FROM CHK ... 7036 TRANSACTION # : 7803938830 |
| | 12/31/2018* | JMJ Development, LLC | Chase | 5193 | -120,000.00 | 7036 | | Carnegie Development, LLC | 12/31 ONLINE TRANSFER TO CHK ... 7036 TRANSACTION # : 7804752685 |
| | 12/31/2018* | JMJ Development, LLC | Chase | 5193 | -50,000.00 | 6928 | | Goldmark Hospitality, LLC | 12/31 ONLINE TRANSFER TO CHK ... 6928 TRANSACTION # : 7803940088 |
| 21,390.08 | 12/31/2018 | Goldmark Hospitality, LLC | Chase | 6928 | 50,000.00 | | 5193 | JMJ Development, LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION # : 7803940088 |
| 72,279.78 | 1/3/2019 | Goldmark Hospitality, LLC | Chase | 6928 | -50,000.00 | | | | Check # 10264 dated 12/31/2018 payable to Universal Solar System paid 10/3/2019 |

*Besides the deposits presented in the schedule, no other deposits were received between 12/26/2018 and 12/28/2018 for Carnegie Development, LLC account no. 7036. No other deposits were further received between 12/28/2018 and 12/31/2018 for JMJ Development, LLC bank account #5193.

# EXHIBIT 10




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 6/26/2018 | Wall007, LLC | Capital One | 5436 | -1,500,000.00 | 1331 | | Carnegie Development, LLC | Transfer Debit TO ... 1331 |
| 67,804.07 | 6/26/2018 | Carnegie Development, LLC | Capital One | 1331 | 1,500,000.00 | | 5436 | Wall007, LLC | Transfer Credit From 5436 |
| 67,804.07 | 6/26/2018 | Carnegie Development, LLC | Capital One | 1331 | -1,500,000.00 | 1846 | | Wall011, LLC | Transfer Debit To 1846 |
| 0.00 | 6/26/2018 | Wall011, LLC | Capital One | 1846 | 1,500,000.00 | | 1331 | Carnegie Development, LLC | Transfer Credit From 1331 |
| | 6/26/2018 | Wall011, LLC | Capital One | 1846 | -1,500,000.00 | | | | Wire Transfer withdrawal Silver Star Title LLC DBA |
| | | | | | | | | | |
| | 6/26/2018 | Wall007, LLC | Capital One | 5436 | -109,000.00 | 1331 | | Carnegie Development, LLC | Transfer Debit TO ... 1331 |
| 67,804.07 | 6/26/2018 | Carnegie Development, LLC | Capital One | 1331 | 109,000.00 | | 5436 | Wall007, LLC | Transfer Credit From 5436 |
| 67,804.07 | 6/26/2018 | Carnegie Development, LLC | Capital One | 1331 | -109,000.00 | 1846 | | Wall011, LLC | Transfer Debit To 1846 |
| 0.00 | 6/26/2018 | Wall011, LLC | Capital One | 1846 | 109,000.00 | 1331 | 1331 | Carnegie Development, LLC | Transfer Credit From 1331 |
| | 6/26/2018 | Wall011, LLC | Capital One | 1846 | -108,059.97 | | | | Wire Transfer withdrawal Silver Star Title LLC DBA |

# EXHIBIT 11




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 7/10/2017 | Wall007, LLC | Capital One | 5436 | -200,000.00 | 1331 | | | Online banking xfer withdrawal TO ...1331 |
| 2,725.00 | 7/10/2017 | Carnegie Development, LLC | Capital One | 1331 | 200,000.00 | | 5436 | | Online bank xfer deposit FROM ...5436 |
| | 7/10/2017 | Carnegie Development, LLC | Capital One | 1331 | -200,000.00 | 6246 | | | Online bank xfer withdrawal TO ...6246 |
| | 7/10/2017 | Wall009 LLC | Capital One | 6246 | 200,000.00 | | 1331 | | Online banking xfer deposit FROM ...1331 |
| | 7/10/2017 | Wall009 LLC | Capital One | 6246 | -1,800,470.53 | | | | Wire transfer withdrawal Silver Star Title, LLC |

# EXHIBIT 12




| Bal Before Trans | Bal After Trans | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 8/29/2018 | Wall016, LLC | Chase | 1761 | -220,000.00 | 7036 | | Carnegie Development, LLC | Online Transfer To Chk ...7036 |
| | | 8/29/2018 | Wall012, LLC | Chase | 0510 | -1,660,000.00 | 7036 | | Carnegie Development, LLC | Online Transfer To Chk ...7036 |
| 119.88 | 220,119.88 | 8/29/2018 | Carnegie Development, LLC | Chase | 7036 | 220,000.00 | | 1761 | Wall016, LLC | ONLINE TRANSFER FROM CHK ... 1761 |
| 220,119.88 | 1,880,119.88 | 8/29/2018 | Carnegie Development, LLC | Chase | 7036 | 1,660,000.00 | | 0510 | Wall012, LLC | ONLINE TRANSFER FROM CHK ... 0510 |
| 1,880,119.88 | 1,940.51 | 8/30/2018 | Carnegie Development, LLC | Chase | 7036 | -1,878,179.37 | | | | DOMESTIC WIRE TRANSFER VIA : CAPITAL ONE NA / 111901014 A / C : LDG001 LLC |

* There were no **other** deposits between 8/29/2018 and 8/30/2018 in Carnegie Development, LLC account # 7036

# EXHIBIT 13




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| $ 30,664.29 | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ 250,000.00 | | 2529 | Wall017, LLC | ONLINE TRANSFER FROM CHK ... 2529 TRANSACTION # : 7804273804 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ 120,000.00 | | 2529 | Wall017, LLC | ONLINE TRANSFER FROM CHK ... 2529 TRANSACTION # : 7803937862 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ 120,000.00 | | 5193 | JMJ Development LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION # : 7804752685 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ 110,000.00 | | 2529 | Wall017, LLC | ONLINE TRANSFER FROM CHK ... 2529 TRANSACTION # : 7804061715 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ 110,000.00 | | 5193 | JMJ Development LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION # : 7804749178 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ (120,000.00) | | 5193 | JMJ Development LLC | 12/31 ONLINE TRANSFER TO CHK ... 5193 TRANSACTION # : 7803938830 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ (104,065.51) | | | | 12/31 ONLINE DOMESTIC WIRE TRANSFER VIA : PROSPERITY BK ELCA / 113122655 A / C : SENDERA TITLE DALLAS TX 75204 US REF : GF 1804244 MCCB 195 5ACRES JOHN N ELY SURVEY JOHNSON COUNTY 1300 FM 15 7 BERKOWITZ CLOSING COSTS / BNF / GF 18 04244 MCCB 195 5ACRES JOHN N ELY SURVEY JOHNSON COUNTY 1300 FM 157 BE RKOWITZ CLOSING COST IMAD : 1231B1QGC01C016477 TRN : |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ (250,000.00) | 6539 | | JMJAV, LLC | 12/31 ONLINE TRANSFER TO CHK ... 6539 TRANSACTION # : 7804279716 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ (110,000.00) | 2529 | | Wall017, LLC | 12/31 ONLINE TRANSFER TO CHK ... 2529 TRANSACTION # : 7804750695 |
| | 12/31/2018 | Carnegie Development LLC | Chase | 7036 | $ (120,000.00) | 2529 | | Wall017, LLC | 12/31 ONLINE TRANSFER TO CHK ... 2529 TRANSACTION # : 7804753745 |

# EXHIBIT 14




*Note that after the deposit of $210,000 was received into Ridgeview Addition, LLC Account no. 8152, a check dated the same day 1/4/2022 was paid to 'Circle H' in the amount of $266,090.29 from Ridgeview Addition, LLC account 8152.

| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 278.75 | 12/30/2021 | Villita Towers LLC | Chase | 8167 | 150,000.00 | | | | Fedwire Credit via: B/O: **Republic Title of Texas, Inc.**Release of EM Deposit 112-120 Villita Street |
| | 12/31/2021 | Villita Towers LLC | Chase | 8167 | 362,242.19 | | | | Fedwire Credit via: B/O: **Republic Title of Texas, Inc.** 112-120 & Villita Street Seller Proceeds Villita Street Sale Proceeds |
| 202,520.94 | 1/4/2022 | Villita Towers LLC | Chase | 8167 | -200,000.00 | 9892 | | Enoch | Online Transfer to Chk 9892 |
| 165.46 | 12/31/2021 | 126 Villita, LLC | Chase | 8392 | 362,242.19 | | | | Fedwire Credit via: B/O: **Republic Title of Texas, Inc.** 112-120 Villita Street Sale Proceeds |
| 179,407.65 | 1/4/2022 | 126 Villita, LLC | Chase | 8392 | -10,000.00 | 9892 | | Enoch Investments, LLC | Online Transfer to Chk 9892 |
| | 1/4/2022 | 126 Villita, LLC | Chase | 8392 | -56,090.00 | 1391 | | LaJolla Construction Management LLC | Online Transfer to Chk 1391 |
| 683.96 | 1/4/2022 | Enoch Investments, LLC | Chase | 9892 | 200,000.00 | | 8167 | Villita Towers LLC | Online Transfer from Chk 8167 |
| | 1/4/2022 | Enoch Investments, LLC | Chase | 9892 | 10,000.00 | | 8392 | 126 Villita, LLC | Online Transfer from Chk 8392 |
| | 1/4/2022 | Enoch Investments, LLC | Chase | 9892 | -210,000.00 | 1391 | | LaJolla Construction Management LLC | Online Transfer to Chk 1391 |
| 232.62 | 1/4/2022 | LaJolla Construction Management LLC | Chase | 1391 | 210,000.00 | | 9892 | Enoch Investments, LLC | Online Transfer from Chk 9892 |
| | 1/4/2022 | LaJolla Construction Management LLC | Chase | 1391 | -210,000.00 | 8152 | | Ridgeview Addition, LLC | Online Transfer to Chk 8152 |
| | 1/4/2022 | LaJolla Construction Management LLC | Chase | 1391 | 56,090.00 | | 8392 | 126 Villita, LLC | Online Transfer from Chk 8392 |
| | 1/5/2022 | LaJolla Construction Management LLC | Chase | 1391 | -56,090.00 | 8152 | | Ridgeview Addition, LLC | Online Transfer to Chk 8152 |
| 1,881.53 | 1/4/2022 | Ridgeview Addition, LLC | Chase | 8152 | 210,000.00 | | 1391 | LaJolla Construction Management LLC | Online Transfer From Chk 1391 |
| | 1/5/2022 | Ridgeview Addition, LLC | Chase | 8152 | 56,090.00 | | 1391 | LaJolla Construction Management LLC | Online Transfer From Chk 1391 |
| | 1/7/2022 | Ridgeview Addition, LLC | Chase | 8152 | -266,090.29 | | | | Check no. 9660 dated 1/4/2022 payable to "Circle H" |

# EXHIBIT 15




| Bal Before Trans | Bal After Trans | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 6/10/2019 | Wall007, LLC | Chase | 3096 | -150,000.00 | 7036 | | Carnegie Development, LLC | Transfer to Chk.7036 |
| 5,561.11 | 155,561.11 | 6/10/2019 | Carnegie Development, LLC | Chase | 7036 | 150,000.00 | | 3096 | Wall007, LLC | Online transfer From ChK ... 3096 |
| 155,561.11 | 5,561.11 | 6/10/2019 | Carnegie Development, LLC | Chase | 7036 | -150,000.00 | 5193 | | JMJ Development, LLC | Online Transfer to Chk ... 5193 |
| 25,379.23 | 175,379.23 | 6/10/2019 | JMJ Development, LLC | Chase | 5193 | 150,000.00 | | 7036 | Carnegie Development, LLC | Online transfer From ChK ... 7036 |
| 175,379.23 | 25,379.23 | 6/10/2019 | JMJ Development, LLC | Chase | 5193 | -150,000.00 | | | | 06/10 ONLINE DOMESTIC WIRE TRANSFER VIA : BENCHMARK / 111902055 A / C : BENCHMARK TITLE LLC ESCROW ACCOUNTPLANO TX 75024 US REF : GF - PI18-22266 - 2999 TURTLE CREEK BLVD - ATTN : BRITTNEY PAYNE 214-485-8650 / BNF / GF - PI18-22266 - 2999 TURTL E CREEK BLVD - ATTN : BRITTNEY PAYNE 2 14-485-8650 IMAD : 0610B1QGC05C009521 |




*The transaction depicted in the chart above represents the purchase of **Turtle Creek**. The purchase was made with funds sourced from Moss and Associate's refinance of 11417 CR 501, Venus, TX, owned by DJD Land Partners. Note that the funds were transferred directly from one title company to the other, without passing through any Entity bank account.




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 242,267.98 | 3/25/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 2,500,000.00 | | | | Wire transfer from Capital Title of Texas LLC |
| | 3/25/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -2,500,000.00 | | | | Withdraw for Cashier's Check for payment to HNGH Turtle Creek. |

*The transaction depicted in the chart above represents a payment to **HNGH Turtle Creek**. The payment was made with funds sourced from LDG001's refinance with Pioneer Finance, Inc. in March of 2022. The refinancing resulted in a wire of $2,500,000 sent from Pioneer's account at Veritex Bank to Capital Title of Texas's account at PNC Bank on March 25, 2022.

# EXHIBIT 16


Wall016, LLC
Chase No. 1761
$100,000
12/13/2018
Wall017, LLC
Chase No. 2529
$35,000
12/03/2018*
$100,000
12/10/2018
$230,000
12/13/2018
Wall012, LLC
Chase No. 0510
$100,000
12/13/2018
Carnegie Development, LLC
Chase No. 7036
Beginning Balance on 12/03/2018: $37,176.65
Beginning Balance on 12/13/2018: $26,406.07
$100,000
12/10/2018
$175,000
12/13/2018*
$100,000
12/13/2018*
JMJ Development, LLC
Chase No. 5193
Beginning Balance on 12/10/2018: $50,967.22
Beginning Balance on 12/13/2018: -$75,397.77
$135,000 12/13/2018
Mansion Apartment Homes at Marine Creek, LLC
Mansions at Marine Creek

| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 37,176.65 | 12/3/2018* | Carnegie Development, LLC | Chase | 7036 | 35,000.00 | | 2529 | Wall017 | |
| 26,667.32 | 12/10/2018* | Carnegie Development, LLC | Chase | 7036 | 100,000.00 | | 2529 | Wall017 | |
| 26,406.07 | 12/13/2018* | Carnegie Development, LLC | Chase | 7036 | 130,000.00 | | 2529 | Wall017 | |
| | 12/13/2018* | Carnegie Development, LLC | Chase | 7036 | 100,000.00 | | 1761 | Wall016 | |
| | 12/13/2018* | Carnegie Development, LLC | Chase | 7036 | 100,000.00 | | 0510 | Wall012 | |
| | 12/13/2018* | Carnegie Development, LLC | Chase | 7036 | 100,000.00 | | 2529 | Wall017 | |
| 50,967.22 | 12/10/2018 | JMJ Development | Chase | 5193 | 100,000.00 | | 7036 | Carnegie Development | |
| 73,715.27 | 12/12/2018 | JMJ Development | Chase | 5193 | 25,000.00 | | 8167 | Villita Towers | |
| **Beg Bal** | **Date** | **Entity** | **Bank** | **Acct #** | **Amount** | **End Bal** | **Transfer From** | **Transfer To/From Entity** | |
| 59,880.07 | ***Total Unrelated disbursements on 12/13/2018:*** | | | | -135,277.84 | -75,397.77 | | | |
| -75,397.77 | 12/13/2018 | JMJ Development, LLC | Chase | 5193 | 175,000.00 | 99,602.23 | 7036 | Carnegie Development, LLC | |
| 99,602.23 | 12/13/2018 | JMJ Development, LLC | Chase | 5193 | 100,000.00 | 199,602.23 | 7036 | Carnegie Development, LLC | |
| 199,602.23 | 12/13/2018 | JMJ Development, LLC | Chase | 5193 | -135,000.00 | 64,602.23 | | | **Happy State Bank for Mansions at Marine Creek** |

*Besides those presented in the schedule, other deposits received between 12/3/2018 and 12/13/2018 amount to $361.97 for Carnegie Development, LLC account 7036.

# EXHIBIT 17




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 1,596,264.00 | 11/3/2017 | WALL010, LLC | Capital One | 3851 | -375,000.00 | 1331 | | Carnegie Development, LLC | Online banking xfer withdrawal TO ...1331 |
| 43,602.98 | 11/3/2017 | Carnegie Development, LLC | Capital One | 1331 | 375,000.00 | | 3851 | WALL010, LLC | ONLINE BANKING XFER DEPOSIT FROM ... 3851 |
| | 11/3/2017 | Carnegie Development, LLC | Capital One | 1331 | -375,000.00 | 5436 | | WALL007, LLC | ONLINE BANKING XFER WITHDRAWAL TO ... 5436 |
| 1,230.54 | 11/3/2017 | WALL007, LLC | Capital One | 5436 | 375,000.00 | | 1331 | | Online banking xfer deposit FROM ...1331 |
| 376,230.54 | 11/6/2017 | WALL007, LLC | Capital One | 5436 | -376,644.74 | | | | Wire transfer withdrawal SILVER STAR TITLE, LLC; 110617 USD81575969 (For purchase of Orchard Farms) |

*Besides the $375,000 deposit on 11/03/2017, no **other** deposits were made into Carnegie Development, LLC account no. 1331 on 11/03/2017.

# EXHIBIT 18




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| $ 4,027.05 | 7/6/2018 | Seagoville Farms, LLC | Capital One | 7841 | $3,433,873.79 | | | | WIRE TRANSFER DEPOSIT TEXAS AMERICAN TITLE COMPANY 070618 USD************08 |
| $ 3,437,885.84 | 7/9/2018 | Seagoville Farms, LLC | Capital One | 7841 | $ (500,000.00) | 1331 | | Carnegie Development, LLC | TRANSFER WITHDRAWAL TO ...1331 |
| $ 17,658.96 | 7/9/2018 | Carnegie Development, LLC | Capital One | 1331 | $ 500,000.00 | | 7841 | Seagoville Farms, LLC | TRANSFER DEPOSIT FROM ...7841 |
| $ 2,937,885.84 | 7/10/2018 | Seagoville Farms, LLC | Capital One | 7841 | $ (200,000.00) | 1331 | | Carnegie Development, LLC | TRANSFER WITHDRAWAL TO ...1331 |
| $ (20,926.04) | 7/10/2018 | Carnegie Development, LLC | Capital One | 1331 | $ 200,000.00 | | 7841 | Seagoville Farms, LLC | TRANSFER DEPOSIT FROM ...7841 |
| $ 2,737,885.84 | 7/13/2018 | Seagoville Farms, LLC | Capital One | 7841 | $ (50,000.00) | 1331 | | Carnegie Development, LLC | TRANSFER WITHDRAWAL TO ...1331 |
| $ 170.00 | 7/13/2018 | Carnegie Development, LLC | Capital One | 1331 | $50,000.00 | | 7841 | Seagoville Farms, LLC | TRANSFER DEPOSIT FROM ...7841 |
| | 7/13/2018 | Seagoville Farms, LLC | Capital One | 7841 | $ (350,000.00) | 1331 | | | TRANSFER WITHDRAWAL TO ...1331 |
| | 7/13/2018 | Carnegie Development, LLC | Capital One | 1331 | $350,000.00 | | 7841 | Seagoville Farms, LLC | TRANSFER DEPOSIT FROM ...7841 |
| | 7/13/2018 | Carnegie Development, LLC | Capital One | 1331 | $ (345,000.00) | 1622 | | | TRANSFER WITHDRAWAL TO ...1622 |
| $ 198,309.97 | 7/13/2018 | JMJ Development, LLC | Capital One | 1622 | $ 345,000.00 | | 1331 | Carnegie Development, LLC | TRANSFER DEPOSIT FROM ...1331 |
| | 7/13/2018 | JMJ Development, LLC | Capital One | 1622 | $ (311,022.06) | | | | WIRE TRANSFER WITHDRAWAL FIRST AMERICAN TITLE COMPANY 071318 USD83833478 |




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| $ 109,300.00 | 6/21/2018 | JMJAV, LLC | Chase | 6539 | $ 29,985.00 | | | | Fedwire Credit Via: Industrial & Comm Bank of China Ltd/02601 4591 B/O: Wu Jia Fei 310115198305200425 Ref Chase Nyc/Ctr/Bnf=Jmjav LLC Dallas, TX 75234/Ac-000000002818 Rfb=O/B I Cbc Obi=Jiafei Wu Bbi=/Chgs/USD15,0 0/Ocmt/USD30000,00/Gysh/ I mad 0621Mmqfmp51000087 Trn 0137609172Ff |
| $ 139,285.00 | 6/25/2018 | JMJAV, LLC | Chase | 6539 | $ (25,000.00) | 5193 | | JMJ Development, LLC | Online Transfer To Chk ... 5193 Transaction #: 7260018118 |
| $ 26,283.63 | 6/25/2018 | JMJ Development, LLC | Chase | 5193 | $ 25,000.00 | | 6539 | JMJAV, LLC | Online Transfer From Chk ... 6539 Transaction #: 7260018118 |
| | 6/25/2018 | JMJ Development, LLC | Chase | 5193 | $ (25,000.00) | | | | 06/25 ONLINE DOMESTIC WIRE TRANSFER VIA : FST AM TR CO SANA / 122241255 A / C : FIRST AMERICAN TITLE INSURANCE CO SANTA ANA CA 92707 US REF : 42ND ST NW , WINTER HAVEN FL 33881 3020-899532 IMAD : 0625B1QGC02C008154 TRN : 5885900176ES |

# EXHIBIT 19




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 8/16/2018 | Wall012, LLC | Chase | 0510 | -400,000.00 | 7036 | | Carnegie Development, LLC | |
| 6,365.06 | 8/16/2018 | Carnegie Development, LLC | Chase | 7036 | 400,000.00 | | 0510 | Wall012, LLC | |
| | 8/16/2018 | Carnegie Development, LLC | Chase | 7036 | -400,000.00 | 5193 | | JMJ Development, LLC | |
| 132,735.04 | 8/16/2018 | JMJ Development, LLC | Chase | 5193 | 400,000.00 | | 7036 | Carnegie Development, LLC | |
| | 8/16/2018 | JMJ Development, LLC | Chase | 5193 | -396,077.99 | | | | 08/16 ONLINE DOMESTIC WIRE TRANSFER VIA : NTL UN GATESVILLE / 111904419 A / C : MONTEITH ABSTRACT AND TITLE CO KILLEEN TX 76542 US REF : 18-0598 ROSEWOOD / BNF / REF 18-0598 ROSEWOOD IMAD : 0816B1QGC08C030143 TRN : 5288500228ES |

# EXHIBIT 20




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 11/30/2017 | Wall010, LLC | Capital One | 3851 | $ (200,000.00) | 1331 | | Carnegie Development, LLC | Online banking xfer withdrawal TO 1331 |
| $ 50,450.36 | 11/30/2017 | Carnegie Development, LLC | Capital One | 1331 | $ 200,000.00 | | 3851 | Wall010, LLC | Online banking xfer deposit FROM 3851 |
| | 11/30/2017 | Carnegie Development, LLC | Capital One | 1331 | $ (200,000.00) | 1622 | | JMJ Development LLC | Online banking xfer withdrawal TO 1622 |
| $ 20,647.99 | 11/30/2017 | JMJ Development LLC | Capital One | 1622 | $ 200,000.00 | | 1331 | Carnegie Development, LLC | ONLINE BANKING XFER DEPOSIT FROM ...1331 |
| | 11/30/2017 | JMJ Development LLC | Capital One | 1622 | $ (150,000.00) | 8090 | | Villita Towers, LLC | ONLINE BANKING XFER WITHDRAWAL TO ...8090 |
| $ 16,845.36 | 11/30/2017 | Villita Towers, LLC | Capital One | 8090 | $ 150,000.00 | | 1622 | JMJ Development LLC | |
| | 11/30/2017* | Villita Towers, LLC | Capital One | 8090 | $ (150,000.00) | | | | Check #1542 payable to Presidio Title, LLC. Per R&D Ledger, the funds were "Earnest Money" for the purchase of Villita Towers. |

*Note that after Villita Towers, LLC received funds in the amount of $150,000 on 11/30/2017, funds in the same amount of $150,000 were further disbursed on the same day via check #1542 payable to Presidio Title, LLC. Per the Receipts & Disbursements ledger, the transaction related to earnest money used for the purchase of Villita Towers.




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 3/13/2017 | Wall007, LLC | Capital One | 5436 | $ 249,974.00 | | | | Wire transfer deposit Zhao Zhong |
| | 3/13/2017 | Wall007, LLC | Capital One | 5436 | $ 249,974.00 | | | | Wire transfer deposit Zhao Zhong |
| | 3/14/2017 | Wall007, LLC | Capital One | 5436 | $ (91,000.00) | 1622 | | JMJ Development, LLC | Online banking xfer withdrawal to 1622 |
| | 3/14/2017 | Wall007, LLC | Capital One | 5436 | $ (91,000.00) | 1622 | | JMJ Development, LLC | Online banking xfer withdrawal to 1622 |
| $ 9,523.34 | 3/14/2017 | JMJ Development, LLC | Capital One | 1622 | $ 91,000.00 | | 5436 | Wall007, LLC | Online banking xfer deposit from 5436 |
| | 3/14/2017 | JMJ Development, LLC | Capital One | 1622 | $ 91,000.00 | | 5436 | Wall007, LLC | Online banking xfer deposit from 5436 |
| | 3/14/2017 | JMJ Development, LLC | Capital One | 1622 | $ (91,000.00) | 8090 | | Villita Towers, LLC | Online banking xfer withdrawal to 8090 |
| $1,560.76 | 3/14/2017 | Villita Towers, LLC | Capital One | 8090 | $ 91,000.00 | | 1622 | JMJ Development, LLC | Online banking xfer deposit FROM ...1622 |
| $92,560.76 | 3/14/2017 | Villita Towers, LLC | Capital One | 8090 | $ (91,426.00) | | | | Wire transfer withdrawal GFC-FHA WIRE ACCOUNT 031417 USD78720863 |

*Note that after Villita Towers, LLC received funds in the amount of $91,000 on 3/14/2017, funds in the amount of $91,426.00 were further disbursed on the same day via a wire transfer to GFC-FHA wire account 031417.




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| - | 5/1/2017 | Wall 007, LLC | Capital One | 5436 | $ (10,000.00) | 1622 | | JMJ Development, LLC | Online banking xfer withdrawal TO ...1622 |
| | 5/1/2017 | Wall 007, LLC | Capital One | 5436 | $ (280,000.00) | 1622 | | JMJ Development, LLC | Online banking xfer withdrawal TO ...1622 |
| $ 2,516.28 | 5/1/2017 | JMJ Development, LLC | Capital One | 1622 | $ 10,000.00 | | 5436 | WALL007, LLC | ONLINE BANKING XFER DEPOSIT FROM ...5436 |
| | 5/1/2017 | JMJ Development, LLC | Capital One | 1622 | $ 280,000.00 | | 5436 | WALL007, LLC | ONLINE BANKING XFER DEPOSIT FROM ...5436 |
| - | 5/1/2017 | JMJ Development, LLC | Capital One | 1622 | $ (11,000.00) | 8090 | | Villita Towers LLC | ONLINE BANKING XFER WITHDRAWAL TO ...8090 |
| | 5/1/2017 | JMJ Development, LLC | Capital One | 1622 | $ (275,000.00) | 8090 | | Villita Towers LLC | ONLINE BANKING XFER WITHDRAWAL TO ...8090 |
| $ 376.42 | 5/1/2017 | Villita Towers, LLC | Capital One | 8090 | $ 11,000.00 | | 1622 | JMJ Development, LLC | Online banking xfer deposit FROM ...1622 |
| | 5/1/2017 | Villita Towers, LLC | Capital One | 8090 | $ 275,000.00 | | 1622 | JMJ Development, LLC | Online banking xfer deposit FROM ...1622 |
| | 5/1/2017 | Villita Towers, LLC | Capital One | 8090 | $ (274,832.66) | | | | Wire transfer withdrawal FIRST AMERICAN TITLE CO. N 050117 USD79435131 |
| | 5/2/2017 | Villita Towers, LLC | Capital One | 8090 | $ (10,000.00) | | | | Check #1517 dated 5/1/2017 payable to Mark Adams for $10,000 |

*Note that after Villita Towers, LLC account no. 8090 received funds in the amount of $275,000 on 5/1/2017, funds of $274,832.66 were further disbursed from Villita Towers, LLC account no. 8090 on the same day via a wire transfer to First American Title Co.

# EXHIBIT 21




| Bal Before Trans | Bal After Trans | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 11/27/2018 | Wall016, LLC | Chase | 1761 | -60,000.00 | 7036 | | Carnegie Development, LLC | |
| 33,329.80 | 93,329.80 | 11/27/2018 | Carnegie Development, LLC | Chase | 7036 | 60,000.00 | | 1761 | Wall016, LLC | |
| 93,329.80 | 593,329.80 | 11/27/2018 | Carnegie Development, LLC | Chase | 7036 | 500,000.00 | | 6539 | JMJAV, LLC | ONLINE TRANSFER FROM CHK ... 6539 |
| | | 11/27/2018 | Wall017, LLC | Chase | 2529 | -1,440,000.00 | 7036 | | Carnegie Development, LLC | |
| 593,329.80 | 2,033,329.80 | 11/27/2018 | Carnegie Development, LLC | Chase | 7036 | 1,440,000.00 | | 2529 | Wall017, LLC | |
| 2,033,329.80 | 33,329.80 | 11/27/2018 | Carnegie Development, LLC | Chase | 7036 | -2,000,000.00 | | | | Domestic Wire Transfer Reference: Bear Creek Ranch |

# EXHIBIT 22




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 6/27/2018 | Wall012 | Chase | 0510 | -300,000.00 | 1331 | | | 06/27 Online Domestic Wire Transfer Via: Capital One NN1 11901014 NC: Carnegie Development Dallas TX 75234 US Ref Lost Creek - Loan From Wa1112 To Carnegie Imad 0627B1 0gc04C01 0299 Trn 51708001 78Es |
| 67,764.66 | 6/27/2018 | Carnegie Development, LLC | Capital One | 1331 | 300,000.00 | | 0510 | | Wire Transfer Deposit Wall012 LLC |
| | 6/27/2018 | Wall007, LLC | Capital One | 1714 | -300,000.00 | | | | TRANSFER WITHDRAWAL TO ...1331 |
| 67,764.66 | 6/27/2018 | Carnegie Development, LLC | Capital One | 1331 | 300,000.00 | | 1714 | | Wall007, LLC |
| 67,764.66 | 6/27/2018 | Carnegie Development, LLC | Capital One | 1331 | -300,000.00 | 1714 | | | Wall007, LLC |
| | 6/27/2018 | Wall007, LLC | Capital One | 1714 | 300,000.00 | | 1331 | Carnegie Development, LLC | TRANSFER DEPOSIT FROM ...1331 |
| 67,764.66 | 6/27/2018 | Carnegie Development, LLC | Capital One | 1331 | -300,000.00 | 3851 | | | Wall010, LLC |
| 55.18 | 6/27/2018 | Wall010, LLC | Capital One | 3851 | 300,000.00 | | 1331 | Carnegie Development, LLC | TRANSFER DEPOSIT FROM ...1331 |
| | 6/27/2018 | Wall010, LLC | Capital One | 3851 | -300,000.00 | | | | Check #1011 dated 6/27/2018 payable to Somerset - Lost Creek Ltd. |

# EXHIBIT 23




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 0.00 | 5/1/2017 | Carnegie Development LLC | Capital One | 1331 | 1,300,000.00 | | 5436 | WALL007, LLC | Transfer Credit From 5436 |
| | 5/1/2017 | Carnegie Development LLC | Capital One | 1331 | -1,300,000.00 | 7841 | | Seagoville Farms, LLC | Transfer Debit to 7841 |
| 103,535.77 | 5/1/2017* | Seagoville Farms, LLC | Capital One | 7841 | 1,300,000.00 | | 1331 | Carnegie Development LLC | Transfer Credit From 1331 |
| 1,403,535.77 | 5/3/2017* | Seagoville Farms, LLC | Capital One | 7841 | -1,400,000.00 | | | | Wire Transfer withdrawal Silver Star Title LLC (Per R&D Ledger funds were for closing on the purchase of Seagoville Farms) |

*Besides the $1,300,000 deposit on 5/1/2017 presented in the schedule and a deposit of $5,352.43 from Silver Star Title, LLC on 5/3/2017, no **other** deposits were made into Seagoville Farms, LLC account no. 7841 between 5/1/2017 and 5/3/2017 .

# EXHIBIT 24




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| | 2/12/2019 | WALL017, LLC | Chase | 2529 | -655,000.00 | 7036 | | Carnegie Development, LLC | 02/12 Online Transfer To Chk .7036 Transaction#: 7933660581 |
| 4,460.76 | 2/12/2019 | Carnegie Development, LLC | Chase | 7036 | 655,000.00 | | 2529 | WALL017, LLC | ONLINE TRANSFER FROM CHK ... 2529 TRANSACTION # : 7933680581 |
| | 2/12/2019 | Carnegie Development, LLC | Chase | 7036 | -655,000.00 | 5193 | | JMJ Development, LLC | 02/12 ONLINE TRANSFER TO CHK ... 5193 TRANSACTION # : 7933682207 |
| 476,010.18 | 2/12/2019 | JMJ Development, LLC | Chase | 5193 | 655,000.00 | | 7036 | Carnegie Development, LLC | ONLINE TRANSFER FROM CHK ... 7036 TRANSACTION # : 7933682207 |
| | 2/12/2019 | JMJ Development, LLC | Chase | 5193 | -650,937.94 | | | | 02/12 DOMESTIC WIRE TRANSFER VIA : BANKERS BK OKC / 103003616 A / C : FIRST NATIONAL BANK REF : REUNION TITLE; ACCT # 0274670FFC : GF2025-261278 - RURAKISHA CHECANAULT (817) 441-6321 REF : 99.963 ACRES WHITE SETTLEMENT RD, ALEDO, TX 76008 IMAD : 0212B1QGC04C004744 TRN : 5152700043ES |

# EXHIBIT 25




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 50,449.42 | 5/6/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 200,000.00 | | | | Wire Transfer from Mansions Apartment Homes at Marine Creek |
| 147,104.31 | 5/10/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 2,000,000.00 | | | | Wire Transfer From AVG West, LLC |
| 1,248,190.40 | 5/12/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -1,040,034.32 | | | | Wire Transfer to Flowers Title Companies LLC |




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 0.00 | 1/11/2022* | Broadview Holdings | Texas Brand Bank | 4611 | 1,100,000.00 | | | | Wire Transfer from Mansions Apartment Homes at Marine |
| 14,980.00 | 1/14/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 400,000.00 | | | | Advance from Loans |
| 233,761.50 | 1/19/2022 | Broadview Holdings | Texas Brand Bank | 4611 | 100,000.00 | | | | Advance from Loans #8464699-10 |
| 108,287.60 | 1/24/2022* | Broadview Holdings | Texas Brand Bank | 4611 | 100,000.00 | | | | Advance from Loans |
| | 1/24/2022 | Broadview Holdings | Texas Brand Bank | 4611 | -15,000.00 | | | | Check #1030 dated 1/18/2022 payable to East Texas Title Companies paid on 1/24/2022 Memo on check states: "3600 Gillespie St Dallas TX 75219 (deposit) GF #424803" |

*Besides the transactions presented in the schedule, no other deposits were received between 1/11/2022 and 1/24/2022 for Broadview Holdings bank account #4611.

# EXHIBIT 26




*The transaction depicted in the chart above represents **TC Hall, LLC's** purchase of **3407 and 3409 Hall Street, Dallas, TX**. The purchase was made with funds sourced from the refinancing of 3600 Gillespie Street. Note that the funds were transferred directly from one title company to the other, without passing through any Entity bank account.

# EXHIBIT 27




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| $ 19,175.77 | 12/31/2020 | JMJ Development LLC | Chase | 5193 | $ 40,000.00 | | | | FEDWIRE CREDIT VIA : THIRD COAST BANK SSB / 113094149 B / O : JMJ DEVELOPMENT LLC DALLAS TX 75244 REF : CHASE NYC / CTR / BNF = JMJ DEVELOPMENT , LLC DALLAS TX 75234 US / AC - 00000000 2762 RFB - O / B THIRD COAST IMAD : 1231 MMQFMPG9000035 TRN : 7018809366FF |
| | 12/31/2020 | JMJ Development LLC | Chase | 5193 | $ 212,170.20 | | | | FEDWIRE CREDIT VIA : WELLS FARGO BANK / 121000248 B / O : CAPITAL TITLE OF TEXAS , LLC PLANO TX US 75093 REF : CHASE NYC / CTR / BNF = JMJ DEVELOPMENT , LLC DALLAS TX 75234 US / AC - 00000000 2762 RFB = 289019 OBI - 148 PITTSBURG S T , DALLAS , TX NOTE SALE TO GRAHAM M ORTGAGE CORP GF # 20-546588 - NJ IMAD : 123111B7032R029120 TRN : |
| $ 230,707.09 | 1/5/2021 | JMJ Development LLC | Chase | 5193 | $ (10,000.00) | | | | 01/05 ONLINE DOMESTIC WIRE TRANSFER VIA : PROSPERITY BK ELCA / 113122655 A / C : SILVER STAR TITLE DBA SENDERA TITLE FARMERS BRANCH TX 75234 US REF : GF - 1901307 - VVJA SELLER - JOHNSON AND ASSOC PURCHASER - JMJ ACQUISITION / BNF / GF - 1901307 - VVJA SELLER - JOHNSON AND ASSOC PURCHASER - JMJ ACQUISITION / TIME / 16 : 29 IMAD : 0105B1QGC07C014762 TRN : 3425941005ES |

**Per R&D Ledger**

| Buyer | Seller | Lender | Closing Date | File Num | Property Address |
|---|---|---|---|---|---|
| Venus 59, LLC | Johnston & Associates, LLP | | 8/31/2021 | 1901307-VVJA | County Road 214, Venus TX |




| Beg Balance | Date | Entity | Bank | Acct # | Amount | Transfer To | Transfer From | Transfer To/From Entity | Description |
|---|---|---|---|---|---|---|---|---|---|
| 23,769.38 | 6/1/2021 | JMJ Development LLC | Chase | 5193 | 5,000.00 | 7036 | | Carnegie Development LLC | 06/01 ONLINE TRANSFER TO CHK ... 7036 TRANSACTION #: 11891124160 |
| 368.30 | 6/1/2021 | Carnegie Development LLC | Chase | 7036 | 40,000.00 | | | | Cash Deposit |
| | 6/1/2021 | Carnegie Development LLC | Chase | 7036 | 5,000.00 | | 5193 | JMJ Development LLC | ONLINE TRANSFER FROM CHK ... 5193 TRANSACTION #: 11891124160 |
| 10,068.30 | 6/3/2021 | Carnegie Development LLC | Chase | 7036 | -5,000.00 | | | | Check #10160 Payable to Lawyers Title Company; Per R&D Ledger, payment is for purchase of property 916 S FM 157, Venus, TX 76084; $5,000 payment relates to the Venus 59, LLC purchase |

*Besides the two deposits presented above, no **other** deposits were received between 06/01/2021 and 06/03/2021 for Carnegie Development, LLC account no. 7036.

# TAB L

## FIFTH CIRCUIT OPINION VACATING FIRST RECEIVERSHIP

*SEC v. Barton, 79 F.4th 573 (5th Cir. 2023)*
No. 22-11132 (August 2023)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 31, 2023
Lyle W. Cayce
Clerk

No. 22-11132

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff—Appellee*,

*versus*

TIMOTHY BARTON,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-2118

ON PETITION FOR REHEARING

Before CLEMENT, GRAVES, and HIGGINSON, *Circuit Judges*.

JAMES E. GRAVES, JR., *Circuit Judge*:

The petition for panel rehearing is DENIED. We withdraw our previous opinion, reported at 72 F.4th 64, and substitute the following.

The Securities and Exchange Commission ("SEC") sued Defendant Timothy Barton as well as other individual Defendants and corporate entities for securities violations. Barton appeals the district court's order appointing a receiver over all corporations and entities controlled by him. For the

> the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities
>
> . . .
>
> the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

The order gave the receiver numerous powers, including the power to determine the nature of the property interests, take possession of any property belonging to receivership entities, and take any actions necessary to preserve receivership property or prevent its dissipation, concealment, or inequitable distribution.

Barton moved to strike the clause allowing the receiver to take possession of assets belonging to "any other entities that Defendant Timothy Barton directly or indirectly controls." The district court denied his motion. On November 1, 2022, the receiver moved for the district court to supplement its receivership order to include over a hundred newly discovered Barton-controlled entities by name. The district court supplemented its order *nunc pro tunc* to expressly identify 126 newly discovered receivership entities. The receiver then moved for the court to set procedures for the disposition of personal property in the custody of receivership entities. The district court granted the motion and adopted the procedures proposed by the receiver. Barton timely appealed the order appointing the receiver and both follow-up orders. On November 28, 2022,

he moved in the district court for a stay pending appeal of the receivership order. While that motion was still pending, he also asked this court for a stay pending appeal. A motions panel of this court denied his request on January 6, 2023, and the district court denied his request on January 17, 2023.

## II. Jurisdiction & Standard of Review

We have jurisdiction over interlocutory appeals from "orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property." 28 U.S.C. § 1292(a)(2). We review a district court's decision to appoint a receiver for abuse of discretion. *Netsphere*, 703 F.3d at 305.

## III. Discussion

### a. The Applicable Test

A central dispute between the parties is what test the district court should have applied before imposing a receivership. Barton argues the district court abused its discretion because it did not apply the standard or make the proper findings under the factors set forth in *Netsphere* ("*Netsphere* factors"). The SEC responds that *Netsphere* is inapplicable and the district court's findings were sufficient under *First Financial*.

In *First Financial*, the SEC sued a securities dealer and its officers for securities violations. 645 F.2d at 431. The district court granted the SEC's motion for a preliminary injunction and enjoined each individual defendant "from offering, purchasing, or selling packages of the specified securities in violation of the federal securities laws, and from disposing of assets and records of First Financial." *Id.* at 432. It also enjoined the defendants from disposing of more than $1,500 in personal assets per week. *Id.* Twelve days later, it granted the SEC's motion for a temporary receiver over the

defendant entity, First Financial. *Id.* The order directed the receiver "to take exclusive control of the corporate assets in order to prevent injury to First Financial investors and to prevent further violations of the federal securities laws." *Id.* at 437-38. Reviewing the injunction order, this court first explained that under the relevant securities laws, preliminary injunctive relief is appropriate upon a showing of "a reasonable likelihood that the defendant is engaged or about to engage in practices that violate the federal securities laws." *Id.* at 434. It concluded that the district court did not abuse its discretion in entering a preliminary injunction. *Id.* at 436. Turning to the district court's appointment of a receiver, it cited a Seventh Circuit case for the following proposition:

> The prima facie showing of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court. It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded. In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.

*Id.* at 438 (quoting *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963)). To protect the public welfare and the interests of those who invested with First Financial, this court concluded that the "appointment of a receiver was a necessary relief measure within the discretion of the court, as an ancillary to preliminary injunctive relief during the continuing civil enforcement proceeding." *Id.* at 439.

The SEC relied upon *First Financial* in both its briefing before the district court and this court, but there is a crucial distinction between that case and the receivership order here. There, the SEC already obtained injunctive relief, so the receivership was "proper as an adjunct to injunctive relief for a securities fraud." *Netsphere*, 703 F.3d at 306 (citing *Keller*, 323

F.2d at 402); *see also Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) ("Courts possess the inherent authority to enforce their own injunctive decrees.") (citation omitted). Here, the SEC did not obtain a preliminary injunction before seeking a receivership, so *First Financial* is inapposite.

That brings us back to *Netsphere*. In that case, a defendant was involved in disputes over the ownership of domain names. *Netsphere*, 703 F.3d at 302. After settling those domain name disputes in related bankruptcy proceedings, the bankruptcy court recommended the appointment of a special master to mediate unpaid legal fees since the defendant kept hiring and firing lawyers without paying them. *Id.* at 303. The district court appointed a special master, but the defendant went on to fire another attorney. *Id.* at 304. The bankruptcy trustee then filed an emergency motion to appoint a receiver, which the district court granted. *Id.*

Before discussing the propriety of the receivership, this court began by noting that a "[r]eceivership is 'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Id.* at 305 (citing 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2983 (3d ed. 2012)). It catalogued the various contexts where receiverships are used, including "cases of non-compliance with SEC regulations, [where] a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors." *Id.* at 306. Turning to the facts of the case at hand, it found that none of the purported justifications supported the imposition of a receivership. *Id.* at 307-11.

Since the SEC had not already obtained an injunction against Barton when the SEC moved for a receivership, *First Financial* does not control and

Thus, we will vacate the current receivership order effective 90 days from the issuance of this court's mandate.

**c. The Receivership's Jurisdiction**

Barton next argues that the district court erred by placing multiple entities he controls in the receivership without any showing that they received or benefitted from ill-gotten investor funds. The SEC responds that the district court acted within its discretion by including all Barton-controlled entities in the receivership. Because it alleges that Barton has engaged in extensive commingling of funds, it claims that Barton's control is an effective proxy for placing an entity in the receivership even if it had not yet traced the funds to that entity.

In *Netsphere*, this court rejected the district court's determination that a receivership was necessary for the defendant to pay his debts to former attorneys because "the jurisdictional principle that a court's equitable powers do not extend to property unrelated to the underlying litigation applies with equal force to receiverships. A court lacks jurisdiction to impose a receivership over property that is not the subject of an underlying claim or controversy." 703 F.3d at 310. In support, it cited *Cochrane v. W.F. Potts Son & Co.* where this court held that a receivership was proper only over the series of bonds subject to litigation, not the other series of bonds that were not subject to the complaint and over which the bondholder did not claim an interest. *Id.* (citing *Cochrane v. W.F. Potts Son & Co.*, 47 F.2d 1026, 1027-29 (5th Cir. 1931)). Accordingly, *Netsphere* held that the district court could not impose a receivership over the plaintiff's personal property or assets owned by certain entities because those assets were not sought in or the subject of the underlying litigation. *Id.*

The SEC relies on *FDIC v. Faulkner* to support the district court's inclusion of all Barton-controlled entities in the receivership regardless of

whether they received or benefitted from ill-gotten funds. 991 F.2d 262, 267-68 (5th Cir. 1993). In *Faulkner*, the defendants allegedly engaged in fraudulent real estate speculation schemes. *Id.* at 264. The FDIC sought a preliminary injunction against the defendants to limit their ability to transfer assets, and the district court granted it. *Id.* On appeal, the defendants argued that the injunction was too broad since it froze assets that were not obtained through alleged fraudulent activities. *Id.* at 267. Since the defendants refused to aid the district court in determining which of the assets were traceable to the alleged fraud, this court held that the district court "did not err in freezing all of the [defendant's] assets, pending a determination through limited discovery of which assets are traceable to [defendant's] alleged fraudulent activities." *Id.* at 268.

*Faulkner* does not support the district court's actions here. Under *Faulkner*, the SEC could have sought an injunction freezing asset transfers while it traced the funds and determined which entities should be placed in the receivership. But it did not. Since a receivership's jurisdiction extends only over property subject to the underlying claims, the district court abused its discretion by including all Barton-controlled entities in the receivership without first finding that they had received or benefited from the ill-gotten funds. *Netsphere*, 703 F.3d at 310. Should the district court decide that a new receivership is justified on remand, it can only extend over entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation.

**d. Stay Pending Appeal**

After oral argument, Barton moved for a partial stay of certain receivership activities pending appeal. He asked this court to: 1) order the receiver to retain possession of all corporations and corporate property pending a final decision on the merits, 2) suspend the receiver's power to sell

or dispose of assets belonging to receivership entities until 60 days after a final opinion on the merits from this court, and 3) stay the receiver's ability to undertake receivership activities that go beyond caring for the seized assets pending a final decision on the merits. Barton also sought emergency relief from the transfer of one of the receivership entity's possessory interests in a particular property. We denied his emergency request as moot but carried the remainder of his motion with the case.

At the outset, the SEC challenges whether Barton's motion complies with Federal Rule of Appellate Procedure 8. Under Rule 8, stay motions ordinarily must first be presented to the district court "unless it clearly appears that further arguments in support of the stay would be pointless in the district court." *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981). The district court denied Barton's initial motion for a stay pending appeal. When Barton sought to preliminarily enjoin the receiver's auction of contents of a particular receivership property, the district court denied his request explaining that "[Barton's motion] requests the same relief, and on the same grounds, that the Court has already denied multiple times, and the Fifth Circuit has already denied once: a stay of the Receiver's activities pending appeal or final judgment." Given the clear indication that the district court would have denied this motion, we find that Barton's motion satisfies Rule 8 because moving first in the district court would have been pointless. *Id.*

Barton's first and third requests are now moot since we have reached a final decision on the merits. However, his second request is not moot because it seeks relief that extends 60 days beyond the issuance of a final decision. For his second request, we consider four factors in deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the

proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks and citation omitted). In light of our vacatur of the receivership order, we conclude that Barton has made the proper showing under the factors and is entitled to a partial stay.

## IV. Conclusion

For the foregoing reasons, we VACATE the district court's order appointing a receiver effective 90 days from the issuance of this court's mandate and REMAND for further proceedings consistent with this opinion. We also GRANT in part Barton's motion for a partial stay pending appeal: the receiver's power to sell or dispose of property belonging to receivership entities, including the power to complete sales or disposals of property already approved by the district court, is immediately suspended, and this suspension will remain in effect until the receivership order is vacated 90 days from the issuance of this court's mandate. This suspension does not apply to activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court. "Activities in furtherance" do not include the completion of the sale of any property. Should the district court enter a new receivership order before the present order is vacated, this partial stay has no bearing on any actions a receiver may take under the new order.

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 28, 2023

Lyle W. Cayce
Clerk

No. 22-11132

Securities and Exchange Commission,

*Plaintiff—Appellee,*

*versus*

Timothy Barton,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-2118

Before Clement, Graves, and Higginson, *Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the order appointing the receiver effective 90 days after the issuance of this court's mandate is VACATED, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.