No. 26-10534

# United States Court of Appeals for the Fifth Circuit

**IN RE TIMOTHY L. BARTON,**
*Petitioner*

On Petition for Writ of Mandamus to the United States District Court for the Northern District of Texas, Dallas Division
SEC v. Barton, No. 3:22-CV-2118-X
The Honorable Brantley Starr, United States District Judge

# MOTION FOR LEAVE TO FILE SUPPLEMENT TO PETITION FOR WRIT OF MANDAMUS AND, TO THE EXTENT NECESSARY, TO EXCEED THE TYPE-VOLUME LIMITATION OF FED. R. APP. P. 21(d)(1)

**Timothy L. Barton, Pro Se**
1846 E Rosemeade Pkwy, #232, Carrollton, TX 75007
Phone: 214-673-8714
Email: Timothy.Barton@proton.me

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned certifies that the following persons and entities have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal:

- **Petitioner:**
  Timothy L. Barton (Pro Se)
- **Respondent:**
  Securities and Exchange Commission
- **Other District-Court Parties / Respondents:**
  Carnegie Development, LLC; WALL007, LLC; WALL009, LLC; WALL010, LLC; WALL011, LLC; WALL012, LLC; WALL016, LLC; WALL017, LLC; WALL018, LLC; WALL019, LLC; Haoqiang Fu (a/k/a Michael Fu); Stephen T. Wall; DJD Land Partners, LLC; and LDG001, LLC.
- **Other Interested Persons and Entities:**
  The fifty-four Receivership Entities identified in Dkts. 416-417, together with their known owners, creditors, lienholders, and claimants.
- **District Court Judge:**
  The Honorable Brantley Starr, U.S. District Judge
- **Court-Appointed Receiver:**

Cortney C. Thomas

- **Receiver's Counsel:**
  Allan Carrillo

- **Receiver's Law Firm:**
  Brown Fox PLLC

- **SEC Counsel (Appellate — Washington, D.C.):**

  Ezekiel L. Hill, Appellate Counsel, Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549.

- **SEC Counsel (District Court — Fort Worth Regional Office):**

  Keefe M. Bernstein, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Fort Worth, TX 76102.

*/s/ Timothy L. Barton*
**Timothy L. Barton,**
**Pro Se Petitioner**

Pursuant to Federal Rules of Appellate Procedure 2, 21, and 27 and Fifth Circuit Rule 27, Petitioner Timothy L. Barton respectfully moves for leave to file the accompanying Supplement to his pending Petition for Writ of Mandamus and, to the extent the Court treats the Petition and Supplement as a single paper subject to the type-volume limitation of Federal Rule of Appellate Procedure 21(d)(1), for leave to exceed that limitation. In support of this motion, Petitioner states as follows:

1. Petitioner's Petition for Writ of Mandamus was filed in June 2026 and docketed as No. 26-10534. As its certificate of compliance reflects, the Petition contains 7,793 words, within but nearly at the 7,800-word type-volume limitation of Rule 21(d)(1).

2. The Petition addresses matters as they stood when it was filed. It could not have addressed the material developments that occurred in the District Court after filing.

3. On July 8, 2026, the District Court entered a two-page order, Dkt. 792, announcing that the receivership can now enter its "next phase." The order was entered without a motion, briefing, or an evidentiary record. It directs the Receiver to solicit lender

proposals for every Receivership Property and to report within ninety days, and states that, absent workable proposals, the Court will instruct the Receiver to conduct free-and-clear sales, with competing claims, liens, and interests to be determined only afterward.

4. On July 30, 2026, the Receiver filed his Sixteenth Quarterly Status Report, Dkt. 838. The Report confirms that implementation of Dkt. 792 is underway: lender outreach has begun and additional sales are anticipated in the near future. The Report also disclosed, for the first time, that the Rock Creek property closed on June 25, 2026, netting $61,836.12 to the estate, and it confirms that the Receiver's forensic accounting and tracing of investor funds remain unfinished.

5. No Federal Rule of Appellate Procedure authorizes supplementation of a mandamus petition as of right, and this Court's rules permit supplemental briefs only with leave of court. Cf. 5th Cir. R. 28.4. A letter of supplemental authorities under Federal Rule of Appellate Procedure 28(j) is confined to intervening decisions and 350 words, and cannot adequately

present intervening record developments of this scope. Leave of Court is therefore the proper vehicle.

6. The proposed Supplement, tendered with this motion, is narrow. It expressly acknowledges the holdings of SEC v. Barton, 135 F.4th 206 (5th Cir. 2025), and SEC v. Barton, No. 24-10788 (5th Cir. Mar. 25, 2026), and seeks no reconsideration of them. It supplements the prejudgment and recusal grounds of the Petition with record material from the District Judge's own 2020 orders treating the instruments at issue as loans, Supp. App. 014–043 (Tabs B–F); presents the post-petition developments described above, Supp. App. 044–166 (Tabs G–H); includes a chronological table cataloging the orders entered on the initiative of the Receiver or of the District Court itself, Supp. App. 003–013 (Tab A); and requests interim preservation relief. Excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and 5th Cir. R. 21, the Supplement contains approximately 2,434 words.

7. Good cause supports leave. Dkt. 792 and Dkt. 838 postdate the Petition and could not have been addressed within it; the Petition's remaining margin of seven words under Rule 21(d)(1)

makes it impossible to present these developments without exceeding the limitation; and a single, focused supplement is preferable to piecemeal letters or a successive petition. The relief the Supplement seeks is time-sensitive because Dkt. 792 contemplates irreversible dispositions on a ninety-day timetable.

8. No party will be prejudiced. The Securities and Exchange Commission and the Receiver may address the Supplement in any answer the Court may invite under Federal Rule of Appellate Procedure 21(b).

9. Opposition status: Pursuant to 5th Cir. R. 27.4, Petitioner contacted Ezekiel L. Hill, Appellate Counsel for the Securities and Exchange Commission — the sole respondent under Federal Rule of Appellate Procedure 21(a)(1) — regarding this motion on August 09, 2026. The Securities and Exchange Commission takes no position on the requested relief.

## CONCLUSION

Petitioner respectfully requests that the Court grant leave to file the Supplement to Petition for Writ of Mandamus and accompanying Supplemental Appendix tendered with this motion, direct the Clerk to file both, and, to the extent the type-volume limitation of Rule 21(d)(1) applies to the Petition and Supplement combined, permit the combined filings to exceed that limitation. Petitioner further requests such other relief as the Court deems appropriate.

Respectfully submitted,

Dated: August 10, 2026.

*/s/ Timothy L. Barton*

**Timothy L. Barton, Pro Se**
1846 E Rosemeade Pkwy, #232,
Carrollton, TX 75007
Phone: 214-673-8714
Email: Timothy.Barton@proton.me

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains approximately 760 words. It complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Timothy L. Barton*
Timothy L. Barton, Pro Se

## CERTIFICATE OF SERVICE

I certify that on August 10, 2026, a true and correct copy of the foregoing motion, the accompanying Supplement, and the Supplemental Appendix were served upon all counsel of record through the Court's CM/ECF system, or by email and/or U.S. Mail upon any party not served electronically, including counsel for the Securities and Exchange Commission. A copy was also provided to the Honorable Brantley Starr, the trial-court judge, as required by Federal Rule of Appellate Procedure 21(a)(1).

*/s/ Timothy L. Barton*
Timothy L. Barton, Pro Se

## CERTIFICATE OF CONFERENCE

Pursuant to Fifth Circuit Rule 27.4, Petitioner certifies that on August 09, 2026 he contacted counsel for the Securities and Exchange Commission regarding the relief requested in this motion. The Securities and Exchange Commission has advised that it takes no position on the requested relief.

*/s/ Timothy L. Barton*
Timothy L. Barton, Pro Se

**No. 26-10534**

# United States Court of Appeals for the Fifth Circuit

**IN RE TIMOTHY L. BARTON,**
*Petitioner*

On Petition for Writ of Mandamus to the United States District Court for the Northern District of Texas, Dallas Division
SEC v. Barton, No. 3:22-CV-2118-X
The Honorable Brantley Starr, United States District Judge

## SUPPLEMENT TO PETITION FOR WRIT OF MANDAMUS

**Timothy L. Barton, Pro Se**
1846 E Rosemeade Pkwy, #232,
Carrollton, TX 75007
Phone: 214-673-8714
Email: Timothy.Barton@proton.me

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned certifies that the following persons and entities have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal:

- **Petitioner:**
  Timothy L. Barton (Pro Se)
- **Respondent:**
  Securities and Exchange Commission

- **Other District-Court Parties / Respondents:**
  Carnegie Development, LLC; WALL007, LLC; WALL009, LLC; WALL010, LLC; WALL011, LLC; WALL012, LLC; WALL016, LLC; WALL017, LLC; WALL018, LLC; WALL019, LLC; Haoqiang Fu (a/k/a Michael Fu); Stephen T. Wall; DJD Land Partners, LLC; and LDG001, LLC.

- **Other Interested Persons and Entities:**
  The fifty-four Receivership Entities identified in Dkts. 416-417, together with their known owners, creditors, lienholders, and claimants.

- **District Court Judge:**
  The Honorable Brantley Starr, U.S. District Judge
- **Court-Appointed Receiver:**
  Cortney C. Thomas

- **Receiver's Counsel:**
  Allan Carrillo

- **Receiver's Law Firm:**
  Brown Fox PLLC

- **SEC Counsel (Appellate — Washington, D.C.):**

  Ezekiel L. Hill, Appellate Counsel, Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549.

- **SEC Counsel (District Court — Fort Worth Regional Office):**

  Keefe M. Bernstein, Securities and Exchange Commission, 801 Cherry Street, Suite 1900, Fort Worth, TX 76102.

*/s/ Timothy L. Barton*
**Timothy L. Barton,**
**Pro Se Petitioner**

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ii
TABLE OF CONTENTS iv
TABLE OF AUTHORITIES v
INTRODUCTION AND PURPOSE OF THIS SUPPLEMENT 1
I. THE SAME DISTRICT JUDGE PREVIOUSLY ADJUDICATED THESE INSTRUMENTS AS LOANS 3
A. In 2020, the Same Judge Presided Over the Lenders' Appeals, Which Were Litigated and Resolved as Loan Disputes. 3
B. In 2022, the Same Judge Recast the Identical Instruments as "Securities" and Imposed Punitive Remedies—Without Any Intervening Adjudication. 5
II. THE UNEXPLAINED REVERSAL DEMONSTRATES PREJUDGMENT AND REINFORCES THE RECUSAL GROUNDS OF THE PETITION 6
III. POST-PETITION DEVELOPMENTS CONFIRM THE PATTERN: THE DISTRICT COURT IS ADVANCING COMPREHENSIVE LIQUIDATION WITHOUT ADVERSARIAL PROCESS 9
IV. PRESERVATION RELIEF IS NEEDED TO PROTECT THIS COURT'S JURISDICTION 12
CONCLUSION AND RELIEF REQUESTED 13
CERTIFICATE OF COMPLIANCE 14
CERTIFICATE OF SERVICE 14
SUPPLEMENTAL APPENDIX App 001

# TABLE OF AUTHORITIES

**Cases**

*In re Murchison*, 349 U.S. 133, 136 (1955) .... 8
*In re WALL007 LLC,* No. 20-31131-hdh7 (N.D. Tex.) .... 3
*Jun Li, et al. v. WALL007 LLC, et al.,* Nos. 3:20-cv-03385-X, 3:20-cv-03386-X, 3:20-cv-03387-X, 3:20-cv-03388-X, and 3:20-cv-03389-X (N.D. Tex.) .... 3, 4
*Liteky v. United States,* 510 U.S. 540, 555 (1994) .... 8
*New Hampshire v. Maine,* 532 U.S. 742, 749–51 (2001) .... 7
*Reves v. Ernst & Young,* 494 U.S. 56 (1990) .... 5
*SEC v. Barton,* 135 F.4th 206, 216–18 (5th Cir. 2025) ("Barton II") .... 1, 2, 7, 11
*SEC v. Barton,* No. 24-10788 (5th Cir. Mar. 25, 2026) ("Barton III") .... 2
*SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946) .... 5
*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) .... 6

**Statutes**

28 U.S.C. § 1292(b) .... 4

**Rules**

5th Cir. R. 21 .... 14
5th Cir. R. 28.2.1 .... ii
Fed. R. App. P. 21(a)(1) .... 14
Fed. R. App. P. 21(d)(1) .... 14
Fed. R. App. P. 32(a)(5)–(6) .... 14
Fed. R. App. P. 32(f) .... 14

# INTRODUCTION AND PURPOSE OF THIS SUPPLEMENT

Petitioner Timothy L. Barton respectfully submits this Supplement to his pending Petition for Writ of Mandamus, No. 26-10534. The Supplement serves two purposes. First, it provides additional record support for the prejudgment and recusal grounds of the Petition, and for Issue I's showing that the District Court itself never adjudicated the threshold securities question, drawn from the same District Judge's own prior orders: before the SEC filed this action, the only judicial treatment these instruments received from Judge Starr was as loans, not securities. Second, it presents material developments that postdate the Petition: the District Court's sua sponte order of July 8, 2026 directing a "next phase" of comprehensive liquidation, Dkt. 792, reproduced at Supplemental Appendix to Petitioner's Supplement to Petition for Writ of Mandamus ("Supp. App.") 045–046 (Tab G), and the Receiver's Sixteenth Quarterly Status Report of July 30, 2026, Dkt. 838, reproduced at Supp. App. 048–166 (Tab H), confirming that implementation is underway.

Petitioner acknowledges the holdings this Court has already issued. Barton II held that the Agency and Loan Agreements qualify as investment contracts and affirmed the renewed receivership. *SEC v.*

*Barton,* 135 F.4th 206, 216–18 (5th Cir. 2025) ("Barton II"). *Barton III* sustained the sale framework applied to particular properties. *SEC v. Barton,* No. 24-10788 (5th Cir. Mar. 25, 2026) ("Barton III"). Certiorari was denied on March 30, 2026. This Supplement does not ask the Court to revisit any of those holdings, to relitigate the appointment or scope of the receivership, or to disturb any completed sale ruling. The points pressed here are judge-specific and have never been decided in any appeal: what the District Judge's own 2020 orders show about prejudgment, and what his conduct after the Petition was filed shows about the need for reassignment and interim preservation.

Newly emphasized record evidence shows that the same District Judge who now presides over this securities-enforcement receivership previously adjudicated appeals arising from these very instruments and disposed of them squarely within a loan and debtor-creditor framework, without ever conducting—then or since—the securities analysis that federal jurisdiction requires. The District Court's subsequent characterization of those same instruments as "securities," and its imposition of punitive securities-law receivership remedies on that

unadjudicated premise, is an unexplained reversal that reinforces the appearance of prejudgment already raised in the Petition.

## I. THE SAME DISTRICT JUDGE PREVIOUSLY ADJUDICATED THESE INSTRUMENTS AS LOANS

### A. In 2020, the Same Judge Presided Over the Lenders' Appeals, Which Were Litigated and Resolved as Loan Disputes.

Nearly two years before the SEC filed this action, the same Chinese lenders whose funds now underlie the SEC's "investor" allegations appealed an order of the Bankruptcy Court to the District Court. Those five consolidated appeals—*Jun Li, et al. v. WALL007 LLC, et al.,* Nos. 3:20-cv-03385-X, 3:20-cv-03386-X, 3:20-cv-03387-X, 3:20-cv-03388-X, and 3:20-cv-03389-X (N.D. Tex.)—arose from the lenders' involuntary bankruptcy petition against the Wall entities. See In re WALL007 LLC, No. 20-31131-hdh7 (N.D. Tex.). Each appeal was assigned to, heard by, and decided by the Honorable Brantley Starr. See Supp. App. 015–019 (Tab B), 021–025 (Tab C), 027–031 (Tab D), 033–037 (Tab E), 039–043 (Tab F).

Judge Starr's orders framed the dispute entirely in loan terms. The orders describe the alleged debtors as parties "in the business of

acquiring and improving land to sell residential lots to home builders," and recite the lenders' own characterization of the transactions:

> The Creditors claim that they each individually "entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors failed to pay the **loans** back as and when required under the **loan documents.**"

Order at 1–2*, Jun Li v. WALL007 LLC*, No. 3:20-cv-03386-X (N.D. Tex. Nov. 30, 2020) (Starr, J.) (and materially identical orders in the parallel -03385, -03387, -03388, and -03389 actions). The instruments now recast by the SEC as "securities" were thus before Judge Starr as "loans", "loan agreements" and "loan documents," advanced by lenders who had filed an involuntary bankruptcy petition and pursued state-court breach-of-loan remedies—not securities claims. See Supp. App. 021–022 (Tab C); see also Supp. App. 015–016, 027–028, 033–034, 039–040 (Tabs B, D–F).

Judge Starr resolved those appeals on a strictly procedural basis. Applying the standard for interlocutory bankruptcy appeals under

28 U.S.C. § 1292(b), he found no "substantial ground for difference of opinion" and "DENIE[D] the Creditors' motion for leave to appeal and DISMISSE[D]" each appeal. Order at 5 (Nov. 30, 2020). At no point did he subject the instruments to the "investment contract" analysis of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), or the "note" analysis of *Reves v. Ernst & Young*, 494 U.S. 56 (1990). The matter was treated, start to finish, as a loan dispute. See Supp. App. 025 (Tab C); see also Supp. App. 019, 031, 037, 043 (Tabs B, D–F).

**B. In 2022, the Same Judge Recast the Identical Instruments as "Securities" and Imposed Punitive Remedies—Without Any Intervening Adjudication.**

When the SEC filed this action in 2022, it sought to relabel the same "loans" and "Agency and Loan Agreements" as securities. See Compl. ¶¶ 22–29 (acknowledging the instruments were styled and executed as "Loan Agreements"). Without ever revisiting the question he had previously approached as a loan dispute—and without conducting a Howey or Reves analysis—Judge Starr entered the Order Appointing Receiver, which proceeds on the express premise that the matter sounds in securities and is punitive in nature:

> WHEREAS, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing . . . .

Order Appointing Receiver at 2, *SEC v. Barton*, No. 3:22-cv-2118-X (N.D. Tex. Oct. 18, 2022) (Dkt. 29) (Starr, J.). The same Order directs the Receiver to identify "all investors, the securities they purchased, the date and amount of their investments"—treating as settled the very characterization ("securities," "investors," "investments") that had never been adjudicated, and that the same judge had previously handled as loans owed to lenders. The renewed receivership order entered after remand repeats the same recital. Dkt. 417 at 3.

## II. THE UNEXPLAINED REVERSAL DEMONSTRATES PREJUDGMENT AND REINFORCES THE RECUSAL GROUNDS OF THE PETITION

A court "cannot proceed at all in any cause" without first establishing its jurisdiction; jurisdiction "is power to declare the law, and

when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998). Where the threshold characterization of an instrument is contested—and here it was contested across two separate proceedings—the court must decide it before exercising power premised upon it. The record shows the District Court never did; that omission is Issue I of the pending Petition, and the 2020 orders quoted above supply new record support for it. This Court's own later holding in *Barton II* does not erase the District Court's failure to make the determination on which its exercise of power was premised, and it is the District Judge's conduct, not the ultimate characterization of the instruments, that matters to recusal. See Supp. App. 015–043 (Tabs B–F).

The same instruments cannot be loans for one purpose and securities for another at the unexplained election of the court, with no analysis bridging the two. A position once taken and acted upon may not be abandoned for a contrary one where doing so would work an unfair advantage and undermine the integrity of the proceedings. Cf. *New Hampshire v. Maine,* 532 U.S. 742, 749–51 (2001) (describing the

inconsistent-position doctrine and its purpose of protecting judicial integrity). Having addressed these instruments as loans in 2020, the District Court owed—at minimum—a reasoned jurisdictional ruling before treating them as securities and imposing penal receivership remedies in 2022 and beyond. None exists.

This reversal also reinforces the prejudgment and bias concerns raised in the Petition. A receivership order that recites the defendant's conduct as "illicit," "fraudulent," and "unlawful," and that frames its purpose as "penalizing past unlawful conduct," treats guilt as established before any adjudication of liability—and does so on a securities premise the same court had previously declined to embrace. While adverse rulings alone rarely show bias, conduct reflecting prejudgment and a settled view of guilt does. See *Liteky v. United States,* 510 U.S. 540, 555 (1994); *In re Murchison,* 349 U.S. 133, 136 (1955) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."). A reasonable observer, aware that the same judge handled these instruments as loans and then—without analysis—as the basis for punitive securities relief, would question the District Court's impartiality.

## III. POST-PETITION DEVELOPMENTS CONFIRM THE PATTERN: THE DISTRICT COURT IS ADVANCING COMPREHENSIVE LIQUIDATION WITHOUT ADVERSARIAL PROCESS

On July 8, 2026, after the Petition was filed, the District Court entered a two-page order announcing that the receivership "can now enter into its next phase." Dkt. 792 at 1; Supp. App. 045 (Tab G). No party moved for that relief. The order issued sua sponte, without briefing, notice, an evidentiary record, or findings concerning any particular property. It directs the Receiver to solicit lender proposals for every Receivership Property and to report within ninety days, and states that, absent workable proposals, the Court "will instruct" the Receiver to conduct sales free and clear of all liens, with competing claims, liens, and interests to be determined only afterward. Dkt. 792 at 1–2; Supp. App. 045–046.

The Receiver's Sixteenth Quarterly Status Report, filed July 30, 2026, confirms that implementation is underway: lender outreach has begun and additional sales are anticipated in the near future. Dkt. 838 at 27–28; Supp. App. 074–075 (Tab H). The same Report disclosed for the first time that the Rock Creek property had already closed on June 25,

2026, netting the estate $61,836.12 on a $1.4 million sale, and it confirms that the forensic accounting intended to trace investor funds remains unfinished. Dkt. 838 at 33–34 (Supp. App. 080–081), 70–71 (Supp. App. 117–118), 101 (Supp. App. 148).

The economics of that closing show why adversarial testing matters. The estate received $61,836.12 on a $1.4 million sale after payment of the lender, two $35,000 brokerage commissions, and closing charges. Dkt. 838 at 33–34; Supp. App. 080–081. The Receiver's own quarterly fee applications tell the other half of the story: through March 31, 2024 alone, their billing exhibits contain 254 block-billed time entries, approximately 1,167 hours and $349,441 in fees, that include work on the Rock Creek property. Dkts. 157, 238, 540, 655, 657. Even on the most conservative reading, counting only the task time the invoices themselves attribute to Rock Creek, those applications reflect approximately $54,000 in Rock Creek-specific fees, nearly ninety percent of everything the estate received from the sale. And no fee application has yet been filed for any period after March 31, 2024, the window that includes the lis pendens litigation over this property and the closing itself. On any realistic accounting, the professional cost of selling Rock Creek met or exceeded

what the sale returned to the estate. A process in which the estate's own officer bills more to sell an asset than the estate receives from its sale, with no party testing the disposition, is precisely the process that requires the safeguards sought here.

These orders are not isolated. A chronological table in the Supplemental Appendix catalogs thirty-two orders and dispositions, thirty-one by the District Court and one by this Court, entered on the initiative of the Receiver or of the District Court itself. See Supp. App. 003–013 (Tab A). In the substantial majority, no filing by the SEC, the only plaintiff, appears in connection with the requested relief; the quarterly fee orders recite the SEC's non-opposition; and Dkt. 792 issued on no motion at all. Barton or another affected party opposed nearly every one. The pattern shows dispositive estate relief advancing through the Court's own appointee, over objection, without adversarial testing, and it culminates in a court-initiated directive for comprehensive liquidation.

These developments reinforce the recusal and prejudgment grounds of the Petition. A judge who has already recited that the purpose of the receivership is "penalizing past unlawful conduct," and who now initiates liquidation of the entire estate before any adjudication of

liability, before completion of the accounting, and before any claims process, has assumed the role of proponent rather than neutral arbiter.

## IV. PRESERVATION RELIEF IS NEEDED TO PROTECT THIS COURT'S JURISDICTION

This Court exercised collateral-order jurisdiction over prior sale orders precisely because completed sales make assets "likely unrecoverable" and the orders "effectively unreviewable." *Barton II,* 135 F.4th at 223–24. Once title passes to a good-faith purchaser and the proceeds are commingled, transferred, or spent, neither this Court nor the District Court can restore the status quo. If implementation of Dkt. 792 proceeds while the Petition is pending, the questions the Petition presents, including recusal, will be answered by accomplished facts rather than by judicial decision. See Supp. App. 045–046 (Tab G).

Interim preservation need not disrupt legitimate administration. At minimum, the net proceeds of any sale that closes should be held, without commingling, in an interest-bearing account identified to the specific Receivership Estate, supported by a complete closing statement, with no inter-estate transfer, professional-fee payment, or distribution until ownership, claims, and priorities are adjudicated after notice and an opportunity to be heard.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, and those stated in the Petition, Petitioner respectfully requests that this Court: (1) stay implementation of Dkt. 792, and any unconsummated sale or distribution, pending disposition of the Petition; (2) grant the relief sought in the Petition, including reassignment of the case to a different district judge; (3) at minimum, direct that the net proceeds of any sale be segregated in an account identified to the specific Receivership Estate, supported by a complete closing statement, with no disputed proceeds transferred, consumed, or distributed until claimant identity, ownership, liens, and priorities are determined after notice and an opportunity to be heard; and (4) grant such further relief as the Court deems just and proper.

Respectfully submitted

this 10th day of August, 2026.

*/s/ Timothy L. Barton*
Timothy L. Barton, Pro Se
1846 E Rosemeade Pkwy, #232,
Carrollton, TX 75007
Phone: 214-673-8714
Email: Timothy.Barton@proton.me

## CERTIFICATE OF COMPLIANCE

This Supplement complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (Century Schoolbook, 14-point) using Microsoft Word. Excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 21, it contains approximately 2,434 words. Because the pending Petition contained 7,793 words, this Supplement is accompanied by a motion for leave to file it and, to the extent necessary, to exceed the type-volume limitation of Fed. R. App. P. 21(d)(1).

*/s/ Timothy L. Barton*
**Timothy L. Barton,** Pro Se

## CERTIFICATE OF SERVICE

I certify that on August 10, 2026, a true and correct copy of the foregoing Supplement and accompanying Supplemental Appendix were served upon all counsel of record through the Court's CM/ECF system, or by email and/or U.S. Mail upon any party not served electronically, including counsel for the Securities and Exchange Commission. A copy was also provided to the Honorable Brantley Starr, the trial-court judge, as required by Federal Rule of Appellate Procedure 21(a)(1).

*/s/ Timothy L. Barton*
**Timothy L. Barton,** Pro Se

**No. 26-10534**

# United States Court of Appeals for the Fifth Circuit

**IN RE TIMOTHY L. BARTON,**
*Petitioner*

On Petition for Writ of Mandamus to the United States District Court for the Northern District of Texas, Dallas Division
SEC v. Barton, No. 3:22-CV-2118-X
The Honorable Brantley Starr, United States District Judge

## SUPPLEMENTAL APPENDIX TO PETITIONER'S SUPPLEMENT TO PETITION FOR WRIT OF MANDAMUS

**Timothy L. Barton, Pro Se**
1846 E Rosemeade Pkwy, #232,
Carrollton, TX 75007
Phone: 214-673-8714
Email: Timothy.Barton@proton.me

# TABLE OF CONTENTS


| Tab | Document Description | Source | App. Pages |
|---|---|---|---|
| **A** | Chronological Table of Receiver Driven- and Court-Initiated Orders and Dispositions | 3:22-CV-02118-X | App 002-013 |
| **B** | Appeal Dismissal Order filed Nov. 30, 2020 | 3:20-CV-03385-X, Doc. 6 | App 014-019 |
| **C** | Appeal Dismissal Order filed Nov. 30, 2020 | 3:20-CV-03386-X, Doc. 7 | App 020-025 |
| **D** | Appeal Dismissal Order filed Nov. 30, 2020 | 3:20-CV-03387-X, Doc. 8 | App 026-031 |
| **E** | Appeal Dismissal Order filed Nov. 30, 2020 | 3:20-CV-03388-X, Doc. 7 | App 032-037 |
| **F** | Appeal Dismissal Order filed Nov. 30, 2020 | 3:20-CV-03389-X, Doc. 8 | App 038-043 |
| **G** | Sua Sponte Order filed July 8, 2026 | 3:22-CV-02118-X, Dkt. 792 | App 044-046 |
| **H** | Receiver's Sixteenth Quarterly Status Report (2Q26), filed July 30, 2026 | 3:22-CV-02118-X, Dkt. 838 | App 047-166 |

# TAB A

## CHRONOLOGICAL TABLE OF RECEIVER DRIVEN- AND COURT-INITIATED ORDERS AND DISPOSITIONS

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 62 | 11/16/2022 | Starr | Supplement Order Appointing Receiver — expressly names ~126 additional Receivership Entities nunc pro tunc | Receiver's Motion to Supplement Order Appointing Receiver (Dkt 41) — Receiver | No SEC filing found in folder re Dkt 41 & not mentioned in order | Objected-opposed (Barton response at Dkt 55; Max Barton Entities response construed as intervention; HNGH opposition at Dkt 51) | Granted as to all entities except the five Max Barton Entities; Max Barton Entities' intervention GRANTED, their hearing request DENIED; supplemental briefing ordered |
| 63 | 11/16/2022 | Starr | Order Governing Administration of Receivership Estate; procedures for notice, sale/abandonment of personal and real property | Receiver's Motion for Order Governing Administration of Receivership Estate and Notice of Disposition of Certain Personal Property (Dkt 47) — Receiver | No SEC filing found in folder re Dkt 47 & not mentioned in order | Objected-opposed (Barton response at Dkt 56; requested hearing) | Granted; Barton's hearing request denied |
| 88 | 12/13/2022 | Starr | Second supplement to receivership order — Max Barton Entities and Additional Entities (TC Hall, Titan 2022, Marine Creek SP, Aledo TX) declared Receivership Entities nunc pro tunc | Receiver's second Motion to Supplement Order Appointing Receiver (Dkt 73) — Receiver | No SEC filing found & not mentioned in order (order cites SEC fraud-examiner declaration Doc 7-1 as evidence only) | Objected-opposed (Max Barton Entities intervened and opposed; Barton response at folder Dkt 81) | Granted; Max Barton Entities' hearing request denied |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 99 | 12/16/2022 | Starr | Appoint appraisers, approve appraisals, set sale hearing — Rock Creek Property (avg appraisal $1,393,333; contract $1,400,000) | Receiver's Motion for Appointment of Appraisers etc. re Rock Creek (Dkt 76) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Barton response Dkt 91 and cross-motion Dkt 92 to prohibit sale of personal property) | Granted in part — appraisers appointed, appraisals accepted, hearing set 12/19/22; sale ruling deferred to hearing |
| 104 | 12/20/2022 | Starr | Approval of Rock Creek sale; Barton lis pendens declared void; $1,200 fee award against Barton; Barton's personal items to storage | Receiver's motion to approve sale (Dkt 76) and motion to declare lis pendens void (Dkt 96) — Receiver; Barton cross-motion to prohibit sale (Dkt 91) | No SEC filing found & not mentioned in order | Objected-opposed (cross-motion, lis pendens, oral stay motion) | Granted Receiver's sale motion and lis-pendens motion; DENIED Barton's cross-motion and oral motion to stay; Barton ordered to pay $1,200 to Receiver |
| 109 | 12/21/2022 | Starr | Ratification of Receiver's agreement with DLP Capital and other DLP Entities | Receiver's Motion to Ratify Agreement with DLP Capital (Dkt 95) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (folder Dkt 106: "DEFENDANT BARTON'S RESPONSE TO VERIFIED MOTION TO RATIFY AGREEMENT WITH DLP CAPITAL AND OTHER DLP ENTITIES"; Barton then moved to stay this order, Dkt 114) | Granted — agreement ratified; Court notes Receiver "was not obligated to obtain the Court's approval for this action" |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 163 | 02/22/2023 | Starr | Ratification of Receiver's agreement with Lumar Land & Cattle, LLC | Receiver's Expedited Motion to Ratify Agreement with Lumar (Dkt 143) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (folder Dkt 155: "DEFENDANT BARTON'S OPPOSITION TO MOTION TO RATIFY AGREEMENT"; Receiver reply Dkt 159) | Granted — agreement ratified; Court notes approval not required and Sec. 2001 inapplicable to settlement compromises |
| 195 | 03/19/2023 | Starr | Receiver's First Quarterly Fee Application granted — $122,455.99 Receiver (Cort Thomas), $220,483.50 Brown Fox PLLC, plus accountant/forensic fees (Oct-Dec 2022) | Receiver's First Quarterly Fee Application (Dkt 156) — Receiver | Unopposed per order text ("The Securities and Exchange Commission (the 'SEC') does not oppose the motion"); no SEC joinder/filing | Objected-opposed ("but Defendant Timothy Barton does"; hearing request denied; Barton response at folder Dkt 176) | Granted — fees found reasonable under lodestar and Johnson factors; Barton's hearing request DENIED |
| 197 | 03/20/2023 | Starr | Appoint appraisers, approve appraisals, set sale hearing — Amerigold Suites (avg appraisal $4,366,667; contract $5,500,000) | Receiver's Verified Motion re Amerigold Suites (Dkt 167) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed ("Defendant Timothy Barton opposes the motion," citing Doc 185) | Granted in part — appraisers, appraisals, hearing 3/20/23; sale ruling deferred to hearing |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 235 | May 15, 2023 | Starr | Compel documents/information, civil contempt sanctions against Barton, and entry of privilege protocol | Receiver's Motion to Compel Documents and Information, Request for Sanctions (Doc 133) | No SEC filing found & not mentioned in order | Objected-opposed (response Dkt 160; surreply sought Dkt 201 denied; hearing request denied) | GRANTED — Barton in civil contempt; compensatory sanction $19,250; $500/day coercive sanction on noncompliance; Receiver-drafted privilege protocol entered; Barton hearing and surreply DENIED |
| 236 | May 15, 2023 | Starr | Approve HNGH Turtle Creek settlement, lift stays of related bankruptcy/appeal, authorize office-contents auction | Receiver's Motion to Approve Settlement (Doc 210) and Receiver's motion to strike (Doc 226); Barton objection + cross-motion for PI (Doc 223) | No SEC filing found & not mentioned in order | Objected-opposed (Dkt 230 opposition to Doc 210; Doc 223 objection and cross-motion) | GRANTED — settlement approved; Barton objection OVERRULED, hearing DENIED, PI cross-motion STRICKEN; Barton ordered to submit sworn ownership statements within 1 day |
| 246 | May 25, 2023 | Fifth Circuit | Receiver's motions in appeal No. 23-10515: intervene, dismiss appeal, expedited ruling | Receiver Cortney C. Thomas (all three motions opposed) | No SEC filing found & not mentioned in order | Objected-opposed (motions recited as "opposed") | DENIED — intervention denied without prejudice to amicus; dismissal and expedited ruling denied as moot |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 287 | June 19, 2023 | Starr | Receiver's Second Quarterly Fee Application (Q1 2023: $109,326.63 Thomas; $235,794.00 Brown Fox; $78,329.20 Ahuja & Clark; $20,944.39 Veracity) | Receiver (Doc 237) | SEC non-opposition recited in order (no SEC filing/joinder) | Objected-opposed (opposition Dkt 256; hearing requested and denied) | GRANTED — fees approved under lodestar and Johnson factors; Barton hearing request DENIED |
| 415 | November 29, 2023 | Starr | Myra Park 635, LLC exempted from any prior order | Receiver's motion regarding Myra Park 635, LLC (Doc 396) | No SEC filing found & not mentioned in order | Objected-opposed (oppositions Dkts 405 and 407, corrected) | GRANTED — "Myra Park 635, LLC is exempted from any prior order based on the Receiver's motion" |
| 419 | November 29, 2023 | Starr | Blessing order — ratification of Receiver's prior good-faith activities and nine prior orders nunc pro tunc; fee carryover; single final accounting; Receiver immunity | Receiver's Expedited Motion to Approve, Ratify, Adopt, and Otherwise "Bless" Previous Actions of Receiver and Orders (Doc 372) | No SEC filing found & not mentioned in order | Objected-opposed (Doc 397 opposition; Barton argued vacated orders "are entitled to no legal effect") | GRANTED IN PART — requests 1-3 and 6 granted (activities ratified; nine orders incl. Dkts 109/236, 163, 63, 104 lis pendens ruling, 235 privilege protocol, 195/287 fee orders, 38 engagements adopted nunc pro tunc; fee carryover; Receiver released from liability); requests 4 (continue old litigation stay) and 5 (preemptive Notice of Compliance from Barton) DENIED as unnecessary |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 420 | November 29, 2023 | Starr | Construe Receiver's three ratifying motions (Rock Creek, Frisco Gate, Amerigold) as new motions to appoint appraisers, approve appraisals, and set hearings; hearings set Dec. 11, 2023; expedited briefing (responses due Dec. 6) | Receiver's motions (Docs 374, 376, 378) | No SEC filing found & not mentioned in order | Barton obtained extension to respond (Dkt 387); affected lenders opposed/objected (Dkt 393 lender opposition; Dkt 395 McCormick limited objection; Dkt 411 TRB sur-reply) | GRANTED as construed — appraisers appointed and appraisals approved on the Receiver's prior submissions; sale-approval hearings set with expedited briefing |
| 436 | December 15, 2023 | Starr | Approval of sale of Amerigold Suites under 28 U.S.C. 2001 | Receiver's verified/expedited motion (Doc 378, construed via Doc 420 as motion to appoint appraisers, approve appraisals, set hearing) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Dkt 428 "DEFENDANT TIMOTHY LYNCH BARTON'S CONSOLIDATED OPPOSITION"; McCormick 101 limited objection Dkt 395 resolved by Joint Stipulation Doc 409) | Granted — sale approved and Receiver authorized to convey free and clear; court relied on receiver-obtained appraisals, publication, absence of competing offers |
| 437 | December 15, 2023 | Starr | Approval of sale of Rock Creek Property under 28 U.S.C. 2001 | Receiver's verified/expedited motion (Doc 374, construed via Doc 420) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Dkt 428 Consolidated Opposition to the three sale motions) | Granted — sale approved free and clear per Joint Stipulation with The Rama Fund (Doc 392); relied on three appraisals and no competing offers |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 438 | December 15, 2023 | Starr | Approval of sale of Frisco Gate Property under 28 U.S.C. 2001 | Receiver's verified/expedited motion (Doc 376, construed via Doc 420) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Dkt 428 Consolidated Opposition); lender TRB and Palisades interests reserved (Dkt 425/426 Lender responses) | Granted — sale approved; "Before closing, the Court will address by subsequent ruling the interests of Texas Republic Bank, N.A. and Palisades-TC, LLC" |
| 451 | January 8, 2024 | Starr | Frisco Gate closing terms: free-and-clear conveyance, stay of default-rate interest, TRB paid principal + standard-rate interest, Palisades paid $3,500,000 purchase money | Receiver's Motion to Authorize the Sale of the Frisco Gate Property (Doc 376) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Barton via Dkt 428); affected lender TRB filed verified opposition (Dkt 393 "LENDER'S VERIFIED RESPONSE IN OPPOSITION") | Granted — additional relief authorized; default/maturity interest stayed as of October 18, 2022; disputed "Additional Amounts" held in trust for claims process |
| 537 | July 25, 2024 | Starr | Approval of sale of Amerigold Suites under 28 U.S.C. 2001 | Receiver's motion to appoint appraisers, approve appraisals, set hearing (Doc 500; granted at Doc 531) — Receiver | No SEC filing found on Doc 500 & not mentioned in order (SEC counsel present at 7/23/24 hearing per Dkt 536) | Objected-opposed (Dkt 516 "DEFENDANT BARTON'S RESPONSE IN OPPOSITION"; Receiver omnibus reply Dkt 528) | Granted — sale approved and conveyance free and clear authorized; court relied on receiver-obtained appraisals, publication, no competing offers |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 538 | July 25, 2024 | Starr | Approval of sale of Hall Street Property under 28 U.S.C. 2001 | Receiver's motion (Doc 502; granted at Doc 532) — Receiver | No SEC filing found on Doc 502 & not mentioned in order (SEC counsel present at 7/23/24 hearing per Dkt 536) | Objected-opposed (Dkt 517 "DEFENDANT BARTON'S RESPONSE IN OPPOSITION") | Granted — sale approved free and clear after paying secured lienholders; same appraisal/notice/no-competing-offer findings |
| 549 | August 14, 2024 | Starr | Ratification of Receiver settlement with Tamamoi, LLC and 3820 Illinois, LLC ($75,000 to estate; mutual releases); Barton's 2001-hearing demand rejected | Receiver's Verified Motion to Ratify Settlement Agreement (Doc 494) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Doc 504 response; argued lack of jurisdiction and demanded 28 U.S.C. 2001 evidentiary hearing) | Granted — settlement in best interest of cash-starved estate; no 2001 hearing required for claim settlements |
| 550 | August 14, 2024 | Starr | Ratification of BM318, LLC settlements with Dixon Water Foundation ($100,000) and Lumar Land & Cattle ($75,000) | Receiver's Verified Motion to Ratify BM318 Settlement Agreements (Doc 524) — Receiver | No SEC filing found & not mentioned in order | Objected-opposed (Dkt 541 Response and Objection; argued claims could recover a $47 million property) | Granted — adopts bankruptcy court findings; settlements in best interest of receivership estate |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 609 | February 26, 2025 | Starr | Grant of Receiver's Fourth Quarterly Fee Application (3Q23): $60,947.06 fees + $12,002.34 expenses (Thomas); $129,944.00 (Brown Fox); $563,081.75 (Ahuja & Clark); $29,255.29 (Veracity); 20% holdback waived (order's internal title misprints "SECOND FEE APPLICATION") | Receiver's Fourth Quarterly Fee Application (Doc 593) — Receiver | No SEC filing; SEC did not oppose per order ("the Securities and Exchange Commission (SEC) does not [oppose]"; "The SEC filed no response or objection"; SEC favored standard holdback per certificate of conference) | Objected-opposed (Doc 597 response; opposed vacatur-period fees, lack of sales, Microsoft/QuickBooks expenses) | Granted — lodestar approved (3,145.25 hours); no 20% holdback imposed |
| 631 | 2025-04-10 | Starr | Barton protective order re legal-defense-fund donor info + Receiver motion to compel that info | Doc 587 motion for protective order - Barton; Doc 591 motion to compel - Receiver | No SEC filing found & not mentioned as filer; order affirmatively bars sharing with SEC | Objected-opposed (Barton resisted disclosure; claimed sources irrelevant) | Both granted - Barton must produce documents on fee sources; Receiver barred from sharing with Commission/government or contacting contributors absent further order |
| 641 | 2025-05-21 | Starr | Order directing Barton to respond re alleged Receivership Order violations (bar grievance vs Receiver counsel) | Receiver's Notice of Barton's Continued Interference and Violations of Receivership Order (Doc 640) - Receiver notice, not a motion | No SEC filing found & not mentioned in order | Objected-opposed (Barton responded via Docs 645/646 disputing any violation) | Order to respond - Barton to explain by May 27 2025 how he and counsel are not violating Doc 417 para 32 injunction |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 649 | 2025-06-23 | Starr | Modification of Receivership Order - pre-clearance required before Barton/counsel file bar grievances | Triggered by Receiver Notice Doc 640; Barton response Doc 645; Receiver reply Doc 647 - Receiver-initiated | No SEC filing found & not mentioned in order | Objected-opposed (Doc 645 response contested violation; Barton appealed at Dkt 659) | Modification granted - no bad faith by Receiver; grievance-defense costs are estate fees; Court clearance required for future bar grievances |
| 650 | 2025-06-23 | Starr | Amended Order Appointing Receiver (Second/Modified Receivership Order incorporating para 85(a) bar-grievance clearance) | Entered per Doc 649; receivership originally sought by SEC; the modification was triggered by Receiver Notice Doc 640 | SEC was original receivership movant ("upon motion of Plaintiff Securities and Exchange Commission"); no SEC filing on the modification itself found in folder | Objected-opposed (opposed modification via Doc 645; appealed Doc 650 at Dkt 658) | Amended receivership order entered in full (28 pp) |
| 667 | 2025-08-04 | Starr | Receiver Fifth and Sixth Quarterly Fee Applications (total $594,116.90 to Thomas, Brown Fox, Ahuja & Clark) | Docs 654 & 656 Fee Applications - Receiver | No SEC filing found & not mentioned in order | No response at time of ruling; Barton filed post-order Consolidated Objection to 4th and 5th fee applications (Dkt 669) and appealed the fee orders (Dkt 679, appeal dismissed at Dkt 706) | Granted - both applications found just and appropriate; specific sums authorized for 4Q23 and 1Q24 |

| Dkt. No. | Date of Order | Issuing Court | Order Subject | Underlying Motion & Movant | SEC Position | Barton / Opposing-Party Position | Ruling |
|---|---|---|---|---|---|---|---|
| 755 | 2026-06-09 | Starr | Voiding Barton's four July 31 2024 Dallas County lis pendens (Goldmark, Rock Creek, Turtle Creek, Hall Street); compensatory sanctions denied without prejudice | Doc 741 Verified and Emergency Motion to Declare Lis Pendens Void and Award Compensatory Sanctions - Receiver | No SEC filing found & not mentioned as filer in order | Objected-opposed (Barton Response and Objection Dkt 754; procedural objections addressed and rejected in order) | Granted in part (lis pendens declared void) / denied in part (the $2,700 sanctions request denied without prejudice for lack of evidence; 21 days to supplement - Receiver supplemented at Dkt 779) |
| 792 | 07/08/2026 | Starr | Post-certiorari "next phase" directive: solicit lender proposals for each Receivership Property; absent workable proposals, future free-and-clear sales and later priority determinations | No motion; entered sua sponte after the Court reviewed the Receiver's Fifteenth Quarterly Status Report (Dkt. 728) | No SEC filing or position identified in the order | No pre-order motion or briefing; no party requested the relief | ORDERED - Receiver to solicit lender proposals and report within 90 days; absent workable proposals, Court states it will instruct free-and-clear sales and later determine competing claims, liens, and interests |

# TAB B

## APPEAL DISMISSAL ORDER

Doc. 06 (November 2020)

*Jun Li, et al. v. WALL007 LLC, et al., No. 3:20-CV-03385-X*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JUN LI, et al., | § | |
| | § | |
| *Petitioning Creditors*, | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-03385-X |
| | § | |
| WALL007 LLC, et al., | § | |
| | § | |
| *Alleged Debtors*. | § | |

# ORDER

Before the Court is the Petitioning Creditors' (Creditors) *Notice of Motion for Leave to Appeal* [Doc. No. 2]. This docket entry includes both the Motion for Leave to Appeal and the Alleged Debtors' Objection to the Motion for Leave to Appeal. After considering the motion, objection, record, and applicable law, and as explained below, the Court **DENIES** the Creditors' motion for leave to appeal and **DISMISSES** this appeal.

## I. Factual Background

This motion arises out of an involuntary bankruptcy case.[1] The Alleged Debtors are in the business of acquiring and improving land to sell residential lots to home builders. The Creditors claim that they each individually "entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors

[1] *See In re WALL007 LLC, et al.*, No. 20-31131-hdh7 (N.D. Tex. Nov. 23, 2020).

failed to pay the loans back as and when required under the loan documents."[2] But the Alleged Debtors tell a different story. They claim that one individual, Michael Fu, located them, "engaged them to provide co-lending through his own entities, organized the transfer of funds, and acted as an agent on behalf of all of the [Creditors]."[3] This variance troubled the Bankruptcy Court because it raises concerns both of fraud and of whether the Creditors can satisfy the requirements for filing an involuntary petition.

The Creditors filed this motion seeking leave to appeal an interlocutory order of the Bankruptcy Court which requires the Creditors to appear for live, in-person depositions in the United States or risk the case being dismissed without prejudice on December 4, 2020. The Creditors, 65 Chinese nationals, oppose appearing in-person due to the COVID-19 pandemic and the complications that traveling from China to the United States would entail. While it acknowledged that traveling to conduct in-person depositions on U.S. soil would be difficult, the Bankruptcy Court found that: (1) it is not impossible; (2) conducting depositions in China may be illegal; and (3) it is the only solution to determine whether a fraud is being perpetrated on that Court.

## II. Legal Standard

Litigants may not appeal an interlocutory bankruptcy court order as of right.[4] And courts generally do not grant leave to appeal an interlocutory order because

[2] Doc. No. 287 at 4.
[3] *Id.*
[4] *See In re Hunt Intern. Resources Corp.*, 57 B.R. 371, 372 (N.D. Tex. 1985).

interlocutory appeals "interfere with the overriding goal of the bankruptcy system, expeditious resolution of pressing economic difficulties."[5] Granting leave to appeal an interlocutory order, then, "should be granted only where circumstances are present which justify the overriding general policy of not allowing such appeals."[6]

The United States district courts have jurisdiction to hear appeals of bankruptcy judgments pursuant to 28 U.S.C. § 158(a). But district court review of interlocutory orders requires leave of court.[7] The decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is within the district court's discretion.[8] While Section 158(a)(3) does not provide a standard for determining whether to grant leave to appeal an interlocutory order, many courts have adopted the standard under 28 U.S.C. § 1292(b).[9] To be appealable under that standard, an interlocutory order must: (1) involve a controlling issue of law; (2) present a question upon which there is substantial ground for difference of opinion; and (3) an immediate appeal of the order must materially advance the ultimate termination of the litigation.[10] Every factor must be satisfied for an interlocutory order to be considered; they should not be weighed or balanced.[11]

[5] *Id.*
[6] *Id.*
[7] *See* 28 U.S.C. § 158(a)(3).
[8] *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 399–400 (5th Cir. 2001).
[9] *Ichinose v. Homer Nat'l Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991).
[10] *Id.*
[11] *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, Case. Nos. 3:11-cv-003-K, 3-10-cv-2541-K, 2011 WL 610016, at *4 (N.D. Tex. Feb. 14, 2011).

III. Analysis

The Court finds that the Creditors did not present a question upon which there is substantial ground for difference of opinion. Because failing to satisfy a single requirement is fatal to obtaining leave to appeal an interlocutory order, the Court discusses only the second requirement.

The fact that a court is the first to rule on a question or that counsel disagrees with the Court's decision "does not qualify the issue as one over which there is substantial disagreement."[12] In its motion, the Creditors argue that the issues are "likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020."[13] They further assert that because the Macau government has allowed tourist travel from China to resume, and the depositions could conceivably be conducted there, "all of the issues presented are in fact controlling issues of law."

The Court finds this argument unconvincing for several reasons: (1) the Creditors rely on an expired travel alert from WorldAware.com for the proposition that depositions can be legally conducted in Macau; (2) Macau is a Chinese territory with a hybrid legal system, and the Creditors have offered no evidence that a video deposition would not violate this hybrid law, even if taken in Macau; (3) the fact that this issue may be one of first impression is irrelevant to whether there exists substantial ground for difference of opinion; and (4) because the depositions can be conducted in the United States (although the Court recognizes the difficulty of doing

[12] *Ryan v. Flowserve Corp.*, 444 F. Supp.2d 718, 724 (N.D. Tex. 2006).
[13] Doc. No. 2. at 18.

so), the Creditors' arguments are akin to a disagreement with the Bankruptcy Court's ruling.

The law here is not unsettled—the Creditors merely disagree with the Bankruptcy Court's opinion. But an appeal of an interlocutory order is not the appropriate vehicle "to obtain a second, more favorable opinion."[14] Accordingly, the Court finds that the Creditors have not presented a question upon which there is substantial ground for difference of opinion. Therefore, the Court determines that interlocutory appeal is inappropriate. Because the Creditors failed to satisfy the second element of the section 1292(b) analysis, the Court need not address the remaining elements.

III. Conclusion

For the foregoing reasons, the Court **DENIES** the Creditor's Motion for Leave to Appeal and **DISMISSES** this appeal.

**IT IS SO ORDERED** this 30th day of November 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

[14] *Flowserve*, 444 F. Supp.2d at 722.

# TAB C

## APPEAL DISMISSAL ORDER

Doc. 07 (November 2020)

*Jun Li, et al. v. WALL007 LLC, et al., No. 3:20-CV-03386-X*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JUN LI, et al., | § | |
| *Petitioning Creditors,* | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-03386-X |
| | § | |
| WALL007 LLC, et al., | § | |
| | § | |
| *Alleged Debtors.* | § | |

**ORDER**

Before the Court is the Petitioning Creditors' (Creditors) *Notice of Motion for Leave to Appeal* [Doc. No. 2]. This docket entry includes both the Motion for Leave to Appeal and the Alleged Debtors' Objection to the Motion for Leave to Appeal. After considering the motion, objection, record, and applicable law, and as explained below, the Court **DENIES** the Creditors' motion for leave to appeal and **DISMISSES** this appeal.

I. Factual Background

This motion arises out of an involuntary bankruptcy case.[1] The Alleged Debtors are in the business of acquiring and improving land to sell residential lots to home builders. The Creditors claim that they each individually "entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors

[1] *See In re WALL007 LLC, et al.*, No. 20-31131-hdh7 (N.D. Tex. Nov. 23, 2020).

failed to pay the loans back as and when required under the loan documents."[2] But the Alleged Debtors tell a different story. They claim that one individual, Michael Fu, located them, "engaged them to provide co-lending through his own entities, organized the transfer of funds, and acted as an agent on behalf of all of the [Creditors]."[3] This variance troubled the Bankruptcy Court because it raises concerns both of fraud and of whether the Creditors can satisfy the requirements for filing an involuntary petition.

The Creditors filed this motion seeking leave to appeal an interlocutory order of the Bankruptcy Court which requires the Creditors to appear for live, in-person depositions in the United States or risk the case being dismissed without prejudice on December 4, 2020. The Creditors, 65 Chinese nationals, oppose appearing in-person due to the COVID-19 pandemic and the complications that traveling from China to the United States would entail. While it acknowledged that traveling to conduct in-person depositions on U.S. soil would be difficult, the Bankruptcy Court found that: (1) it is not impossible; (2) conducting depositions in China may be illegal; and (3) it is the only solution to determine whether a fraud is being perpetrated on that Court.

## II. Legal Standard

Litigants may not appeal an interlocutory bankruptcy court order as of right.[4] And courts generally do not grant leave to appeal an interlocutory order because

[2] Doc. No. 287 at 4.
[3] *Id.*
[4] *See In re Hunt Intern. Resources Corp.*, 57 B.R. 371, 372 (N.D. Tex. 1985).

interlocutory appeals "interfere with the overriding goal of the bankruptcy system, expeditious resolution of pressing economic difficulties."[5] Granting leave to appeal an interlocutory order, then, "should be granted only where circumstances are present which justify the overriding general policy of not allowing such appeals."[6]

The United States district courts have jurisdiction to hear appeals of bankruptcy judgments pursuant to 28 U.S.C. § 158(a). But district court review of interlocutory orders requires leave of court.[7] The decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is within the district court's discretion.[8] While Section 158(a)(3) does not provide a standard for determining whether to grant leave to appeal an interlocutory order, many courts have adopted the standard under 28 U.S.C. § 1292(b).[9] To be appealable under that standard, an interlocutory order must: (1) involve a controlling issue of law; (2) present a question upon which there is substantial ground for difference of opinion; and (3) an immediate appeal of the order must materially advance the ultimate termination of the litigation.[10] Every factor must be satisfied for an interlocutory order to be considered; they should not be weighed or balanced.[11]

[5] *Id.*
[6] *Id.*
[7] *See* 28 U.S.C. § 158(a)(3).
[8] *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 399–400 (5th Cir. 2001).
[9] *Ichinose v. Homer Nat'l Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991).
[10] *Id.*
[11] *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, Case. Nos. 3:11-cv-003-K, 3-10-cv-2541-K, 2011 WL 610016, at *4 (N.D. Tex. Feb. 14, 2011).

## III. Analysis

The Court finds that the Creditors did not present a question upon which there is substantial ground for difference of opinion. Because failing to satisfy a single requirement is fatal to obtaining leave to appeal an interlocutory order, the Court discusses only the second requirement.

The fact that a court is the first to rule on a question or that counsel disagrees with the Court's decision "does not qualify the issue as one over which there is substantial disagreement."[12] In its motion, the Creditors argue that the issues are "likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020."[13] They further assert that because the Macau government has allowed tourist travel from China to resume, and the depositions could conceivably be conducted there, "all of the issues presented are in fact controlling issues of law."

The Court finds this argument unconvincing for several reasons: (1) the Creditors rely on an expired travel alert from WorldAware.com for the proposition that depositions can be legally conducted in Macau; (2) Macau is a Chinese territory with a hybrid legal system, and the Creditors have offered no evidence that a video deposition would not violate this hybrid law, even if taken in Macau; (3) the fact that this issue may be one of first impression is irrelevant to whether there exists substantial ground for difference of opinion; and (4) because the depositions can be conducted in the United States (although the Court recognizes the difficulty of doing

[12] *Ryan v. Flowserve Corp.*, 444 F. Supp.2d 718, 724 (N.D. Tex. 2006).
[13] Doc. No. 2. at 18.

so), the Creditors' arguments are akin to a disagreement with the Bankruptcy Court's ruling.

The law here is not unsettled—the Creditors merely disagree with the Bankruptcy Court's opinion. But an appeal of an interlocutory order is not the appropriate vehicle "to obtain a second, more favorable opinion."[14] Accordingly, the Court finds that the Creditors have not presented a question upon which there is substantial ground for difference of opinion. Therefore, the Court determines that interlocutory appeal is inappropriate. Because the Creditors failed to satisfy the second element of the section 1292(b) analysis, the Court need not address the remaining elements.

III. Conclusion

For the foregoing reasons, the Court **DENIES** the Creditor's Motion for Leave to Appeal and **DISMISSES** this appeal.

**IT IS SO ORDERED** this 30th day of November 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

[14] *Flowserve*, 444 F. Supp.2d at 722.

# TAB D

## APPEAL DISMISSAL ORDER

Doc. 08 (November 2020)

*Jun Li, et al. v. WALL007 LLC, et al., No. 3:20-CV-03387-X*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JUN LI, et al., | § | |
| *Petitioning Creditors*, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-03387-X |
| | § | |
| WALL007 LLC, et al., | § | |
| | § | |
| *Alleged Debtors*. | § | |

**ORDER**

Before the Court is the Petitioning Creditors' (Creditors) *Notice of Motion for Leave to Appeal* [Doc. No. 2]. This docket entry includes both the Motion for Leave to Appeal and the Alleged Debtors' Objection to the Motion for Leave to Appeal. After considering the motion, objection, record, and applicable law, and as explained below, the Court **DENIES** the Creditors' motion for leave to appeal and **DISMISSES** this appeal.

I. Factual Background

This motion arises out of an involuntary bankruptcy case.[1] The Alleged Debtors are in the business of acquiring and improving land to sell residential lots to home builders. The Creditors claim that they each individually "entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors

[1] *See In re WALL007 LLC, et al.*, No. 20-31131-hdh7 (N.D. Tex. Nov. 23, 2020).

failed to pay the loans back as and when required under the loan documents."[2] But the Alleged Debtors tell a different story. They claim that one individual, Michael Fu, located them, "engaged them to provide co-lending through his own entities, organized the transfer of funds, and acted as an agent on behalf of all of the [Creditors]."[3] This variance troubled the Bankruptcy Court because it raises concerns both of fraud and of whether the Creditors can satisfy the requirements for filing an involuntary petition.

The Creditors filed this motion seeking leave to appeal an interlocutory order of the Bankruptcy Court which requires the Creditors to appear for live, in-person depositions in the United States or risk the case being dismissed without prejudice on December 4, 2020. The Creditors, 65 Chinese nationals, oppose appearing in-person due to the COVID-19 pandemic and the complications that traveling from China to the United States would entail. While it acknowledged that traveling to conduct in-person depositions on U.S. soil would be difficult, the Bankruptcy Court found that: (1) it is not impossible; (2) conducting depositions in China may be illegal; and (3) it is the only solution to determine whether a fraud is being perpetrated on that Court.

## II. Legal Standard

Litigants may not appeal an interlocutory bankruptcy court order as of right.[4] And courts generally do not grant leave to appeal an interlocutory order because

[2] Doc. No. 287 at 4.
[3] *Id.*
[4] *See In re Hunt Intern. Resources Corp.*, 57 B.R. 371, 372 (N.D. Tex. 1985).

interlocutory appeals "interfere with the overriding goal of the bankruptcy system, expeditious resolution of pressing economic difficulties."[5] Granting leave to appeal an interlocutory order, then, "should be granted only where circumstances are present which justify the overriding general policy of not allowing such appeals."[6]

The United States district courts have jurisdiction to hear appeals of bankruptcy judgments pursuant to 28 U.S.C. § 158(a). But district court review of interlocutory orders requires leave of court.[7] The decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is within the district court's discretion.[8] While Section 158(a)(3) does not provide a standard for determining whether to grant leave to appeal an interlocutory order, many courts have adopted the standard under 28 U.S.C. § 1292(b).[9] To be appealable under that standard, an interlocutory order must: (1) involve a controlling issue of law; (2) present a question upon which there is substantial ground for difference of opinion; and (3) an immediate appeal of the order must materially advance the ultimate termination of the litigation.[10] Every factor must be satisfied for an interlocutory order to be considered; they should not be weighed or balanced.[11]

[5] *Id.*
[6] *Id.*
[7] *See* 28 U.S.C. § 158(a)(3).
[8] *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 399–400 (5th Cir. 2001).
[9] *Ichinose v. Homer Nat'l Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991).
[10] *Id.*
[11] *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, Case. Nos. 3:11-cv-003-K, 3-10-cv-2541-K, 2011 WL 610016, at *4 (N.D. Tex. Feb. 14, 2011).

III. Analysis

The Court finds that the Creditors did not present a question upon which there is substantial ground for difference of opinion. Because failing to satisfy a single requirement is fatal to obtaining leave to appeal an interlocutory order, the Court discusses only the second requirement.

The fact that a court is the first to rule on a question or that counsel disagrees with the Court's decision "does not qualify the issue as one over which there is substantial disagreement."[12] In its motion, the Creditors argue that the issues are "likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020."[13] They further assert that because the Macau government has allowed tourist travel from China to resume, and the depositions could conceivably be conducted there, "all of the issues presented are in fact controlling issues of law."

The Court finds this argument unconvincing for several reasons: (1) the Creditors rely on an expired travel alert from WorldAware.com for the proposition that depositions can be legally conducted in Macau; (2) Macau is a Chinese territory with a hybrid legal system, and the Creditors have offered no evidence that a video deposition would not violate this hybrid law, even if taken in Macau; (3) the fact that this issue may be one of first impression is irrelevant to whether there exists substantial ground for difference of opinion; and (4) because the depositions can be conducted in the United States (although the Court recognizes the difficulty of doing

[12] *Ryan v. Flowserve Corp.*, 444 F. Supp.2d 718, 724 (N.D. Tex. 2006).
[13] Doc. No. 2. at 18.

so), the Creditors' arguments are akin to a disagreement with the Bankruptcy Court's ruling.

The law here is not unsettled—the Creditors merely disagree with the Bankruptcy Court's opinion. But an appeal of an interlocutory order is not the appropriate vehicle "to obtain a second, more favorable opinion."[14] Accordingly, the Court finds that the Creditors have not presented a question upon which there is substantial ground for difference of opinion. Therefore, the Court determines that interlocutory appeal is inappropriate. Because the Creditors failed to satisfy the second element of the section 1292(b) analysis, the Court need not address the remaining elements.

III. Conclusion

For the foregoing reasons, the Court **DENIES** the Creditor's Motion for Leave to Appeal and **DISMISSES** this appeal.

**IT IS SO ORDERED** this 30th day of November 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

[14] *Flowserve*, 444 F. Supp.2d at 722.

# TAB E

## APPEAL DISMISSAL ORDER

Doc. 07 (November 2020)

*Jun Li, et al. v. WALL007 LLC, et al., No. 3:20-CV-03388-X*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JUN LI, et al., | § | |
| *Petitioning Creditors,* | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-03388-X |
| | § | |
| WALL007 LLC, et al., | § | |
| | § | |
| *Alleged Debtors.* | § | |

# ORDER

Before the Court is the Petitioning Creditors' (Creditors) *Notice of Motion for Leave to Appeal* [Doc. No. 2]. This docket entry includes both the Motion for Leave to Appeal and the Alleged Debtors' Objection to the Motion for Leave to Appeal. After considering the motion, objection, record, and applicable law, and as explained below, the Court **DENIES** the Creditors' motion for leave to appeal and **DISMISSES** this appeal.

## I. Factual Background

This motion arises out of an involuntary bankruptcy case.[1] The Alleged Debtors are in the business of acquiring and improving land to sell residential lots to home builders. The Creditors claim that they each individually "entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors

[1] *See In re WALL007 LLC, et al.*, No. 20-31131-hdh7 (N.D. Tex. Nov. 23, 2020).

failed to pay the loans back as and when required under the loan documents."[2] But the Alleged Debtors tell a different story. They claim that one individual, Michael Fu, located them, "engaged them to provide co-lending through his own entities, organized the transfer of funds, and acted as an agent on behalf of all of the [Creditors]."[3] This variance troubled the Bankruptcy Court because it raises concerns both of fraud and of whether the Creditors can satisfy the requirements for filing an involuntary petition.

The Creditors filed this motion seeking leave to appeal an interlocutory order of the Bankruptcy Court which requires the Creditors to appear for live, in-person depositions in the United States or risk the case being dismissed without prejudice on December 4, 2020. The Creditors, 65 Chinese nationals, oppose appearing in-person due to the COVID-19 pandemic and the complications that traveling from China to the United States would entail. While it acknowledged that traveling to conduct in-person depositions on U.S. soil would be difficult, the Bankruptcy Court found that: (1) it is not impossible; (2) conducting depositions in China may be illegal; and (3) it is the only solution to determine whether a fraud is being perpetrated on that Court.

## II. Legal Standard

Litigants may not appeal an interlocutory bankruptcy court order as of right.[4] And courts generally do not grant leave to appeal an interlocutory order because

[2] Doc. No. 287 at 4.
[3] *Id.*
[4] *See In re Hunt Intern. Resources Corp.*, 57 B.R. 371, 372 (N.D. Tex. 1985).

interlocutory appeals "interfere with the overriding goal of the bankruptcy system, expeditious resolution of pressing economic difficulties."[5] Granting leave to appeal an interlocutory order, then, "should be granted only where circumstances are present which justify the overriding general policy of not allowing such appeals."[6]

The United States district courts have jurisdiction to hear appeals of bankruptcy judgments pursuant to 28 U.S.C. § 158(a). But district court review of interlocutory orders requires leave of court.[7] The decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is within the district court's discretion.[8] While Section 158(a)(3) does not provide a standard for determining whether to grant leave to appeal an interlocutory order, many courts have adopted the standard under 28 U.S.C. § 1292(b).[9] To be appealable under that standard, an interlocutory order must: (1) involve a controlling issue of law; (2) present a question upon which there is substantial ground for difference of opinion; and (3) an immediate appeal of the order must materially advance the ultimate termination of the litigation.[10] Every factor must be satisfied for an interlocutory order to be considered; they should not be weighed or balanced.[11]

[5] *Id.*
[6] *Id.*
[7] *See* 28 U.S.C. § 158(a)(3).
[8] *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 399–400 (5th Cir. 2001).
[9] *Ichinose v. Homer Nat'l Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991).
[10] *Id.*
[11] *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, Case. Nos. 3:11-cv-003-K, 3-10-cv-2541-K, 2011 WL 610016, at *4 (N.D. Tex. Feb. 14, 2011).

III. Analysis

The Court finds that the Creditors did not present a question upon which there is substantial ground for difference of opinion. Because failing to satisfy a single requirement is fatal to obtaining leave to appeal an interlocutory order, the Court discusses only the second requirement.

The fact that a court is the first to rule on a question or that counsel disagrees with the Court's decision "does not qualify the issue as one over which there is substantial disagreement."[12] In its motion, the Creditors argue that the issues are "likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020."[13] They further assert that because the Macau government has allowed tourist travel from China to resume, and the depositions could conceivably be conducted there, "all of the issues presented are in fact controlling issues of law."

The Court finds this argument unconvincing for several reasons: (1) the Creditors rely on an expired travel alert from WorldAware.com for the proposition that depositions can be legally conducted in Macau; (2) Macau is a Chinese territory with a hybrid legal system, and the Creditors have offered no evidence that a video deposition would not violate this hybrid law, even if taken in Macau; (3) the fact that this issue may be one of first impression is irrelevant to whether there exists substantial ground for difference of opinion; and (4) because the depositions can be conducted in the United States (although the Court recognizes the difficulty of doing

[12] *Ryan v. Flowserve Corp.*, 444 F. Supp.2d 718, 724 (N.D. Tex. 2006).
[13] Doc. No. 2. at 18.

so), the Creditors' arguments are akin to a disagreement with the Bankruptcy Court's ruling.

The law here is not unsettled—the Creditors merely disagree with the Bankruptcy Court's opinion. But an appeal of an interlocutory order is not the appropriate vehicle "to obtain a second, more favorable opinion."[14] Accordingly, the Court finds that the Creditors have not presented a question upon which there is substantial ground for difference of opinion. Therefore, the Court determines that interlocutory appeal is inappropriate. Because the Creditors failed to satisfy the second element of the section 1292(b) analysis, the Court need not address the remaining elements.

III. Conclusion

For the foregoing reasons, the Court **DENIES** the Creditor's Motion for Leave to Appeal and **DISMISSES** this appeal.

**IT IS SO ORDERED** this 30th day of November 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

[14] *Flowserve*, 444 F. Supp.2d at 722.

# TAB F

## APPEAL DISMISSAL ORDER

Doc. 08 (November 2020)

*Jun Li, et al. v. WALL007 LLC, et al., No. 3:20-CV-03389-X*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JUN LI, et al., | § | |
| *Petitioning Creditors,* | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-03389-X |
| | § | |
| WALL007 LLC, et al., | § | |
| | § | |
| *Alleged Debtors.* | § | |

# ORDER

Before the Court is the Petitioning Creditors' (Creditors) *Notice of Motion for Leave to Appeal* [Doc. No. 3]. This docket entry includes both the Motion for Leave to Appeal and the Alleged Debtors' Objection to the Motion for Leave to Appeal. After considering the motion, objection, record, and applicable law, and as explained below, the Court **DENIES** the Creditors' motion for leave to appeal and **DISMISSES** this appeal.

## I. Factual Background

This motion arises out of an involuntary bankruptcy case.[1] The Alleged Debtors are in the business of acquiring and improving land to sell residential lots to home builders. The Creditors claim that they each individually "entered into loan agreements with the Alleged Debtors for the purpose of providing the Alleged Debtors with funding for the purchase and development of land, and the Alleged Debtors

[1] *See In re WALL007 LLC, et al.*, No. 20-31131-hdh7 (N.D. Tex. Nov. 23, 2020).

failed to pay the loans back as and when required under the loan documents."[2] But the Alleged Debtors tell a different story. They claim that one individual, Michael Fu, located them, "engaged them to provide co-lending through his own entities, organized the transfer of funds, and acted as an agent on behalf of all of the [Creditors]."[3] This variance troubled the Bankruptcy Court because it raises concerns both of fraud and of whether the Creditors can satisfy the requirements for filing an involuntary petition.

The Creditors filed this motion seeking leave to appeal an interlocutory order of the Bankruptcy Court which requires the Creditors to appear for live, in-person depositions in the United States or risk the case being dismissed without prejudice on December 4, 2020. The Creditors, 65 Chinese nationals, oppose appearing in-person due to the COVID-19 pandemic and the complications that traveling from China to the United States would entail. While it acknowledged that traveling to conduct in-person depositions on U.S. soil would be difficult, the Bankruptcy Court found that: (1) it is not impossible; (2) conducting depositions in China may be illegal; and (3) it is the only solution to determine whether a fraud is being perpetrated on that Court.

## II. Legal Standard

Litigants may not appeal an interlocutory bankruptcy court order as of right.[4] And courts generally do not grant leave to appeal an interlocutory order because

[2] Doc. No. 287 at 4.
[3] *Id.*
[4] *See In re Hunt Intern. Resources Corp.*, 57 B.R. 371, 372 (N.D. Tex. 1985).

interlocutory appeals "interfere with the overriding goal of the bankruptcy system, expeditious resolution of pressing economic difficulties."[5] Granting leave to appeal an interlocutory order, then, "should be granted only where circumstances are present which justify the overriding general policy of not allowing such appeals."[6]

The United States district courts have jurisdiction to hear appeals of bankruptcy judgments pursuant to 28 U.S.C. § 158(a). But district court review of interlocutory orders requires leave of court.[7] The decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is within the district court's discretion.[8] While Section 158(a)(3) does not provide a standard for determining whether to grant leave to appeal an interlocutory order, many courts have adopted the standard under 28 U.S.C. § 1292(b).[9] To be appealable under that standard, an interlocutory order must: (1) involve a controlling issue of law; (2) present a question upon which there is substantial ground for difference of opinion; and (3) an immediate appeal of the order must materially advance the ultimate termination of the litigation.[10] Every factor must be satisfied for an interlocutory order to be considered; they should not be weighed or balanced.[11]

[5] *Id.*
[6] *Id.*
[7] *See* 28 U.S.C. § 158(a)(3).
[8] *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 399–400 (5th Cir. 2001).
[9] *Ichinose v. Homer Nat'l Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991).
[10] *Id.*
[11] *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, Case. Nos. 3:11-cv-003-K, 3-10-cv-2541-K, 2011 WL 610016, at *4 (N.D. Tex. Feb. 14, 2011).

III. Analysis

The Court finds that the Creditors did not present a question upon which there is substantial ground for difference of opinion. Because failing to satisfy a single requirement is fatal to obtaining leave to appeal an interlocutory order, the Court discusses only the second requirement.

The fact that a court is the first to rule on a question or that counsel disagrees with the Court's decision "does not qualify the issue as one over which there is substantial disagreement."[12] In its motion, the Creditors argue that the issues are "likely of first impression, given the COVID-19 pandemic has largely only been with us in the U.S. since February or March of 2020."[13] They further assert that because the Macau government has allowed tourist travel from China to resume, and the depositions could conceivably be conducted there, "all of the issues presented are in fact controlling issues of law."

The Court finds this argument unconvincing for several reasons: (1) the Creditors rely on an expired travel alert from WorldAware.com for the proposition that depositions can be legally conducted in Macau; (2) Macau is a Chinese territory with a hybrid legal system, and the Creditors have offered no evidence that a video deposition would not violate this hybrid law, even if taken in Macau; (3) the fact that this issue may be one of first impression is irrelevant to whether there exists substantial ground for difference of opinion; and (4) because the depositions can be conducted in the United States (although the Court recognizes the difficulty of doing

[12] *Ryan v. Flowserve Corp.*, 444 F. Supp.2d 718, 724 (N.D. Tex. 2006).
[13] Doc. No. 2. at 18.

so), the Creditors' arguments are akin to a disagreement with the Bankruptcy Court's ruling.

The law here is not unsettled—the Creditors merely disagree with the Bankruptcy Court's opinion. But an appeal of an interlocutory order is not the appropriate vehicle "to obtain a second, more favorable opinion."[14] Accordingly, the Court finds that the Creditors have not presented a question upon which there is substantial ground for difference of opinion. Therefore, the Court determines that interlocutory appeal is inappropriate. Because the Creditors failed to satisfy the second element of the section 1292(b) analysis, the Court need not address the remaining elements.

III. Conclusion

For the foregoing reasons, the Court **DENIES** the Creditor's Motion for Leave to Appeal and **DISMISSES** this appeal.

**IT IS SO ORDERED** this 30th day of November 2020.



BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

[14] *Flowserve*, 444 F. Supp.2d at 722.

# TAB G

## SUA SPONTE ORDER

Doc. 792 (July 8, 2026)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| TIMOTHY BARTON et al., | § | Civil Action No. 3:22-CV-2118-X |
| | § | |
| *Defendants*, | § | |
| | § | |
| DJD LAND PARTNERS LLCS, LDG001 LLC, | § | |
| | § | |
| *Relief Defendants*. | § | |

**ORDER**

In light of the Supreme Court's denial of Defendant Timothy Barton's petition for certiorari,[1] the Receivership can now enter into its next phase.

The Court has reviewed the Receiver's Fifteenth Quarterly Report and is aware of the difficulties facing the Receivership stemming from the Receivership's significant debt and the inability of the Receiver to close sales due to Barton's multiple appeals of sales orders.

Accordingly, the Court directs the Receiver to solicit proposals from lenders for each Receivership Property to determine if there is a path forward to accomplish sales, pay down some or all the outstanding pre-Receivership balances on the loans, and allow remaining claims to be dealt with as part of the Receivership's claims

[1] *Barton v. SEC*, 2026 WL 1463202 (Mem), at *1 (U.S. May 26, 2026).

process. The Receiver will file a status report with the Court detailing the outcome of these discussions within ninety (90) days of the issuance of this Order.

If the Receiver is unable to secure workable proposals, the Court will instruct the Receiver to begin to sell Receivership Properties free and clear of all liens and loans. The Court will then determine the priority of all competing claims, liens, and interests and distribute proceeds accordingly.

**IT IS SO ORDERED** this 8th day of July, 2026.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

# TAB H

## RECEIVER'S SIXTEENTH QUARTERLY STATUS REPORT(2Q26)

Doc. 838 (July 30, 2026)

*SEC v. Barton, No. 3:22-CV-2118-X (N.D. Tex.)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| ***Plaintiff,*** | § | |
| **v.** | § | **No. 3:22-cv-2118-X** |
| **TIMOTHY BARTON, CARNEGIE DEVELOPMENT, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, HAOQIANG FU (A/K/A MICHAEL FU), STEPHEN T. WALL,** | § | |
| ***Defendants,*** | § | |
| **DJD LAND PARTNERS, LLC, and LDG001, LLC,** | § | |
| ***Relief Defendants.*** | § | |

**RECEIVER'S SIXTEENTH QUARTERLY STATUS REPORT (2Q26)**

Cortney C. Thomas, as the court-appointed Receiver in the above-referenced case, submits the following quarterly status report for the Second Quarter of 2026 pursuant to this Court's Order Appointing Receiver [Dkt. 417] (the "Receivership Order" or "RO").

The Receiver previously filed his Initial Status Report [Dkt. 67], covering the period October 18, 2022, through November 17, 2022; his Second Status Report [Dkt. 139], covering the period November 18, 2022, through December 31, 2022; his Third Status Report [Dkt. 225], covering the period January 1, 2023, through March 31, 2023; his Fourth Status Report [Dkt. 299],

APP 048

covering the period April 1, 2023, through June 30, 2023; his Fifth Status Report [Dkt. 373], covering the period July 1, 2023, through September 30, 2023;[1] his Sixth Status Report [Dkt. 456], covering the period October 1, 2023, through Dec. 31, 2023; his Seventh Status Report [Dkt. 491], covering the period Jan. 1, 2024, through March 31, 2024; his Eighth Status Report [Dkt. 543], covering the period April 1, 2024, through June 30, 2024; his Ninth Status Report [Dkt. 583], covering the period July 1, 2024, through September 30, 2023; his Tenth Status Report [Dkt. 599], covering the period October 1, 2024, through Dec. 31, 2024; his Eleventh Status Report [Dkt. 636], covering the period Jan. 1, 2025, through March 31, 2025; his Twelfth Status Report [Dkt. 663], covering the period April 1, 2025, through June 30, 2025; his Thirteenth Status Report [Dkt. 689], covering the period July 1, 2025, through Sept. 30, 2025; his Fourteenth Status Report [Dkt. 707], covering the period October 1, 2025, through December 31, 2025; and his Fifteenth Status Report [Dkt. 728], covering the period January 1, 2026, through March 31, 2026. This Sixteenth Status Report provides an updated summary of the Receivership for the period spanning April 1, 2026, through June 30, 2026. Where possible, the Receiver has incorporated background and other information from prior status reports and previous briefing from this case to most cost-effectively summarize the activities of the Receivership from the prior Quarter.[2]

Pursuant to the Receivership Order, the Receiver is directed to submit quarterly reports that contain the following information:

A. A summary of the operations of the Receiver;

---

[1] On September 5, 2023, the Receiver also filed a Declaration and Interim Report [Dkt. 308] at the Court's request.

[2] The Receiver's first nine Quarterly Reports reiterated much of the background information from prior reports. With his Tenth Status Report [Dkt. 599], the Receiver instead largely included only those matters with actual changes from the prior Quarter. However, in response to the more streamlined Report, Defendant Barton's new counsel filed a Motion for More Definite Statement [Dkt. 604]. While the Court ultimately denied [Dkt. 653] Barton's requested relief, in the hopes of avoiding the cost of responding to future requests of a similar nature, the Receiver has decided to return to the original format of his first nine Reports.

B. A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

C. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

D. A schedule of all the Receiver's receipts and disbursements (attached as **Exhibit A** to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

E. A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in; (i) reducing the claims to judgment; and (ii) collecting such judgments);

F. A list of all known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and

H. The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations."

RO at ¶ 59.

## I. SUMMARY OF THE OPERATIONS OF THE RECEIVER AND DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY

As outlined below, the Receiver and his team once again performed substantial work on behalf of the Receivership Estate during the Second Quarter of 2026, albeit less than the first quarters of the Receivership. The decrease in work performed is largely attributable to two factors:

First, Barton's second appeal of the Receivership Order, on a non-expedited basis, continued to delay the Receiver's institution of a claims process, pursuit of certain lawsuits, and clean-up of the majority of the dozens of lawsuits the Receiver inherited upon his appointment. Although the Fifth Circuit affirmed the Second Receivership Order and denied Barton's request for rehearing en banc, in October 2025 Barton filed a petition for certiorari with the United States Supreme Court (the "Cert. Petition"). On March 30, 2026, the United States Supreme Court denied

APP 050

Barton's Cert. Petition. As detailed herein, the Receiver began moving the receivership forward during the second quarter of 2026 and will continue doing so during the third and fourth quarters of 2026.

Second, and far more impactful to the Receiver's work, Barton's interlocutory appeals of sale orders have historically prevented the Receiver from being able to secure title policies for any of his approved sales, effectively giving Barton the stay he previously sought (and was denied) by both the District Court and the Fifth Circuit. As detailed in prior Quarterly Reports and below, this *de facto* stay has had immense consequences on the Receivership Estate because of the significant debt that encumbers every single property currently held by the Receiver. However, during the Second Quarter of 2026, the Receiver was finally able to close the sale of the Rock Creek Property. The Receiver is hopeful that he will be able to close at least one additional sale during the Third Quarter of 2026 and that future sales that maximize the value of the Receivership Estate in the face of existing debt will move forward more rapidly. In the interim, however, the limited equity that remains in the Receivership Assets—with the exception of the four HUD Properties, which have their own substantial legal issues—will continue to erode at a rate of approximately $180,000 per month—and over $2 million per year.

The remainder of this Section of the Quarterly Status Report includes (A) a summary of the SEC's allegations and the procedural posture of the case; (B) a summary of the Receiver's efforts to identify, sell, develop, hold, or otherwise dispose of real estate assets; (C) a summary of the Receiver's efforts to identify, sell, hold, or otherwise dispose of other property; (D) a summary of the efforts expended by the accountants engaged by the Receiver's counsel (the "Receiver's Accountants"), including an update on their forensic accounting; and (E) a summary of other Receivership Activities from the Quarter.

### A. Summary of SEC Allegations and Status of Proceedings

#### 1. The SEC's Lawsuit

On September 23, 2022, the SEC filed its Complaint [Dkt. 1] against Defendants Timothy Barton ("Barton"), Carnegie Development, LLC ("Carnegie Development"), Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC (collectively, the "Wall Entities"), Haoqiang Fu (a/k/a Michael Fu) ("Fu"), and Stephen T. Wall ("Wall" and together with Barton, Carnegie Development, the Wall Entities, and Fu, the "Defendants").

Among other things, the SEC alleges that between March 2017 and June 2019, Barton "raised approximately $26 million from over 100 investors . . . in unregistered, fraudulent securities offerings related to real-estate investments in Texas." Compl. ¶ 1. The SEC further alleges that Barton "partnered with Wall . . . and Fu . . . to offer and sell investment loans issued by" the Wall Entities. *Id.* ¶ 2. More specifically, the SEC alleges that Defendants promised that funds raised by the Wall Entities would be used to purchase specific parcels of land at specific prices set forth in the offering materials, those parcels would then be developed by Barton into residential lots, and then Wall would build homes on the lots and sell them. *Id.* ¶ 3.

While the Wall Entities purportedly promised investors that they would receive their principal back in two years along with annual interest payments, the SEC contends that Defendants misappropriated nearly all of the investor funds and misused them to, among other things:

- pay personal expenses of Barton and his family, including credit card bills, rent, and to buy a plane;
- pay Fu undisclosed and unauthorized commissions and fees;
- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);
- make political contributions;

- acquire properties not related to the offerings in the names of other Barton companies;
- acquire properties identified in a Wall offering but in the name of other Barton companies and using funds from a different Wall Entity;
- pay professional fees (such as engineering, surveying, and land development) related to, in most cases, properties unrelated to the offerings; and
- make payments to Wall.

*Id.* ¶¶ 3-5, 35. In the end, the SEC alleges that the Wall Entities "were left with little or no assets, the projects were not developed, and the investors were never paid back." *Id.* ¶ 5.

**2. The Appointment of the Receiver**

On September 26, 2022, the SEC filed a Motion for Appointment of Receiver [Dkt. 6], requesting that United States District Judge Brantley Starr appoint a federal equity receiver over the Wall Entities, Carnegie Development, certain Relief Defendants (DJD Land Partners, LLC and LDG001, LLC) and "[a]ny other entities that Barton directly or indirectly controls, including, but not limited to" BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, the "Receivership Entities"). On October 17, 2022, Barton filed a Response [Dkt. 24] in opposition to the appointment of a Receiver. On October 18, 2022, the Court entered the Receivership Order [Dkt. 29] (the "Initial Receivership Order"), which appointed the undersigned to serve as Receiver over the Receivership Entities.

**3. Original Supplementation of the Receivership Order**

The Receivership Order states that the Court assumed "exclusive jurisdiction and possession of the assets . . . of . . . any other entities that Defendant Timothy Barton directly or indirectly controls . . . ." RO ¶ 1. While several entities controlled by Defendant Barton are

included in the Receivership Order, the Receiver quickly discovered from a review of formation binders in the Turtle Creek Office that over 100 entities controlled by Defendant Barton had not been specifically listed in the Receivership Order. Because certain banks and lenders had refused to follow the Receivership Order's mandates absent specific identification of certain companies as "Receivership Entities," on November 1, 2022, the Receiver filed a Motion to Supplement Order Appointing Receiver [Dkt. 41], asking the Court to supplement its Order to specifically list each of these entities. Defendant Barton opposed the motion [Dkt. 55], as did his son Maximilien Barton ("Max Barton") [Dkt. 53]. On November 16, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 62] (the "First Supplemental Order") as to the vast majority of these entities and directed the Receiver to file supplemental briefing addressing certain Max Barton-related entities.

On November 30, 2022, the Receiver filed his Supplemental Brief in Support of the Motion to Supplement [Dkt. 73], asking the Court to specifically identify the following entities as Receivership Entities because they were controlled by Defendant Barton: Gillespie Villas, LLC; Venus 59, LLC; TRTX Properties, LLC; MXBA, LLC; Titan Investments, LLC; TC Hall, LLC; and Titan 2022 Investment, LLC. Defendant Barton filed a Response [Dkt. 81] opposed to the requests contained in the supplemental brief. Max Barton similarly filed a Response [Dkt. 82] the same day opposed to the requested relief. On December 13, 2022, the Court entered an Order Granting Receiver's Motion to Supplement Order Appointing Receiver [Dkt. 88] (the "Second Supplemental Order").

#### 4. Stay of the SEC Case and Barton's Attempts to Stay the Receivership

On November 2, 2022, the United States Department of Justice filed an Unopposed Motion to Intervene and to Stay Proceedings, whereby it sought to stay the SEC's civil enforcement lawsuit pending resolution of certain Defendants' criminal proceedings. On November 16, 2022, the

Court entered an Order Granting Motion to Intervene and Stay Proceedings [Dkt. 64], but ordered that "[n]othing in this Order shall preclude the Court-appointed Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Court's Order Appointing Receiver." On August 7, 2025, the District Court provided similar directives in administratively closing the case:

> In light of the 5.5 month continuance recently granted in Barton's related criminal case, which must resolve before this case can, the Court ADMINISTRATIVELY CLOSES this matter. This order does not prevent any party from making appropriate filings in this case. And nothing in this Order shall preclude the Court-appointed Receiver from performing the duties and obligations, and from exercising the powers and rights, set forth in the Courts Order Appointing Receiver

As detailed in the Receiver's Third Quarterly Report, Defendant Barton filed motions with both the District Court and the Fifth Circuit to stay the Receivership Order pending his appeal. These motions were both denied during the First Quarter of 2023. Additional motions to stay were denied during the Second Quarter of 2023.

**5. Barton's Appeal of the Initial Receivership Order**

On November 17, 2022, Defendant Barton filed a Notice of Appeal [Dkt. 66] concerning the Receivership Order, the First Supplemental Order, and other orders entered by the Court. Case No. 22-11132. The Fifth Circuit Court of Appeals heard oral argument on May 1, 2023, and on June 28, 2023, that court issued a published opinion that vacated the Receivership Order effective 90 days after the issuance of the Fifth Circuit's mandate and remanded back to the district court for further proceedings. The Fifth Circuit issued its mandate on August 31, 2023.

The Fifth Circuit also suspended the Receiver's ability to sell or dispose of any property not previously approved by the Court; however, initially the court expressly authorized the Receiver to engage in "activities in furtherance of sales or dispositions of property that have already occurred or been approved by the district court." The Fifth Circuit later modified its prior

opinion and suspended the Receiver's ability to sell or dispose of any property, including those properties that the District Court had previously authorized the Receiver to sell.

### 6. The SEC's Second Motion to Appoint Receiver

On July 5, 2023, the District Court entered an order noting the Fifth Circuit's remand for further proceedings and directing the SEC and Barton, in the interest of expediency, to meet and confer and inform the Court whether they would agree to proceed before a mandate issued from the Fifth Circuit. On July 12, 2023, the SEC and Barton submitted a joint status report in which the SEC indicated that they were willing to proceed before the mandate issued, but Barton indicated that he was not willing to so proceed. On July 16, 2023, the District Court entered an order (a) stating that because the parties did not consent to proceed before the mandate issues, the Court lacked jurisdiction to order the parties to proceed; (b) indicating that once the mandate issues, the Court intends to order the SEC to move for appointment of a receiver; and (c) noting that, consistent with the Fifth Circuit's opinion, the Court will require the SECs motion to (1) request appointment of a receiver under the factors set out in *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012); (2) request injunctive relief; and (3) provide a basis for the inclusion of entities in the receivership that complies with the Fifth Circuits standard, *i.e.*, that limits the receivership to entities that received or benefitted from assets traceable to Barton's alleged fraudulent activities that are the subject of this litigation." Finally, the Court indicated that the SEC's motion would be due within one week of the Fifth Circuit's mandate issuing and that it would set a briefing schedule after issuance of the mandate.

The Fifth Circuit's mandate issued on August 31, 2023. That same day, the District Court ordered [Dkt. 305] the SEC to move for entry of a new Receivership Order on or before September 7, 2023, with Barton's response due September 25, 2023, and the SEC's reply due October 5, 2023. The Court also directed [Dkt. 305] the Receiver to submit a declaration

"providing all information obtained since his appointment that he believes is relevant to the Court's consideration of a proposed new receivership order, or anything else he believes will assist the Court or help inform the Court's deliberation on this matter."

The Receiver filed his Declaration and Interim Report [Dkt. 308][3] on September 5, 2023. As detailed more fully in the Declaration and Interim Report, the significant time and expense of preparing the Declaration and Interim Report were justified, among other things, because the filing was mandated by the District Court, complied with the Receiver's duties under the Receivership Order, and most importantly, gave the Receivership (and thus defrauded investors and creditors) the best chance to maximize and accurately identify the assets to be included in the Receivership Estate given the Receiver's extensive efforts during the first months of the Receivership.

The SEC filed its Motion for Appointment of a Receiver, for a Preliminary Injunction and Ancillary Relief, and to Lift Stay for Limited Purpose [Dkt. 309] (the "Second Motion to Appoint Receiver") on September 7, 2023. On September 27, 2023, the Court granted Barton's request for additional time to respond to the Second Motion to Appoint Receiver and set a hearing on the motion for October 11, 2023. Barton and interested parties Max Barton and Southern Properties Capital, Ltd. ("SPC") all filed responses opposed to the SEC's Motion. The hearing occurred on October 11, 2023.

### 7. The Second Receivership Order

On November 29, 2023, the District Court entered several orders, including (1) its Memorandum Opinion and Order [Dkt. 416], which grants the SEC's Second Motion to Appoint Receiver as to 54 of the 82 entities included in the motion; (2) an Order Appointing Receiver (the

[3] The Receiver's Declaration and Interim Report, together with all prior Quarterly Status Reports of the Receiver, are hereby incorporated by reference as if fully set forth herein.

"Second Receivership Order") [Dkt. 417], which re-appointed the undersigned to administer the Receivership Estate for the 54 entities; and (3) a Preliminary Injunction Order [Dkt. 418], which, among other things, freezes the assets of any other entity that Barton directly or indirectly controls, including almost all of the Initial Receivership Entities that were not included in the Second Receivership Order.

**8. Approval of the Receiver's Blessing Motion**

On October 27, 2023, the Receiver filed an Expedited Motion to Approve, Ratify, Adopt, and Otherwise "Bless" Previous Actions of Receiver and Orders Issued Prior to Effective Date of Vacatur of Initial Receivership Order [Dkt. 372] (the "Blessing Motion"). The purpose of the Blessing Motion was to preserve Receivership Estate Assets and prevent confusion in light of vacatur of the Initial Receivership Order and the anticipated entrance of a second receivership order. More specifically, the Blessing Motion asked the Court to ratify certain prior actions in order to minimize the costs related to performance of a new Receivership Order—for instance the necessity of filing amended Notices of Stay in each of the ancillary cases stayed in reliance on the Initial Receivership Order as well as many other similar tasks—and to foreclose Barton's ability to sue the Receiver individually[4] or otherwise seek to unwind sales, settlements, and other activities previously approved by the Court under the Initial Receivership Order. Alternatively, in the event the Court decided not to enter a new Receivership Order, the Receiver requested a discharge and the related and incidental relief related to discharge.

On November 29, 2023, the District Court entered its Order Granting in Part Receiver's Blessing Motion [Dkt. 419] (the "Blessing Order"), which, among other things, (1) ratifies all activities undertaken by the Receiver and his retained professionals in good faith under the Initial

[4] Barton had intimated this intent. *See* Dkt. 223 at 9; *SEC v. Barton*, Appeal No. 22-11132, ECF No. 113 at 7.

APP 058

Receivership Order (and provided immunity for such acts); (2) approved the carryover of accrued fees and expenses and authorized the Receiver to file one Final Accounting at the end of the Receivership; and (3) specifically ratified the following prior Orders:

- Orders Ratifying or Approving Agreements with DLP Capital [Dkt. 109] and HNGH Turtle Creek [Dkt. 236];
- Order Ratifying Agreement with Lumar Land and Cattle [Dkt. 163];
- Order Granting Motion for Order Governing Administration of the Receivership Estate [Dkt. 63];
- Order Declaring Lis Pendens Void (as included in the Order Approving the Sale of the Rock Creek Property) [Dkt. 104];
- Order Granting Motion to Compel and Establishing Privilege Protocol [Dkt. 235];
- Orders Granting Fee Petitions [Dkts. 195, 287]; and
- Order Approving Engagement Agreements [Dkt. 38].

**9. Denial Without Prejudice of All Other Pending Motions**

On August 31, 2023, the District Court ordered [Dkt. 306] that all pending motions in the case as of August 31, 2023, were denied without prejudice and directed the parties to refile any such motions after the Court resolved the SEC's Second Motion to Appoint Receiver. On November 29, 2023, concurrent with issuing the Second Receivership Order, the District Court entered a similar Order [Dkt. 421].

**10. Barton's Appeal of the Second Receivership Order**

On December 7, 2023, Defendant Barton filed an interlocutory appeal of the Memorandum Opinion and Order, the Second Receivership Order, the Preliminary Injunction and Freeze Order, and the Blessing Order. Fifth Circuit Case No. 23-11237. On February 28, 2024, Barton filed a

Motion to Consolidate Case Nos. 23-11237 and 24-10004 (discussed below). The Motion was later granted, as were subsequent requests for extensions of time to file Barton's appellant's brief. Barton filed his appellant's brief on May 7, 2024. The SEC filed its appellee's brief on July 22, 2024. The Receiver filed an amicus brief, in support of continuation of the Receivership on July 29, 2024. Significant effort went into this amicus brief during the Second and Third Quarters of 2024. Barton filed his reply brief on September 11, 2024.

The Fifth Circuit Court of Appeals heard oral argument in February 2025. On April 17, 2025, that court issued a published opinion (the "*Barton II* Opinion") affirming the Receivership Order. Among other things, the Fifth Circuit found that the District Court did not abuse its discretion and affirmed the imposition and scope of the Receivership, as well as the Court's grant of a preliminary injunction. The Fifth Circuit also dismissed Barton's appeal of certain orders administering the receivership for lack of jurisdiction and denied Barton's request to reassign the case to another district-court judge. Finally, the Fifth Circuit found that while it had jurisdiction to consider the interlocutory appeals of the sale order for the Frisco Gate, Amerigold Suites, and Rock Creek Properties,

> [t]he district court acted within its discretion to approve the sales of certain assets from the receivership. The district court only approved the sales after determining that it was in the best interests of the receivership estate and otherwise complied with the law. Indeed, the district court considered changes in market conditions and all statutory requirements before determining the sales were in the best interest of the receivership estate and approving the sales. And as the SEC notes, evidence showed market conditions had deteriorated since the prior approvals of the sales, which reinforced that sales would be better than allowing the property value to decrease. Accordingly, the district court did not abuse its discretion when it approved certain sales of assets from the receivership estate.

On June 2, 2025, Barton filed a Petition for Rehearing En Banc. The Fifth Circuit denied Barton's request on June 16, and the Fifth Circuit's Mandate issued on June 23, 2025.

On October 14, 2025, Barton filed a Petition for Writ of Certiorari (the "Cert. Petition") with the United States Supreme Court. The SEC filed its Response on February 25, 2026. On March 30, 2026, the Supreme Court denied the Cert. Petition. As will be detailed in future Quarterly Reports, Barton has now exhausted his appellate remedies, and the Receiver has begun working through several tasks that have been paused pending Barton's appeals.

#### 11. Other Dismissed Appeals Relating to the First Receivership Order

In addition to the main appeals of the Initial Receivership Order and the Second Receivership Order, Defendant Barton and others have filed appeals of other orders granting motions filed by the Receiver.[5] These other appeals include the following:

On December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order. Case No. 22-11226. On June 19, 2023, the Fifth Circuit entered an Order dismissing the appeal. On September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot. The mandate issued on October 24, 2023. This appeal is no longer pending, but, as discussed below, during the Fourth Quarter of 2023, Barton appealed the Second Rock Creek Sale Order. Case No. 24-10004.

On December 23, 2022, Defendant Barton filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Ratify Agreement with DLP Capital and Other DLP Entities. Case No. 22-11242 (the "DLP Appeal"). The parties initially fully briefed the appeal. While the case was tentatively scheduled for oral argument for the week of October 2, 2023, the Fifth Circuit notified the parties that the panel assigned to the case had determined that oral argument was not required for the case. During the Fourth Quarter of 2023, the Fifth Circuit later

[5] As discussed below, Barton opposed the Receiver's request that the appellate docket reflect the Receiver as an appellee or other real party in interest, despite the order on appeal having been issued based on the Receiver's motion. Accordingly, the Receiver has sought to be heard in those appeals as an amicus.

directed the parties to submit supplemental briefing regarding the appeal. On March 13, 2024, the Fifth Circuit dismissed the DLP Appeal as moot. On October 14, 2025, Barton filed (pro se) a Motion to recall the mandate, vacate the opinion, and reinstate the case. The SEC filed a request for a stay of its response deadline in light of the Government shutdown the same day. On October 21, 2025, the Fifth Circuit denied Barton's requested relief.

On January 12, 2023, Max Barton filed a Notice of Appeal of the Second Supplemental Order. Case No. 23-10046. The parties fully briefed the appeal. During the Fourth Quarter of 2023, the Fifth Circuit asked the parties for supplemental briefing, specifically on the question of whether the appeal should be dismissed as moot in light of the Second Receivership Order. On January 3, 2024, the Fifth Circuit entered an unpublished opinion dismissing the appeal as moot.

On May 16, 2023, Defendant Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property. Case No. 23-10515. On July 17, 2023, the Fifth Circuit entered an Order dismissing the appeal. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot. The mandate issued on October 20, 2023. This appeal is no longer pending, but, as discussed below, during the Fourth Quarter of 2023, Barton appealed the Second Amerigold Suites Sale Order. Case No. 24-10004.

On May 16, 2023, Defendant Barton also filed a Notice of Appeal of the District Court's Order Granting the Receiver's Motion to Approve Settlement Agreement with HNGH Turtle Creek, LLC. Case No. 23-10516. On July 17, 2023, the Fifth Circuit entered an Order dismissing this appeal as well. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated that the opposed motion to dismiss the appeal would instead be carried with the case. During the Second Quarter of 2024, oral argument was first scheduled and then cancelled by the Fifth Circuit

because it determined that oral argument was not necessary in the case. On August 14, 2024, the appeal was dismissed as moot in light of the Court's ratification order. The appeal and a variety of matters concerning 2999 Turtle Creek are discussed further below.

On June 21, 2023, Defendant Barton filed a pro se direct appeal to the Fifth Circuit from the 2999TC Acquisitions, LLC bankruptcy case. Case No. 23-10648. Counsel from two separate law firms later appeared on his behalf. While oral argument was initially set for February 7, 2024, the Fifth Circuit later determined that oral argument was not necessary in the case. On March 26, 2024, the Fifth Circuit dismissed Barton's appeal for lack of jurisdiction and taxed costs against Barton.

**12. Other Appeals Relating to Second Receivership Order**

On December 29, 2023, Defendant Barton filed a Notice of Appeal of the Second Rock Creek Sale Order, the Second Frisco Gate Sale Order, and the Second Amerigold Suites Sale Order. Case No. 24-10004 (the "Second Sale Orders Appeal"). On February 28, 2024, the SEC filed a Motion to Dismiss this appeal, and Barton later responded. Barton also filed a motion to consolidate the appeal with his appeal of the Second Receivership Order. On March 18, 2024, the Fifth Circuit consolidated the two appeals. The Fifth Circuit also decided to carry the SEC's motion to dismiss with the case. Barton's appellant's brief was filed on May 7, 2024, the SEC's appellee's brief was filed on July 22, 2024, and Barton's reply brief was filed on September 11, 2024. The Fifth Circuit Court of Appeals heard oral argument in February 2025, and, as noted above, issued its published opinion on April 17, 2025, finding that the District Court "acted within its discretion to approve" the Second Rock Creek Sale Order, the Second Frisco Gate Sale Order, and the Second Amerigold Suites Sale Order. The Fifth Circuit's Mandate issued on June 23, 2025. On October 18, 2025, Barton filed (pro se) a Motion to recall the mandate. The SEC filed a request for a stay of its response deadline in light of the Government shutdown the same day,

and then later filed a response to Barton's motion. On October 22, 2025, the Fifth Circuit denied Barton's requested relief.

On August 21, 2024, Barton filed a Notice of Appeal of the Hall Property Sale Order, the Third Amerigold Suites Sale Order, the Dixon/Lumar Settlement Ratification Order, and the Tamamoi Settlement Ratification Order (each discussed separately below). Case No. 24-10788. On December 2, 2024, Barton filed a motion to stay that appeal pending resolution of the consolidated appeal of the Receivership Order and other sale orders. The Fifth Circuit granted the Motion on December 4, 2024. One day after the issuance of the Fifth Circuit's mandate, the Fifth Circuit resumed its briefing calendar. Barton filed his initial brief on August 8, 2025. The SEC sought a stay of its response deadline in light of the government shutdown. The Fifth Circuit ultimately denied the request but gave the SEC an extension of its deadline. The SEC filed its brief on October 22, 2025. On March 25, 2026, the Fifth Circuit entered a published opinion that (1) found that the Fifth Circuit lacked jurisdiction to consider the Amerigold Suites sale (because the purchaser is unwilling to consummate the sale), the Tamamoi settlement ratification, and the Dixon/Lumar settlement ratification; and (2) affirmed the Hall Property Sale Order, The Fifth Circuit also noted the following, with regard to Barton's serial appeals to the Fifth Circuit:

> In deciding this appeal, we have considered the receiver's amicus brief filed on behalf of the SEC. The receiver asks this court to "expedite and summarily dispose of Barton's appeal of sale orders," deem Barton's appeals of non-sale administrative orders frivolous, and deter him from filing such appeals moving forward. Barton has filed approximately thirteen appeals in the last three years. The receiver argues that those appeals have "prevented the [r]eceiver from securing title policies" on the properties, increased accrual of interest, and that changing market conditions have lowered the sale prices. We are mindful that appeals have impacted the management of the receivership estate, significantly reduced funds potentially available to ultimate beneficiaries of the receivership, and expended court resources. Further appeals from sale orders or non-sale administrative orders will be viewed with skepticism and will incur sanctions if deemed frivolous. *See Howard v. St. Germain*, 599 F.3d 455, 458 (5th Cir. 2010) (citation modified) ("An

APP 064

> appeal is frivolous if the result is obvious or the arguments of error are wholly without merit."); *see also* FED. R. APP. P. 38.

The Fifth Circuit's mandate issued on May 29, 2026.

On July 22, 2025, Barton filed (pro se) interlocutory appeals of the District Court's orders (1) requiring that Barton obtain leave of Court before filing additional grievances against the Receiver and the Receiver's Counsel and (2) amending the Receivership Order for the limited purpose of including such a requirement. Case No. 25-10871. On October 10, 2025, Barton filed a "Motion for Stay of Receiver Actions Pending Appeal," in which he sought an immediate stay of all acts" by the receiver as well as an "administrative stay." On October 17, 2025, the Fifth Circuit denied Barton's "motion for stay pending appeal;" however, it granted an "administrative stay," ordered the SEC to submit a response, and stated that it would reconsider the motion for stay pending appeal after receipt of the SEC's response. On October 20, 2025, the SEC filed its response and also asked for clarification regarding the nature of the administrative stay. On November 4, 2025, the Fifth Circuit denied Barton's requested stay for failure to first seek a stay with the District Court. On December 10, 2025, Barton filed his opening brief. During the Second Quarter of 2026, Barton filed an Emergency Motion to Stay [Dkt. 691] with the District Court. The Court denied the district court stay on January 8, 2026 [Dkt. 700]. The SEC filed its Appellee's Brief on February 9, 2026 Barton filed a Reply brief on March 2, 2026. . On May 18, 2026, the Fifth Circuit entered an unpublished opinion dismissing Barton's interlocutory appeal for lack of appellate jurisdiction and ordering Barton to show cause because of his repeated receivership-related appeals. Barton filed a response on June 29, 2026 and a petition for rehearing en banc on July 2, 2026. As of the date of this Report, the Fifth Circuit has yet to rule on Barton's petition for rehearing en banc or on potential sanctions.

On September 9, 2025, Barton appealed (pro se) the District Court's Order lifting of the stay in the Wall bankruptcy cases [Dkt. 660]. Case No. 25-11043. The SEC filed a motion to dismiss that the Fifth Circuit has determined will be carried with the case. Barton filed his opening brief on January 13, 2026. The SEC filed its Appellee's Brief on March 13, 2026 Barton filed a Reply brief on April 2, 2026. On June 3, 2026, the Fifth Circuit entered an unpublished opinion dismissing Barton's interlocutory appeal for lack of appellate jurisdiction and ordering Barton to show cause because of his repeated receivership-related appeals. Barton did not file response.

On September 9, 2025, Barton also filed (pro se) an interlocutory appeal of the District Court's grant of the Receiver's Fifth and Sixth Fee Applications [Dkt. 667]. Case No. 25-11044. On December 10, 2025, the SEC filed a motion to dismiss the appeal for lack of jurisdiction. On January 21, 2026, the Fifth Circuit granted the SEC's motion to dismiss. The Fifth Circuit's mandate issued on March 16, 2026.

On June 8, 2026, Barton filed (pro se) a mandamus petition, complaining of a host of actions by Judge Starr. As of the date of this Report, this original proceeding is still pending.

### 13. Status of Defendants Barton and Fu's Criminal Trial

On September 20, 2022, at the United States Department of Justice's request, a grand jury indicted Defendant Barton for wire fraud, conspiracy to commit wire fraud, and securities fraud. *See United States v. Barton, et al.*, No. 3:22-cr-352-K (N.D. Tex.). On October 13, 2022, Defendant Fu, rather than being similarly indicted, instead waived indictment and pleaded guilty to the sale of unregistered securities. On December 12, 2023, the Department of Justice filed its First Superseding Indictment, which names Tim Barton, Stephen Wall, and Saskya Bedoya as co-defendants.

Barton's criminal trial was initially set for May 8, 2023. Since that initial setting, it has since been re-set (at Barton or other defendants' request) to February 5, 2024, then September 9,

2024, March 3, 2025, and March 23, 2026. During the Second Quarter of 2026, Barton requested (and the Government did not oppose) yet another extension of Barton's trial date. On February 3, 2026, the court granted the motion and reset Barton's criminal trial for November 2, 2026.

### 14. Barton's Counsel and Fees

As detailed in the Receiver's Fourth Status Report [Dkt. 299], on March 21, 2023, the Receiver filed his Motion to Compel Documents and Information from Attorneys, Request for Sanctions, and Brief in Support [Dkt.199], seeking an order compelling attorneys representing Defendant Barton, Hunton Andrews Kurth LLP, to disclose the source of any retainer or security interest and related information received in connection with their representation of Defendant Timothy Barton, so the Receiver could verify that counsel complied with their duty to ensure that the funds or security interest received were not paid with Receivership Assets. On April 26, 2023, Hunton Andrews Kurth LLP ("Hunton") provided the Receiver with information and documents he had requested and by agreement, paid half of the requested sanctions. Accordingly, the Receiver withdrew the Motion on April 27, 2023.

During the Second Quarter of 2024, Hunton informed the Receiver that it had received an additional, small payment of fees on behalf of Barton. The Receiver requested additional details surrounding the transaction (again, to verify that the funds or security interest received were not paid with Receivership Assets). On August 1, 2024, Barton instead filed a motion for leave to file a motion for protective order under seal [Dkt. 544]. The motion was initially denied without prejudice [Dkt. 545] for failure to comply with the Court's local rules. The motion for leave to file under seal was re-filed on August 22 [Dkt. 555]. On October 16, 2024, the Court noted another deficiency in Barton's filing (that it was not accompanied by a signed declaration). Barton's counsel submitted a declaration on October 25, 2024. On November 6, 2024, the Court denied Barton's Motion for Leave [Dkt. 585]. Barton then filed his Motion for Protective Order

[Dkt. 587] on November 18, 2024. The Receiver responded [Dkt. 591], and Barton replied [Dkt. 592].

On April 10, 2025, the Court entered an Order [Dkt. 631] directing Barton to "provide the Receiver with the information requested, but such information is restricted as follows: (1) barring the Receiver from sharing the information with the Commission or any other Government entity (without further order of the Court) and (2) barring the Receiver from contacting or making inquiry of the contributor without further order of the Court, and then only upon showing a serious and good faith basis that the contributor possesses information relevant to the legitimate purpose of the Receiver." The Court further instructed Barton to produce "documents evidencing payments or security agreements received from or for the benefit of Barton, and the due diligence, if any, conducted regarding the source of any fees paid on Bart[o]n's behalf."

In April 2025, the Receiver also sent a letter to Barton's new co-counsel in this case (Warren Norred), requesting similar information regarding the source of any retainer or payments to counsel. This information was never provided. On July 29, 2025, and again on August 7, 2025, Norred filed motions to withdraw as counsel [Dkts. 662 & 673], claiming that he had not been paid for work performed. The District Court initially denied the motions to withdraw [Dkt. 674] but ultimately granted Norred's request [Dkt. 676].

During the pendency of the motion to withdraw, Barton filed a pro se "consolidated objection" to the Receiver's Fifth and Sixth Fee Applications [Dkt. 669]. However, the objection was later stricken by the Court [Dkt. 670] because Barton was not able to both make pro se filings and be represented by counsel in the District Court.

On October 9, 2025, attorney Jules Slim made an appearance on behalf of Barton before the District Court. On November 6, 2025, Barton filed a pro se Notice of Limited Termination of

Counsel [Dkt. 690], in which he notified the Court that Michael J. Edney "is no longer acting as counsel of record for Mr. Barton on the district-court docket." On December 22, 2025, Barton filed a *pro se* motion to remove Mr. Edney as counsel or record [Dkt. 697]. The Motion was eventually granted in part [Dkt. 698].

On March 16, 2026, Baron filed a Motion of Leave to Proceed Pro Se and Authorization to file via CM/ECF [Dkt. 717]. The Court denied the Motion on March 25, 2026, in light of the fact that Barton was still represented by counsel Jules Slim. On April 14, 2026, Mr. Slim filed a motion to withdraw from the case [Dkt. 724]. The Court entered an Order [Dkt. 747] granting the withdrawal on June 5, 2026. Between June 3, 2026 and July 27, 2026, Barton filed a total of over thirty *pro se* motions. While the Receiver and his team have endeavored to be efficient with their responses to these motions, the sheer number and breadth have resulted in an increase in briefing activity during the end of the Second Quarter of 2026 and beginning of the Third Quarter of 2026.

### 15. Barton's Grievance Against the Receiver's Counsel

On May 14, 2025, the Receiver and his attorneys became aware of a Grievance that Barton filed with the State Bar of Texas against one of the Receiver's attorneys regarding briefs, motions and lawsuits filed on behalf of the Receiver. In response, the Receiver filed a Notice of Continued Interference notifying the Court of Barton's misconduct [Dkt. 640]. The Court, in turn, ordered Barton and his counsel to show cause how they were not violating the Receivership Order by interfering with the Receiver's duties [Dkt. 641]. Both Hunton and Norred filed responses denying prior knowledge of Barton's plan to file the grievance [Dkts. 645, 646]. The Court then revised the Receivership Order requiring Barton to seek leave from the Court before filing similar grievances against the Receiver or his attorneys [Dkt. 650]. As discussed above, Barton then appealed the order. On October 17, 2025, the Summary Disposition Panel for the District Grievance Committee dismissed Barton's complaint.

### B. Status of Receiver's Efforts to Sell, Develop, Hold or Otherwise Dispose of Real Estate.

Prior to Barton's appeal of the Second Receivership Order, the majority of the Receiver's time—and a substantial portion of his counsel's time, when not responding to Defendant Barton's filings—was spent (1) identifying real estate-related assets of the Receivership Entities; (2) reaching out to lenders and other interested parties on each property; (3) responding to a multitude of those same lenders' motions to lift the Receivership Order's stay on foreclosure efforts (many of the properties were already in default upon the Receiver's appointment, and the Receiver has not had sufficient cash to service any of the debt on the properties); (4) determining insurance, utility, tax, and other payments coming due on each of the properties; (5) identifying and communicating with a host of potential purchasers of each of the properties; (6) identifying brokers and other professionals willing to assist in the initial valuation and eventual sale of these properties; (7) identifying appraisers who will be able to help carry out the mandates of 28 U.S.C. § 2001; and (8) reviewing lien reports and title commitments on the properties.

As originally outlined in the Receiver's Initial Report and then further illustrated in every Report that followed, without exception, the real estate assets held by the Receivership Entities face significant challenges. All but one of the real property assets are heavily leveraged,[6] with some having favorable interest rates and others having abnormally high rates. Additionally, as to the most valuable assets at one time owned by the Receivership Entities (the HUD apartments described below), significant legal challenges have complicated potential dispositions of such properties, making recovery uncertain. Finally, as of the date of this Report, the economic environment remains uncertain and interest rates have remained at high levels.

[6] The one property that is not "heavily" leveraged—the Gillespie Property discussed below—still has a sizeable loan on the property ($550,000 principal loan balance compared to $1.1 million value).

APP 070

Additionally, the Receivership has been cash-starved from the outset. While the Receivership had certain amounts of cash-on-hand as of June 30, 2026, such cash was not sufficient to cover outstanding liabilities (unpaid property taxes and administrative expenses, such as fee applications for several prior quarters), let alone service the significant debt on each property. These cash-flow issues still exist today—despite the Receiver's best efforts to increase liquidity and the District Court and Fifth Circuit's repeated denials of Barton's requested stays[7]—because Barton's practice of appealing sale orders has caused title companies to refuse to issue title policies. For the majority of 2023, sales that would net over $4 million to the Receivership sat approved; to date, however, only one of these sales has closed, and that one sale occurred in June 2026. Even worse, as outlined below, this delay and associated uncertainty have already caused both the original purchaser of the Amerigold Suites and a second purchaser to walk away from the previously approved (and re-approved) sale. The market has changed markedly since the Spring of 2023, and even with a fully brokered process, the highest bidder in 2024 was willing to pay $700,000 less than the original purchaser for the Amerigold Suites.

Continuing liquidity concerns have prevented the Receiver from servicing any of the outstanding debt, which in turn has led to multiple motions to lift stay filed by secured lenders. But–for the automatic stay, given the significant debt on virtually all properties, significant foreclosures would have happened months (or years) ago on nearly every real estate asset of the Receivership. And finally, these same liquidity concerns have forced the Receiver to delay submission of fee applications for work performed since April 2024 and to pick-and-choose which property taxes to pay.

[7] But–for the Receiver's decision to delay submission of his fee applications to the Court, the cash concerns would have only been further exacerbated. To date, the Receiver has elected to pay certain other administrative expenses (*e.g.*, property taxes) while consistently delaying submission of over two years' worth of fee applications.

With the Supreme Court's denial of Barton's Cert. Petition during the First Quarter of 2026, the Receivership continues to stand at an important crossroads, particularly on the question of who should bear the burden of Barton's serial appeals. Barton's appeals have prevented the sales of all but one of the Receivership's real estate assets. This delay has potentially caused millions of dollars in additional interest to accrue. Everyone will (justifiably) point their fingers at Barton; however, Mr. Barton and his attorneys have made very clear that he has no funds to pay. The secured lenders will undoubtedly continue to insist that they should be paid in full to the detriment of all others. Defrauded investors will insist that all other creditors should take a backseat to their interest in the defrauded amounts and that the secured lenders in particular should not be allowed to profit (via additional interest) from Barton's continued delays. And others will raise yet additional arguments for how their interest should take priority over all others.

As the Receiver noted in his Fifteenth Quarterly Report [Dkt. 728], the Court is left with at least a few potential solutions, with the most obvious as follows:

**Option 1:** Instruct the Receiver to sell Receivership Properties free and clear of all liens and loans, with the creditors and investors' competing liens and interests attaching to the sale proceeds, and with the Court ultimately determining the priority of the competing claims/liens as part of the claims process in this matter.[8] Notably, while the claims process will enable the

[8] Multiple examples from other courts employ this very process and support selling properties "free and clear" of all liens and loans. *E.g.*, *SEC v. Champion-Cain*, No. 3:19-CV-1628-LAB-AHG, 2020 WL 4673397, at *5 (S.D. Cal. Aug. 12, 2020) ("[I]t has long been recognized that under appropriate circumstances, a federal court presiding over a receivership may authorize the assets of the receivership to be sold free and clear of liens and related claims.") (internal citation omitted); *see Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910, at *8 (N.D. Tex. July 30, 2014), *aff'd on other grounds*, 847 F.3d 231 (5th Cir. 2017) (A "receiver is not bound to adopt the contracts, accept the leases, or otherwise step into the shoes of his assignor, if in his opinion it would be unprofitable or undesirable to do so; and he is entitled to a reasonable time to elect whether to adopt or repudiate such contracts") (internal citation omitted); *see SEC v. BIC Real Est. Dev. Corp.*, No. 116CV00344LJOJLT, 2017 WL 2463854, at *7 (E.D. Cal. June 7, 2017) (denying a secured creditor's request for attorney's fees incurred in receivership litigation before the court had "even considered distributing receivership assets to other creditors and investors," because reimbursing a secured creditor's

APP 072

Court to determine what percentage of the pie each claimant is entitled to recover, the Receiver likely will be unable to distribute any funds until Barton's liability has been determined, either through his criminal trial or via a judgment as to liability in this case.

**Option 2:** Instruct the Receiver to solicit proposals from lenders for each Receivership Property to determine if there is some path forward to accomplish sales, pay down some or all of the outstanding pre-Receivership balances on the loans, and allow remaining amounts/claims to be dealt with as part of the Receivership's claims process. The Receiver previously engaged in similar efforts in November and December of 2023. However, substantial interest has accrued on all properties (except for the HUD Properties) since that date.

**Option 3:** Allow secured lenders to move to lift the Receivership stay to allow them to foreclose on Receivership Properties that are in default. With the exception of the HUD Properties, because the Receivership's liquidity issues have prevented the Receiver from servicing any of the debts on the Receivership Properties, this approach would lead to foreclosures on virtually every Receivership Property. These foreclosures would very likely result in the loss of all or the vast majority of the equity that was held in these properties at the time the Receivership was initiated, especially if

attorney's fees "during the pendency of the receivership estate" would "not comport" with the court's "equity obligations" or "promote judicial economy"); *SEC v. Capital Cove Bancorp LLC*, No. SACV 15-980-JLS (JCx), 2015 WL 9701154, at *9 (C.D. Cal. Oct. 13, 2015) (declining to order payment of a secured creditor's attorneys' fees and charges in connection with a property sale process).

APP 073

the lenders are allowed to recover the substantial amounts of default interest, late fees, and attorneys' fees.

As will be detailed more fully in the Receiver's next Quarterly Report, on July 8, 2026, the Court entered an Order [Dkt. 792] (the "Lender Order") acknowledging "the difficulties facing the Receivership stemming from the Receivership's significant debt and the inability of the Receiver to close sales due to Barton's multiple appeals of sales orders;" directing the Receiver "to solicit proposals from lenders for each Receivership Property to determine if there is a path forward to accomplish sales, pay down some or all the outstanding pre-Receivership balances on the loans, and allow remaining claims to be dealt with as part of the Receiverships claims process;" further instructing the Receiver to file a status report with the Court detailing the outcome of these discussions within 90 days—*i.e.*, October 6, 2026; and noting that "[i]f the Receiver is unable to secure workable proposals, the Court will instruct the Receiver to begin to sell Receivership Properties free and clear of all liens and loans."

The Receiver has already begun reaching out to the lenders on Receivership Properties to begin preparing the status report mandated by the Court. The Receiver is optimistic that additional sales will close in the near future. For one, the prior difficulties with title companies may no longer be an issue, as at least one title company and its underwriters were willing to bless the sale of the Rock Creek Property in June 2026. Additionally, the Receiver is hopeful that the Court's prior Agreed Injunction [Dkt. 580-1]—which among other things prohibits Barton from "[w]ithout seeking and obtaining leave of Court, commencing or participating, directly or indirectly, in any lawsuit against any buyer, prospective buyer, managers, or brokers, person or entity, related to any Receivership Asset or the management of any Receivership Asset"—will provide a meaningful deterrent to such conduct and assure future buyers of their protection from suit.

Finally, based on conversations with lenders to date, the Receiver is confident that he will be able to reach agreement with many of the lenders regarding an equitable path forward. For example, with the closing of the Rock Creek Property, the lender agreed to hold back approximately 60% of the interest that accrued between October 2022 and June 2026, as well as all default interest and attorneys' fees. These remaining items will be adjudicated among all creditors as part of the Receivership's claims process. The Receiver remains hopeful that other lenders will reach similar agreements. However, to the extent they will not agree to a workable proposal, the Court has already indicated that it will allow the sales to proceed and will handle the competing claims of stakeholders as part of the claims process. Dkt. 792.

Based on the information now known by the Receiver, the Receiver believes the following real estate assets may result in a net recovery for the Receivership Estate and provides an update to his proposed plan for the fair, reasonable, and efficient disposition of the properties:

**1. 4107 Rock Creek Drive**

As detailed in the Initial Status Report, while reviewing documents at the Turtle Creek Office, the Receiver's team discovered documents indicating loans and insurance payments on a property located at 4107 Rock Creek Drive in Dallas (the "Rock Creek Property"). Upon further examination, the Receiver determined that this property was owned by SF Rock Creek, LLC, a Receivership Entity controlled by Defendant Barton. *See* Dkt. 41 ¶¶ 6-7. Wall Investor Funds have been traced into the Rock Creek Property, and accordingly the Rock Creek Property is a Receivership Asset. *See* Mem. Op. and Order [Dkt. 416] at 13-14 & n.63.

The Receiver obtained an initial opinion of value that the property is worth approximately $1.45 million. Because (1) the property was financed with a "house flipping loan" that included a high interest rate (9.99%), in addition to being saddled with continuing obligations to pay utilities, insurance, and taxes; (2) the Receivership faced a general dearth of liquid assets with which to

administer its ongoing needs; and (3) the relative ease and efficiency in selling residential properties versus commercial properties, the Receiver listed this property for sale as expeditiously as possible through a respected, independent broker during the first weeks of the Receivership.

After receiving several offers on the property, the Receiver ultimately agreed, subject to Court approval, to sell the Rock Creek Property "AS IS" to the potential purchaser with the highest offer for a total payment price of $1.4 million. In accordance with 28 U.S.C. § 2001 and the Court's Administration Order [Dkt. 63], the Receiver obtained three separate appraisals that resulted in an average appraised value of $1,393,333. The contracted sales price not only exceeded two-thirds of the average appraised value of the Property as required by 28 U.S.C. § 2001(b) but exceeded the average appraised value.

On December 2, 2022, the Receiver filed a Motion for Appointment of Appraisers, Approval of Appraisals of Rock Creek Property, and Setting Hearing Regarding Approval of Sale of Rock Creek Property [Dkt. 76], contending that the sale of the Rock Creek Property for $1.4 million was in the best interest of the Receivership. The Court set a hearing to consider approval of the sale for December 19, 2022. Barton filed a Response in opposition to the Receiver's proposed sale [Dkt. 91].

Shortly before the December 19 hearing, the title company assisting the Receiver with the sale of the Rock Creek Property notified the Receiver that on December 1, 2022—after the Receiver had discussed his efforts to sell the Rock Creek Property in his Initial Status Report and the same day that the Receiver's counsel conferred on the sale of the property—Defendant Barton recorded a lis pendens on the property. Because the title company was unwilling to issue a title policy with the existence of the lis pendens, the Receiver was forced to file an Emergency Motion to Declare Lis Pendens Void [Dkt. 96] on December 16, 2022.

At the December 19 hearing, which started at 10 am and concluded shortly before lunch, the Court found that the sale was in the best interest of the Receivership, giving the Receiver authority to complete the sale at the scheduled December 28 closing. The Court also ordered Barton to pay for the Receiver's fees (totaling $1,200) in seeking to have the lis pendens declared void.

However, just hours after the conclusion of the hearing, Defendant Barton reached out to the purchaser (unsolicited and without permission from the Court or the Receiver) to notify the purchaser of purported past foundation and flooding issues Barton claims to have had with the property. In light of Barton's communication, the purchaser requested an extension of the closing date.

Moreover, on December 21, 2022, Defendant Barton filed a Notice of Appeal of the Rock Creek Sale Order. Case No. 22-11226. The title company refused to issue a title policy while the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by the Receiver), the Receiver initially sought to intervene in the appeal, be treated as an appellee, or alternatively be treated as an amicus and submitted a motion to dismiss. The Fifth Circuit denied the request to be treated as appellee or an intervenor, but granted the Receiver leave to file as an amicus. During the Second Quarter of 2023, the Receiver sought leave to file a second amicus brief in response to arguments by Barton relating to tracing of funds into the Rock Creek Property. This motion was opposed by Barton and denied. However, on June 19, 2022, the Fifth Circuit entered an Unpublished Opinion dismissing the appeal based on the absence of jurisdiction. On September 1, 2023, the Fifth Circuit withdrew its prior opinion and entered a new opinion that dismissed the appeal as moot in light of its opinion vacating the Initial Receivership Order. The mandate in that appeal issued on October 24, 2023.

On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify [Dkt. 374] the Rock Creek Sale Order. In the Motion, the Receiver also sought permission to sell the property free and clear of all liens and to stay accrual of post-Receivership Default Rates of Interest. The Court ultimately construed the Rock Creek Ratification Motion as a new sale motion, re-appointed the Receiver's appraisers, and set a hearing on the Motion. The hearing was held on December 14, 2023. On December 15, 2023, the Court entered its Order approving the sale of the Rock Creek Property [Dkt. 437] (the "Second Rock Creek Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

In connection with the Rock Creek Ratification Motion, the Receiver and the lender on the Rock Creek Property, The Rama Fund, LLC ("Rama") initially entered a joint stipulation and agreed order, whereby the parties agreed that at the scheduled closing, Rama would be paid the principal due under its note ($1,053,000) as well as all interest accrued under the Standard Interest Rate. The parties further agreed that any claims for amounts in excess of this amount (e.g., for default rate interest or attorneys' fees) would be submitted by Rama in connection with an eventual claims process, though the Receiver may object to the priority of any such claim. The transaction did not close in 2024.

On December 29, 2023, Barton filed an interlocutory appeal of the Second Rock Creek Sale Order (and two other sale orders). Fifth Circuit Case No. 24-10004. Because of Barton's interlocutory appeal of the Second Rock Creek Sale Order, the title company again decided that it could not issue a title policy until that appeal of the sale order was dismissed or otherwise resolved. With its *Barton II* Opinion, the Fifth Circuit found that the District Court did not abuse its discretion in entering the Second Rock Creek Sale Order. The Fifth Circuit's mandate issued on June 23, 2025. Barton filed a Petition for Rehearing En Banc, which the Fifth Circuit also denied.

On October 14, 2025, Barton filed the Cert. Petition (as discussed above). On March 30, 2026, the United States Supreme Court denied the Cert. Petition.

On February 10, 2026, Barton (through counsel) filed an Emergency Motion to Modify Receivership over Homestead [Dkt. 710], seeking to have the Rock Creek Property carved out of the Receivership and questioning the Receiver's management. The Receiver filed a Response [Dkt. 714], and on April 8, 2026, the Court entered an Order [Dkt. 723] denying Barton's motion.

Barton filed yet another lis pendens against the Rock Creek Property (and other properties) on July 31, 2024. The Receiver filed his Verified and Emergency Motion to Declare Lis Pendens Void [Dkt. 741] on June 3, 2026. Barton filed a Response [Dkt. 754] on June 5, 2026. On June 9, 2026, the Court entered an Order [Dkt. 755] declaring the lis pendens void. The Court further directed the Receiver to submit supplemental briefing relating to requested sanctions against Barton. Ther Receiver filed his Supplemental Motion for Sanctions [Dkt. 779] on June 30, 2026. As of the date of this Report, the Receiver's request for sanctions remains pending.

In the months between the District Court's issuance of the First Rock Creek Sale Order and the eventual closing, the Receiver and the Rock Creek purchaser entered into numerous extensions of the closing date. Until closing, the Rock Creek purchaser continued to rent the property subject to a long-term lease. In the interim, the financial problems that plagued the Rock Creek Property—namely the accrual of interest—persisted.[9] While the Receiver encountered great difficulties finding a title company willing to close the sale of the Rock Creek Property between October 2022 and March 2026, during the Second Quarter of 2026, the Receiver located a title company that was

[9] As detailed in prior Quarterly Reports, the loan on the Rock Creek Property was not a traditional homeowner's loan. To the contrary, Defendant Barton agreed that during the term of the Loan, SF Rock Creek would "not occupy any portion of the Mortgaged Property in any manner" and that "persons with a direct or indirect ownership interest in [SF Rock Creek] shall not occupy any portion of the Mortgaged Property in any manner throughout the term of the loan." Interest continues to accrue daily. While the Receiver leased the Rock Creek Property to the approved purchaser to salvage the sale, the lender took the position that all rent payments should go to the lender.

willing and able to close the sale in light of the affirmance of the Receivership and the Second Rock Creek Sale Order. The Receiver is optimistic that this same title company will be able to assist it with future property sales.

The Court approved the Receiver's request to sell the Rock Creek property for $1.4 million on December 20, 2022. However, as of June 25, 2026, the principal balance of the existing loan was $1,053,000 and note interest (applying the non-default interest rate) was $401,785.10, for a total of $1,454,785.10.

During the Second Quarter of 2026, the Receiver negotiated[10] extensively with the lender to ensure that net proceeds (sale proceeds plus certain amounts prepaid rent) would flow into the Receivership despite the fact that the Rock Creek Property was significantly underwater. As detailed above, significant interest has accrued on every Receivership Asset except for the HUD Properties since the inception of this case in October 2022. Although the Court had not yet entered its Lender Order, the Rock Creek lender was nevertheless willing to negotiate with the Receiver in good faith to ensure that the closing finally occurred. Ultimately, the lender agreed to accept the return of its principal ($1,053,000) plus $162,198 in interest (a discount of approximately 60% from the total of $401,785.10 in accrued interest), for a total payout to the lender of $1,215,198. The lender maintains the right to seek the remainder of its claimed losses (the remaining 60% of note-rate interest, default interest, late fees, and attorneys' fees) as part of the claims process.

As approved by the Court, the property sold for $1,400,000 to JNJ Group, LLC. The sale occurred on June 25, 2026. After accounting for the $1,215,198 payment to the Lender, a credit for $31,528 in pre-paid rent held by the Receiver, $13,595.88 in prorated county taxes, $35,000 to

[10] The Receiver notes that such negotiations occurred prior to the entrance of the Court's Lender Order, which provides additional guidance to the Receiver.

APP 080

the Receiver's broker (who reduced its percentage to 2.5% to facilitate closing), $35,000 to buyer's broker (who also reduced its percentage to 2.5% to facilitate closing), and $7,842 to the title company, the Receivership ultimately received $61,836.12 at closing.

Between the prepaid rent still held by the Receiver and the cash payment received at closing, the net benefit to the Receivership Estate from this transaction was $93,364.12. This payment was substantially less than it would have been but–for Barton's initial interference and appeals. At most, accrued interest on the Rock Creek loan would have been approximately $35,000 by the end of January 2023. While the Receiver would not have had to negotiate the brokers' commissions down from their contractual rate (a savings of $14,000), he would have saved approximately $125,000 in interest. Thus, Barton's appeals cost the Receivership at least **<u>$110,000</u>** in additional equity with respect to the Rock Creek Sale, plus at least tens of thousands of dollars relating to the extensive briefing before the District Court and Fifth Circuit related to the Rock Creek appeal.

**2. Frisco Gate Property**

Receivership Entity FHC Acquisitions, LLC is the record owner of approximately 4.5 acres at the corner of the Dallas North Tollway and John Hickman Parkway in Frisco (the "Frisco Gate Property"). Wall Investor Funds have been traced into the Frisco Gate Property, and accordingly the Frisco Gate Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n. 61.

Early in the Receivership, the Receiver obtained multiple broker's opinions of value for this property that generally estimated the property's value between $8.9MM and $10.8MM. Through a broker previously retained by Barton, and with Barton's cooperation, a potential purchaser of the Frisco Gate Property approached the Receiver about acquiring the Frisco Gate

Property for $9,000,000. The parties entered a Letter of Intent on October 31, 2022. Between October 31 and December 13, 2022, the parties negotiated a purchase and sale agreement.

Pursuant to 28 U.S.C. § 2001, the Receiver sought three appraisals on the property—two broker opinions of value and one formal appraisal. The three appraisals valued the Property at $9,016,920 - $10,018,800, $8,896,365 - $9,884,850, and $9,000,000, respectively. After receiving the formal appraisal on December 16, 2022, the Receiver and his team prepared a Motion for Appointment of Appraisers, Approval of Appraisals, and a Hearing Regarding Approval of Sale of Frisco Gate Property [Dkt. 110], which was filed on December 22, 2022. Barton filed a Notice of Non-Opposition [Dkt. 123]. On January 31, 2023, the Court held a hearing to approve the sale of the Frisco Gate Property and entered an Order [Dkt. 142] approving the sale the same day.

Because of certain challenges regarding potential parking commitments on the property and obligations under certain master development agreements, on January 24, 2023, the Receiver and purchaser entered an Addendum to the purchase and sale agreement. The Addendum did not materially alter the agreement, but simply (1) extended the Feasibility Period defined in the Agreement by an additional 30 days, (2) extended the closing date in proportion to the Feasibility Period, and (3) made certain Earnest Money nonrefundable if specified conditions are met. Pursuant to the Addendum, the Feasibility Period would end on February 13, 2023, with Closing set to occur on or before April 14, 2023. The Receiver and purchaser ultimately entered similar Second and Third Amendments that extended the Feasibility Period and Closing Date because the parking issues remained unresolved. Pursuant to a Fourth Amendment, the purchaser agreed to let the feasibility period expire, with closing set to occur in late September 2023. However, prior to the closing date, the purchaser indicated it would not be able to close in September, and the Fifth

Circuit suspended any ability to close on the transaction prior to a new Receivership Order. Moreover, additional parking complications have arisen since the Fourth Amendment was entered.

On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify [Dkt. 376] the Frisco Gate Sale Order. In the Motion, the Receiver also sought permission to sell the property free and clear of all liens and to stay accrual of post-Receivership Default Rates of Interest. The Court ultimately construed the Frisco Gate Ratification Motion as a new sale motion, re-appointed the Receiver's appraisers, and set a hearing on the Motion. The hearing was held on December 14, 2023. On December 15, 2023, the Court entered its Order approving the sale of the Frisco Gate Property [Dkt. 438] (the "Second Frisco Gate Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

On January 8, 2024, the District Court entered a separate order regarding the Receiver's dispute with the lender on the Frisco Gate Property, Texas Republic Bank, finding that at closing, Texas Republic Bank would be paid the principal due under its note as well as all interest accrued under the Standard Interest Rate.[11] The Court also found that Palisades' purchase money funds ($3,500,000) would be paid at closing as well. Any default interest, penalties, attorneys' fees, or other costs would be handled as part of an eventual claims process, though the Receiver may object to the priority of any such claim. The transaction did not close in 2024 and remains pending today.

On December 29, 2023, despite previously ***not objecting*** to the sale and in fact originally bringing the sale to the Receiver's attention, Barton filed an interlocutory appeal of the Second Frisco Gate Sale Order (and two other sale orders). Fifth Circuit Case No. 24-10004. Because of Barton's interlocutory appeal of the Second Frisco Gate Sale Order, the title company once again

[11] Texas Republic Bank filed a motion for reconsideration of this Order. The Court denied the motion for reconsideration during the Second Quarter of 2024.

took the position that it could not issue a title policy until that appeal is dismissed or resolved. With its *Barton II* Opinion, the Fifth Circuit found that the District Court did not abuse its discretion in entering the Second Frisco Gate Sale Order. The Fifth Circuit's mandate issued on June 23, 2025. Barton filed a Petition for Rehearing En Banc, which the Fifth Circuit also denied. On October 14, 2025, Barton filed the Cert. Petition (as discussed above). On March 30, 2026, the United States Supreme Court denied the Cert. Petition.

The Receiver continues to believe that this sale is in the best interest of the Receivership because, among other things, it allows the Receiver to accomplish a sale of the property (a) without a listing process, (b) without having to pay any broker fees (the potential purchaser of the property has agreed to pay its broker separately and outside of the sale proceeds), and (c) with a purchaser who is willing to work through and take the risk of the various parking and master development issues. However, if the parking issues persist, the Receiver may be forced to take the property through a fully brokered process that accounts for the parking challenges.

Barton filed a lis pendens against the Frisco Gate Property on July 31, 2024. The Receiver's Verified and Emergency Motion to Declare Lis Pendens Void [Dkt. 741], which was filed on June 3, 2026, included a request that the Frisco Gate lis pendens be declared void as well. On June 9, 2026, the Court entered an Order [Dkt. 755] declaring the lis pendens void. As of the date of this Report, the Receiver's request for sanctions remains pending.

The debt on the Frisco Gate Property remains significant. Given the Lender Order, the Receiver is optimistic he will be able to reach a workable solution with the property's lenders prior to his next Report and prior to closing. Separate and apart from any agreement between the lenders and the Receiver, after payment of the principal balance of the existing loan ($2,981,661.92),

interest at the standard rate (approximately $1,017,483.97 as of June 30, 2026),[12] Palisades' purchase money of approximately $3.5 million, 2023 taxes ($180,508.04), 2024 taxes ($158,335.48), 2025 taxes ($107,652.17), and closing costs, the Receiver anticipates that if this sale were to close today, it would result in net proceeds of approximately $900,000 into the Receivership Estate. Notably, but-for the sale order appeals and the undisclosed parking issue, the Receiver would have closed this transaction on or before April 14, 2023. Between that day and April 30, 2026, at least $765,914.41 in additional interest has accrued, as well as approximately $446,495.69 in property taxes ($1,212,410,10 in total equity lost).[13] The Receiver estimates that interest continues to accrue on this property at a rate of $24,994.66 per month (and $299,935.94).

### 3. 2999 Turtle Creek

At one time, Receivership Entity 2999TC Acquisitions, LLC[14] was the owner of 2999 Turtle Creek Boulevard in Dallas (the "Turtle Creek Office"), having purchased the property in or around September of 2019. In connection with this purchase, 2999TC Acquisitions, LLC or its predecessor secured a loan in the amount of $32,500,000. Through protracted litigation in the bankruptcy court—and millions of dollars in payments from other Receivership Entities to the lender, HNGH Turtle Creek, LLC ("HNGH")—the Bankruptcy Court eventually entered an Order (the "Order Enforcing Agreed Orders") on September 28, 2022 that found, among other things, that HNGH, not 2999TC Acquisitions, LLC "owned" the Turtle Creek Office. That Order was

[12]In addition to principal and non-default interest, the lender claims that as of April 17, 2026, default interest of $1,964,679.89 (18%) and legal fees of $53,765.30 have also accrued.

[13] Despite a stay prohibiting the suit, the relevant taxing authority has also instituted a lawsuit to recover the taxes owed on the property, which have not been paid due to cash limitations and other considerations.

[14] Wall Investor Funds have been traced into 2999TC Acquisitions, LLC, and accordingly 2999TC Acquisitions, LLC is a Receivership Entity. *See* Mem. Op. & Order [Dkt. 416] at 20 & n.100.

appealed shortly after it was entered, and the appeal, which was also with this Court, was automatically stayed upon the Receiver's October 18, 2022, appointment.

On November 25, 2022, HNGH filed a Motion to Intervene and to Confirm Ownership of Property Located at 2999 Turtle Creek Boulevard [Dkt. 69]. Among other things, HNGH claimed that the Bankruptcy Court's September 28 order confirmed that as of May 2022, HNGH owned the Turtle Creek Office. The Receiver filed a Response [Dkt. 94] on December 15, 2022, in which he indicated that he was not opposed to HNGH's request to intervene as a party in interest but was opposed to HNGH's requested confirmation of any ownership interest in 2999 Turtle Creek and HNGH's implicit request to lift the stay of litigation imposed by the Receivership Order to permit resolution of the pending bankruptcy appeal. Defendant Barton also filed a Response [Dkt. 97] opposed to HNGH's request.

The Court ultimately granted [Dkt. 154] HNGH's motion to intervene but denied HNGH's request that the Court confirm ownership of the property. Instead, the Court ordered the parties to mediate the dispute and appointed Retired Bankruptcy Judge Harlin Hale as mediator. Mediation occurred on March 10, 2023.

As detailed more fully in the Receiver's Verified Motion to Approve Settlement Agreement with HNGH [Dkt. 210], the Receiver and HNGH settled their dispute as a result of the mediation. Pursuant to the terms of the Settlement Agreement, HNGH agreed to pay the Receiver a total of $2.5 million in the following intervals following the Court's approval of the Settlement Agreement: (i) $500,000 paid within seven days; (ii) $500,000 paid within one year; (iii) $750,000 paid within eighteen months; and (iv) $750,000 paid within two years (collectively, the "Settlement Payments").

The Receiver entered the Settlement Agreement and presented the Motion to the Court because the settlement with HNGH was in the best interest of the Receivership. More specifically,

(1) After an extensive investigation, the Receiver determined that there were significant, potentially impossible hurdles to unwinding the bankruptcy court's prior Agreed Orders, the confirmed and effective Plan, and the Order Enforcing Agreed Orders. The Appeal would likely be unsuccessful, given the bankruptcy court's thoroughly examined factual record "in a hearing that lasted over fifty hours, stretched out over two months" and the requisite "clear error" standard of review for a bankruptcy court's findings of fact.

(2) Even if the Receiver were to succeed on the Appeal—after an indefinite amount of time for the District Court's decision and then HNGH's inevitable appeal to the Fifth Circuit—the likely amount due under the Loan Documents would far exceed the value of the Property and the likely selling price of the Property.

(3) The Receiver contended that $3.95 million of the $4.735 million that the Receivership Entities paid to HNGH under the Loan Documents were arguably fraudulent transfers, although $3.8 million of that was paid in accordance with obligations incurred by 2999TC under the Agreed Orders (albeit by non-Debtor Receivership Entities), which obligations were incorporated into the confirmed and now-effective Plan, approved in the Bankruptcy Case. Even if the payments were made with actual or constructive fraudulent intent, the Receiver faced the significant hurdle of overcoming HNGH's good-faith defense because these payments were made by Receivership Entities on behalf of the Debtor pursuant to court orders. The substantial financial costs and delay of litigating these fraudulent

transfer claims would only deplete the Receivership Estate with no guarantee of success. Consequently, the Receivership Estate's receipt of $2.5 million of potentially $3.95 million in fraudulent transfer amounts was a fair and equitable result.

The Court ultimately granted [Dkt. 236] the Motion to Approve Settlement Agreement with HNGH on May 15, 2023. On May 16, 2023, Defendant Barton filed a Notice of Appeal of the Court's Order approving the HNGH Settlement Agreement. Fifth Circuit Case No. 23-10516. On May 26, 2023, Barton separately filed a motion to stay with the Fifth Circuit that, among other things, sought a stay of the HNGH Settlement, including the Receiver's transfer of possession of the Turtle Creek Office to HNGH. On June 8 and June 9, 2023, the Fifth Circuit denied the motion to stay to the extent it sought to suspend the HNGH Settlement. On July 17, 2023, the Fifth Circuit dismissed Barton's separate appeal of the Order approving the HNGH Settlement Agreement. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and stated that the opposed motion to dismiss the appeal would instead be carried with the case. On August 14, 2024, the appeal was dismissed as moot in light of the Court's ratification order.

As of the date of this Report, certain ancillary matters remain pending, including the Receiver's Motion for Final Decree. During the Fourth Quarter of 2025, the District Court adopted the bankruptcy court's report and recommendation that the District Court withdraw the reference. The case is now pending in Case No. 3:25-cv-1949-X. During the First Quarter of 2026, certain ancillary filings were submitted by Barton and his former counsel, including an improper motion for summary judgment. On June 17, 2026, the Court struck the motion for summary judgment.

**4. HUD Apartments**

Receivership Entities D4DS, LLC, D4FR, LLC, DRIN, LLC, and D4OP, LLC, are the record owners and HUD borrowers on four separate apartment complexes in Texas and Alabama

(collectively, the "HUD Apartments"). These properties include Bellwether Ridge in DeSoto, Texas (owned by D4DS, LLC), the Parc at Windmill Farms in Forney, Texas (owned by D4FR, LLC), the Parc at Ingleside near Corpus Christi, Texas (owned by D4IN, LLC), and the Parc at Opelika in Alabama (owned by D4OP, LLC). The HUD Apartments each received or benefitted from Wall Investor Funds, and accordingly the HUD Apartments are Receivership Assets. *See* Mem. Op. & Order at 14-19.

Each of these properties was developed under (and is currently encumbered by) separate sizeable HUD loans administered through Greystone. Third-Party Southern Properties Capital, Ltd. ("SPC") provided a smaller second loan for each of the properties. SPC claims that its mezzanine loans were "convertible" in nature, whereby it had the option to convert its debt position into equity ownership of certain affiliated Receivership Entities and, indirectly, ownership of the HUD Apartments. SPC further claims that as to the DeSoto, Forney, and Ingleside HUD Apartments, it exercised conversion options prior to the appointment of the Receiver.

During the First Quarter of 2023, the Receiver entered into contracts to sell the DeSoto and Forney HUD Apartments owned by D4DS and D4FR, respectively, and filed motions to approve these sales free and clear of SPC's purported "ownership" premised on the claimed conversion of its debt into equity. [Dkts. 161 & 164]. SPC responded that the Receiver had no right to sell the DeSoto and Forney HUD Apartments [Dkt. 178]. The Court ultimately continued the hearing on the Receiver's motions to sell these properties and ordered the Receiver and SPC to file summary judgment briefing on the issue of ownership of the HUD Apartments. The Receiver filed his motion for summary judgment on April 13, 2023 [Dkt. 207], and SPC filed its response on May 30, 2023 [Dkts. 246 & 247]. The Receiver's deadline to file a reply brief was originally stayed in light of the Fifth Circuit's opinion regarding the Receivership Order, and the Court has since dismissed

without prejudice all pending motions, including the sale motion and the motion for summary judgment. While the Receiver believes that he would ultimately succeed on the question of ownership of the HUD Apartments, if SPC is successful in its challenge, the possibility exists that the Receivership Entities will not obtain any recovery on these properties.

As noted in prior Reports, Defendant Barton has suggested in various filings that the sale of one, two, or three of these properties would result in the recovery of sufficient funds to pay a 100% recovery to the Wall Investors. However, as the Receiver has detailed in prior filings, this position not only ignores SPC's arguments regarding its equity position in the properties, but, even assuming that SPC's loans are treated as debt, ignores the existing HUD and SPC debt. If SPC is determined to be the owner of the HUD Apartments, the Receivership will receive $0. Even if the Receiver is victorious after protracted and expensive litigation with SPC, the best-case scenario to the Receivership in terms of value realized would be far less than the $26 million alleged in the SEC's complaint. Barton's suggestion also ignores the non-Wall creditors who would participate in the Receivership's eventual claims process, increasing total losses well in excess of $26 million.

Finally, at the hearing on the Motion to Approve the sale of the Amerigold Suites (discussed below), Barton indicated (through counsel) that contrary to prior assertions regarding the use of sale proceeds from these properties, Barton now contends he should receive the proceeds from the sale of any HUD Apartments rather than the Receivership Estate because the D4 Entities should not be receivership entities in the first place. Barton's change of heart was later confirmed by his challenges to the HUD Apartments (and other properties) being included in any new Receivership Order, as well as by argument at the hearing related to the Second Receivership Order. While Barton's arguments were rejected (first by the District Court and then the Fifth Circuit), SPC sought to intervene and participate in the hearing. The District Court denied SPC's

request without prejudice to SPC refiling at a later date. SPC claims that it has not had an opportunity to be heard on this issue and intends to ask the District Court to hear it on this issue. As will be detailed in future reports during the Fall of 2025, the Receiver and SPC mediated their ownership dispute with Retired United States Bankruptcy Judge Harlin Hale.

Similar to prior Quarterly Reports, each of the HUD Apartments is dealt with in turn:

**a) Bellwether Ridge (DeSoto)**

Receivership Entity D4DS, LLC is the record owner and HUD borrower on a certain apartment complex located at 841 S. Polk Street in DeSoto, Texas ("Bellwether Ridge"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals valued Bellwether Ridge at $28,000,000, $27,750,000 - $29,750,000, and $28,800,000 - $31,900,000 resulting in an average appraised value of $29,033,333.

After the Receiver's appointment, he consulted multiple industry professionals and brokers regarding the potential value of the Property and three other similar projects (Parc at Windmill Farms in Forney, the Parc at Ingleside outside of Corpus Christi, and the Parc at Opelika in Alabama) that involve both HUD loans serviced by Greystone and additional loans from SPC to JMJ. Due to the uncertainty surrounding the outstanding dispute with SPC, the Receiver ultimately was unable to reach agreement to engage the brokers, who expressed unease in marketing the properties due to SPC's ownership claims.

Despite difficulties listing the Property with a broker, the Receiver communicated with dozens of potential interested purchasers. While most of the potential purchasers ultimately were unwilling to submit offers on the Property, the Receiver obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Palmetto Capital Partners, LLC—on behalf

APP 091

of a joint venture (Polk Street 2023, LLC) between Palmetto and i3 Interests LLC (collectively, "Palmetto/i3")—on November 30, 2023 at a purchase price of $27,000,000.

During the following months, the Receiver and Palmetto/i3 engaged in protracted negotiations regarding the purchase and sale agreements for the Property and one other related property. During this time, the Receiver continued to communicate with other potential interested purchasers, none of whom provided higher offers than that received from Palmetto/i3. Finally, on February 21, 2023, the Receiver and Palmetto/i3 entered into a Purchase and Sale Agreement, whereby the Receiver agreed, subject to Court approval and certain other contingencies, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $27,000,000.[15]

The Receiver has been increasingly pessimistic in light of the protracted and thorough summary judgment briefing, that he will be able to reach agreement with SPC to treat its loan as just that—a loan that will be paid at closing. Regardless of any ultimate agreement, SPC's claims to the proceeds from the sale of Bellwether Ridge can be administered through a claims process, where the adjudication of its claim to the proceeds from the sale of any HUD Apartment complex could range from treatment as an unsecured creditor, to the Court's determination that SPC is entitled to 100% of the sale proceeds.

As of the date of this Report, the contract for the sale of Bellwether Ridge remains pending, but the Sale Motion has been denied without prejudice. Pursuant to the parties' contract, because several months have passed since the execution of the agreement, either of the parties to the contract may terminate at any time. Once the issue of SPC's claimed ownership has been resolved, court approval for any sale will still be necessary pursuant to 28 U.S.C. § 2001. If SPC is ultimately determined not to be the rightful owner of the property, if the D4 Entities ultimately

[15] SPC's claimed ownership was a significant factor in the purchase price.

APP 092

remain Receivership Entities, and if the Court approves the sale, after discounting the HUD loan balance ($17,044,548), the SPC loan balance including interest $4,539,194), and the fee to buyer's broker ($270,000), the sale would result in a net benefit of approximately $5.1 million to the Receivership Estate prior to other closing costs.

**b) Parc at Windmill Farms (Forney)**

Receivership Entity D4FR, LLC is the record owner and HUD borrower on a certain apartment complex located at 1003 Windmill Farms Blvd., Forney, TX 75126 ("Windmill Farms"). In accordance with this Court's Orders and 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of Windmill Farms. One is a certified appraisal, and two are informal broker opinions of value. The three appraisals value Windmill Farms at $50,000,000, $52,000,000 - $56,000,000, $53,000,000 - $58,000,000 resulting in an average appraised value of $53,166,666.

Despite difficulties listing the Property with a broker (as outlined above), after communicating with dozens of potential interested purchasers, the Receiver ultimately entered into a Purchase and Sale Agreement with Palmetto/i3 whereby the Receiver agreed, subject to Court approval, to sell the Property to Palmetto/i3, which will assume the existing HUD loan, for a total of $51,000,000.

As of the date of this Report, the contract for the sale of Windmill Farms remains pending, but the Sale Motion has been denied without prejudice. If SPC is ultimately determined not to be the rightful owner of the property, if the D4 Entities ultimately remain Receivership Entities, and if the Court approves the sale, after discounting the HUD loan balance ($33,654,892), the SPC loan balance including interest ($9,709,647), and the fee to buyer's broker ($510,000), the sale would result in a net benefit of approximately $7.1 million to the Receivership Estate prior to other closing costs.

**c) Parc at Ingleside (Corpus Christi area)**

Receivership Entity D4IN, LLC is the record owner and HUD borrower on a certain apartment complex located at 2850 Ave. J, Ingleside, TX, 78362 ("Parc at Ingleside"). The Receiver is still gathering opinions of value and appraisal(s) on this property and anticipates discussing those in future status reports. To date, he has received opinions of value ranging between $28 million and $31.1 million. As of March 31, 2026, the balance on the HUD loan for this property was $23,792,490, and the SPC loan including interest was $4,824,670. While the Receiver is hopeful that the value of this property compared to its loans will continue to increase in the coming months while the ownership dispute with SPC is resolved, the estimates above indicate that the sale of this property would result in the infusion of between $0 and $2.5 million into the Receivership Estate.

**d) Parc at Opelika (Alabama)**

Receivership Entity D4OP, LLC is the record owner and HUD borrower on a certain apartment complex located at 1375 McCoy Street, Opelika, AL 36801 (the "Parc at Opelika). Construction on Opelika is complete. While the Receiver encountered multiple challenges that delayed final endorsement of the HUD loan on the property—including construction liens, interest payments that had to be made when draw requests were delayed, ongoing challenges surrounding the Receiver's lack of access to QuickBooks and the Receivership Entities' digital files (as outlined below), and Barton's refusal to sign cost certification documents—final endorsement of the HUD loan finally occurred during the Fourth Quarter of 2023. As noted in prior Reports, pre-Receivership findings identified by auditors—regarding repayment of an SBA loan and repayment of monies sent to other Receivership Entities—have been cured.

Similar to Bellwether Ridge, Windmill Farms, and Ingleside, Opelika has both a HUD loan as well as additional funding from SPC. As of March 31, 2026, the balance on the HUD loan for

this property was $21,962,056, and the SPC loan including interest was $4,702,900. SPC claims that while it has not yet converted its debt to equity, its convertible loan will allow it to do so in the future.

**5. Amerigold Suites**

Receivership Entity Goldmark Hospitality, LLC is the record owner of a 70-unit extended-stay hotel located at 13636 Goldmark Dr. in Dallas, Texas (the "Amerigold Suites"). Wall Investor Funds have been traced into the Amerigold Suites, and accordingly the Amerigold Suites is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n.62.

While the HUD Apartments have third-party property managers, Goldmark Hospitality, LLC and other Receivership Entities coordinated with contractors to manage the Amerigold Suites. As discussed in his Initial Report, in the months prior to the institution of the Receivership, the Amerigold Suites had negative cashflow, in part because of a high number of vacant units and the generally poor condition of several units. Within days of the Receiver's appointment, he learned, among other things, that insurance on the property was on the verge of cancellation, that electricity was on the verge of being shut off, and that significant water bills were long overdue, even under a prior negotiated settlement. The Receiver was forced to expend scarce Receivership resources to preserve this asset and ensure that operations continued. Moreover, but–for the Receivership Order's automatic stay on foreclosure and other lender remedies, the lender, Texas Brand Bank, would likely have been entitled to foreclosure after the Receiver's appointment since insufficient assets existed (and continue to exist) to make mortgage payments (whether on this property or any of the other properties owned by the Initial Receivership Entities).

During the Fourth Quarter of 2022 and continuing into the First Quarter of 2023, the Receiver and his team were forced to expend considerable effort (1) convincing electrical and water utility companies not to shut off services to the property; (2) securing property and liability

insurance despite the history of the property and the existence of the Receivership; (3) meeting with the property manager to discuss the ongoing maintenance and repair needs of the property; and (4) analyzing various options to maximize the value of the Amerigold Suites.

In December 2022, Texas Brand Bank sold the note secured by the Amerigold Suites to a third party. The Receiver is aware of the possible existence of at least one other smaller loan on the property, as well as a few other smaller liabilities.

Upon my appointment, one lawsuit involving a personal injury at Amerigold was already pending. During the First Quarter of 2024, the plaintiff in that case requested that the Court lift the stay in that proceeding in order to pursue settlement with the insurance carrier. The case has since been dismissed.

During the First Quarter of 2023, the Receiver was notified of a second potential personal injury claim that occurred because of a recent storm. The insurance carrier has been notified of this incident, and the Receiver's investigation of the incident is ongoing.

During the Second Quarter of 2023, a City of Dallas fire inspector visited Amerigold and discovered a host of items that were out of compliance. Over several weeks the Amerigold property manager resolved each of the findings in the inspection report and eventually received a clean bill of health from the fire inspector. On or about July 6, 2023, a small fire occurred at the property. The Dallas Fire Department was called to the property, and the fire was extinguished with minimal property damage.

During the Third and Fourth Quarters of 2023, the Texas heat took its toll on the unit's air conditioning units, resulting in significant repair costs. Meanwhile, interest on the property has continued to accrue, the necessity for significant repairs have continued, property tax and insurance bills remain high, and the Receiver and his team are required to continue devoting significant

attention to this property. The majority of these challenges have been present from the outset of the Receivership.

During the First Quarter of 2024, Defendant Barton once again violated the Receivership Order and arrived unannounced at the Amerigold Suites to question its property manager. The Receiver's counsel was subsequently forced to send Barton a cease and desist letter.

During the Second and Third Quarters of 2024, Amerigold Suites had to cure additional findings from a second fire inspection, repair roof damage related to severe storms, and perform extensive repairs to the community pool.

In light of these challenges, and to avoid using limited receivership assets to continue operating the Property at a loss, the Receiver continues to believe that selling the Property is in the best interest of the Receivership Estate. After consulting multiple industry professionals and brokers regarding the Property's potential value, the Receiver engaged a broker to market the Property in late 2022 and early 2023.

The broker obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Matthew Flume (the "First Amerigold Purchaser") on January 25, 2023, at a purchase price of $5,500,000. The First Amerigold Purchaser (and his affiliated entities) have extensive experience rehabilitating distressed multifamily assets.

The Receiver and the First Amerigold Purchaser engaged in negotiations regarding a purchase and sale agreement for the Property, and on March 1, 2023, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "First Amerigold Contract"), pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Amerigold Purchaser for $5,500,000.

In connection with the sale and pursuant to 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. Two are informal broker opinions of value, and one is a certified appraisal (collectively, the "Appraisals"). The three Appraisals valued the Property at $4,400,000, $3,500,000, and $4,900,000 - $5,500,000, resulting in an average appraised value of $4,366,667.[16] Thus, the contracted sales price, $5,500,000, not only greatly exceeded two-thirds of the average appraised value of the Property ($2.9 million) as required by 28 U.S.C. § 2001, but also exceeds the average appraised value by over $1 million.

On March 2, 2023, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 167] (the "Amerigold Sale Motion"). Barton objected to the sale [Dkt. 185]. On March 20, 2023, the Court held a hearing on the Amerigold Sale Motion, and, on March 29, 2023, entered an Order approving the sale [Dkt. 202].

On May 16, 2023, Defendant Barton filed a Notice of Appeal of the District Court's Sale Order approving the sale of the Amerigold Property. Case No. 23-10515. Similar to the Rock Creek Property, the title company refused to issue a title policy so long as the appeal of the sale order was pending. Because of the title company's unwillingness to close (and the fact that the motion to approve the sale was filed by the Receiver, not the SEC) and the particular issues outlined above prompting the expeditious sale of this property, the Receiver once again sought to intervene or be treated as appellee. The Fifth Circuit denied the request to be treated as appellee or an intervenor, instead inviting the Receiver to file an amicus brief. The SEC ultimately filed a motion to dismiss, and on July 17, 2023, the Fifth Circuit granted the motion and dismissed the appeal. On October 12, 2023, the Fifth Circuit withdrew its prior opinion and entered a new

---

[16] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

opinion that dismissed the appeal as moot in light of the separate Opinion vacating the Initial Receivership Order. The mandate issued on October 20, 2023.

On November 1, 2023, the Receiver filed his Verified and Expedited Motion to Ratify [Dkt. 378] the Amerigold Suites Sale Order. In the Motion, the Receiver also sought permission to sell the property free and clear of all liens and to stay accrual of post-Receivership Default Rates of Interest. The Court ultimately construed the Amerigold Suites Ratification Motion as a new sale motion, re-appointed the Receiver's appraisers, and set a hearing on the Motion. The hearing was held on December 14, 2023. On December 15, 2023, the Court entered its Order approving the sale of the Amerigold Suites [Dkt. 436] (the "Second Amerigold Suites Sale Order"), determining that the sale of the property was still in the best interest of the Receivership.

In connection with the Amerigold Suites Ratification Motion, the Receiver and the lender on the Amerigold Suites, McCormick 101, LLC ("McCormick") entered a joint stipulation and agreed order, whereby the parties agreed that at closing, McCormick would be paid the principal due under its note ($2,481,098.27) as well as all interest accrued under the Standard Interest Rate. The parties further agreed that any claims for amounts in excess of this amount (e.g., for default rate interest or attorneys' fees) can be submitted by McCormick in connection with an eventual claims process, though the Receiver may object to the priority of any such claim. The transaction did not close in 2024, and the buyer has since indicated an unwillingness to close the transaction.

On December 29, 2023, Barton filed an interlocutory appeal of the Second Amerigold Suites Sale Order (and two other sale orders). Fifth Circuit Case No. 24-10004. Because of Barton's interlocutory appeal of the Second Amerigold Suites Sale Order, the title company has indicated that it once again cannot issue a title policy until that appeal is dismissed or resolved. With its *Barton II* Opinion, the Fifth Circuit found that the District Court did not abuse its

APP 099

discretion in entering the Second Amerigold Suites Sale Order. Barton filed a Petition for Rehearing En Banc, which the Fifth Circuit denied. Barton has since filed the Cert. Petition, which was denied on March 30, 2026.

At the end of the Fourth Quarter of 2023, the First Amerigold Suites Purchaser indicated that it was no longer willing to close the transaction because of the continued uncertainty surrounding the transaction and what it believes is a much more buyer-friendly market today compared to when they first contracted to purchase the Amerigold Suites. Accordingly, the Receiver retained a broker to widely market the property and find a replacement purchaser. During the First Quarter of 2024, the broker spent significant efforts marketing the sale widely and soliciting bids.

The broker once again obtained multiple offers on the Property, the highest of which was submitted by Neel Jain and Aaron Friedman and their affiliated entity Centeridge, LLC (the "Second Amerigold Purchaser"). The Second Amerigold Purchaser (and their affiliated entities) also had extensive experience rehabilitating distressed multifamily assets.

The Receiver and the Second Amerigold Purchaser engaged in negotiations regarding a purchase and sale agreement for the Property, and on June 3, 2024, the Receiver and the Second Amerigold Purchaser entered into a Purchase and Sale Agreement (the "Second Amerigold Contract"), pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Second Amerigold Purchaser for $4,800,000—$700,000 less than the original contract with the First Amerigold Purchaser.

In connection with the sale and pursuant to 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Property. One is an informal broker opinion of value, and two are certified appraisals (collectively, the "Appraisals"). The three Appraisals valued the Property at

$4,170,000, $5,570,000, and $6,700,000–$7,100,000, resulting in an average appraised value of $5,546,667. Thus, the contracted sales price, $4,800,000, greatly exceeded two-thirds of the average appraised value of the Property ($3.7 million) as required by 28 U.S.C. § 2001.

On June 5, 2023, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Amerigold Suites [Dkt. 500] (the "Second Amerigold Sale Motion"). Barton objected to the sale [Dkt. 516]. On July 17, 2024, the Receiver filed a Notice of Continued Interference with Receiver's Management of Receivership Property, in which the Receiver notified the Court of Barton's improper visits to the Amerigold Suites, as well as communications Barton sent to the Second Amerigold Purchaser and Hall Purchaser, ostensibly to sow doubt about the Receiver's ability to sell the properties. On July 23, 2024, the Court held a hearing on the Second Amerigold Sale Motion, and, on July 25, 2024, entered an Order approving the sale [Dkt. 537] (the "Third Amerigold Sale Order").

After payment of the principal balance of the existing loan ($2,481,098.27), interest at the standard rate (approximately $287,637.46 as of July 30, 2024), broker commissions (approximately $190,000), and closing costs, the Receiver anticipated net proceeds flowing into the Receivership Estate of approximately $1.8 million from the sale to the Second Amerigold Purchaser.

However, in August 2024, the Second Amerigold Purchaser notified the Receiver that it was terminating the Second Amerigold Contract because Barton had contacted that buyer and advised he would soon resume possession and control over the property and the Receiver would not be able to close on the approved sale. The buyer also advised that after reviewing additional information about Barton, it was deeply concerned about being sued by him after the sale closed.

As discussed further below, this and other actions of Barton led the Receiver to file a Motion to Show Cause [Dkt. 558] on August 23, 2024.

On August 21, 2024, Barton appealed [Dkt. 537] the Third Amerigold Sale Order. While the appeal was later stayed for considerable time, the Fifth Circuit ultimately found that it lacked jurisdiction to consider this appeal because of the purchaser's unwillingness to move forward with the transaction.

After the Second Amerigold Purchaser's termination of the Second Amerigold Contract, McCormick 101, LLC filed a motion [Dkt. 563] renewing its request that the Court lift the Receivership Order's stay of litigation. The Receiver filed his Response [Dkt. 570] on September 25, 2024.

On November 6, 2024, the Court denied McCormick's motion [Dkt. 584]. It explained that lifting the Receivership Stay for McCormick would likely cause a flood of similar motions from other creditors which would force the cash-strapped Receivership to expend its limited funds responding to each of these motions. Among other things, the court also noted that McCormick purchased its loan on the Amerigold Suites ***after*** the Receivership was already in place.

Undeterred, only four months later McCormick hired a new law firm and filed another motion to lift stay under the guise of "emergency life safety issues" at the Amerigold Suites [Dkts. 612, 613]. On March 27, 2025, the Receiver filed his Response [Dkt. 620]. On April 10, 2025, the Court denied McCormick's motion to lift stay but ordered the Receiver to permit a third-party inspection of Amerigold Suites using an inspector of the Receiver's choice [Dkt. 630].

While the issues were not as dire as McCormick painted them to be, during the First Quarter and continuing into the Second Quarter of 2025, the Receiver agreed that the issues should be fixed and hired the appropriate professionals to begin making these repairs. On May 31, 2025, an

inspector conducted an inspection on the Amerigold Suites. The inspector later reported that there are no serious life safety issues on the property.

Additionally, in 2025 a retaining wall contractor demolished and rebuilt a portion of the retaining wall that was in disrepair, and the certain other repairs were made to the decking on the property.

On April 1, 2026, there was a break in at the Amerigold Suites offices, resulting in the theft of $2,200 in rent deposits. A police report was filed and detectives took fingerprints of the office area. As of the date of this Report, the Receiver is still awaiting the results of the ensuing investigation.

During the First and Second Quarter of 2026, a tenant at Amerigold Suites stopped paying rent and began inviting homeless persons into her unit. The Amerigold property manager successfully evicted the tenant in justice court; however, the tenant appealed to the County Court at Law. During the Second Quarter, the Receiver's counsel successfully achieved the tenant's eviction after trial in the County Court at law.

Barton filed a lis pendens against the Amerigold Suites on July 31, 2024. The Receiver's Verified and Emergency Motion to Declare Lis Pendens Void [Dkt. 741], which was filed on June 3, 2026, included a request that the Amerigold Suites lis pendens be declared void as well. On June 9, 2026, the Court entered an Order [Dkt. 755] declaring the lis pendens void.

The debt on the Amerigold Suites remains significant. Given the Lender Order, the Receiver is optimistic he will be able to reach a workable solution with the property's lender prior to his next Report. During the Second Quarter of 2026, the Receiver's brokers once again re-listed the Amerigold Suites for sale. Separate and apart from any agreement between the lenders and the Receiver, even if the Receiver were able to find another purchaser for $4,800,000, after

payment of the principal balance of the existing loan ($2,481,098.27),[17] interest at the standard rate (approximately $674,786.64 as of June 30, 2026),[18] broker commissions (approximately $190,000), and closing costs, the Receiver would anticipate net proceeds flowing into the Receivership Estate of approximately $1.5 million from a sale on similar terms to the Second Amerigold Purchaser. Notably, the continued appellate delays resulting from Barton's interlocutory appeal of the original March 29, 2023, sale order has already cost the Receivership roughly $518,756.30 in standard, non-default interest through June 30, 2026, and $700,000 in reduction in value (a total of $1,218,756.30). The Receiver estimates that interest continues to accrue on this property at a rate of $17,094.38 per month (and $205,132.52 per year).

### 6. Venus Development

Prior to the Receiver's appointment, several Initial Receivership Entities were in the process of developing single-family communities around Venus, Texas and were negotiating a development agreement with the City of Venus. The properties included in this potential development, including the Initial Receivership Entity that currently owns the properties, are detailed below:[19]

| Project Name | Current Owner | Approximate Address | CAD Geographic ID | Acres |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00050 | 1 |
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00051 | 110.9 |

[17] The Amerigold lender claims that the principal balance of the loan is $2,509,031.68.

[18] In addition to principal and non-default interest, the lender claims that as of April 17, 2026, default interest of $717,843.46, late fees of $1,000, an insurance advance of $139.45, and legal fees totaling $222,568.85 have also accrued.

[19] Wall Investor Funds have been traced into each of the Venus properties outlined herein, and accordingly the Venus Properties are Receivership Assets. *See* Mem. Op. & Order [Dkt. 416] at 12-13 & nn.54-57, 66.

| | | | | |
|---|---|---|---|---|
| Northstar | DJD Land Partners, LLC | 11417 CR 501, Venus, TX | 126.0857.00052 | 14.25 |
| Northstar | DJD Land Partners, LLC | 1025 N FM 157, Venus, TX | 126.0857.00030 | 1 |
| Northstar | Lynco Ventures, LLC | 1209 Cr 501, Venus, TX | 126.0358.00070 | 62.8 |
| Northstar | Lynco Ventures, LLC | 11209 Cr 501, Venus TX | 126.0358.00060 | 1 |
| Griffin I | LDG001, LLC | 980 CR 110, Venus, TX | 126.0093.00010 | 150.9 |
| Griffin II | LDG001, LLC | 324 W CR 109, Venus, TX | 126.0758.00100 | 46.9 |
| Griffin House | LDG001, LLC | 940 CR 110 Venus, TX | 126.0093.00009 | 1 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00044 | 17.6 |
| Berkowitz | Carnegie Development, LLC | 10901 CR 507, Venus, TX | 126.0261.00039 | 86.9 |
| Berkowitz | Carnegie Development, LLC | 11129 CR 506, Venus, TX | 126.0261.00040 | 1 |
| Berkowitz | Carnegie Development, LLC | 11101 CR 506, Venus, TX | 126.0261.00041 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00042 | 30 |
| Berkowitz | Carnegie Development, LLC | 11129 N FM 157, Venus, TX | 126.0261.00043 | 30 |
| Johnston | Venus 59, LLC | 916 S Fm 157, Venus, TX | 126.0379.00110 | 3.4 |
| Johnston | Venus 59, LLC | 817 CR 214, Venus, TX | 126.0379.00040 | 59 |

At the time of the Receiver's appointment in October 2022, foreclosure proceedings initiated by secured lenders were in process regarding many of these properties. Those proceedings were automatically stayed upon entry of the Receivership Order, although the Receiver and his team had to expend effort to avoid scheduled foreclosure sales since not all lenders were aware of the stay included in the Receivership Order or even entry of the Receivership Order. Through the date of this Report, lenders on many of these properties have continued to threaten (and some have actually filed) motions to intervene and lift the stay of enforcement to permit them to initiate foreclosure proceedings.[20] For example, during the Second Quarter of 2024, lender Southern Star filed a renewed motion to lift stay [Dkt. 499]. The Court denied [Dkt. 551] Southern Star's motion on August 14, 2024. Moreover, non-party D. Crow continues to challenge the Receiver's ownership of Receivership Entity Venus 59, LLC, with his most recent motions being denied during the First Quarter of 2025.

On April 27, 2026, a local utility provider filed an Emergency Motion to Lift Litigation Stay [Dkt. 725], asking the court to lift stay to allow it to condemn certain Receivership Property in Venus. The Receiver filed a Response [Dkt. 732] in opposition on May 18, 2026. As of the date of this report, the filing remains pending.

Throughout 2023 and early 2024, the Receiver continued discussing the Venus Project with the representatives from the City of Venus, lenders and secured creditors, multiple developers who are potentially interested in developing the project, other potential interested purchasers of the land, and experts who have provided advice and opinions relating to the development. If the development agreements with the City are finalized, the value of the properties could increase

[20] Another property (Venus Farms) was intended to be included in the development, but closing on the property never occurred.

significantly. During 2023 and 2024, the Receiver met with multiple industry professionals who were willing to examine the feasibility of the Venus Project. While these individuals were willing to examine the development out of courtesy to the Receiver and without a fee, none of these individuals was willing to be engaged by the Receiver because of Defendant Barton's litigious history before and during this Receivership.

During the First Quarter of 2024, the Receiver retained a consulting expert to advise him on the highest and best use of the properties included in the Venus Project, as well as the feasibility of Barton's proposed development of the Venus Project. The details of this consulting expert's work will be shared at a later date. At this time, the Receiver still cannot determine if he will be able to recover any value for the Receivership Estate from the Venus Development or, if any net recoverable value exists, what that value will ultimately be. At a minimum, however, over $5.6 million in interest has accrued on these properties since the Receiver's appointment. In light of the Fifth Circuit's mandate and the Supreme Court's recent denial of the Cert. Petition, the Receiver continues to analyze next steps for moving forward with a sale of the Venus Properties.

The debt on the Venus Properties remains significant. Given the Lender Order, the Receiver is optimistic he will be able to reach a workable solution with the properties' lenders prior to his next Report. Separate and apart from any agreement between the lenders and the Receiver, the Receiver estimates that interest continues to accrue on these properties at a rate of $157,484.34 per month (and $1,889,812.10 per year).

**7. Ridgeview Addition**

Receivership Entity Ridgeview Addition, LLC owns approximately 54 platted lots near Bulldog Road in Venus, Texas (the "Ridgeview Property"). Wall Investor Funds have been traced into the Ridgeview Property, and accordingly the Ridgeview Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13 & n. 59.

APP 107

On or around July 2021, Ridgeview Addition LLC entered into a Lot Take-Down Contract whereby it agreed to sell 54 developed lots to an affiliate of Lillian Homes at a price of $61,000 per lot (for a total purchase price of $3,294,000). The contract did not require conveyance of all lots at one time; rather twelve lots would be conveyed at closing, an additional twelve lots would be conveyed 120 days later, and three successive transfers of ten lots each would occur at 90-day intervals thereafter. All told, the contract contemplated that the take-down of the lots will occur over a thirteen-month period.

The Receiver is aware of one loan on Ridgeview Addition (to a separate SPC-related entity) and a second loan burdening the property, which is cross-collateralized (to a separate SPC-related entity). Collectively, these loans exceed the value of the property. Moreover, the Receiver has discovered significant additional liens burdening the property that would require release or satisfaction prior to closing the Lot Take-Down Contract or other transfer of the lots. And finally, the City of Venus insists that Defendant Barton agreed to construct a playground at the development as part of a platting promise, but the playground has not yet been constructed. Thus, despite Defendant Barton's prior claim [Dkt. 56] that the sale of this property will bring in "approximately $265,000 in immediate cash equity" into the Receivership, significant challenges and uncertainties render predicting the net recovery, if any, based on the Lot Take-Down Contract impossible.

**8. Gillespie Property**

Receivership Entity Gillespie Villas, LLC owns a residential/multi-family property located at 3600 Gillespie Dr. in Dallas, Texas (the "Gillespie Property"). On December 13, 2022, the Court entered its Second Supplemental Order, which, among other things, confirmed that Gillespie Villas LLC is a Receivership Entity. Wall Investor Funds have been traced into the Gillespie Property, and accordingly the Gillespie Property is a Receivership Asset. *See* Mem. Op. & Order

[Dkt. 416] at 13-14 & n.64. Max Barton's appeal of the Second Supplemental Order has been dismissed as moot in light of the Second Receivership Order.

During the First and Second Quarters of 2026, multiple neighbors contacted the Receiver about individuals feeding racoons and cats at the Gillespie Property despite signs explicitly warning individuals not to do so. As will be detailed in an upcoming Quarterly Report, in July 2026, the Receiver contracted with a pest control company to remove the raccoons from the Gillespie property and to secure the crawl space.

The Receiver has secured the necessary appraisals and opinions of value on the Gillespie Property, which on average value the property at approximately $1,100,000. The property remains in poor physical condition and without extensive repairs, is unrentable.

The debt on the Gillespie Property remains significant. Given the Lender Order, the Receiver is optimistic he will be able to reach a workable solution with the property's lender prior to his next Report. The Gillespie Property is subject to a single promissory note, with a principal balance of $550,000 and an interest rate of 18%. Separate and apart from any agreement between the lender and the Receiver, the Receiver estimates that interest continues to accrue on this property at a rate of approximately $16,059.42 per month (and $192,713.03 per year).

**9. Hall Property**

Receivership Entity TC Hall, LLC owns approximately 0.5 acres of raw land located at 3407 & 3409 Hall Street in Dallas, Texas (the "Hall Property"). The Court's December 13, 2022, Second Supplemental Order clarified that TC Hall, LLC is a Receivership Entity controlled by Defendant Barton. Wall Investor Funds have been traced into the Hall Property, and accordingly the Hall Property is a Receivership Asset. *See* Mem. Op. & Order [Dkt. 416] at 13-14 & n.65. Once again, Max Barton's appeal of the Second Supplemental Order was dismissed as moot in light of the Second Receivership Order.

Substantial debt exists on this property, in the form of a variable-rate loan from Louisiana National Bank. During the Second Quarter of 2023, the Receiver's brokers listed the Hall Property for sale at a price of $6 million. In light of the Fifth Circuit's opinion, the Receiver's efforts to sell this property were paused until after the District Court entered the Second Receivership Order.

After the Second Receivership Order was entered, the Receiver's brokers redoubled their efforts in earnest. The brokers obtained multiple offers on the Property, the highest of which was a letter of intent submitted by Glacier Development Partners, LLC (the "Hall Purchaser") at a purchase price of $6,000,000.

The Receiver and the Hall Purchaser engaged in negotiations regarding a purchase and sale agreement for the Property, and on May 30, 2024, the Receiver and the Buyer entered into a Purchase and Sale Agreement (the "Hall Contract"), pursuant to which the Receiver agreed, subject to Court approval, to sell the Property to the Hall Purchaser for $6,000,000.

In connection with the sale and pursuant to 28 U.S.C. § 2001, the Receiver obtained three independent appraisals of the Hall Property. One is an informal broker opinion of value, and two are certified appraisals (collectively, the "Appraisals"). The three Appraisals valued the Property at $5,300,000, $4,780,000, and $4,487,800–$6,170,725, resulting in an average appraised value of $5,136,421.[21] Thus, the contracted sales price, $6,000,000, not only greatly exceeded two-thirds of the average appraised value of the Property ($3.4 million) as required by 28 U.S.C. § 2001, but also exceeds the average appraised value by almost $1 million.

On June 5, 2024, the Receiver filed his Verified Motion for Appointment of Appraisers, Approval of Appraisals, Approval Hearing, and Approval of Sale of Hall Street Property [Dkt. 502] (the "Hall Sale Motion"). Barton objected to the sale [Dkt. 517]. On July 23, 2024,

[21] The averaged appraised value was calculated using the average of the WDIS Broker Opinion of Value, $5,200,00.

APP 110

the Court held a hearing on the Hall Sale Motion, and, on July 25, 2024, entered an Order approving the sale [Dkt. 538] (the "Hall Sale Order"). On August 21, 2024, Barton filed an interlocutory appeal [Dkt. 554] of the Hall Sale Order. Case No. 24-10788. On March 25, 2026, the Fifth Circuit affirmed the Hall Sale Order. On May 11, 2026, Barton filed a petition for rehearing, which was denied on May 22, 2026. The Fifth Circuit's mandate issued on May 29, 2026.

The debt on the Hall Property remains significant. Given the Lender Order, the Receiver is optimistic he will be able to reach a workable solution with the property's lender prior to his next Report and closing. Separate and apart from any agreement between the lender and the Receiver, after payment of the principal balance of the existing loan ($4,063,000.00),[22] interest at the standard rate (approximately $1,220,438.37 as of April 16, 2026, according to the lender),[23] broker commissions (approximately $180,000), property taxes (currently totaling over $275,000), and closing costs, the Receiver anticipates net proceeds flowing into the Receivership Estate of approximately $200,000. The Receiver estimates that interest continues to accrue on this property at a rate of $42,573.82 per month (and $510,885.79 per year).

**10. Other Potential Real Estate Assets**

As outlined in the Receiver's original Motion to Compel (which was filed in January 2023 and granted during the Second Quarter of 2023), Defendant Barton still has not provided the overwhelming majority of the information required by the Initial Receivership Order, including a list of properties owned by the Receivership Entities. The Second Receivership Order contained the same requirements, and while Barton sought [Dkt. 424] and received [Dkt. 427] an extension

[22] The Hall lender claims that the principal balance of the loan is $4,091,622.40.

[23] In addition to principal and non-default interest, the lender claims that as of April 17, 2026, legal fees of $32,301.34 have also accrued.

of his deadline to comply with these requirements (including a list of assets), he did not provide any information before the deadline and still has not provided the requested information as of the date of this Report. While the Receiver has endeavored to identify separately all properties owned by the Receivership Entities, the Receiver has reason to believe other properties that received or benefitted from Wall Investor Funds and that are owned, either directly or indirectly, by Defendant Barton exist. The Receiver's investigation is ongoing.

**C. Other Identified Assets of the Receivership.**

Although still subject to his on-going investigation, the Receiver believes the following assets may be additional sources of recovery for the Receivership:

Artwork and other Contents of Turtle Creek Office. As outlined in prior Quarterly Reports, the Artwork and other Contents of the Turtle Creek Office were previously sold and/or otherwise disposed of.

Artwork at Rock Creek Property. As discussed in the Initial Report, upon securing possession of the Rock Creek Property, the Receiver noticed several holes in the wall confirming, as he had been told, that artwork had been removed prior to his visit to the residence. Despite multiple oral and written requests, for several weeks, Defendant Barton provided no list of artwork. However, on November 15, Defendant Barton disclosed, perhaps inadvertently, pictures of some of the artwork that had been removed. *See* Dkt. 58 at 29, 30, 33, 35. Additionally, the Receiver located financial statements indicating that Barton believed the Receivership Entities owned artwork worth approximately $12 million. In January 2023, the Receiver filed a Motion to Compel [Dkt. 133] Barton to disclose this and other information in accordance with the Receivership Order. Barton has claimed that very little artwork was in either the Rock Creek Property or the Turtle Creek Property. *See* Dkt. 160-1 at 23. Without additional information regarding these pieces of art and their current location, it is impossible to ascertain the value of any such art.

Contents of Rock Creek Property. In connection with approving the sale of the Rock Creek Property, the Court ordered that the Receiver move and store personal items belonging to Defendant Barton "before the Property is sold." Because closing had yet to occur pending Barton's appeal of the sale order, the contents of the Rock Creek Property remained on site for over a year. Because the Receiver determined that storage expenses would quickly erode the limited recoverable value, during the First Quarter of 2024, the Receiver allowed Barton to use the Receiver's selected mover to remove the vast majority of the contents of the Rock Creek Property. During the Second Quarter of 2024, the Receiver returned the unused portion of Barton's prepaid moving expenses. In July 2026, the Receiver returned the washer and dryer that were housed at the Rock Creek property.[24]

Vehicles. The Receiver has identified multiple vehicles that may have been purchased in whole or in part with Receivership Assets. The Receiver is still determining what ownership interest the Receivership Entities have in these vehicles.

Airplane. Receivership Entity JMJAV, LLC was the registered owner of a 1982 Learjet 55 located in Arlington, Texas. The Receiver learned that Third Coast Bank, SSB held an approximately $350,000 note on the plane, and Elite Jet Solutions, LLC holds a $143,576.63 mechanic's lien. The Receiver was informed that the aircraft has been parked at Elite Jet Solutions since 2019. Elite Jet Solutions estimates the plane needs approximately $355,000 in parts and repairs to make it airworthy.

The Receiver estimated the plane was worth approximately $65,000 in its condition, and if taken apart and selectively sold for parts, it could be worth as much as $200,000. If the plane was

[24] Although Barton never demonstrated that he paid for the washer and dryer with personal funds (instead of Receivership Entity funds), the Receiver determined that it was cost-prohibitive to do a forensic analysis of the details and source of funds surrounding the purchase of the washer and dryer.

operational, third-parties informed the Receiver it may be worth approximately $900,000 - $1 million.

During the Fourth Quarter of 2024, the Receiver obtained a professional appraisal of the airplane, which assessed the value of the plane at $100,000. During the end of 2024 through early 2025, the Receiver negotiated with Third Coast Bank and Elite Jet to reach a resolution to the issues with the airplane. Third Coast Bank eventually agreed to release its claim to the airplane (though it retained the right to file a claim through the eventual claims process) and Elite Jet then agreed pay $20,000 to the Receivership Estate in exchange for the Receiver agreeing to dismiss the lawsuit filed by JMJAV and turn the airplane over to Elite Jet to sell for parts to satisfy its mechanic's lien. Both Third Coast Bank and Elite Jet entered into separate settlement agreements with the Receiver and JMJAV, LLC. To prevent Elite Jet from receiving a windfall, the settlement agreement provided that if Elite Jet was able to sell the airplane parts for more than its mechanic's lien plus its verifiable expenses, then Elite Jet would split any surplus funds equally with the Receivership Estate.

First Development Escrow Settlement. Before the Receiver's appointment, Receivership Entity Titan Investments, LLC contracted to purchase 16.3 acres of real property in Grayson County, Texas from First Development Company of Ohio, LLC ("FDCO"). Pursuant to the contract, Titan deposited $105,000 into escrow, consisting of $55,000 in earnest money and an additional $50,000 in option payments. However, Titan terminated the purchase contract shortly before the Receiver's appointment, and the escrowed funds were trapped in escrow due to the Receivership Order's stay. Upon investigating the source of the escrowed funds, the Receiver determined that some of the funds were investor funds or the proceeds of investor funds. The Receiver also recognized that litigating to recover all of these funds would be expensive and

recovery would be uncertain. Although the purchase contract provided that the escrowed funds were nonrefundable, the Receiver and FDCO determined that splitting the escrow funds would be in the best interest of both parties. Accordingly, the Receiver and FDCO entered into a settlement agreement to equally split the escrowed funds in exchange for the Receiver's agreement to settle all claims against FDCO related to the funds and the property.

Motion to Ratify. On April 25, 2025, the Receiver filed his Motion to Ratify the Elite Jet and FDCO Settlement Agreements [Dkt. 633], which counsel for Barton later confirmed was unopposed. On May 14, 2025, the Court entered an order ratifying the Receiver's Settlement Agreements with Elite Jet and FDCO [Dkt. 639]. Pursuant to the settlement agreement, the title company holding Titan's escrowed funds released $52,500 on February 26, 2025, to both FDCO and the Receivership Estate. Similarly, Elite Jet satisfied its obligation under the settlement agreement by causing $20,000 to be wired to the Receivership estate on July 17, 2025.

Participation Interests. During the twelve months prior to the appointment of the Receiver (or longer in some instances), Receivership Entities AVG West, LLC, Orchard Farms Village, LLC, Mansions Apartment Homes at Marine Creek, LLC, D4KL, LLC, and 126 Villita, LLC (or their affiliates) sold properties in Fort Worth, Killeen, San Antonio, and Winter Haven, Florida. In connection with these sales, the Receivership Entities often (though not always) received millions of dollars in sale proceeds, while also retaining a participation interest in the projects moving forward.

For example, the following funds were among those paid to Receivership Entities surrounding the sales of developments at Marine Creek, Orchard Farms, and Winter Haven:

- $800,000 on March 14, 2022, to Mansions Apartment Homes at Marine Creek, LLC

APP 115

- $500,000 on March 14, 2022, to Orchard Farms Village, LLC
- $200,000 on May 6, 2022, to Mansions Apartment Homes at Marine Creek, LLC
- $2,000,000 on May 9, 2022, to AVG West, LLC (Winter Haven)

Although the Receiver's accountants still have not completed their forensic accounting, it appears that the majority of the above-described funds flowed into a bank account held at Texas Brand Bank in the name of Receivership Entity Broadview Holdings LLC.[25]

Certain Receivership Entities maintained participation interests of varying percentages with regard to some but not all of the above-referenced property sales (e.g., the Receiver does not believe a participation agreement exists for AVG West, LLC). The Receiver is still investigating and analyzing potential value of participation interests related to the Killeen and San Antonio properties. While it is impossible to predict the value these contractual interests may ultimately generate for the Receivership Estate, the Receiver is optimistic that some value will be realized.

Ratification of DLP Settlement. The Receiver's settlement with DLP and the Court's ratification of the settlement agreement are detailed in prior Quarterly Status Reports. During the Second Quarter of 2026, Magistrate Judge Rutherford held a hearing on DLP and Tamamoi's Motions to Declare Lis Pendens void. On June 23, 2026, Magistrate Judge Rutherford entered her Findings, Conclusions, and Recommendations [Dkt. Nos. 774 and 775], which found that the Court should indeed declare the lis pendens void.

Walker Ranch. As detailed in prior reports, the Receiver previously engaged in extensive negotiations with Byron Walker regarding the return of certain fraudulent transfers. The Receiver

[25] A bank statement from September 2022 indicates that over $100,000 in Receivership Entity funds were transferred from the Broadview Holdings Account to Defendant Barton's law firms.

remains optimistic that he and Walker will be able to reach agreement, but is waiting on completion of the forensic accounting to conclude any such settlement.

**D. Status of Forensic Accounting and Other Work Performed by Accountants**

Although the Receiver assumed possession of all documents and computers belonging to the Receivership Entities housed in the Turtle Creek Office on the first day of the Receivership, completion of the forensic accounting has been delayed for a variety of reasons, including (1) Barton's refusal to assist in identifying the location of or responsible persons for the Receivership Entities' QuickBooks accounts; (2) Intuit's delays in providing access to the Receivership Entities' online QuickBooks accounts, which were finally made available during the Second Quarter of 2023; (3) the Receivership Entities' banks providing bank statements and debit and credit information inconsistently and slowly; (4) the general lack of operating cash during the first months of the Receivership; (5) a temporary change in focus for the forensic accounting during the Summer and Fall of 2023 from its primary focus—determining potential fraudulent transferees and identifying each Wall Investor and the size of their investment(s)—to a focus, in light of the Fifth Circuit's *Barton I* opinion, on finding tracing examples where Wall Investor Funds eventually flowed into the various assets described above; and (6) the Receiver's continued non-payment of his accountants and lawyers for time incurred since April 1, 2024.

The Receiver's counsel has retained Ahuja & Clark to prepare the forensic accounting, which when complete should enable tracing (1) the amount of funds flowing from each Wall-entity investor into other Receivership Entities and (2) potentially, the use of those investor funds (*i.e.*, whether they were saved, spent, or transferred to someone else). As discussed in prior reports, however, the accountants have observed *extensive* comingling between various Receivership Entity funds and accounts, thereby complicating the process exponentially. This forensic accounting is of paramount importance to the Receiver's duties in analyzing claims received from

APP 117

investors, identifying potential targets of fraudulent transfer claims, and determining the amounts owing to the Receivership on account of such claims. It is also of particular importance in performing any sort of tracing analysis into the various Receivership Entities and assets. During the Second Quarter of 2026, the Receiver's accountants continued their work on the forensic accounting (albeit in a very limited fashion). As of the date of this Report, the forensic accounting is still ongoing.

The Receiver remains hopeful that the online QuickBooks accounts, as well as certain Enterprise versions of QuickBooks, will enable his accounting team to avoid some of the time and expense associated with manually entering transactions from bank statements. However, as the Receiver's accountants slowly gained access to the Receivership Entities' various QuickBooks accounts, they determined that the most accurate means of confirming the data in QuickBooks was electronically scanning bank records and comparing them against any QuickBooks accounts that have been located.

Separately, during the Second Quarter of 2026, the Receiver's Accountants continued to prepare various federal and state tax filings and forms associated with the Receivership.

**E. Show Cause Motion and Agreed Injunction**

As detailed in various parts of this Report, and as articulated more fully in the Receiver's Motion for "Show Cause" Hearing, Sanctions, Injunctive Relief, and Brief in Support [Dkt. 558] (the "Show Cause Motion"), from virtually the outset of this Receivership, Barton has engaged in a pattern of conduct that is detrimental to the Receiver's fulfillment of his duties and has negatively impacted the value of the assets in the Receivership Estate. This conduct has included, among other things:

- In February 2024, the Receiver learned that Barton visited the Amerigold Suites, owned by Receivership Entity Goldmark Hospitality, LLC. During the visit, Barton

APP 118

sought out the property manager, boasting that he had thwarted the earlier sale of that property and questioning her about the operation of the property—a flagrant violation of ¶ 32 of the Receivership Order. The Receiver provided written notice to Barton's counsel that Barton is "expressly prohibited from setting foot on any property owned by a Receivership Entity, contacting any person or entity employed by or contracted to a Receivership Entity regarding any such Receivership Property, (including loans, sales or transactions related to such Properties) or from interfering with the duties of anyone employed by a Receivership Entity." The Receiver requested confirmation that these instructions had been communicated to Barton. No response was provided. This prompted the Receiver to file a Notice of Non-Compliance and Continuing Interference [Dkt. 478].

- On July 12, 2024, the Receiver was informed that Barton had contacted the respective buyers for the Amerigold Suites Property and Hall Street Property, ostensibly to sow doubt about the Receiver's ability to sell the properties prior to the July 23 hearing or the Receiver's motions to approve those sales. Moreover, the Receiver learned on July 16, 2024, that Barton also contacted the broker who previously listed the Rock Creek property for sale, again in violation of the Receivership Order, requesting documents related to the proposed sale of that property, purportedly because he had "lost" his copies. This interference prompted the Receiver to file his Notice of Continued Interference with the Receiver's Management of Receivership Property [Dkt. 530].
- In response to the Receiver's Notice of Continued Interference, during a hearing held on July 23, 2024, to approve the sale of the Amerigold Suites and Hall Street

Property, the Court read into the record portions of the Receivership Order prohibiting interference with the Receiver and specifically directed Barton to not contact buyers contracted to purchase Receivership Property and to cease interfering with the Receiver. However, on August 19, 2024—less than a month after the Court's admonition about interfering—the Receiver learned that Barton had recently left a voicemail for the buyer of the Frisco Gate Property asking the buyer to call him back. Around the same time Barton also contacted the Frisco Gate buyer's broker (who also previously assisted Barton in marketing the property), inquiring if the deal was moving forward or if the contract was abandoned.

- On the same day, the buyer of the Hall Street property notified the Receiver that Barton is telling industry participants that he is exonerated and will regain his properties by the end of the year.
- These revelations came on the heels of the buyer for the Amerigold Suites notifying the Receiver that it was terminating its contract to purchase the Amerigold Suites because Barton had contacted that buyer and advised he would soon resume possession and control over the property and the Receiver would not be able to close on the approved sale. The buyer also advised that after reviewing additional information about Barton, it was deeply concerned about being sued by him after the sale closed.[26]

[26] Barton's interference, while brazen, is not new. Barton's history of interference with the Receiver's duties started almost immediately upon the Receiver's appointment under the Initial Receivership Order. In November 2022, Barton contacted the owner of the UPS mail store where mail for most of the Receivership Entities is delivered and demanded that the UPS store close those mail accounts and divert them to another address. Shortly thereafter, Barton also contacted Greystone, the lender on the D4 HUD apartment complexes, in December of 2022 attempting to set up a meeting with Greystone to discuss the HUD loans.

Because of Barton's continued interference with the Receiver's possession and control over the Receivership Properties (and sale orders involving same), on August 23, 2024, the Receiver filed the Show Cause Motion, seeking an injunction that would prohibit Barton's continued interference with contracted or interested buyers of Receivership Properties, their brokers, lenders, or lawyers, and any person associated with managing or operating any Receivership Assets. After negotiations lasting several weeks, the Receiver and Barton eventually reached agreement regarding the language of an Agreed Injunction (obviating the need for a Show Cause hearing). The Court entered the Agreed Injunction [Dkt. 580-1] on October 10, 2024. Among other things, the injunction prohibits Barton from:

(1) Communicating about the Receivership with a "Contracted Purchaser," a "Negotiating Purchaser," an "Identified Potential Purchaser" and the broker, attorney, employee, or agent of any Contracted Purchaser, Negotiating Purchaser, or Identified Potential Purchaser.

(2) Disrupting, hindering, terminating, delaying, or interfering with the Receiver's or his agents and broker's efforts to (a) locate buyers interested in purchasing Receivership Properties; (b) contract for the sale of any Receivership Property; or (c) close an approved sale.

(3) Communicating, directly or indirectly, with any person or entity whom Barton knows, has notice or reason to believe is employed by, contracted to, or actively involved in managing, operating, supervising, or assisting in the management, care, or supervision of any Receivership Asset.

(4) Without seeking and obtaining leave of Court, commencing or participating, directly or indirectly, in any lawsuit against any buyer, prospective buyer, managers, or brokers, person or entity, related to any Receivership Asset or the management of any Receivership Asset.

### F. Other Second Quarter 2026 Activities of the Receiver

Between April 1, 2026, and June 30, 2026, the Receiver and his attorneys also engaged in the following:

Maintenance of Receivership Website. During the Second Quarter of 2026, the Receiver maintained www.bartonreceivership.com (the "Receivership Website"). The Receivership

Website enables the Receiver to quickly, inexpensively, and broadly convey information regarding the Receivership, particularly to potentially impacted investors who live overseas. The Receiver continues to update the Receivership Website periodically as the Receivership progresses. The Receiver will post a copy of this Report on the Website and intends to continue posting periodic updates, information and links to any potential sales or auctions of real estate or other property.

Freeze Letters and Requests for Information. The Receiver and his attorneys continued to send freeze letters and requests for information to banks, creditors, and others as they became aware of additional persons who conducted business with the Receivership Entities.

Mail. The Receiver and his team have continued to review the substantial amount of mail received by the Receivership Entities, both at a UPS Store and from other forwarded addresses.

Privilege Review. As detailed in prior Quarterly Reports, the Court previously entered a privilege protocol related to documents seized from the Turtle Creek Office [Dkt. 235]. In prior Quarters, a member of the Receiver's team who has not previously and is not currently working on any other task associated with the Receivership, continued reviewing paper documents stored at the Receivership's storage units, pulled potentially privileged documents, and continued creating a log of such documents.

Communications with the IRS. During the Second Quarter of 2026, the Receiver and his team also continued to correspond with the IRS regarding certain penalties related to Barton's failure to file tax returns for tax years 2020, 2021, and 2022. The Receiver and his team are in ongoing discussions with the IRS regarding these penalties; however, communications have been difficult and time-consuming, and to-date, limited progress has been made.

Other Miscellaneous Activities. Among other things, the Receiver and his team have also continued (1) securing access to the Receivership Entities' bank records, (2) communicating with

interested parties, potential purchasers of assets, litigation counter-parties, former employees, attorneys, creditors, and others and (3) identifying potential third-party claims and other sources of recovery.

## II. AMOUNT OF CASH ON HAND AND ACCRUED ADMINISTRATIVE EXPENSES, INCLUDING SECOND QUARTER RECEIPTS AND DISBURSEMENTS

During the initial 30 days of the Receivership, the Receiver opened bank accounts for the Receivership Estate at Veritex Bank in order to administer the receipt and disposition of monies in the Receivership. Additionally, because of the continued operations of the Amerigold Suites, the Receiver also maintained separate accounts for Goldmark Hospitality at Veritex Bank.[27] During the First Quarter of 2026, the Receivership accounts transitioned to Huntington Bank.

As reflected more fully in the schedule of the Receiver's receipts and disbursements that is attached hereto as Exhibit A,[28] during the Second Quarter of 2026, the Receiver deposited $65,505.36 into the main Receivership Account (including earned interest) and also received rental income from the Amerigold Suites totaling $180,536.17. Total expenses during the Second Quarter of 2026 were $130,837.20.

As of the end of the Second Quarter of 2026, the balance held in the receivership bank accounts is $ 1,359,539.51;[29] however, substantial amounts of accrued-but-unpaid property taxes

[27] During the Fourth Quarter of 2023, the Receiver moved the Amerigold Suites accounts from Vista Bank to Veritex Bank at Vista's insistence.

[28] Included in Exhibit A are (1) the Standardized Fund Accounting Report ("SFAR") required by the Court, (2) an itemized list of receipts and disbursements to date in the Receivership accounts at Huntington Bank, (3) an itemized list of receipts and disbursements to date in the Amerigold Suites accounts; and (4) an itemized list of receipt and disbursements to date in the D4OP LLC account.

[29] Of the total deposits into the main Receivership bank account, $60,000 are funds related to the Walker Ranch transaction discussed above, and $400,192.49 related to funds held in the name of D4OP LLC that are currently unavailable to the other Receivership Entities.

and other administrative expenses (including Receiver, counsel, and accountants' fees since April 1, 2024) continue to hamper the Receivership.

As of June 30, 2026, other than the outstanding property taxes referenced above, the only accrued and unpaid administrative expenses are fees and expenses incurred by the Receiver and his professionals for work performed during the Second, Third, and Fourth Quarters of 2024, the First, Second, Third, and Fourth Quarters of 2025, and the First and Second Quarters of 2026. Given the length of time (April 1, 2024, to the present) of the Receiver and his professionals' unpaid fees, combined with the large amount of work that has been required to maintain the receivership, these outstanding liabilities are extensive.

### A. Description of Recoveries from Second Quarter of 2026

#### 1. Deposits into Main Receivership Account

Between April 1, 2026, and June 30, 2026, the Receiver deposited $66,039.71 into the Main Receivership Account, comprised of the following:

Rock Creek Payment. As detailed above, during the Second Quarter of 2026, the Receiver's title company wired $61,836.12 to the Receivership related to the sale of the Rock Creek Property.

Royalty Payment. During the Second Quarter of 2026, BKV Barnett LLC issued a royalty payment in the amount of $528.00 related to Receivership Entity BM318 LLC.

Interest Deposits. During the Second Quarter of 2026, the Receiver received a total of $3,669.24 in interest payments.

#### 2. Deposits into Amerigold Suites Account

Between April 1, 2026, and June 30, 2026, the Amerigold Suites generated $180,052.44 in gross rental income.

#### 3. Deposits into D4OP LLC Account

Between April 1, 2026, and June 30, 2026, the Receiver did not deposit any funds into the D4OP LLC account held at Huntington.

### B. Description of Disbursements from Second Quarter of 2026

#### 1. Disbursements from Main Receivership Account

Between April 1, 2026, and June 30, 2026, the Receivership spent $5,341.68 from the Main Receivership Account, comprised of the following:

Utility Fees. The Receiver paid $25.87 to Dallas Water Utilities[30] related to water and sewage at Gillespie during the Quarter.

Landscaping. During the Second Quarter of 2026, the Receiver paid $2,025.00 to landscapers related to mowing and other work at the Gillespie, Hall, and Frisco Properties.

Insurance. During the Second Quarter of 2026, the Receiver paid $1,872.70 related to insurance for the Rock Creek Property.[31]

IT Expenses. Because of the delays in paying his professionals for time spent on this matter, the Receiver has been forced to incur certain expenses directly. During the Second Quarter of 2026, this included charges related to data hosting (of the Defendants email servers), totaling $1,408.11.

Other Miscellaneous Expenses. During the Second Quarter of 2026, the Receiver also paid $10.00 in miscellaneous bank service fees.

[30] During the Second Quarter of 2026, the City of Dallas switched to an online billing system that resulted in the Gillespie property nor receiving its normal bills for the majority of the Second Quarter. Certain of the Second Quarter invoices were therefore paid in the Third Quarter of 2026.

[31] The Receiver's team inadvertently paid for property insurance for the Amerigold Suites from the Main Receivership account on February 24, 2026 and then again on March 30, 2026. On April 7, 2026, the Receiver transferred a total of $13,880.70 from the Amerigold Suites account to the Main Receivership Account.

### 2. Disbursements from Amerigold Huntington Account

Between April 1, 2026, and June 30, 2026, the Receivership spent $125,546.14 on the Amerigold Suites, comprised of the following:

Payments to Property Manager. During this Quarter, the Receiver paid the property manager at Amerigold a total of $9,798.00.

Maintenance and Cleaning Payments. During this Quarter, the Receiver paid maintenance and cleaning contractors a total of $7,995.00.

Landscaping. During this Quarter, the Receiver paid $7,800.00 in landscaping and tree trimming invoices.

Repair Costs. During this Quarter, the Receiver paid $6,725.00 in repairs to HVAC, flooring, and roofing contractors.

Utility Payments. During this Quarter, the Receiver paid $45,757.88 in utility payments for electricity, water, and internet.

Trash Payments. During this Quarter, the Receiver paid $4,744.08 for trash collection at the property.

Pest Control. During this Quarter, the Receiver paid $1,315.23 relating to pest control at the property.

Insurance Payments. During this Quarter, the Receiver paid $41,287.57 in insurance premium payments. [32]

Bank Fees. During this quarter, the Receiver paid $123.38 in check fees, wire fees, and other miscellaneous bank fees.

[32] Again, the Receiver's team inadvertently paid for property insurance for the Amerigold Suites from the Main Receivership account on February 24, 2026 and then again on March 30, 2026. On April 7, 2026, the Receiver transferred a total of $13,880.70 from the Amerigold Suites account to the Main Receivership Account.

## III.
## DEVELOPMENT OF CLAIMS HELD BY RECEIVERSHIP ESTATE AND OTHER PENDING LITIGATION

The Receiver continues to investigate potential claims against third parties and the likelihood of success of such claims. On March 1, 2024, the Receiver filed his Motion for Leave to File Complaints against Third Parties [Dkt. 472]. The Court granted the motion [Dkt. 488]. Based upon his ongoing forensic accounting, the Receiver has determined that he has valid fraudulent conveyance claims against several transferees. A summary of the lawsuits and developments from the Second Quarter of 2026 are discussed below:

### A. Thomas v. Walji, et al., No. 3:24-cv-512-X

On March 1, 2024, the Receiver filed a Complaint in federal court against several attorneys who received significant payments from the Receivership Entities before the institution of the Receivership. These attorneys include: Khudabuksh K. Walji, Law Office of K. Walji, Esq., P.C., Justin M. Guenley, Law Office of Justin Guenley PLLC, Joyce W. Lindauer, Joyce W. Lindauer Attorney, PLLC, Randy P. Marx, The Marx Firm, LLC, William V. McMurry individually and d/b/a McMurry Legal, PLLC, McMurray Law, PLLC, McMurry & McMurry, LLP, Steven C. Metzger, Metzger Law PLLC, and Metzger & McDonald, PLLC. The Receiver filed a Motion to Stay or Abate this lawsuit, pending the disposition of the Appeal of the Second Receivership Order, and the requested stay was granted. The case is assigned to United States District Judge Brantley Starr.

*There are no updates from the Second Quarter of 2026; however, the Receiver and his team are actively analyzing next steps and anticipate requesting a lifting of the stay after completion of certain property sales.*

**B. Thomas v. Fu. et al., No. 3:24-cv-612-X**

On March 13, 2024, the Receiver filed a Complaint in federal court against another group of fraudulent transferees who received significant payments from the Receivership Entities before the institution of the Receivership. These transferees include: Haoqiang Fu (a/k/a Michael Fu, "Fu"), PIC Consultant, LLC, Silverland Finance Limited, Stephen T. Wall, Carnegie Homes, LLC, Saskya Bedoya Zuniga, Timothy L. Barton, Victoria L. Barton, V Strategies, LLC, Maximilien E. Barton, Martine G. Barton, Sada Cumber, individually, and dba Plumbrook Global Consulting Company, Murugan Venkatachalam, individually and dba Broward Accountants, Vincap, LLC, and Mark Adams. The Receiver filed a Motion to Stay or Abate this lawsuit, pending the disposition of the Appeal of the Second Receivership Order, and the requested stay was granted. This case is also assigned to United States District Judge Brantley Starr.

*There are no updates from the Second Quarter of 2026; however, the Receiver and his team are actively analyzing next steps and anticipate requesting a lifting of the stay after completion of certain property sales.*

**C. Thomas v. Barton. et al., No. 3:25-cv-946-X**

On March 28, 2025, Barton's ex-wife, Martine, and his two children Maximillien and Victoria, filed a Motion to Lift Stay and Reopen or Alternatively, Motion to Lift Stay and Sever Action in the *Fu* lawsuit referenced above. The Receiver filed a response stating that he was not opposed to the Court severing Martine, Maximillien, and Victoria and allowing that action to proceed. On April 15, 2025, the Court entered an order severing Martine, Maximillien, and Victoria into a separate action styled *Thomas v. Barton*, Cause No. 3:25-cv-00946.

Since filing the lawsuit over a year ago, the Receiver discovered evidence indicating that the Transfers attributed to Martine Barton were instead made to or for the benefit of Tim Barton. More specifically, Martine Barton provided the Receiver a declaration stating that she did not

APP 128

receive any funds or financial benefits from any of the Receivership Entities. The Receiver has also obtained additional financial records that suggest the Transfers reflected in the bank statements attributed to Martine Barton were made to or for the benefit of Tim Barton and one or more of the Receivership Entities (including Goldmark Hospitality) that he controlled. Accordingly, the Receiver dismissed Martine without prejudice from *Thomas v. Barton.*

During the Third Quarter of 2025, counsel for Victoria and Max Barton withdrew from the lawsuit, and they filed pro se answers. The Receiver re-urged his prior motion to stay, and the Court entered a stay on September 19, 2025.

*There are no updates from the Second Quarter of 2026; however, the Receiver and his team are actively analyzing next steps and anticipate requesting a lifting of the stay after completion of certain property sales.*

## IV.
## OTHER PENDING LITIGATION

During the first day of the Receivership, the Receiver and his team interviewed multiple lawyers who officed in the Turtle Creek office who were aware of (and in many respects involved in) dozens of active and closed litigation matters involving the Receivership Entities. As the Fourth Quarter of 2022 progressed, the Receiver and his team became aware of several additional active litigation matters involving the Receivership Entities and began speaking to counsel for counter-parties. These conversations continued throughout 2023, with one additional lawsuit against the Receivership Entities being filed (and stayed upon the Receiver's discovery of the proceeding) during the Fourth Quarter of 2023. Pursuant to ¶¶ 34-36 of the Receivership Order, all civil legal proceedings of any nature involving the Receivership Entities and the Receivership Entities' past or present officers, directors, managers, agents, parent or affiliated entities, are stayed until further order of the Receivership Court.

Included below is a list of the active (but stayed) litigation matters of which the Receiver is currently aware, as well as developments (if any) from the Second Quarter of 2026 (*in italics*). After the Fifth Circuit's *Barton I* opinion was entered on June 28, 2023, the Receiver and his team generally paused efforts to resolve these disputes pending the Court's consideration of a renewed motion for entry of a new Receivership Order. In light of the Court's entrance of the Second Receivership Order (and the Fifth Circuit's affirmance in *Barton II*), the Receiver continues to methodically work through the dozens of pending cases and anticipates making recommendations on each of these cases on a rolling basis in future reports.

### A. Wall-Related Litigation

#### 1. Wall Entity Bankruptcies[33] (Bankr. E.D. Tex.)

On August 19, 2022, the Wall Entities and Seagoville Farms, LLC filed voluntary Chapter 11 bankruptcy petitions in the Eastern District of Texas. Prior to the Receiver's appointment, counsel for the Debtors and the US Trustee's office agreed that the bankruptcy filings should be dismissed. The Receiver has been told by counsel to the Debtors that the purpose of these bankruptcy filings was to identify all investors in the Wall Entities. Assuming this to be the case, these bankruptcy filings are unnecessary because one of the central purposes of the claims process in the Receivership is to identify investors in the Wall Entities. Moreover, it does not appear that there is any monetary value to be gained by proceeding with those cases.

During the Second Quarter of 2025, the Receiver filed a Motion to Lift Stay [Dkt. 648] with the District Court to permit the agreed dismissal of the Wall Entity Bankruptcies. During the Second Quarter of 2026, the Court entered an order granting the Receiver's Motion to Lift Stay

---

[33] These cases are styled In re: *WALL007, LLC*, No. 22-41049; *In re: WALL009, LLC*, No. 22-41113; *In re: WALL011, LLC*, No. 22-41114; *In re: WALL010, LLC*, No. 22-41125; *In re: WALL012, LLC*, No. 22-41135; *In re: WALL016, LLC*, No. 22-41136; *In re: WALL017, LLC*, No. 22-41137; *In re: WALL018, LLC*, No. 22-41176; *In re: WALL019, LLC*, No. 22-41177; *In re: Seagoville Farms, LLC*, No. 22-41181.

APP 130

for the limited purpose of dismissing the Wall Entity Bankruptcies. Barton has since filed a pro se appeal of the Court's order.

In accordance with the District Court's Order, the Receiver filed a motion to dismiss the Wall Entity Bankruptcies. In October 2025, the Bankruptcy Court dismissed the Wall Entity Bankruptcies, Barton moved to vacate the order and reinstate the case, and the Bankruptcy Judge denied Barton's motion on procedural grounds. This matter is now closed.

1. **Sun Yun, Qu Yi, Ma Jinghui, Gao Huaizen v. WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, Platinum Investment Corporation (PIC), JMJ Holdings, LLC, No. DC-20-04575 (44th District Court, Dallas County, Texas)**

Plaintiffs assert they loaned the various Wall Entities a total of $700,000 and claim Defendants defaulted on the loans. The Wall Defendants filed a third-party petition against Haoqiang Fu a/k/a Michael Fu, his spouse, Jin Wang, and Silverland Finance, Ltd, and asserted cross claims against Platinum Investment Corporation. On September 13, 2022, the Wall Defendants filed a notice of their Chapter 11 Bankruptcy.

*No new updates from Second Quarter of 2026.*

2. **Rone Engineering Services, Ltd. v. JMJ Development, LLC, WALL017, LLC, WALL009, LLC, and Seagoville Farms, LLC, No. DC-19-20384 (116th District Court, Dallas County, Texas)**

Rone initiated this lawsuit for breach of contract for unpaid services related to engineering work performed on properties owned by Wall007, Wall009, and Seagoville Farms. Rone asserts the work was contracted by JMJ. Wall007 filed bankruptcy in 2020 and on August 10, 2020, the Court administratively closed the case. The case remains inactive.

*No new updates from Second Quarter of 2026.*

**3. JMJAV, LLC v. Michael Fu, Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, Shirley Qing, and Michele Guo, No. 2020-00720 (281st District Court, Harris County, Texas)**

Plaintiff initiated this lawsuit to recover funds in excess of $1 million paid to defendants based on defendants' allegedly fraudulent representations they were Texas realtors. Defendant Shirley Quing was dismissed, and Plaintiff nonsuited claims against defendants Jin Wang, Lynn Zhou, Tidy Fan, Summer Tian, and Michele Guo. The case has been abated.

*While the case remained abated through the first several quarters of the Receivership, on May 6, 2026, the Court set this case for trial on December 7, 2026. As will detailed in the next quarterly report, during the Third Quarter of 2026, the Receiver once again filed a notice of stay in this case.*

**B. HNGH Bankruptcy Cases (2999 Turtle Creek)**

**1. *2999TC Acquisitions, LLC*, Chap. 11 Bk, No. 3:21-bk-31954 (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)**

Receivership Entity 2999TC Acquisitions borrowed $32.5M from HNGH to acquire property at 2999 Turtle Creek Blvd for the eventual construction of hotel but was unable to repay the loan. Facing a deed in lieu of foreclosure, 2999TC Acquisitions filed chapter 11 bankruptcy.

The Bankruptcy Court held another status conference regarding the Receiver's pending Motion for Final Decree in April 2025.

During the Third Quarter of 2025, the Receiver filed a motion to withdraw the reference related to a motion for entry of final decree. The Bankruptcy Court held a hearing and later issued a report and recommendation that the District Court withdraw the reference, which was subsequently adopted by the District Court, as discussed above. The case is now pending in Case No. 3:25-cv-1949-X.

APP 132

During the First Quarter of 2026, Barton requested a hearing on (i) the Receiver's Motion for Entry of Final Decree Closing Chapter 11 Bankruptcy Case (the "Final Decree Motion") and (ii) Objection of Timothy L. Barton, Party in Interest, to Receiver's Motion for Entry of Final Decree Closing Chapter 11 Case.

*During the Second Quarter of 2026, the Court struck the pending motion for summary judgment. Otherwise, as of the date of this report, this matter (and Barton's request for a hearing) remain pending.*

**2. *2999TC Acquisitions, LLC v. HNGH*, No. 22-03061-swe (United States Bankruptcy Court for the Northern District of Texas, Dallas Division)**

Related to 3:21-bk-31954, Plaintiff filed the adversarial proceeding based on breach of contract and a request for declaratory judgment that they are the rightful owner of the disputed property at 2999 Turtle Creek.

*No new updates from Second Quarter of 2026.*

**3. *2999 Turtle Creek, LLC v. Timothy Lynch Barton*, No. DC-20-12133 (192nd District Court Dallas County, Texas)**

Plaintiff sued Defendant claiming he guaranteed $32.5M loan on 2999 Turtle Creek property and when borrower defaulted, Defendant refused to pay. The parties filed an agreed motion to abate the case based on an order entered in the related bankruptcy case. The court granted an abatement until March 15, 2022. Shortly after March 15, 2022, Defendant filed a motion to dismiss which is still pending.

*No new updates from Second Quarter of 2026.*

**C. Palisades Litigation (2999 Turtle Creek and Frisco Gate Property)**

**1. *In Re: Dallas Real Estate Investors*, No. 21-41488 (US Bk Ct, ND Fort Worth Division)**

**2. *In Re: Dallas Real Estate Investors Palisades TC, LLC, Individually and on behalf of Five Star GM, LLC v. Dallas Real Estate Investors, LLC et al.*, Nos. 21-04061, 21-04073 (United States District Court for the Northern District of Texas, Fort Worth Division)**

Cases 21-04061 and 21-04073 were adversary proceedings that were consolidated in October 2022 under 21-04061. Palisades invested approximately $4M in 2999 Turtle Creek Acquisition through Five Star MM, and approximately $3.5M in Frisco Gate property through FHC Acquisitions. Palisades alleges the money was a loan intended to be repaid and Defendants defaulted by not repaying. Defendants allege the money was a capital contribution. Parties engaged in settlement talks but could not come to an agreement.

*See discussion of Palisades in context of sale of Frisco Gate Property. No other updates for Second Quarter of 2026.*

**D. Hodges Litigation (2999 Turtle Creek)**

**1. *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLC, JMJ Development, LLC and Timothy Barton*, No. 141-316567-20, (141st District Court Tarrant County, Texas)**

In September 2019, Defendant 2999 TC LP, LLC borrowed $4,000,000 from Plaintiffs in connection with property at 2999 Turtle Creek. Timothy Barton, individually, and JMJ Development, LLC guaranteed the loan. According to Plaintiffs, 2999 TC defaulted, and Plaintiffs accelerated the note. Defendants counterclaimed asserting Plaintiffs slip sheeted the loan documents and changed terms. The Court granted Plaintiff's motion for summary judgment and awarded actual damages of $4.25M, pre and post judgment interest, costs of court, and $111,962

APP 134

in attorney's fees. The Court also entered an order severing claims not covered by the summary judgment. Defendants appealed, and the case is pending in the Court of Appeals.

*No new updates from Second Quarter of 2026.*

**2. *In re 2999TC LP, LLC*, Chap. 11 BK, No. 4:20-BK-43204 (Bankr. N.D. Tex.)**

Related to 141-316567-20. A few months after the related case was filed, 2999 TC, the debtor, filed for Chapter 11 bankruptcy. In September 2022, the bankruptcy trustee filed a motion to dismiss or in the alternative convert to Chapter 7, stating that the debtor was not likely to successfully reorganize. Debtor objected and a hearing on the matter was postponed due to the Receiver's stay.

*No new updates from Second Quarter of 2026.*

**3. *Hodges III, L. Allen, as Independent Executor of the Estate of Leland A. Hodges, Jr., Tejas Group, Ltd., LAH III Family Specific Interests, Ltd., and Blackfoot Interest, Ltd. v. 2999TC LP, LLP, JMJ Development, LLC and Timothy Barton*, No. 141-328490-21 (141st District Court, Tarrant County, Texas)**

Related to 141-316567-20. This case originated when the Court in the related case entered an order severing claims not covered by the Order granting MSJ in the related case. Defendants appealed, and the case is pending in the Court of Appeals.

*No new updates from Second Quarter of 2026.*

**4. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-21-00414-CV (Second Court of Appeals, Fort Worth Division)**

Appeal from 141-328490-21. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-00414 and 02-22-00288. The appeal is pending.

*No new updates from Second Quarter of 2026.*

**5. *JMJ Development, LLC and Tim Barton v. L. Allen Hodges III, et al.*, No. 02-22-00288-CV (Second Court of Appeals, Fort Worth Division)**

Appeal from 141-316567-20. On August 25, 2022, the Court of Appeals granted an order consolidating appeals 02-21-00414 and 02-22-00288. The appeal is pending.

*No new updates from Second Quarter of 2026.*

**E. Kirby Litigation (2999 Turtle Creek)**

**1. *Pamela Kirby v. Timothy L. Barton, John McElwee, JMJ Development, LLC, 2999TC Acquisitions, LLC, 2999TC Founders, LLC, 2999TC JMJ, LLC, 2999TC JMJ GM, LLC, 2999 Five Star GM, LLC, Five Star GM, LLC, Five Star MM, LLC, Five Star TC, LLC*, No. 3:22-cv-01447-M (N.D. Tex.)**

Pursuant to a subscription agreement, in 2019 Ms. Kirby invested $1M with 2999TC Founders, LLC for the purchase and development of 2999 Turtle Creek. She contends her investment was fraudulently induced, that Barton failed to disclose foreclosure proceedings, and misappropriated her funds which were comingled with the Chinese investor funds. She contends she is a victim of the crimes Barton has been charged with and requests a judicial determination of that fact so she can claim a tax credit for her loss. For any distributions, she also seeks treatment as an investor rather than a creditor. The Receiver's counsel has had several lengthy communications with Ms. Kirby's counsel and will continue to seek a fair resolution.

*No new updates from Second Quarter of 2026.*

**2. *In Re: 2999TC Finders, LLC* (Bk.), No. 22-40911 (Bankr. E.D. Tex.)**

On July 21, 2022, 2999TC Founders filed for voluntary Chapter 11 bankruptcy. On October 7, 2022, debtor Pamela Kirby filed a Motion to Dismiss the Chapter 11 case. In light of the receivership, the Court entered an order Staying Debtor's Pending Motion to Dismiss and All Other Matters.

*No new updates from Second Quarter of 2026.*

### F. Nitya Capital Litigation (2999 Turtle Creek)

#### 1. *Nitya Capital, LLC v. 2999TC Acquisitions MZ, LLC*, No. DC-22-09841 (14th District Court, Dallas County, Texas)

Plaintiff made a loan to Defendant for approximately $1.5M related to the development of 2999 Turtle Creek. When 2999TC Acquisitions filed for bankruptcy in 3:21-bk-31954, Nitya asserts this caused an event of default without opportunity to cure and called the loan. Defendant did not pay the loan balance and Nitya filed suit. Defendant has not filed an answer.

*No new updates from Second Quarter of 2026.*

### G. Dowdall Litigation (2999 Turtle Creek)

#### 1. *John Dowdall v. 2999TC JMJ MGR, LLC and Timothy Barton*, No. DC-22-14770 (193rd District Court, Dallas County, Texas)

Plaintiff initiated suit against the Defendants to recover $2M loaned to JMJ MGR which Barton guaranteed. Plaintiff alleges Defendants failed to make any payments and defaulted on the note. This case was filed October 21, 2022, after the Receiver was appointed, and no answer has been filed.

*No new updates from Second Quarter of 2026.*

### H. Amerigold-Related Litigation

#### 1. *Serena Badgley, As Next Friend of Bryson Badgley, Minor v. Goldmark Hospitality, LLC*, No. CC-21-02991-B (County Court at Law No. 2, Dallas County, Texas)

Plaintiffs are mother and son who lived at Amerigold Suites owned by Defendant. Son fell from a second story window and was injured when a closed window gave way.

During the First Quarter of 2024, the Receiver filed a motion to lift stay for the limited purpose of allowing the plaintiff in this lawsuit to mediate with Goldmark Hospitality's insurer. During the Second Quarter of 2024, the Court granted the motion and lifted the stay for the limited purpose of allowing the mediation to proceed.

During the Third Quarter of 2024, Badgley and Goldmark Hospitality's insurer participated in a mediation and reached a settlement within the limits of Goldmark's insurance policy. The County Court of Law has been notified of the settlement, and the case is awaiting a dismissal order.

During the Fourth Quarter of 2024, the Court appointed a guardian ad litem to represent Badgley since he is a minor.

During the First Quarter of 2025, the Court held a hearing to approve the guardian ad litem's report and Badgley and Goldmark Hospitality's insurer submitted an agreed judgment to the Court.

On April 21, 2025, the County Court at Law signed the agreed order and the case is now closed.

*No new updates from Second Quarter of 2026.*

**2. *Stream SPE LTD. v. Goldmark Hospitality by and through its General Partner, TRTX Properties, LLC*, No. 2021-81644 (80th District Court, Harris County, Texas**

Plaintiff initiated suit against Defendant based on Defendant's failure to pay for contracted electrical service. Defendant has answered. On February 20, 2026 Plaintiffs filed a Motion to Retain, but the order remains unsigned.

*No new updates from Second Quarter of 2026.*

**I. Ridgeview-Related Litigation**

**1. *Circle H Contractors, LP, v. La Jolla Construction Management, LLC, and Ridgeview Addition, LLC*, No. DC-C202200522 (18th Dist. Ct. Johnson Cnty., Tex.)**

Plaintiff initiated this lawsuit to recover approximately $64,000 in fees owed for work done installing a PVC water main system and fire hydrant assemblies, with related testing, connection of manholes, and sewer services and installation of storm drain system for the Ridgeview Addition project. This lawsuit was filed after the Receiver was appointed, and no answer has been entered.

APP 138

*No new updates from Second Quarter of 2026.*

**J. Windmill Farms-Related Litigation**

**1. *BGE, Inc. v. JMJ Development, LLC*, No. 471-03497-2020 (471st District Court, Collin County, Texas)**

Plaintiff initiated suit against Defendant to recover fees owed for surveying and engineering services provided for Windmill Farms Development in Kaufman County, Texas. Defendant contracted with Plaintiff to provide the services and allegedly refused to pay invoices sent by the Plaintiff. An order compelling discovery responses from Defendant was entered August 8, 2022. This case has been stayed.

*No new updates from Second Quarter of 2026.*

**K. Ramolia Litigation**

**1. *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. DC-19-11030 (191st District Court, Dallas County, Texas)**

**2. *JMJ Development, LLC and Timothy Barton v. "David" Dhiraj Ramolia*, No. 05-21-01100-CV (From DC-19-11030, 5th Court of Appeals)**

**3. *"David" Dhirah Ramolia, v. Timothy Barton and JMJ Development*, No. 22-0922 (Appellate Case (to Sup. Ct.) Supreme Court from 5th Court of Appeals)**

Defendants each executed a $3M note payable to the Plaintiff in connection with the sale of real property and a settlement agreement in Bankruptcy Case Nos. 17-34255-SGJ-11 and 17-34274-SGJ-11. Defendants' counterclaimed asserting that conditions to the note were not completed by the Plaintiff and that the notes were not valid. After considering Plaintiff's motion for summary judgment, the court entered a judgment against each Defendant for $3M plus pre-judgment interest.

Defendants appealed the final judgment entered in DC-19-11030. The Fifth Court of Appeals dismissed the case on the grounds that the appeal was not timely filed. Defendants then appealed to the Texas Supreme Court on October 13, 2022.

*No new updates from Second Quarter of 2026.*

**4. *Timothy Barton and JMJ Development, LLC v. A.J. Babaria, Bilal Khaleeq and Dan Morenoff*, No. DC-20-17086, (Related case DC-19-11030) (191st District Court, Dallas County, Texas)**

Plaintiffs in this case, (defendants in DC-19-11030) severed claims related to defendants from DC-19-11030. Among the claims are violations of ethical obligations related to Khaleeq's role as a former attorney for JMJ, and legal malpractice claims against Morenoff as attorney for JMJ and Barton in the bankruptcy proceeding underlying this case and the related case.

*No new updates from Second Quarter of 2026.*

**5. *TRTX Properties, LLC and JMJ Development v. Dhirah "David" Ramolia*, No. 471-00033-2022 (471st District Court, Collin County, Texas)**

Tim Barton and JMJ Development allege they entered into an agreement with Defendant and a third party to purchase a piece of land involved in a dispute between the third party and the Defendant. As part of the agreement, Defendant was supposed to release his ownership claims to the property, but failed to do so, resulting in Barton and JMJ losing the property. Barton assigned his claims to TRTX, making it a party.

*No new updates from Second Quarter of 2026.*

### L. Lost Creek-Related Litigation

**1. *The Somerset-Lost Creek Golf Ltd. v. Timothy Barton, LC Aledo TX LLC, WALL010, LLC, JMJ Acquisitions*, No. 096-319595-20 (96th District Court, Tarrant County, Texas)**

As detailed in prior Quarterly Status Reports, this case was dismissed with prejudice during the Second Quarter of 2024.

APP 140

## M. BM318-Related Litigation

### 1. *BM318, LLC v. Dixon Water Foundation*, No. 4:20-BK-42789 (Bankr. N.D. Tex.)

BM318 purchased a tract of land from Dixon with $2M down and a seller financed note of $33 million held by Dixon. BM318 defaulted on the note, and Dixon recorded a special warranty deed transferring most of the property back to Dixon. BM318 then filed Chapter 11 bankruptcy and the Bankruptcy court confirmed the plan on August 2, 2021.

As detailed more fully in the Receiver's Verified Motion to Ratify BM318, LLC's Settlement Agreements with the Dixon Water Foundation and Lumar Land & Cattle, LLC [Dkt. 524], during the First Quarter of 2024, the Receiver filed a motion to lift stay in the bankruptcy case in order for the Receiver, Dixon, and Lumar to present a settlement agreement to the bankruptcy court for approval. On April 15, 2024, the Court granted the motion to lift stay to allow the Receiver, Dixon, and Lumar to present their settlement to the bankruptcy court for approval. The bankruptcy court held a hearing on the requested approvals on May 20, 2024, entered his findings orally on the record via a second hearing on May 22, 2024, and then entered Settlement Approval Orders on May 28, 2024.

During the Second Quarter of 2024, the Receiver filed his Motion to Ratify the Dixon and Lumar settlements with the Receivership Court. On August 14, 2024, the Court entered its Order [Dkt. 550] granting the Motion to Ratify. In accordance with the settlement agreement, Dixon and Lumar subsequently made their settlement payments.

As detailed above, on August 21, 2024, Barton filed an interlocutory appeal of the Receivership Court's Order granting the Motion to Ratify. The appeal has been docketed with the Fifth Circuit as 24-10788. As of the date of this Report, this appeal is fully briefed and has not been set for oral argument.

On September 6, 2024, Barton filed a pro se appeal of the Bankruptcy Court's Order to the Fort Worth Division of the Northern District of Texas. Case No. 4:24-cv-863-P. Counsel later appeared on Barton's behalf, and the parties briefed the appeal in the Fourth Quarter of 2024 and the Second Quarter of 2025.

On October 24, 2024, counsel for Lumar filed a motion to expunge a lis pendens that Barton filed in September 2024. A hearing on Lumar's motion was held in November 2024. The bankruptcy judge ultimately determined that the lis pendens was wrongly filed and directed its expunction.

On February 4, 2025, the District Court entered a Memorandum Opinion & Order [Dkt. 24] and Final Judgment [Dkt. 25] dismissing Barton's appeal. Barton then filed a Notice of Appeal. Case No. 25-10367.

During the Second Quarter of 2025, Barton filed an initial brief; Dixon, Lumar, and the Receiver filed a joint response; and Barton filed a reply.

During the Third Quarter of 2025, the Fifth Circuit affirmed the District Court's judgment. The Fifth Circuit also entered a show cause order against Barton's counsel for citing certain caselaw that does not exist and ultimately entered a sanction of $1,000.00 against counsel. Barton filed a Petition for Rehearing En Banc, which was ultimately denied. The Fifth Circuit's mandate issued on September 16, 2025.

During the Fourth Quarter of 2025, the Bankruptcy Court requested a case status update, which the Receiver provided through counsel.

During the First Quarter of 2026, Barton filed a Motion to Compel Final Report/Final Account and Accounting of Settlement Proceeds; Objection and Entry of Final Decree, and, in the Alternative, Motion to Reopen Case. On April 10, 2026, the Court denied Barton's motion.

### 2. *BM318, LLC v. Dixon Water Foundation*, Adversary No. 4:21-AP-4051, Related to 4:20-BK-42789 (United States Bankruptcy Court, Northern District of Texas, Dallas Division)

After the Court approved the Chapter 11 plan in the related case, Plaintiff filed an adversarial proceeding against Dixon alleging the special warranty deed was a preferential or fraudulent transfer. Plaintiff also filed a lis pendens. Dixon filed a counterclaim requesting that if the Court determines the transfer was void to find that Dixon still has a lien on the property.

See above. The Bankruptcy Court closed this adversary proceeding during the Fourth Quarter of 2025.

### 3. *BM318, LLC v. Lumar Land Cattle, et al.*, AP: 4:21-AP-4051 (United States Bankruptcy Court, Northern District of Texas, Dallas Division, Related to 4:20-BK-42789)

During the pending bankruptcy in the related case, but several months before the adversarial proceeding was filed, Lumar bought a 204-acre tract of land from Dixon. The land later became part of the adversarial proceeding between BM318 and Dixon. Lumar then contracted to sell part of the land and the lis pendens was discovered causing the sale to fall through. After discovering the lis pendens, Lumar sought, and was granted, permission to intervene in the adversarial proceeding and asserts it was a good faith purchaser and that the lis pendens is an incorrect cloud on its title. Otherwise, see above.

## N. 3820 Illinois-Related Litigation

### 1. *JMJ Development, LLC v. Tamamoi, LLC and 3820 Illinois, LLC*, No. DC-22-02622 (68th District Court, Dallas County)

Plaintiff obtained a $500,000 loan from Tamamoi to purchase land located at 3820 E. Illinois Ave. After repeated missed payments and several extensions to the loan, Tamamoi foreclosed on the property. Tamamoi then conveyed the property to 3820 Illinois, LLC. Plaintiff

asserts it was a wrongful foreclosure and initiated this lawsuit seeking to set aside the foreclosure. Defendants filed an MSJ shortly before the receivership.

As detailed more fully in the Receiver's Verified Motion to Ratify Settlement Agreement with Tamamoi, LLC and 3820 Illinois, LLC [Dkt. 494], during the Second Quarter of 2024, the Receiver and Tamamoi successfully mediated this dispute with retired United States Bankruptcy Judge Harlin Hale. On May 15, 2024, the Receiver filed the Motion to Ratify.

On August 14, 2024, the Court entered its Order [Dkt. 550] granting the Motion to Ratify. In accordance with the settlement agreement, Tamamoi subsequently made its settlement payment and the state court litigation was dismissed with prejudice.

As detailed above, on August 21, 2024, Barton filed an interlocutory appeal of the Receivership Court's Order granting the Motion to Ratify. The appeal has been docketed with the Fifth Circuit as 24-10788. On March 25, 2026, the Fifth Circuit entered a published opinion that found, among other things, that the Fifth Circuit lacked jurisdiction to consider the Dixon/Lumar settlement ratification. The mandate issued on May 29, 2026.

**2. *Deshazo Group v. Timothy Barton, JMJ Development*, No. CC-22-04381-B (County Court at Law No. 2, Dallas County, Texas)**

Plaintiff sued Defendants in JP court on an unpaid invoice related to a traffic study that was performed for property owned by JMJ Development on Illinois Ave in Dallas. A default was granted. Defendants assert the JP suit was not properly served and appealed the judgment to the county court.

*No new updates from Second Quarter of 2026.*

**O. Other Pending Litigation Matters**

**1. *JMJAV v. Elite Jet*, No. 017-333443-22 (17th District Court, Tarrant County)**

Plaintiff initiated this lawsuit asserting that defendants failed to provide reasonable estimates and overcharged Plaintiffs for work done to Plaintiff's Learjet 55. Plaintiff refused to pay for the excess charges and in return defendant refused to release the aircraft, associated log books, and other documentation pertaining to the aircraft. Defendant filed counterclaims against Plaintiff and Tim Barton, as a third party, based on suit on a sworn account, breach of contract, and unjust enrichment.

During the First Quarter of 2025, the Receiver reached a settlement with Elite Jet in which the Receiver agreed to dismiss the lawsuit if the Receivership Court ratifies the settlement agreement.

The Receivership Court entered an order on May 14, 2025, ratifying the Settlement Agreement. The case was dismissed in July 2025.

**2. *In Re: FM 544 Park Vista, Ltd. and Pavist, LLC*, No. 17-34255-SGJ-11/17-34274-SJG-11 (N.D. Tex. Bankr., Dallas Division); on appeal, *JMJ Development, LLC, et al. v. Roger Sefzik, et al.*, No. 3:22-cv-02254-L (N.D. Tex.)**

Dispute arose between Tim Barton, JMJ and TRTX, and Debtor FM 544, Debtor Pavist in connection with the ownership and development of certain real property, consisting of approximately 31.159 acres located in Plano, Collin County, Texas. The Court entered a Chapter 11 reorganization plan which became final in September 2018. As part of the plan, the parties agreed to release certain claims and not sue based on those claims. JMJ and TRTX filed a lawsuit against debtors in this case, and others, in violation of the Court's order. In response, the Court entered an injunction and contempt order against JMJ, TRTX, Tim Barton and the responsible

APP 145

attorneys (the "contemnors"). On October 4, 2022, the contemnors filed an appeal, which has been docketed but no other action has been taken.

*No new updates from Second Quarter of 2026.*

**3. *Cardno, Inc. v. JMJ Development, LLC, Villita Towers, LLC and Tim Barton*, No. DC-22-10928 (160th District Court, Dallas County)**

Plaintiff initiated this suit to recover approximately $84,000 in unpaid fees from Defendant related to Plaintiff's work as a structural engineer on the Villita Towers project. Defendants have yet to file an answer.

*No new updates from Second Quarter of 2026.*

**4. *Dallas County et al., v. TC Hall, LLC et al.*, No. TX-23-02224 (193rd District Court, Dallas County, Texas)**

During the Fourth Quarter of 2023, Dallas County and its associated entities sued TC Hall, LLC for unpaid property taxes related to property TC Hall owns on Hall Street in Dallas. Upon learning of the proceeding, the Receiver filed a notice of stay, and the Court ordered the case be administratively closed.

*No new updates from Second Quarter of 2026.*

**5. *City of Frisco v. FHC Acquisition, LLC et al.*, No. 493-07371-2024 (493rd District Court, Collin County, Texas)**

During the Fourth Quarter of 2024, the City of Frisco sued FHC Acquisition, LLC for unpaid property taxes related to the Frisco Gate Property. Upon learning of the proceeding, the Receiver filed a notice of stay.

During the First Quarter of 2025, the 493rd Court ordered both parties to submit a status report. The Receiver filed a status report on behalf of FHC Acquisition on January 29, 2025, explaining that the case was stayed by the Receivership Order. On March 18, 2025, FHC

Acquisition was served with a summons related to the lawsuit; however, the lawsuit is still stayed by the Receivership Order.

*During the Second Quarter of 2026, Intervenors (Collin County/Collin College) filed a Petition in Intervention. However, the lawsuit is still stayed by the Receivership Order.*

## V.
## STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process.

### A. Wall Investors

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities. The letters also included a request for information. This letter and request for information were also posted to the Receivership Website. Dozens of the investors have completed the information forms. If a claims process is initiated, the Receiver anticipates receiving additional information from these investors, other Wall investors, and other creditors. Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

### B. Other Investors and Creditors

In addition to investors in the Wall Entities, the Receiver has continued identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities. While the Receiver's efforts to date have focused primarily upon identifying investors and assets, dozens of creditors have already been identified, and the Receiver anticipates receiving many more creditor claims when the Court commences a claims process.

## VI.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership include (1) continuing to secure and maintain the assets of the Receivership, including, liquidating assets of the Receivership where necessary to preserve and maximize their value; (2) completing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting will likely be the best means of determining where investor monies flowed.

## VII.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the sixteenth report from the Receiver and extensive work still remains. More specifically, the Receiver intends to (1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (5) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

Dated: July 30, 2026

Respectfully submitted,

**RECEIVER CORTNEY C. THOMAS**

By: */s/ Cortney C. Thomas*
Cortney C. Thomas
State Bar No. 24075153
cort@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

# EXHIBIT A

# EXHIBIT A-1

Timothy Barton Receivership Entities
Civil Action No.: 3:22-CV-2118-X
Standardized Fund Accounting Report
As of June 30, 2026

| | | |
|---|---|---|
| Beginning Balance April 1, 2026: | | $ 1,245,547.36 |
| | | |
| Business Income | | 180,536.17 |
| | | |
| Funds Received | | 61,836.12 |
| | | |
| Interest/Dividend Income | | 3,669.24 |
| | | |
| Business Asset Liquidation | | |
| | | |
| Personal Asset Liquidation | | |
| | | |
| Third-Party Litigation Income | | |
| | | |
| Miscellaneous - Other | | |
| | | |
| Disbursements to Investors | | |
| | | |
| Disbursements for Receivership Operations: | | 130,837.20 |
| Disbursements to Receiver or Other Professionals | - | |
| Business Asset and Operating Expenses | 130,837.20 | |
| Personal Asset Expenses | | |
| Investment Expenses | | |
| Third-Party Litigation Expenses | | |
| Tax Administrator Fees and Bonds | | |
| Federal and State Tax Expenses | | |
| | | |
| Disbursements for Distribution Expenses Paid by the Fund | | - |
| Distribution Plan Development Expenses | | |
| Distribution Plan Implementation Expenses | | |
| | | |
| Disbursements to Court/Other | | - |
| Court Registry Investment System (CRIS) or other banking fees related to the Fund. | | |
| Federal income taxes | | |
| | | |
| Ending Balance - June 30, 2026 | | $ 1,360,751.69 |
| | | |
| Ending Balance of Fund - Net Assets | | 1,360,751.69 |
| Cash & Cash Equivalents | 1,360,751.69 | |
| Investments | | |
| Other Assets or Uncleared Funds | | |
| | | |
| Disbursements for Plan Administration Expenses Not Paid by the Fund | | |
| Plan Development Expenses Not Paid by the Fund | | |
| Plan Implementation Expenses Not Paid by the Fund | | |
| Tax Administrator Fees & Bonds Not Paid by the Fund | | |

# EXHIBIT A-2

**Barton Receivership Account**
**Cash Accounting Summary**
**April 1, 2026 through June 30, 2026**

**Cash Receipts**

| Date | Item Description | Cash Receipts 2Q26 | Cash Receipts 4Q22 to present |
|---|---|---|---|
| 12/31/2022 | Cash Receipts 4Q22 | | $819,171.90 |
| 03/31/2023 | Cash Receipts 1Q23 | | $129,887.29 |
| 06/30/2023 | Cash Receipts 2Q23 | | $622,543.82 |
| 09/30/2023 | Cash Receipts 3Q23 | | $4,988.77 |
| 12/31/2023 | Cash Receipts 4Q23 | | $14,056.20 |
| 03/31/2024 | Cash Receipts 1Q24 | | $8,528.09 |
| 06/30/2024 | Cash Receipts 2Q24 | | $794,468.89 |
| 09/30/2024 | Cash Receipts 3Q24 | | $297,560.87 |
| 12/31/2024 | Cash Receipts 4Q24 | | $754,064.99 |
| 03/31/2025 | Cash Receipts 1Q25 | | $83,995.16 |
| 06/30/2025 | Cash Receipts 2Q25 | | $757,459.64 |
| 09/30/2025 | Cash Receipts 3Q25 | | $45,634.71 |
| 12/31/2025 | Cash Receipts 4Q25 | | $6,209.56 |
| 03/31/2026 | Cash Receipts 1Q26 | | $33,814.31 |
| 04/10/2026 | BKV Barnett LLC (royalty payment) | $528.00 | |
| 04/24/2026 | Refund on Service Charge | $6.35 | |
| 04/30/2026 | Interest Deposit | $1,207.13 | |
| 05/29/2026 | Interest Deposit | $1,249.93 | |
| 06/25/2026 | Incoming Wire Transfer [Sale of 4107 Rock Creek] | $61,836.12 | |
| 06/30/2026 | Interest Deposit | $1,212.18 | |
| **TOTAL RECEIPTS 2Q26** | | **$66,039.71** | |
| **TOTAL RECEIPTS RECEIVERSHIP** | | | **$4,438,423.91** |

**Cash Disbursements**

| Date | Item Description | Cash Disbursements 2Q26 | Cash Disbursements 4Q22 to present |
|---|---|---|---|
| 12/31/2022 | Cash Disbursements 4Q22 | | $10,764.09 |
| 03/31/2023 | Cash Disbursements 1Q23 | | $504,163.52 |
| 06/30/2023 | Cash Disbursements 2Q23 | | $713,478.93 |
| 09/30/2023 | Cash Disbursements 3Q23 | | $129,682.01 |
| 12/31/2023 | Cash Disbursements 4Q23 | | $45,993.79 |
| 03/31/2024 | Cash Disbursements 1Q24 | | $75,623.72 |
| 06/30/2024 | Cash Disbursements 2Q24 | | $16,630.70 |
| 09/30/2024 | Cash Disbursements 3Q24 | | $464,215.53 |
| 12/31/2024 | Cash Disbursements 4Q24 | | $52,989.42 |
| 03/31/2025 | Cash Disbursements 1Q25 | | $831,734.59 |
| 06/30/2025 | Cash Disbursements 2Q25 | | $7,105.34 |
| 09/30/2025 | Cash Disbursements 3Q25 | | $650,690.73 |
| 12/31/2025 | Cash Disbursements 4Q25 | | $133,081.69 |
| 03/31/2026 | Cash Disbursements 1Q26 | | $87,344.59 |
| 04/01/2026 | Bank Service Fee | $10.00 | |
| 04/07/2026 | Lumos Technology (#458) (IT services) | $469.37 | |
| 04/07/2026 | Alfredo Nino (#459) (lawn maintenance) | $225.00 | |
| 04/21/2026 | Alfredo Nino (#460) (lawn maintenance) | $225.00 | |
| 04/28/2026 | AFCO [ACH] (Rock Creek insurance) | $901.45 | |
| 05/07/2026 | Dallas Water Utilities (#461) (utilities-Gillespie) | $25.87 | |
| 05/08/2026 | Lumos Technology (#462) (IT services) | $469.37 | |

| Date | Item Description | Cash Disbursements 2Q26 | Cash Disbursements 4Q22 to present |
|---|---|---|---|
| 05/18/2026 | Alfredo Nino (#463) (lawn maintenance) | $225.00 | |
| 05/21/2026 | Alfredo Nino (#464) (lawn maintenance) | $225.00 | |
| 05/29/2026 | AFCO [ACH] (Rock Creek insurance) | $971.25 | |
| 06/03/2026 | Alfredo Nino (#466) (lawn maintenance) | $225.00 | |
| 06/08/2026 | Lumos Technology (#465) (IT services) | $469.37 | |
| 06/17/2026 | Alfredo Nino (#467) (lawn maintenance) | $225.00 | |
| 06/29/2026 | Alfredo Nino (#468) (Frisco mow) | $675.00 | |
| **TOTAL DISBURSEMENTS 2Q26** | | **$5,341.68** | |
| **TOTAL DISBURSEMENTS RECEIVERSHIP** | | | **$3,728,840.33** |

# EXHIBIT A-3

**Goldmark Hospitality**
**Cash Accounting Summary**
**April 1, 2026 through June 30, 2026**

## Cash Receipts

| Date | Item Description | Cash Receipts 2Q26 | Cash Receipts 4Q22 to present |
|---|---|---|---|
| 12/31/2022 | Cash Receipts 4Q22 | | $108,460.28 |
| 03/31/2023 | Cash Receipts 1Q23 | | $206,811.44 |
| 06/30/2023 | Cash Receipts 2Q23 | | $204,650.27 |
| 09/30/2023 | Cash Receipts 3Q23 | | $202,645.84 |
| 12/31/2023 | Cash Receipts 4Q23 | | $200,006.81 |
| 03/31/2024 | Cash Receipts 1Q24 | | $231,233.80 |
| 06/30/2024 | Cash Receipts 2Q24 | | $204,678.83 |
| 09/30/2024 | Cash Receipts 3Q24 | | $182,857.52 |
| 12/31/2024 | Cash Receipts 4Q24 | | $185,510.00 |
| 03/31/2025 | Cash Receipts 1Q25 | | $217,102.06 |
| 06/30/2025 | Cash Receipts 2Q25 | | $161,947.20 |
| 09/30/2025 | Cash Receipts 3Q25 | | $162,354.13 |
| 12/31/2025 | Cash Receipts 4Q25 | | $238,834.04 |
| 03/31/2026 | Cash Receipts 1Q26 | | $181,326.60 |
| 04/02/2026 | DHA Deposit [ACH] (rents) | $3,232.00 | |
| 04/02/2026 | DDA Regular Deposit (rents) | $5,092.14 | |
| 04/03/2026 | DDA Regular Deposit (rents) | $4,546.00 | |
| 04/03/2026 | DDA Regular Deposit (rents) | $2,565.00 | |
| 04/07/2026 | DDA Regular Deposit (rents) | $2,637.84 | |
| 04/08/2026 | DDA Regular Deposit (rents) | $1,446.00 | |

| Date | Item Description | Cash Receipts 2Q26 | Cash Receipts 4Q22 to present |
|---|---|---|---|
| 04/09/2026 | DDA Regular Deposit (rents) | $1,335.38 | |
| 04/15/2026 | DDA Regular Deposit (rents) | $2,425.00 | |
| 04/17/2026 | DDA Regular Deposit (rents) | $1,502.48 | |
| 04/23/2026 | DDA Regular Deposit (rents) | $1,016.00 | |
| 04/24/2026 | Service Charge Refund | $44.27 | |
| 04/24/2026 | DDA Regular Deposit (rents) | $1,291.16 | |
| 04/28/2026 | DDA Regular Deposit (rents) | $559.00 | |
| 04/29/2026 | Square, Inc. [ACH] (rents) | $33,406.75 | |
| 04/30/2026 | DDA Regular Deposit (rents) | $1,600.20 | |
| 05/01/2026 | DDA Regular Deposit (rents) | $2,220.00 | |
| 05/04/2026 | DHA Deposit [ACH] (rents) | $3,232.00 | |
| 05/04/2026 | DDA Regular Deposit (rents) | $4,725.04 | |
| 05/06/2026 | DDA Regular Deposit (rents) | $1,892.82 | |
| 05/11/2026 | DDA Regular Deposit (rents) | $2,885.00 | |
| 05/13/2026 | DDA Regular Deposit (rents) | $1,868.00 | |
| 05/15/2026 | DDA Regular Deposit (rents) | $2,219.14 | |
| 05/19/2026 | DDA Regular Deposit (rents) | $1,648.22 | |
| 05/21/2026 | DDA Regular Deposit (rents) | $1,215.00 | |

| Date | Item Description | Cash Receipts 2Q26 | Cash Receipts 4Q22 to present |
|---|---|---|---|
| 05/27/2026 | DDA Regular Deposit (rents) | $1,150.00 | |
| 05/29/2026 | DDA Regular Deposit (rents) | $2,182.00 | |
| 05/29/2026 | Square, Inc. [ACH] (rents) | $36,199.19 | |
| 06/01/2026 | DDA Regular Deposit (rents) | $2,250.00 | |
| 06/01/2026 | DDA Regular Deposit (rents) | $300.00 | |
| 06/02/2026 | DHA Deposit [ACH] (rents) | $3,232.00 | |
| 06/02/2026 | DDA Regular Deposit (rents) | $2,355.00 | |
| 06/03/2026 | DDA Regular Deposit (rents) | $3,579.02 | |
| 06/05/2026 | DDA Regular Deposit (rents) | $3,073.00 | |
| 06/09/2026 | DDA Regular Deposit (rents) | $2,881.48 | |
| 06/15/2026 | DDA Regular Deposit (rents) | $1,136.50 | |
| 06/18/2026 | DDA Regular Deposit (rents) | $1,664.00 | |
| 06/26/2026 | DDA Regular Deposit (rents) | $2,275.10 | |
| 06/29/2026 | Square Inc. [ACH] (rents) | $33,170.71 | |
| **TOTAL GOLDMARK RECEIPTS 2Q26** | | **$180,052.44** | |
| **TOTAL GOLDMARK RECEIPTS TO PRESENT** | | | **$2,868,471.26** |

**Cash Disbursements**

| Date | Item Description | Cash Disbursements 2Q26 | Cash Disbursements 4Q22 to present |
|---|---|---|---|
| 12/31/2022 | Cash Disbursements 4Q22 | | $99,830.15 |
| 03/31/2023 | Cash Disbursements 1Q23 | | $202,341.23 |
| 06/30/2023 | Cash Disbursements 2Q23 | | $187,686.31 |
| 09/30/2023 | Cash Disbursements 3Q23 | | $181,476.12 |
| 12/31/2023 | Cash Disbursements 4Q23 | | $113,782.01 |
| 03/31/2024 | Cash Disbursements 1Q24 | | $265,056.05 |
| 06/30/2024 | Cash Disbursements 2Q24 | | $137,949.57 |
| 09/30/2024 | Cash Disbursements 3Q24 | | $160,466.53 |
| 12/31/2024 | Cash Disbursements 4Q24 | | $185,313.41 |
| 03/31/2025 | Cash Disbursements 1Q25 | | $217,102.06 |
| 06/30/2025 | Cash Disbursements 2Q25 | | $150,322.05 |
| 09/30/2025 | Cash Disbursements 3Q25 | | $203,565.89 |
| 12/31/2026 | Cash Disbursements 4Q25 | | $164,776.82 |
| 03/31/2026 | Cash Disbursements 1Q26 | | $229,452.39 |
| 04/01/2026 | First Insurance Funding [ACH] (insurance) | $5,116.63 | |
| 04/03/2026 | ABC Home and Commercial [ACH] (pest control) | $438.41 | |
| 04/07/2026[1] | Alfredo Nino (#548) (lawn maintenance) | $1,300.00 | |
| 04/09/2026 | Jovanca Silvasan (#547) (property manager) | $1,633.00 | |
| 04/10/2026 | Billy Steele (#544) (maintenance) | $364.00 | |
| 04/10/2026 | Frank Guzman (#545) (maintenance) | $292.50 | |

[1] As detailed in the prior quarter's cash accounting summaries, on April 7, 2026, the Receiver transferred $6,940.35 from the Amerigold Suites account to the Main Receivership Account on two separate occasions to reverse payments of property insurance for the Amerigold Suites from the Main Receivership account.

| Date | Item Description | Cash Disbursements 2Q26 | Cash Disbursements 4Q22 to present |
|---|---|---|---|
| 04/10/2026 | Matthew Hilburn (#546) (maintenance) | $489.50 | |
| 04/16/2026 | Bank Service Fees | $32.16 | |
| 04/17/2026 | Dallas Water Utilities (#550) (utilities) | $17,271.35 | |
| 04/20/2026 | Republic Services [ACH] (trash collection) | $1,562.35 | |
| 04/20/2026 | Jose Vasquaez (#551) (maintenance) | $544.50 | |
| 04/21/2026 | Alfredo Nino (#554) (lawn maintenance) | $1,300.00 | |
| 04/23/2026 | Spectrum [ACH] (internet) | $257.90 | |
| 04/24/2026 | Hailey Young (#552) (lobby cleaning) | $200.00 | |
| 04/27/2026 | Jovanca Silvasan (#553) (property manager) | $1,633.00 | |
| 04/27/2026 | gotoPremium Finance [ACH] (property insurance) | $6,940.35 | |
| 04/27/2026 | Matthew Hilburn (#549) (maintenance) | $506.00 | |
| 04/28/2026 | TXU Energy [ACH] (utilities) | $6,413.05 | |
| 04/29/2026 | Bank Service Fees | $10.00 | |
| 04/29/2026 | First Insurance Funding [ACH] (insurance) | $5,116.63 | |
| 05/01/2026 | Hailey Young (#538) (lobby cleaning) | $200.00 | |
| 05/05/2026 | ABC Home and Commercial [ACH] (pest control) | $438.41 | |
| 05/08/2026 | Jovanca Silvasan (#557) (property manager) | $1,633.00 | |
| 05/11/2026 | Jose Vasquez (#555) (maintenance) | $726.00 | |

| Date | Item Description | Cash Disbursements 2Q26 | Cash Disbursements 4Q22 to present |
|---|---|---|---|
| 05/11/2026 | Matthew Hilburn (#556) (maintenance) | $665.50 | |
| 05/14/2026 | Dallas Water Utilities (#559) (utilities) | $14,485.85 | |
| 05/18/2026 | Alfredo Nino (#558) (lawn maintenance) | $1,300.00 | |
| 05/18/2026 | Bank Service Fees | $33.90 | |
| 05/21/2026 | Jovanca Silvasan (#564) (property manager) | $1,633.00 | |
| 05/21/2026 | Alfredo Nino (#565) (lawn maintenance) | $1,300.00 | |
| 05/22/2026 | Frank Guzman (#561) (maintenance) | $202.50 | |
| 05/22/2026 | Jose Vasquez (#562) (maintenance) | $632.50 | |
| 05/22/2026 | Matthew Hilburn (#563) (maintenance) | $374.00 | |
| 05/22/2026 | Republic Services [ACH] (trash collection) | $1,562.35 | |
| 05/26/2026 | Air Texas AC and Heating (#566) (HVAC) | $225.00 | |
| 05/26/2026 | Goto Premium Finance [ACH] (property insurance) | $6,940.35 | |
| 05/27/2026 | Hailey Young (#560) (lobby cleaning) | $200.00 | |
| 05/27/2026 | Wire transaction fee | $10.00 | |
| 05/27/2026 | TXU Energy [ACH] (utilities) | $6,813.93 | |
| 05/28/2026 | Spectrum [ACH] (internet) | $257.90 | |
| 06/03/2026 | ABC Home and Commercial [ACH] (pest control) | $438.41 | |
| 06/03/2026 | Alfredo Nino (#571) (lawn maintenance) | $1,300.00 | |

| Date | Item Description | Cash Disbursements 2Q26 | Cash Disbursements 4Q22 to present |
|---|---|---|---|
| 06/04/2026 | Jovanca Silvasan (#570) (property manager) | $1,633.00 | |
| 06/05/2026 | Jose Vasquez (#568) (maintenance) | $676.50 | |
| 06/05/2026 | Matthew Hilburn (#569) (maintenance) | $555.50 | |
| 06/05/2026 | Frank Guzman (#567) (maintenance) | $172.50 | |
| 06/10/2026 | First Insurance Funding [ACH] (insurance) | $5,116.63 | |
| 06/15/2026 | Air Texas AC and Heating (#572) (HVAC) | $6,500.00 | |
| 06/15/2026 | Bank Service Fees | $27.32 | |
| 06/16/2026 | Republic Services [ACH] (trash collection) | $1,619.38 | |
| 06/17/2026 | Alfredo Nino (#576) (lawn maintenance) | $1,300.00 | |
| 06/18/2026 | Jovanca Silvasan (#575) (property manager) | $1,633.00 | |
| 06/22/2026 | Jose Vasquez (#573) (maintenance) | $500.50 | |
| 06/22/2026 | Matthew Hilburn (#574) (maintenance) | $693.00 | |
| 06/26/2026 | Spectrum [ACH] (internet) | $257.90 | |
| 06/26/2026 | First Insurance Funding [ACH] (insurance) | $5,116.63 | |
| 06/26/2026 | gotoPremium Finance [ACH] (property insurance) | $6,940.35 | |
| 06/29/2026 | Payment processing Fee | $10.00 | |
| **TOTAL DISBURSEMENTS 2Q26** | | **$125,546.14** | |
| **TOTAL RECEIVERSHIP DISBURSEMENTS** | | | **$2,624,666.73** |

# EXHIBIT A-4

**D4OP RECEIVERSHIP ACCOUNT[1]**
**Cash Accounting Summary**
**April 1, 2026 through June 30, 2026**

**Cash Receipts**

| Date | Item Description | Cash Receipts 1Q26 | Cash Receipts 3Q23 to present |
|---|---|---|---|
| 09/31/2023 | Cash Receipts 3Q23 (opening account) | | $126,643.63 |
| 12/31/2023 | Cash Receipts 4Q23 | | $210,786.07 |
| 03/31/2024 | Cash Receipts 1Q24 | | $62,762.79 |
| 06/30/2024 | Cash Receipts 2Q24 | | $0.00 |
| 09/30/2024 | Cash Receipts 3Q24 | | $0.00 |
| 12/31/2024 | Cash Receipts 4Q24 | | $0.00 |
| 03/31/2025 | Cash Receipts 1Q25 | | $0.00 |
| 06/30/2025 | Cash Receipts 2Q25 | | $0.00 |
| 09/30/2025 | Cash Receipts 3Q25 | | $0.00 |
| 12/31/2025 | Cash Receipts 4Q25 | | $0.00 |
| 03/31/2026 | Cash Receipts 1Q26 | | $0.00 |
| 06/30/2026 | Cash Receipts 2Q26 | $0.00 | |
| **TOTAL RECEIPTS 2Q26** | | **$0.00** | |
| **TOTAL RECEIPTS RECEIVERSHIP** | | | **$400,192.49** |

**Cash Disbursements**

| Date | Item Description | Cash Disbursements 1Q26 | Cash Disbursements 3Q23 to present |
|---|---|---|---|
| **TOTAL DISBURSEMENTS 2Q26** | | **$0.00** | |
| **TOTAL DISBURSEMENTS RECEIVERSHIP** | | | **$0.00** |

[1] The use of funds in the D4OP Receivership Account are generally restricted by HUD regulations.